## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,    )
                                 )
        Plaintiff,          )
                                 )
        v.               )        Civil Action No. 04-875 GMS
                                 )
LUCENT TECHNOLOGIES, INC.      )
                                 )
        Defendant.      )

## TELCORDIA'S ANSWERING CLAIM CONSTRUCTION BRIEF
### ADDRESSING TELCORDIA'S '306 PATENT

<div style="margin-left:40%;">

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc.*

</div>

*Of Counsel:*

Donald R. Dunner
Don O. Burley
Steven M. Anzalone
Richard H. Smith
Houtan K. Esfahani
James T. Wilson
John M. Williamson
Pedro F. Suarez
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Dated: March 24, 2006

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................... ii

I.    Introduction .................................................................................................................1

II.   The '306 Patent .........................................................................................................1

    A.    Preliminary Statement ........................................................................................1

    B.    Argument Regarding Claim Constructions .........................................................4

        1.    "frame timing information" and "timing information"..........................4

        2.    "empty payload field" ...........................................................................5

        3.    "filling" and "inserting".........................................................................7

        4.    data in packetized format [claim 1], data packets [claim 3], data . . . into packet format [claim 4] ...........................................................11

        5.    plurality of sources which have access to the bit stream [claim 1] / plurality of sources having different bit rates and which have access to said bit stream [claim 3]................................................12

        6.    "such that" clauses [claims 1, 3] and "inserting" clause [claim 4].......................15

        7.    available empty payload field [claims 1, 3] / empty payload field of any of said frames available to said inserting means [claim 4] ......................17

        8.    generating means [claim 4] ..................................................................19

        9.    processing means [claim 4] ..................................................................20

        10.   inserting means [claim 4] .....................................................................21

        11.   generating a bit stream [claims 1, 3] ....................................................21

III.  The '633 Patent .........................................................................................................22

IV.  The '763 Patent .........................................................................................................22

V.   Conclusion.................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*A.B. Dick Co. v. Burroughs Corp.*,
713 F.2d 700 (Fed. Cir. 1983)..............................................................................17

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
340 F.3d 1298 (Fed. Cir. 2003)...............................................................................1

*Autogiro Co. of Am. v. United States*,
384 F.2d 391 (Ct. Cl. 1967) ....................................................................................1

*Bell Communications Research, Inc. v. FORE Sys., Inc.*,
113 F. Supp. 2d 635 (D. Del. 2000)..................................................................passim

*Bell Communications Research, Inc. v. FORE Sys., Inc.*,
62 Fed. Appx. 951 (Fed. Cir. 2003) (non-precedential) .............................3, 10, 16

*Bell Communications Research, Inc. v. FORE Sys., Inc.*,
No. Civ. A. 98-586 JJF, 2003 WL 22295442 (D. Del. Oct. 3, 2003) ..................6, 16

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
418 F.3d 1225 (Fed. Cir. 2005)...............................................................................1

*Mendenhall v. Cedarapids, Inc.*,
5 F.3d 1557 (Fed. Cir. 1993)...............................................................................5, 17

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
194 F.3d 1250 (Fed. Cir. 1999)..............................................................................20

*Nazomi Communications, Inc. v. ARM Holdings, PLC*,
403 F.3d 1364 (Fed. Cir. 2005)...............................................................................1

*Northrop Grumman Corp. v. Intel Corp.*,
325 F.3d 1346 (Fed. Cir. 2003)...............................................................................2

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001)...............................................................................2

*S.R.I. Int'l v. Matsushita Elec. Corp. of Am.*,
775 F.2d 1107 (Fed. Cir. 1985) (en banc)..............................................................14

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
239 F.3d 1225 (Fed. Cir. 2001)..............................................................................20

**Statutes**

35 U.S.C. § 112(6) ........................................................................................19, 20, 21

**Other Authorities**

*American Heritage College Dictionary* 8 (4th ed. 2002) ..............................................................................12

## I.    Introduction

In its opening claim construction brief, Lucent dealt solely with the '306 patent, relying on the discussion of the '763 patent found in Cisco's brief and the discussion of the '633 patent found in Alcatel's brief.  To make things easier for the Court, Telcordia will follow suit.  That is, Telcordia will specifically address only the '306 patent in this answering brief and address the '763 and '633 patents in its answering briefs in the Cisco and Alcatel cases, respectively.

## II.    The '306 Patent

### A.    Preliminary Statement

Lucent's approach to the '306 patent, and how the patent's claims should be construed, suffers from critical substantive flaws.  Most notably, the purpose of a specification is to "provide[] the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of invention."  *Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005).  Rather than using the '306 specification in this way, however, Lucent uses it in an effort to limit the scope of the patent to one specific embodiment disclosed in the specification.

The Federal Circuit, of course, has repeatedly cautioned against this.  *See, e.g., CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005) ("[T]his court will not at any time import limitations from the specification into the claims."); *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003) ("[L]imitations may not be read into the claims from the written description.").  Lucent, aware of this bedrock principle of claim construction law, contends that the claims cover only one embodiment disclosed in the specification—that of Figure 4—because the specification "describes an embodiment as being the invention itself and not only one way of utilizing it." *See* Lucent Technologies Inc.'s Opening Claim Construction Brief Regarding U.S. Patent No. 4,893,306 ("Lucent Op. Br.") at 10 (citing *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 398 (Ct. Cl. 1967)).

But Lucent cites to no specific reference in the specification to support its position, which is meritless.  In addition to the fact that the specification discloses multiple embodiments beyond Figure 4

(for example, Figure 9, Figure 10), it is peppered with language establishing that the embodiments disclosed are merely by way of example. It includes *eighteen* instances of "illustratively" (Col.5:13,20,30; Col.6:58; Col.7:33; Col.9:25; Col.10:5,13,36; Col.12:46; Col.13:22; Col.15:19; Col.16:24,30,41,43,50; Col.17:23;) and *nine* instances of "for example" or "an example" (Col.4:53; Col.5:39; Col.8:27; Col.9:8; Col.13:6,15,35; Col.14:13,17). The specification also expressly notes that the disclosures are "specific embodiments" and not "the invention itself." Col.16:8-11 ("The framer unit is an important component for the *implementation of specific embodiments* of the assemblers, disassemblers, multiplexers and demultiplexers which comprise the DTDM network discussed above.") (emphasis added). And before reciting the claims, the specification states that:

> [T]he above described embodiments of the invention are intended to be illustrative only. Numerous alternative embodiments may be devised by those skilled in the art without departing from the spirit and scope of the following claims.

Col.17:38-42.

In the face of this clear language, it would be error to limit the claims to cover only the embodiment disclosed in Figure 4 (or even to it and the other embodiments disclosed in the specification). *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1355-56 (Fed. Cir. 2003) (reversing construction limiting a claim term to the disclosure in the specification where "the patent teaches one skilled in the art that 'the present invention may be made to conform to any one of a variety of data transfer algorithms'"); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1345-48 (Fed. Cir. 2001) (reversing construction limiting a claim term to the disclosure in the specification where the specification included the language that "it is to be understood that the invention is not limited in its application to the details of construction and the arrangements of components set forth in the following description or illustrated in the drawings" and "[t]he invention is capable of other embodiments and of being practiced or being carried out in various ways").

In short, the premise of Lucent's entire claim construction philosophy collapses at the outset. Simply put, this is not even a close case—even a casual reading of the specification shows that '306 patent claims should not be limited to the embodiment shown in Figure 4. Rather, the claim construction

focus should remain on the language of the claims, and the specification should be used, as Telcordia does, to assist in defining the specific claim terms at issue rather than limiting the scope of the invention as a whole.

Another fundamental flaw in Lucent's position is its misunderstanding of the Federal Circuit's opinion in *Bell Communications Research, Inc. v. FORE Sys., Inc.,* 62 Fed. Appx. 951, 954-57 (Fed. Cir. 2003) (non-precedential) (attached as Ex. C to Telcordia's Opening Claim Construction Brief, filed in the Lucent and Cisco cases ("Telcordia Op. Br. (Lucent/Cisco)")). Specifically, Lucent points to the *FORE* opinion in a misguided effort to convince this Court that the Federal Circuit expressly limited '306 claim terms that it actually never considered. No fewer than ten times in its brief, Lucent cites to language contained in two paragraphs on the first page of the Federal Circuit's opinion under the heading "BACKGROUND." The Federal Circuit's "BACKGROUND" discussion, however, is an obviously abbreviated discussion of the '306 patent that discussed what was necessary to set the framework for the Court's analysis of the claim constructions at issue in the appeal. There is absolutely no basis for reading this discussion as concerning the scope of claim terms that were not even before the Court.

In addition to its questionable use of the '306 specification and the Federal Circuit opinion, Lucent persists in all of the other dubious claim construction techniques identified in Telcordia's opening brief (for example, contradicting Judge Farnan's constructions, proposing multiple inconsistent constructions, and manipulating or ignoring grammatical syntax). *See* Telcordia Op. Br. (Lucent/Cisco) at 1-2. Confusing matters further, Lucent fails to adhere to the structure set out in the Final Joint Claim Chart (D.I. 93). Telcordia believes that the parties have a responsibility to address and support all of the constructions that were proffered in the Final Joint Claim Chart. Accordingly, the charts in each section of Telcordia's opening brief setting forth the disputed claim terms and the parties' respective positions are taken verbatim from the Final Joint Claim Chart (D.I. 93).[1]

---

[1] The only exception to this is due to a change in position by the defendants. As noted in Telcordia's opening brief, Telcordia accommodated the defendants' last-minute (and technically untimely) request to change their position on the structure corresponding to the "inserting means" claim term. *See* Telcordia Op. Br. (Lucent/Cisco) at 20 n.6.

The charts in Lucent's opening brief, however, are reordered, regrouped, and in some instances rephrased versions of the information in the Final Joint Claim Chart. Moreover, Lucent inexplicably fails to address seven of the nineteen total disputed claim terms. Lucent's approach is unhelpful and hard to follow, and its failure even to address seven terms should result in a finding in Telcordia's favor regarding the unaddressed terms. In this answering brief, therefore, Telcordia will again address the disputed claim terms in the same order as they are set forth in the Final Joint Claim Chart.

## B.    Argument Regarding Claim Constructions

### 1.    "frame timing information" and "timing information"

| '306 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| frame timing information [claims 1, 3]<br><br>timing information [claim 4] | frame alignment information comprised of more than one bit. | frame alignment information |

Lucent addresses "frame timing information" and "timing information" (the first terms in the parties' Final Joint Claim Chart) in section II(F) of its brief. *See* Lucent Op. Br. at 25-26. Lucent quotes the language of the '306 specification ("frame alignment word for frame time [sic–timing]") to support its position that "frame timing information means frame alignment information without regard to how many bits." Col.6:61-65; Lucent Op. Br. at 26. Lucent fails to note, however, that it cites to the exact portion of the '306 specification that Judge Farnan considered in reaching the opposite conclusion. *See Bell Communications Research, Inc. v. FORE Sys., Inc.*, 113 F. Supp. 2d 635, 643-44 (D. Del. 2000). Specifically, Judge Farnan recognized that "[t]he overhead field includes, for example, *a frame alignment word for frame timing*," and that "[t]he following information may be available in the overhead field of every frame, *frame alignment word for frame timing* . . . ." *Bell Communications*, 113 F. Supp. 2d at 643 (citing Col.4:52-54, Col.6:61-64) (emphasis in original). Judge Farnan then reasoned that:

> In the IEEE Standard Dictionary of Electrical and Electronic Terms, 6th Edition, there are sixteen different definitions of "word," all of which require more than one bit. (D.I. 152, Exh M at A143-44). Accordingly, the Court concludes that "frame timing information" means frame alignment information comprised of more than one bit.

*Id.* at 644. (IEEE definitions attached as Ex. A.)

4

Lucent offers no new argument, no new or different support from the specification, and no explanation for why it believes that Judge Farnan was wrong. Telcordia thus submits that Judge Farnan's construction should adopted. *See Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993) ("[D]eference should be given by one court to prior decisions of other tribunals on the same legal issue.").

### 2.     "empty payload field"

Lucent addresses "empty payload field" (the second term in the parties' Final Joint Claim Chart) in section II(D) of its brief. *See* Lucent Op. Br. at 20-21. Lucent purports to agree with Judge Farnan's construction of the term "empty payload field," while at the same time asking the Court to materially change the language of Judge Farnan's construction. Specifically, Lucent contends that Judge Farnan's construction ("a payload field that is empty of source data, but including bit signals of some kind") should be changed to "a payload field that is empty of source data, but including garbage bits." Lucent Op. Br. at 21 ("The Court should clarify that an 'empty payload field' means 'a payload field that is empty of source data, but including bit signals of some kind,' and 'bit signals of some kind' are 'garbage bits.'"). Lucent argues that Telcordia's position (i.e., that Judge Farnan's construction means what it says and requires nothing further) "is inconsistent with the record" in the *Bellcore* case, and that the "context" in which Judge Farnan issued his construction dictates that "bit signals of some kind" must be "garbage bits." Lucent Op. Br. at 20-21.

Lucent, however, mischaracterizes the "context" of the *Bellcore* case, and in fact neglects to provide the Court with the true context and genesis of the term "garbage bits." The term was first used by Judge Bryson during oral argument at the Federal Circuit:

| | |
|---|---|
| Judge Clevenger: | Can we come back to the empty payload field? "Empty" seems to me . . . the common meaning of the word "empty" means there is nothing there. So, you are saying that there is something in the written description that tells me what empty means? |
| Mr. Dunner: | I am saying . . . |
| Judge Clevenger: | Where in the written description? |
| Mr. Dunner: | A144, column 7, lines 29-35, and what you will see there at that point . . . |

| Judge Clevenger: | There is a bit rate. |
|---|---|
| Mr. Dunner: | It says, "this train." It is talking about empty payload fields. "This train 10 has a bit rate." In other words, it's empty, but it has a bit rate. Because in order to have . . . sometimes there won't be a packet ready. The stream must continue. There must be a bit in the stream. *It just won't be a data bit, it won't be a source data bit. It will be a bit. And it will have information in it, but it won't be source information.* |
| Judge Bryson: | *It would just be garbage, I take it. I mean it will just be 1's and 0's that have no relationship to the stream of any information that's coming in from the source.* |
| Mr. Dunner: | Exactly, Your Honor. |

Transcript of Oral Argument on February 3, 2003 (Unofficial) (attached as Ex. B), at 7-8 (emphasis added). The colloquy between Judge Bryson and Mr. Dunner indicates that they understood what was meant by their colloquial use of the word "garbage"—that there will be bits, just not *source information* bits—and Judge Farnan ultimately issued a construction that accurately captured that meaning (albeit without using the word "garbage"). *Bell Communications Research, Inc. v. FORE Sys., Inc.*, No. Civ. A. 98-586 JJF, 2003 WL 22295442, at *1 (D. Del. Oct. 3, 2003). Contrary to Lucent's characterization, Telcordia's position on "empty payload field" (i.e., that Judge Farnan's construction should not be further manipulated) is entirely consistent with the context of the record in the *Bellcore* case. Judge Farnan had the transcript of the oral argument before him when he issued his construction of "empty payload field," and Telcordia submits that Judge Farnan's construction, as it stands and without modification, remains true to the context of the prior record.

Unveiled, this dispute is simple: Lucent wants this Court to include the pejorative term "garbage" in Judge Farnan's construction, so that the term "garbage" may be presented to the jury as meaning something different from "non-source." But the entire point of the exchange between Judge Bryson and Mr. Dunner at oral argument, and the point of Judge Farnan's subsequent construction, was that a payload field was "empty" *within the meaning of the '306 patent* so long as it did not include source data, and that a payload field could have *anything* in it *but* source data and still be empty. In context, therefore, when Judge Bryson used the term "garbage," it is clear that his point was that the bits were *not* source data.

Moreover, Judge Farnan did not use the term "garbage" in his actual construction, instead stating simply—and accurately—that a payload field is empty so long as it is empty of *source data*, and that it may have "bit signals of some kind" in it. There is no need to go beyond Judge Farnan's construction.

### 3. "filling" and "inserting"

| '306 claim term | Telcordia's construction | Defendants' construction |
| --- | --- | --- |
| filling the empty payload fields in said frames with data in packetized format from a plurality of sources which have access to the bit stream including circuit or packet sources [claim 1] | writing data in packetized format from sources into all available bit positions of payload fields that would otherwise be occupied by non-source bit signals | replacing the empty payload field with data from a single source |
| inserting said packets from said sources into the empty payload fields of said frames [claim 3] | writing packets from the sources into payload fields that would otherwise be occupied by non-source bit signals | replacing the empty payload field with data from a single source |
| inserting each of said packets comprised of data from one of said plurality of sources into any empty payload field [claim 4] | writing packets from the sources into payload fields that would otherwise be occupied by non-source bit signals, where the packets are written on a first-come, first-served basis because no payload fields are pre-assigned for use by particular sources | replacing the empty payload field with data from a single source |

While Lucent addresses the "inserting" language from claim 4 (the fifth term in the parties' Final Joint Claim Chart) in section II(B) of its brief (*see* Lucent Op. Br. at 13-16), Lucent fails to directly address claims 1 and 3. By ignoring these claims, Lucent tries to distance itself from the irreconcilable inconsistencies in its proposed constructions of these claim terms. Specifically:

- Lucent does not explain why it proffered to this Court (and forced Telcordia to address) four different and inconsistent constructions for the functional language of the "inserting means."

- Lucent does not address the fact that its constructions assign the exact same meaning to two different terms (filling and inserting) that in context clearly mean different things.

- Lucent does not address its use of "replacing" where the specification uses the term "writing" to describe how data is moved into the transmission bit stream.

Regarding the disputed language in claim 4, Lucent frames the issue as "whether the data that replaces the empty payload field must be from a single source or whether that data may be from multiple sources." Lucent Op. Br. at 13-14. As fully set forth in Telcordia's opening brief, while Telcordia disagrees with Lucent's "single source" limitation, Telcordia also disagrees with (1) Lucent's use of "replacing" instead of "writing," and (2) Lucent's unsupported attempt to equate "inserting" with "filling." *See* Telcordia Op. Br. (Lucent/Cisco) at 5-9.[2]

Lucent's "single source" limitation belies the language of claim 4 and the intrinsic evidence. Specifically, the claim language requires "inserting each of said packets comprised of data from one of said plurality of sources into any empty payload field of any of said frames." This claim language dictates that each "packet" is comprised of data from one source, and that each packet is inserted "into any empty payload field of any of said frames." The claim language "comprised of data from one of said plurality of sources" modifies "packets," and does not modify "empty payload field" or "frames." Accordingly, the claim language dictates only that each *packet* comes from one source, and that multiple packets can come from more than one source (in fact, it's the whole purpose of the invention that packets (plural) can come from multiple sources).

Lucent attempts to support its "single source" argument by relying on the specification's discussion of the embodiment shown in Figure 4, which discusses sources "contending" for and "seizing" frames, and also pointing to Figure 2 of the '306 patent. *See* Lucent Op. Br. at 15-16. Again, though, Lucent is relying on the specification's discussion of a *specific* embodiment in the patent in which only *one* packet is inserted into each empty payload field. *See id.* at 16 (citing Col.9:34-41). Obviously, in that situation, each payload field will necessarily contain data from only one source. This one embodiment, however, is not "the invention." Indeed, Judge Farnan expressly determined that this

---

[2] In its opening brief, Lucent confuses the concepts of "filling" (from claim 1) and "inserting" (from claims 3 and 4). For example, in the section addressing the "inserting" language of claim 4, Lucent states that "each frame is *filled* with data," "each frame can be *filled*," "each frame may be *filled*," and "once a frame is *filled* with data." Lucent Op. Br. at 14-16. All of these references to "filling" are misplaced, as only claim 1 contains the limitation that data "fills" the empty payload fields. Claims 3 and 4 only require that data be "inserted" into empty payload fields.

embodiment was not to be imported into the language of the claims. *See infra* pp. 13-14; *Bell Communications*, 113 F. Supp. 2d at 650 ("[A] daisy chain [Figure 4] configuration is not mandatory.").

Moreover, Lucent goes beyond saying that the data being inserted into a payload field must come from a single source and asserts that the claim only covers systems that insert only one data packet into each frame. Specifically, Lucent contends that "once data from one source is inserted into a frame, other sources cannot subsequently insert data into the same frame because the frame is occupied by *a valid packet.*" Lucent Op. Br. at 16 (emphasis added). This additional limitation, however, conflicts with both the claim language and the intrinsic record. That is, in addition to the fact that no claim language restricts claim 4's coverage to situations where only one data packet is inserted into each payload field, the prosecution history makes it clear that inserting more than one packet into each empty payload field was expressly contemplated as part of the invention. *See* August 21, 1989, Response to Office Action (Ex. D to Telcordia Op. Br. (Lucent/Cisco)) at 7 (stating that "it may be possible for a payload field of a frame to have the capacity for more than one packet"); February 17, 1989, Response to Office Action (Ex. E to Telcordia Op. Br. (Lucent/Cisco)) at 8 (stating that "it may be possible for a payload field of a frame to contain more than one packet"). As a result, claim 4 should be construed to cover the insertion of multiple packets into the same payload field.

Further, this result is both confirmed by the '306 patent specification and required by the Federal Circuit's decision in the *FORE* appeal. The '306 patent describes the "emp" (for "empty") signal as indicating that the upcoming payload field will be generated in the empty state. Col.9:34-49.[3] When the "emp" (empty) signal appears in any framer in the disclosed embodiments, the framer knows that it can start inserting a packet (or "data in packetized format") when the frame's payload field begins. *Id.* A different signal, "en" (enable), determines when packet insertion ends—specifically, the "en" signal begins when data insertion begins *and continues until the frame ends.* Col.9:43-45.

---

[3] The specification refers to the upcoming payload field (the one in the process of being generated) as the "incoming frame." Col.9:38-41.

As the Federal Circuit recognized in *FORE*, the process of inserting data into the frame's payload field is a continuing one. In particular, the Court recognized that the invention does not instantaneously insert an entire packet into a completed frame (or payload field), but instead operates *on the fly*, inserting source data into the frames *as the frames are being created*. *See Bell Communications*, 62 Fed. Appx. at 954 (accepting Telcordia's position that "the framer can begin filling the 'front' part of the frame with data while the 'rear' end is still being generated"); *see also id.* at 955 (holding that "both 'generating and filling' are continuous and concurrent processes").

Once this operation is understood, the lack of merit in Lucent's position is apparent. This is because accepting Lucent's position would mean that as soon as the first byte of source data was inserted into a frame's empty payload field, the payload field would no longer be "empty." But that would be nonsensical. Instead, a payload field is "empty" within the meaning of the patent when the process of inserting data into a given payload field or frame *begins*. Col.9:34-49. So long as the process of data insertion at a given framer is underway (i.e., while "en" is active), the framer is, within the meaning of the patent, writing packet data into the "empty" payload field. Col. 9:38-49.

No analogy is perfect, but the situation involving "empty" might be illustrated by thinking of a mother telling her children to put jelly beans in an "empty" jar until the jar is full. If Lucent were correct, the task would be impossible. As soon as the first jelly bean was put into the empty jar by one child, the jar would no longer be empty, and no more jelly beans could be put in it—by any of the children. Obviously, however, this is not what the mother meant when she told her children to fill the empty jar with the jelly beans.

In direct contravention of the intrinsic record, Lucent (through several of its proposed constructions) is proffering constructions that would limit the '306 claims to covering only systems that have one packet per frame. If Lucent were willing to acknowledge the intrinsic record, and clarify that the claims cover systems where more than one packet can be put in each frame, Telcordia could certainly agree that the construction "packets are only put in frames which are empty" is correct. Otherwise, Telcordia must maintain its proposed construction which, while acknowledging that packets are put in

"empty payload fields," is not prone to a hyper-literal application that would directly conflict with the intrinsic record.

In sum, Lucent's construction of claim 4's "inserting" limitation is unsupported, and Telcordia's construction should be adopted. Further, Telcordia's arguments regarding claim 4 apply with equal weight to claims 1 and 3, even though Lucent fails to address those claims.

    **4.**    **data in packetized format [claim 1], data packets [claim 3], data . . . into packet format [claim 4]**

| '306 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| data in packetized format [claim 1] | data which is part of a discrete block of data having an address header at the front thereof | a discrete block of data having an address header at the front thereof |
| data packet[s] [claim 3] | discrete blocks of data, each having an address header at the front thereof. | a discrete block of data having an address header at the front thereof |
| data . . . into packet format [claim 4] | processing data from a plurality of sources into a plurality of discrete blocks of data each having an address header at the front thereof | a discrete block of data having an address header at the front thereof |

Although the parties disputed these terms during the meet and confer process and presented competing constructions to the Court in their Final Joint Claim Chart, Lucent fails to address these terms in its opening brief. Although Lucent's proposed constructions are superficially similar to Telcordia's, Lucent does not address its manipulation of the grammatical syntax of these claims (from plural into singular), its failure to account for the different language used in each claim, and its failure to acknowledge the specification and the prosecution history, which explain that multiple packets from multiple sources are written into multiple payload fields. *See* Telcordia Op. Br. (Lucent/Cisco) at 9-11. Given Lucent's failure even to address these terms, the Court should adopt Telcordia's constructions.

5.  **plurality of sources which have access to the bit stream [claim 1] / plurality of sources having different bit rates and which have access to said bit stream [claim 3]**

| '306 claim term | Telcordia's construction | Defendants' construction |
| --- | --- | --- |
| plurality of sources which have access to the bit stream [claim 1] | sources connected to a circuit path for supplying data to a framer generating a transmission bit stream | two or more sources that each insert data into the generated bit stream via its own tributary |
| plurality of sources having different bit rates and which have access to said bit stream [claim 3] | sources connected to a circuit path for supplying data to a framer generating a transmission bit stream | two or more sources that each insert data into the generated bit stream via its own tributary |

Lucent addresses the "access" limitations (the ninth and tenth terms in the parties' Final Joint Claim Chart) in section II(A) of its brief. *See* Lucent Op. Br. at 9-13. The only dispute regarding these claims centers on what is meant by "access." Indeed, the parties agree that there must be a plurality of sources, and that those sources must have "access" to the "bit stream." However, in construing the "access" limitations to mean that each data source must insert data into the bit stream "via its own tributary" (*id.* at 9), Lucent is limiting "access" to direct, unshared access. *See also id.* at 12 (saying that "each source must access the bit stream separately via its own tributary"). Telcordia, on the other hand, contends that the meaning of "access" is not limited in the way Lucent suggests.

Again, Lucent reads the direct, unshared restriction into the claim term "access" through an elaborate characterization of the embodiment of the invention (the "daisy chain" embodiment discussed at Col.8:55-59) illustrated by Fig. 4, and the way it supposedly operates. Lucent asserts, of course, that this embodiment is "not an embodiment of the invention——is the invention itself" (Lucent Op. Br. at 10), but for all the reasons noted above, there is no merit to this position.

Telcordia's position, on the other hand, begins with the ordinary meaning of the term "access." Access is defined as "[a] means of approaching, entering, exiting, or making use of; a passage." *American Heritage College Dictionary* 8 (4th ed. 2002) (attached as Ex. C). Nothing in this ordinary meaning connotes direct, unshared access as Lucent contends. Rather, every common use of the word access connotes openness and sharing (e.g., access road, access ramp, access gate, accessibility). The

term "access" appears unmodified in the claims, and without modifiers such as "direct," "exclusive," or "unshared," the plain meaning of the term covers a shared circuit path to the bit stream.

The specification explicitly reinforces Telcordia's understanding of the term. As noted in Telcordia's opening brief, the top portion of Figure 3 illustrates how different sources share the same path to the bit streams formed at different stages of the network. *See* Telcordia Op. Br. (Lucent/Cisco) at 12. The language of the specification also describes how data from specific sources may be multiplexed or merged together to share a circuit path to the bit stream (as Lucent recognizes, Lucent Op. Br. at 2, "[m]ultiplexing is the process of combining multiple channels that carry data into one common connection"):

> Illustratively, a DTDM multiplexer may be used to merge traffic from three different communications sources or tributaries into a single DTDM bit stream. . . . DTDM streams may be multiplexed into more densely populated DTDM bit streams at the same bit rate. These more densely populated basic backbone rate bit streams may then be multiplexed into higher bit rate streams for point-to-point inter-office transmission.

Col. 5:13-67.[4] Where traffic from a plurality of sources is merged or multiplexed together, that traffic then necessarily shares the same circuit path.

In short, the specification reinforces that "access" as used in the claims carries its ordinary meaning, and is not limited to direct, unshared access. Moreover, while Lucent contends that Telcordia's construction "reads out the word 'plurality' by allowing a single stream of merged data to access the DTDM bit stream" (Lucent Op. Br. at 9), that is wrong. Telcordia's construction expressly requires "sources" (plural), and indeed merging data onto a single shared path presupposes that there is a plurality of sources (otherwise there would be no merging).

Telcordia's construction is further supported by Judge Farnan's claim construction in the *FORE* case. FORE, like Lucent here, recognized the narrow Figure 4 embodiment and argued that Figure 4 was

---

[4] Figure 3 illustrates packets from multiple sources being multiplexed onto line 62 (Fig. 3). Further, Figure 7 shows packets from multiple sources coming into DTDM multiplexer 36' on several lines 62 and being multiplexed onto line 63, which presents the packets to multiplexer 42. The multiple sources thus have access via shared line 63 to the DTDM bit stream formed in framer 160 of multiplexer 42. Col.15:5-8.

the '306 invention and that the claims were limited to the Figure 4 disclosure of a "daisy chain" configuration. Judge Farnan correctly recognized that such a limitation would directly conflict with the language of the specification, which indicates that Figure 4's configuration is not mandatory:

> FORE directs the Court to Figure 4 which depicts a daisy chained configuration of framer units . . . . [T]he Court acknowledges that the specification indicates that the "framer units *may* be connected in a daisy chain fashion." ('306 Patent, col. 16, lines 32-33 (emphasis added)). However, a daisy chain configuration is not a mandatory requirement.

*Bell Communications*, 113 F. Supp. 2d at 650.[5]

Moreover, the narrow "daisy chain" configuration of Figure 4 is explicitly claimed in unasserted claim 6, which requires "a plurality of interfaces, each of said interfaces serving to interface one of said sources with the train of frames . . . ." Col. 18:46-48. Thus, the doctrine of claim differentiation also weighs against Lucent's assertion that the Figure 4 "daisy chain" embodiment should be imported into all claims of the '306 patent. *S.R.I. Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (en banc) (en banc) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.").

In sum, Telcordia submits that the Court should adopt Telcordia's construction of "access" because (1) Telcordia's construction comports with the ordinary meaning of "access," (2) Telcordia's construction reflects the type of "access" expressly illustrated and described in the specification, (3) the construction does not incorrectly presume that the '306 invention is limited to a single embodiment disclosed in the specification, (4) the construction is consistent with Judge Farnan's opinion, and (5) the construction is supported by the doctrine of claim differentiation.

---

[5] Indeed, in its own brief (albeit in a different section), Lucent recognizes that "[t]he Federal Circuit has made clear that the use of the word 'may' is permissive and cannot serve to limit the claims." Lucent Op. Br. at 26 (citation omitted).

6.     "such that" clauses [claims 1, 3] and "inserting" clause [claim 4]

| '306 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| such that data in packetized format from any of said sources is written into any available empty payload field of any of said frames [claim 1] | Data in packetized format from the sources can utilize the empty payload fields of the frames on a first-come, first-served basis because no payload fields are pre-assigned for use by particular sources. | packets are only put in frames which are empty |
| such that a packet from any of said sources is inserted into any available empty payload field of any of said frames [claim 3] | Data packets from the sources can utilize the empty payload fields of the frames on a first-come, first-served basis because no payload fields are pre-assigned for use by particular sources. | packets are only put in frames which are empty |
| inserting each of said packets comprised of data from one of said plurality of sources into any empty payload field of any of said frames available to said inserting means [claim 4] | *See* Telcordia's construction for "inserting each of said packets comprised of data from one of said plurality of sources into any empty payload field [claim 4]" which is provided above. | packets are only put in frames which are empty |

Here again, Lucent only addresses the "such that" clause from claim 1, and ignores the similar language in claims 3 and 4. Lucent also trivializes the differences in language in the different claims, stating that the "distinction is not meaningful for purposes of this claim limitation." Lucent Op. Br. at 17 n.9. The distinction is indeed meaningful, as only Telcordia's constructions recognize the substantive difference between "filling" and "inserting," as well as the difference between "data packets" and "data in packetized format." *See* Telcordia Op. Br. (Lucent/Cisco) at 6-11.

Lucent addresses the "such that" clause in claim 1 (the eleventh term in the parties' Final Joint Claim Chart) in section II(C) of its brief. *See* Lucent Op. Br. at 17-20. Telcordia largely agrees with Lucent on the point that packets are only put in frames that are "empty," but Telcordia believes that its proposed construction accurately reflects what this means in the context of the '306 patent (and given the prior litigation concerning the term). Indeed, Telcordia's proposed constructions use the phrase "empty payload fields."

Lucent's proposed constructions, on the other hand, are incorrect for two reasons. First, Lucent intends to apply its proposed construction in a hyper-literal manner that is inconsistent with the plain meaning of the claims as well as the intrinsic record. Specifically, by arguing that "packets are only put

in frames which are empty," Lucent Op. Br. at 17, it is apparent that Lucent is insisting that only one packet can be put in each frame (i.e., once the first packet is written into the frame, that frame is no longer "empty" and therefore cannot receive additional packets). As previously noted, however, the "empty" signal is used to initiate packet insertion in the '306 patent, but the "enable" signal (which is based on the length of the frame) permits data insertion until the frame ends. *See supra* p. 10. As stated above, therefore, Lucent's construction should be rejected.

Second, while Lucent insists that its proposed construction is the same as Judge Farnan's construction in the *FORE* case, that is wrong. Although Lucent uses some of the same words that Judge Farnan used in his original construction, Lucent ignores the fact that aspects of Judge Farnan's original construction were overturned by the Federal Circuit and modified on remand.

Judge Farnan originally construed the "such that" clause of claim 1, and his complete construction (not the truncated version offered by Lucent) provided that "packets are only put in frames which are empty, i.e. which have zero data in their payloads." *Bell Communications*, 113 F. Supp. 2d at 650. Judge Farnan noted that "this construction is consistent with the Court's conclusion that an empty payload field has zero data in it." *Id*. But after the Federal Circuit disagreed with that construction and reversed, Judge Farnan modified it and determined that an empty payload field does not have "zero data in it." *Bell Communications*, 2003 WL 22295442 at *1 (Ex. A to Telcordia Op. Br. (Lucent/Cisco)). Additionally, the Federal Circuit determined that Judge Farnan's construction of a "frame" was inaccurate. *Bell Communications*, 62 Fed. Appx. at 955-56 ("We therefore agree with Bellcore that the claims encompass the insertion of data into a frame's empty payload field while the frame is still being generated.")

In particular, when Judge Farnan stated that "packets are only put in frames which are empty," he envisioned inserting packets into fully formed empty frames. The Federal Circuit, however, held that the claims cover the insertion of packets into frames as the frames are being generated, and *before* a complete empty frame ever exists. *See supra* p. 10. Following remand from the Federal Circuit, therefore, the concept of a "frame" became entirely different from the concept of a "frame" when Judge Farnan used the

term in his original construction. Against these fundamental changes in meaning, Lucent is not truly "adopt[ing] the construction that Judge Farnan issued in the *Fore Systems* litigation." Lucent Op. Br. at 17.

As a final note, Lucent contends that Telcordia is collaterally estopped from offering a construction that is different from Judge Farnan's original construction in the *FORE* case. Lucent Op. Br. at 19 (arguing that Telcordia is trying to "escape collateral estoppel on this term"). That is simply untrue. Rather, Telcordia is merely pointing out that the construction Lucent offers is no longer valid—two fundamental aspects of the construction ("frame" and "zero data") were overturned and modified on the record in the *FORE* case.[6]

7.    **available empty payload field [claims 1, 3] / empty payload field of any of said frames available to said inserting means [claim 4]**

| '306 claim term | Telcordia's construction | Defendants' construction |
| --- | --- | --- |
| available empty payload field [claims 1, 3] | a payload field that is available to receive packet data from a source | an empty payload field that can be filled with a data packet from the source, among the plurality of sources, of the highest priority with a data packet ready to transmit |
| empty payload field of any of said frames available to said inserting means [claim 4] | a payload field that is available to receive packet data from a source | an empty payload field that can be filled with a data packet from the source, among the plurality of sources, of the highest priority with a data packet ready to transmit |

Lucent addresses the "available empty payload field terms (the fourteenth and fifteenth terms in the Final Joint Claim Chart) in section II(E) of its brief. *See* Lucent Op. Br. at 22. However, Lucent's construction of "available empty payload field" imports far-reaching and unrelated concepts into the relatively simple term "available." As noted above, Lucent repeatedly attempts to import the filling

---

[6] Given that it is Telcordia's claim construction positions, not Lucent's, that are consistent with Judge Farnan's *final* claim constructions (i.e., those that were made after, or otherwise survived, the Federal Circuit's decision in the case), Telcordia is reluctant to minimize the importance of collateral estoppel here. Nonetheless, collateral estoppel does not apply here because there was no final judgment on the merits in the *FORE* case. *See A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 704 (Fed. Cir. 1983) ("[J]udicial statements regarding the scope of patent claims are entitled to collateral estoppel effect in a subsequent infringement suit only to the extent that determination of scope was essential to a final judgment on the question of validity or infringement."). On the contrary, the principle that applies here is one of deference to another court's legal conclusions. *See Mendenhall*, 5 F.3d at 1570.

limitation from claim 1 into claims 3 and 4, which require "inserting" rather than "filling." *See supra* p. 8; Telcordia Op. Br. (Lucent/Cisco) at 6-8. Additionally, Lucent is again attempting to import the entire priority scheme set out as one embodiment of the invention (Figure 4) into the straightforward term "available empty payload field."

What Lucent calls the "priority" of packets and sources has nothing to do with whether an empty payload field is "available" to receive packet data from a source. Lucent argues that only framers 53 of the Figure 4 embodiment can generate "available" empty payload fields because only the daisy-chain configuration of framers 53 provides a "priority" feature (i.e., resolves contention for empty frames). Col.9:50-53. As noted above, the '306 claims are not so limited. *See supra* pp. 13-14. Indeed, Lucent's attempt to import the Figure 4 embodiment into the claim term at issue here ("available empty payload field") is particularly inappropriate because all of the other packet-insertion framers described in the patent—specifically, framer 92 (Fig. 7), framer 132 (Fig. 9), and framer 160 (Fig. 10)—use the same framer circuit to make empty payload fields "available" to receive packet data in exactly the same manner as framers 53. Col.16:8-10; Col.16, 49-58.

Telcordia's construction remains grounded in the claim language and the specification. Telcordia's construction explains (1) what the empty payload field is available to ("a source"), and (2) what it is available to do ("receive packet data"). Moreover, Telcordia's proposed construction does not read out the limitation "available," as Lucent contends. *See* Lucent Op. Br. at 24. Rather, Telcordia's construction expressly uses the term "available" and gives meaning to both the "empty" limitation ("empty of source data but including bit signals of some kind") and the "available" limitation ("a payload field that is available to receive packet data from a source"). Telcordia's construction recognizes that there are two types of empty payload fields described in the '306 specification, those that are available to receive packet data from a source, and those that not. An empty payload field is "available to receive packet data from a source" only if generation of the payload field begins *after* a packet is ready to be inserted (i.e., the "packet ready" signal is asserted before or while "emp" is generated). Col.9:37-49,

Col.6:61-65; Fig. 12. Otherwise, the current empty payload field is not "available" and the packet must wait for the start of the next payload field (which is the empty payload field "available" to that packet).

In sum, Lucent is wrong in asserting that Telcordia's construction reads "available" out of the claim and equates "available" with "empty." Rather, Telcordia's construction expressly incorporates the straightforward concept of an "available" empty payload field as disclosed in the specification, and should be adopted by the Court.

### 8.    generating means [claim 4]

| '306 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| generating means [claim 4] | The function is "generating a train of frames wherein each frame includes a transmission overhead field containing timing information and an empty payload field."<br><br>The structures corresponding to the 'generating means' are control 210, tristate device 222, ROM 224 and timing generator 209. | The claimed function is "generating a train of frames wherein each frame includes a transmission overhead field containing timing information and an empty payload field."<br>The corresponding structure is: a control 210 that generates a periodic signal, a tristate device 222 connected to the control 210 that receives the periodic signal, a timing generator 209 connected to the tristate device 222 from which a frame alignment word is read when the tristate device 222 receives the periodic signal, a bus 219 connected to the ROM 224 that carries the frame alignment word to a parallel-to-serial converter 216, a serial output 206. |

Lucent addresses the "generating means" (the eighteenth term in the parties' Final Joint Claim Chart) in section II(G) of its brief. *See* Lucent Op. Br. at 26-27. The parties agree that this term is covered by 35 U.S.C. § 112(6). However, Lucent incorrectly contends that the bus 219, parallel-to-serial converter 216, and serial output 206 are "integral components" for performing the recited function. Lucent's conclusory position conflicts with Judge Farnan's recognition that the only components that are integral to performing the recited function are control 210, tristate device 222, ROM 224, and timing generator 209. *See Bell Communications*, 113 F. Supp. 2d at 649. In addition to adding structure that does not perform the recited function, Lucent adds a host of new functional limitations under the auspices of corresponding structural elements ("that generates a periodic signal," "that receives the periodic signal," "from which a frame alignment word is read when the tristate device 222 receives the periodic signal," and " that carries the frame alignment word to a parallel-to-serial converter 216"). As such,

Lucent's construction conflicts with two fundamental principles governing the construction of means-plus-function claims. *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (holding that it is improper to "import functional limitations that are not recited in the claim"); *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) (finding that § 112(6) does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function.") Judge Farnan's construction is correct and consistent with the law governing construction of means-plus-function claims, and should be adopted by this Court.

9.    **processing means [claim 4]**

| '306 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| processing means [claim 4] | The function is "processing data from a plurality of sources into packet format."<br><br>Packetizers 55 are the structures which perform the function recited in this element. | The claimed function is "processing data from a plurality of sources into packet format."<br><br>The corresponding structure is a plurality of packetizers 55 each of which adds a packet header to its own source data and communicates a packet ready pulse to its own framer when a complete packet is stored in its own FIFO. |

Lucent addresses the "processing means" (the nineteenth term in the parties' Final Joint Claim Chart) in section II(H) of its brief. *See* Lucent Op. Br. at 27. The parties agree that this term is covered by § 112(6). Once again, however, Lucent attempts to read the limitations from the Figure 4 embodiment into the language of the claims, this time by adding functional language that is not recited in the claim. This new functional language ("each of which adds a packet header to its own source data and communicates a packet ready pulse to its own framer when a complete packet is stored in its own FIFO") is both inconsistent with Judge Farnan's earlier construction (which identified only packetizers 55 and nothing more), and is inconsistent with the law of claim construction (which prohibits the importation of functional limitations not recited in the claim). *See Wenger*, 239 F.3d at 1233; *Bell Communications*, 113 F. Supp. 2d at 650. Again, Judge Farnan's construction is correct and consistent with the law governing construction of means-plus-function claims, and should be adopted by this Court.

### 10.    inserting means [claim 4]

| '306 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| inserting means [claim 4] | The function is "receiving said train of frames and inserting each of said packets comprised of data from one of said plurality of sources into any empty payload field of any of said frames available to said inserting means to form said bit stream so that data from each of said sources can be transmitted at its own desired bit rate via said bit stream and so that data from said plurality of sources can be transmitted simultaneously via said bit stream."<br><br>The structures corresponding to the 'inserting means' are control 210, tristate device 218, tristate device 220, frame detect 214 and timing generator 209. | The claimed function is "receiving said train of frames and for inserting each of said packets comprised of data from one of said plurality of sources into any empty payload field of any of said frames available to said inserting means to form said bit stream so that data from each of said sources can be transmitted at its own desired bit rate via said bit stream and so that data from said plurality of sources can be transmitted simultaneously via said bit stream."<br><br>The corresponding structure is a plurality of framers 53, each of which includes: a control 210, a tristate device 218, a tristate device 220, a fame detect 214 and a timing generator 209. |

The parties agree that this term is covered by § 112(6). However, despite offering four separate and conflicting constructions for the claim 4 "inserting means" element in the Final Joint Claim Chart, Lucent fails to properly support any of its proposed constructions in its opening brief. Rather, Lucent conflates its analysis of the "inserting means" term with another claim term (the "plurality of sources" element), and relegates its entire discussion of the "inserting means" element to a footnote. *See* Lucent Op. Br. at 13 n.5. To the extent that Lucent's argument can be understood, moreover, Lucent again appears to be importing a limitation found only in Figure 4 ("a plurality of framers 53") into the claim. For the reasons already noted, this approach to construing the '306 claims is not correct.

### 11.    generating a bit stream [claims 1, 3]

In the parties' Final Joint Claim Chart (D.I. 93), Telcordia proposes a construction for the "generating a bit stream" limitation ("encompasses the creation of either serial or parallel bit stream"), while Lucent said that no construction was necessary. Even though this indicated a dispute between the parties, Lucent has included no discussion of this issue in its opening brief, and has thus failed to provide any reason to conclude either that no construction is necessary or that Telcordia's construction is wrong. Accordingly, Telcordia's construction should be adopted by the Court.

21

III.    **The '633 Patent**

In addressing the claim construction issues relating to the '633 patent, Telcordia relies on the discussion of that patent in the opening claim construction brief filed in this case (D.I. 104) as well as the discussion of the patent in Telcordia's Answering Claim Construction Brief Addressing Telcordia's '633 Patent and Alcatel's '052 Patent, filed in the *Alcatel* case.

IV.    **The '763 Patent**

In addressing the claim construction issues relating to the '763 patent, Telcordia relies on the discussion of that patent in the opening claim construction brief filed in this case (D.I. 104) as well as the discussion of the patent in Telcordia's Answering Claim Construction Brief Addressing Telcordia's '763 Patent, filed in the *Cisco* case.

## V.     Conclusion

For the reasons stated above and in Telcordia's opening brief, Telcordia respectfully requests that the Court adopt Telcordia's proposed claim constructions.

/s/ Tiffany Geyer Lydon

Steven J. Balick (I.D. #2114)
John G. Day (I.D.#2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Of Counsel:*

Donald R. Dunner
Don O. Burley
Steven M. Anzalone
Richard H. Smith
Houtan K. Esfahani
James T. Wilson
John M. Williamson
Pedro F. Suarez
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Ave., NW
Washington, DC  20001
(202) 408-4000

Dated:  March 24, 2006

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc.*

167966.1

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of March, 2006, the attached **TELCORDIA'S**

**ANSWERING CLAIM CONSTRUCTION BRIEF ADDRESSING TELCORDIA'S '306**

**PATENT** was served upon the below-named counsel of record at the address and in the manner

indicated:

John W. Shaw, Esquire                                                <u>HAND DELIVERY</u>
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street
Wilmington, DE  19801

Steven C. Cherny, Esquire                                        <u>VIA ELECTRONIC MAIL</u>
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY  10022

David A. Nelson, Esquire                                         <u>VIA ELECTRONIC MAIL</u>
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL  60606


                                                                */s/ Tiffany Geyer Lydon*
                                                                _____
                                                                Tiffany Geyer Lydon

150909.1