# EXHIBIT A

# The IEEE Standard Dictionary of Electrical and Electronics Terms

## Sixth Edition

### Standards Coordinating Committee 10, Terms and Definitions
### Jane Radatz, Chair

This standard is one of a number of information technology dictionaries being developed by standards organizations accredited by the American National Standards Institute. This dictionary was developed under the sponsorship of voluntary standards organizations, using a consensus-based process.

Property of
Finnegan, Henderson, Farabow
Garrett & Dunner Library
1300 I Street. N.W., #700
Washington, D.C.  20005

ISBN 1-55937-833-6



9 781559 378338      90000

A142

in an OR function. that
e wired together will be
(C) 610.10-1994

all common equipment.
ctivate the point requires
re for the specific point.
(PE/SUB) C37.1-1994

systems) A program em-
l interconnection among
(COM) 312-1977r

witching equipment) A sys-
(COM) 312-1977r

er graphics) A technique
object as a series of lines
ing hidden surfaces. (See



entation.
(C) 610.6-1991

. the American Wire Gage
en & Sharpe (B&S), is the
num, and other conductors.
for which the Steel Wire
e Birmingham Wire Gage is
(NESC) C2-1997

ntenna constructed of wire
x of refraction (and thus the
by the dimensions and the
east: geodesic lens antenna;
(AP) 145-1993

ator of generally cylindrical
securing the conductor and
e also: insulator.
(EEC) [89]

ry) The insulation that is ap-
into a coil or inserted in a
(PE) [9]

general physical arrange-
quipment and connections
and terminal boards for out-
apparatus. Connections are
y lines. An elementary for
uded in the connection dia-
(IA) [60], 270-1966w

rhead ground wire.

tion in which an auxiliary me
ommunicating means between

C37.100-1981s. C37.90-1978
ner.

inging equipment) The point
joined together. The various
 wire ropes together include
compression splices that utilize
 incorporate loops (eyes) in the
hanical splices that are
 in the ends of the ropes held
 fittings or wire rope clips. the
 connector links or steel bo
 eye to eye. Woven splices are

often classified as short or long. A short splice varies in length
from 7 to 17 ft (2 to 5m) for 1/4 to 1 1/2 in diameter ropes.
respectively, while a long splice varies from 15 to 45 ft (4 to
14m) for the same-size ropes.
(PE/T&D) 524-1980s

**wire spring relay** A relay design in which the contacts are at-
tached to round wire springs instead of the conventional flat
or leaf spring.
(PE) 43-1974r

**wire storage** See: plated wire storage.

**wiretapping** Passive surveillance of communication channels
to gain access to information transmitted over those channels.
Wiretapping may be perpetrated through physical, electrical.
and radio-frequency taps into the communication channel.
and could result in the unauthorized disclosure of information
transmitted over communication channels. Also known as
eavesdropping.
(BA/C) 896.3-1993

**wireway (1)** (packaging machinery) A rigid rectangular race-
way provided with a cover.
(IA) 333-1980w

**(2)** (raceway systems for Class 1E circuits for nuclear
power generating stations) Sheet-metal troughs with hinged
or removable covers to house or protect wires and cables ex-
ternal to panelboards and cabinets.
(PE) 628-1987r

**wireways** Sheet-metal troughs with hinged or removable covers
for housing and protecting electric wires and cable and in
which conductors are laid in place after the wireway has been
installed as a complete system.
(NEC/NESC) [86]

**wire-wrapped board** A circuit board in which electrical con-
nections between components are accomplished by wrapping
wire around contact posts on the board. Contrast: printed cir-
cuit board.
(C) 610.10-1994

**wiring closet** A central point at which all the circuits in a wiring
system begin or end, allowing cross-connection. Synonym:
main distribution frame.
(C) 610.7-1995

**wiring or busing terminal, screw and/or lead** That terminal,
screw or lead to which a power supply will be connected in
the field.
(PE) C57.12.80-1978r

**wiring panel** See: patch bay.

**with Ada language construct to make the contents of an external**
Ada library unit visible within another Ada compilation unit.
(ATL) 1226.2-1993

**withdrawal weighting** Response weighting by omission of se-
lected fingers, or weighting by changing the connections of
selected fingers from one bus bar to the other.
(UFFC) 1037-1992

**withholder (microprocessor architectures)** A potential master
that requires control of the bus module and is fairness inhib-
ited.
(C/MM) 896.1-1987s

**withstand current (surge)** The crest value attained by a surge
of a given wave shape and polarity that does not cause dis-
ruptive discharge on the test specimen.
(PE/T&D) [10]

**withstand probability** The probability that one application of
a prospective voltage of a given shape and type will not cause
a disruptive discharge.
(PE) 4-1995

**withstand test voltage** The voltage that the device must with-
stand without flashover, disruptive discharge, puncture, or
other electrical failure when voltage is applied under specified
conditions. Note: For power frequency voltages, the values
specified are RMS values and for a specified time. For light-
ning or switching impulse voltages, the values specified are
crest values of a specified wave. For direct voltages, the val-
ues specified are average values and for a specified time.
(PE) 48-1996

**withstand voltage (1)** (high voltage testing) (power and dis-
tribution transformers) The voltage that electrical equip-
ment is capable of withstanding without failure or disruptive
discharge when tested under specified conditions.
(PE/PSPD) C57.12.80-1978r, C62.22-1991

**(2)** (electric power) (impulse) The crest value attained by an
impulse of any given wave shape, polarity, and amplitude.
that does not cause disruptive discharge on the test specimen.
(PE/PSPD) 32-1972r

**(3)** (surge arresters) A specified voltage that is to be applied
to a test object in a withstand test under specified conditions.
During the test, in general no disruptive discharge should oc-
cur. See also: basic impulse insulation level.

**(4)** The prospective value of the test voltage that equipment
(PE) [8], [8a]
is capable of withstanding when tested under specified con-
ditions.
(PE) 4-1995

**(5)** The specified voltage that, under specified conditions, can
be applied to insulation without causing flashover or punc-
ture.
(PE/SWG/T&D) 386-1995, C37.100-1992

**(6)** The voltage that an insulation is capable of withstanding.
In terms of insulation, this is expressed as either conventional
withstand voltage or statistical withstand voltage.
(C/PE) 1313.1-1996

**withstand voltage test** A high-voltage test that the armature
winding must withstand without flashover or other electric
failure at a specified voltage for a specified time and under
specified conditions.
(PE) 433-1974r

**word (1)** (mathematics of computing) A sequence of bits or
characters that is stored, addressed, transmitted, and operated
on as a unit within a given computer. See also: byte.
(C) 1084-1986w, 610.7-1995

**(2)** (microprocessor operating systems) An ordered set of
bytes or bits that is the normal unit in which information may
be stored, transmitted, or operated on within a given com-
puter.
(C/MM) 162-1963w, 855-1990

**(3)** (microcomputer system bus) (signals and paths) Two
bytes or sixteen bits operated on as a unit.
(C/MM) 796-1983r

**(4)** (696 interface devices) A set of bit-parallel signals cor-
responding to binary digits and operated on as a unit. For
IEEE Std 696-1983 word connotes a group of 16 bits where
the most significant bit carries the subscript 15 and the least
significant bit carries the subscript 0.
(C/MM) 696-1983w

**(5)** (data management) (mathematics of computing) (soft-
ware) A sequence of bits or characters that is stored, ad-
dressed, transmitted, and operated on as a unit within a given
computer. Synonyms: computer word; fullword; machine
word. See also: byte.
(C) 1084-1986w, 610.12-1990, 610.5-1990

**(6)** (data management) (software) An element of computer
storage that can hold a sequence of bits or characters as in
the following definition for "word:" A sequence of bits or
characters that is stored, addressed, transmitted, and operated
on as a unit within a given computer. Synonyms: computer
word; fullword; machine word.
(C) 610.12-1990, 610.5-1990

**(7)** (software) A sequence of bits or characters that has mean-
ing and is considered an entity in some language: For example,
a reserved word in a computer language. See also: bit; byte.
(C) 610.12-1990

**(8)** (SBX bus) Two bytes operated on as a unit.
(C/MM) 959-1988r

**(9)** (NuBus) For the purpose of IEEE Std 1196-1987, 32-bit
data item taken as a unit.
(C/MM) 1196-1987

**(10)** A group of adjacent binary digits operated on as a unit.
Usually an integral number of octets.
(PE/SUB) 999-1992

**(11)** Four bytes or 32 bits operated on as a unit. The most
significant byte carries the index value 0 and the least signif-
icant byte carries the index value 3.
(BA/C) 1496-1993

**(12)** An aligned quadlet. Note: The definition of this term is
architecture-dependent, and so may differ from that used in
other processor architectures.
(C/MM) 1754-1994

**(13)** An ordered set of 16 bits operated on as a unit. The most
significant bit is labeled bit 15 and the least significant bit is
labeled bit 0. Note: When a word of data is embedded in a
MTM-Bus packet, bit (0) of the data word is placed in bit (0)
of the 17-bit packet.
(C/TT) 1149.5-1995

**(14)** An element of computer storage that can hold a sequence
of bits or characters as in (1).
(C) 610.7-1995

word address format                                                    1208                                                    working store

(15) In the shell command language, a token other than an operator. In some cases a word is also a portion of a word token: in the various forms of parameter expansion (3.6.2), such as $ {name+word}, and variable assignment, such as name=word, the word is the portion of the token depicted by word. The concept of a word is no longer applicable following word expansions—only fields remain.

(C/PA) 9945-2-1993

(16) A character string or bit string that is considered to be an entity for some purpose. See also: alphabetic word; bit; computer word; index word; instruction word; parameter word; status word.                (C) 610.10-1994

(17) See also: Forth word.            (BA/C) 1275-1994

word address format Addressing each word of a block by one or more characters that identify the meaning of the word.
(IA) [61]

word-alterable read-only memory (WAROM) A memory that permits erasing and writing to memory cells constituting a computer word without disturbing any other word.
(ED) 641-1987w

word and author index (WADEX) A variation of a keyword out of context (KWOC) index in which author and keyword entries are combined and presented in a KWOC format. Contrast with: author and keyword in context index.
(C) 610.2-1987

word index An automatic index containing an alphabetical list of the words found in a given text and indicating the number of times each word occurs in the text and each word's position in the text.            (C) 610.2-1987

word length (1) (analog-to-digital converter) (hybrid computer linkage components) The number of data bits, including sign, that form the digital representation of the analog input in a prescribed voltage range.    (C) 166-1977w
(2) (digital-to-analog converter) The number of data bits, including sign, in the digital register of a digital-to-analog converter, or a digital-to-analog multiplier.
(C) 166-1977w
(3) The number of characters or bits in a word.
(C) 610.10-1994

word mark A mark that indicates the beginning or end of a word. Note: Used when word length is not fixed by the architecture but can vary under software control.
(C) 610.10-1994

word name A text string denoting a particular Forth word.
(BA/C) 1275-1994

word-organized storage A type of storage in which data can be stored or from which data can be retrieved in units of computer words.            (C) 610.10-1994

word processing (WP) The use of computers to enter, view, edit, store, retrieve, manipulate, organize, transmit, and print textual material. A word processor system typically includes text editing and text formatting. Synonym: text processing. See also: clustered word processing; dedicated word processing; office automation; shared-logic word processing; shared-resource word processing; stand-alone word processing; word processor.            (C) 610.2-1987

word processing output microfilm (WPOM) Microimages produced by a word processor.            (C) 610.2-1987

word processor (WP) (A) A computer capable of performing word processing functions. (B) A computer program capable of performing word processing functions. See also: text editor; text formatter.            (C) 610.2-1987

word serial The simplest required communication method supported by message-based devices in the VXIbus system. It utilizes the A16 communication registers to transfer data using a simple polling handshake method.
(C/MM) 1155-1992

word time (electronic computation) In a storage device that provides serial access to storage locations, the time interval between the appearance of corresponding parts of successive words. See also: minor cycle.
(C) [20], [85], 610.10-1994

word wrap The ability of a word processing system to divide text into lines that fit into the horizontal space available on a display device without leaving broken words or requiring explicit carriage returns.            (C) 610.2-1987

work The work done by a force is the dot-product line integral of the force. See also: line integral.    (Std 100) 270-1966w

work area The region of a window where controls such as buttons, settings, and text fields are displayed.
(C) 1295-1993

work coil See: load, work, or heater coil.

worker certification The act of documenting the training and demonstrated proficiency of the worker for the task to be performed.            (PE/T&D) 1307-1996

work file (A) (data management) A file used to provide storage space for data that is needed only during the duration of a particular event, such as the execution of a computer program. (B) (data management) In sorting, an intermediate file used for temporary storage of data between phases of the sort.
(C) 610.5-1990

work function The minimum energy required to remove an electron from the Fermi level of a material into field-free space. Note: Work function is commonly expressed in electron volts.            (ED) 161-1971w

working (electrolysis) The process of stirring additional solid electrolyte or constituents of the electrolyte into the fused electrolyte in order to produce a uniform solution thereof. See also: fused electrolyte.            (EEC/PE) [119]

working area See: working space.

working directory A directory, associated with a process, that is used in pathname resolution for pathnames that do not begin with a slash. Synonym: current working directory.
(C/PA) 1003.5-1992, 1003.5b-1995, 9945-1-1996, 9945-2-1993

working distance (x-ray energy spectrometers) The distance, measured along the working axis, between the source of x-rays and the outermost window on the detector.
(NPS) 759-1984r

working level Any combination of short-lived radon daughters in air that will result in the ultimate emission of $1.3 \times 10^5$ MeV of alpha-particle energy.
(NI) N42.17B-1989r

working level monitor Monitors used to measure the alpha-energy deposition from the decay of radon daughters. Calibrated in units of working levels.    (NI) N42.17B-1989r

working optical aperture (acousto-optic device) That aperture which is equal to the size of the acoustic column that the light will encounter.            (UFFC) [23]

working point See: operating point.

working pressure The pressure, measured at the cylinder of a hydraulic elevator, when lifting the car and its rated load at rated speed. See also: elevator.            (EEC/PE) [119]

working reference system A secondary reference telephone system consisting of a specified combination of telephone sets, subscriber lines, and battery supply circuits connected through a variable distortionless trunk and used under specified conditions for determining, by comparison, the transmission performance of other telephone systems and components.            (EEC/PE) [119]

working set (software) In the paging method of storage allocation, the set of pages that are most likely to be resident in main storage at any given point of a program's execution.
(C) 610.12-1990

working space (software) That portion of main storage that is assigned to a computer program for temporary storage of data. Synonyms: working area; working storage; working store.
(C) 610.10-1994, 610.12-1990

working standard (illuminating engineering) (luminous standards) A standardized light source for regular use in photometry.            (EEC/IE) [126]

working storage See: temporary storage; working space.

working store See: working space.

# EXHIBIT B

**BELL COMMUNICATIONS v. FORE SYSTEMS**
**Nos. 02-1083, -1084**

**Transcript of Oral Argument on February 3, 2003**

Judge Mayer:  The next case is 02-1083, -1084 Bell Communications Research, Inc. v. FORE Systems, Inc.

Mr. Dunner:  May it please the Court. Good morning. Your Honors, at the heart of the district court's claim construction is what Bellcore submits is a misunderstanding of the inventions of both of the patents on appeal. That misunderstanding led to such a narrow claim construction that the claims do not read on any embodiment disclosed in either patent.

Let me be more specific. Let me go to the '306 patent. The district court held that the claims in the '306 patent require a two-step process.

Judge Clevenger:  Can I just ask one question, Mr. Dunner, to help me focus my attention before you go on? At the end of your brief at pages 67-68, you list what you believe to be the correct claim interpretations on various limitations in claims in the '306 and '768.

Mr. Dunner:  Yes.

Judge Clevenger:  Is it correct for me to understand that in order for your client to be able to avoid the summary judgment of noninfringement you have to prevail on each of these limitations?

TELC2946866

1

Mr. Dunner:       Not quite, Your Honor, and the reason I say not quite, is there are

                  limitations in two different patents.  We could prevail on

                  limitations in one of the patents, the '306, and still not have

                  summary judgment as to that patent, and …

Judge Clevenger:  Yes, but my point is in order for you to say prevail on the '306,

                  you have to succeed with each of your three arguments there.

Mr. Dunner:       Exactly right, Your Honor.

Judge Clevenger:  And, on the '768 you have to prevail on each of your three

                  arguments there.

Mr. Dunner:       Exactly right.

Judge Clevenger:  Fine, thank you.

Mr. Dunner:       The district court held that the '306 claims require a two-step

                  process.  First, the court held you had to generate multiple

                  complete frames—empty frames.  Secondly, you fill the frames.

                  Bellcore agrees that the claims to the '306 patent impose an

                  order—you start the generating step before you start the filling

                  step.  But Bellcore submits that the claims do not impose a

                  complete frame limitation.  And that the district court, in imposing

                  that limitation, has written words into the claim that don't exist,

                  and more significantly are inconsistent with the disclosed operation

                  of the device in the '306 patent.  The claims, the grammatical

                  structure of the claims, which the court looked at, indeed requires

                  that there be first a generating step.  You start the generating step.

TELC2946867

2

Judge Clevenger:    How soon after you start generating can you start filling?

Mr. Dunner:    When the first byte of the frame generator in figure 4, the frame

generator 52, reaches the first inserting framer, at that point you

start filling immediately. Only one byte has at that point reached

the point of the frame, of the inserting framers. So, what happens

is the invention operates on a byte-by-byte basis. The problem that

the district court had—the district court conceptualized the

invention as a container, such as this water container. It has walls,

it has a body that holds water. We are not talking about that.

Judge Clevenger:    At what stage does the empty frame signal disappear?

Mr. Dunner:    The empty frame signal disappears? It doesn't. It disappears the

minute the frame starts being filled. The minute the frame starts

being filled, and that bit stream moves along to the next inserting

framer. The next inserting framer gets a message that says "that is

not an empty frame."

Judge Bryson:    Let me see if I understand—what you're saying as I understand it,

is that on figure 4 framer 52 will send the beginning of a frame

past framer 53, lets call it 53 sub 1. 53 sub 1 will look at the first

byte and will discover that there is no payload at that point in that

frame, because it is the first frame 51, 53 sub 1.

Mr. Dunner:    Exactly.

TELC2946868

3

Judge Bryson: It will then ... if it has data that is ready to put in, source data that is ready to put into the payload, it will do so, otherwise it will pass it. If it puts it in, that first byte will change to full.

Mr. Dunner: Yes.

Judge Bryson: At that moment.

Mr. Dunner: Exactly.

Judge Bryson: And then when that gets to 53 sub 2, 53 sub 2, when that first byte gets to 53 sub 2, 53 sub 2 will say full.

Mr. Dunner: Exactly.

Judge Bryson: Even though at that point nothing has really happened with the payload.

Mr. Dunner: Exactly.

Judge Bryson: Alright.

Mr. Dunner: This invention does not operate with complete frames before you start filling. There is nothing in this disclosure, notwithstanding FORE's position, nothing in this disclosure that suggests that. And in fact, in order for that to happen, the generating framer and the inserting framer would have to be .85 miles apart for a single complete frame. And would have to be 1.70 miles apart for multiple frames, the minimum number of multiple frames the district court talked about.

TELC2946869

4

Judge Bryson:     Well, but you could certainly create those frames, stick them in

memory, and then pull them out, and fill them after they were

completed, could you not? That would be a way to do it within a

machine that wasn't a mile long.

Mr. Dunner:     Your Honor, there is nothing in this disclosure that suggests that,

or suggests how to do that. And I don't know how to do that. You

are saying something like that could be done. If so, there is

nothing in this disclosure that suggests that. And FORE has not

suggested any specific structure that would do that.

Judge Bryson:     And, you said that claim 4, which is I guess a means-plus-function,

therefore, can't possibly encompass that kind of function.

Mr. Dunner:     Exactly, claim 4 was properly identified as ... the structure

corresponding to the function in claim 4 of the generating, and

filling steps, was properly identified by the district court. That

structure will not perform the functions as defined by the district

court. It just won't happen. Now, FORE has all kinds of

hypotheticals, but they are not in the spec. And I would say that

FORE is ... you will hear from FORE's counsel, "Well, look at

figure 2, and look at the prosecution history which talk about a

train of frames, or a train of railroad cars." The figure 2 was

described in the spec as a schematic. It was described in the

prosecution history as an analogy. It was described in the spec as

an analogy. And the reason it is an analogy is it can't ... it's only a

5

TELC2946870

vision of what happens over time. Over time you get a train of frames. It's just that they are not formed in one instant. And they are not formed before the filling step starts. So, the analogy stops there. And in fact, if you interpret figure 2 literally, for reasons we spell out in the brief, it doesn't work.

The next definition the court had was "empty payload field." It said it means "zero data." Now, again we submit this reflects a misunderstanding of the invention. None of the streams have zero data in it. They all have bits because the spec describes, in column 7, you have a backbone transmission rate, every frame has bits, whether it's empty or full. What happens is it goes from one framer to another, if there isn't any packet ready it keeps going. But, it has bits in it. Those bits don't mean anything, but they are zero or they are one, because you have to maintain the transmission rate of the stream.

"Simultaneous insertion" versus "transmission." The court, this is, I would submit the most bizarre of the district court's holdings. "Simultaneous" clearly modifies "transmission." FORE has admitted that there has to be "simultaneous transmission." But FORE has gone further and says, "logically required from that simultaneous transmission is the fact that there must be simultaneous insertion, since you get transmission from multiple sources." The problem with that argument is ... the spec points

TELC2946871

out that these frames are filled on a first-come, first-served basis. There is a contention for empty DTDM frames. If you had simultaneous insertion, the invention would not work because you wouldn't ... these data sources would not maintain their own bit rate. That's inconsistent not only with the exact claim language, but with the description of how the invention works.

Judge Clevenger:  Can we come back to empty, Mr. Dunner?

Mr. Dunner:  Pardon?

Judge Clevenger:  Can we come back to empty payload field? "Empty" seems to me ... the common meaning of the word "empty" means there is nothing there. So, you are saying that there is something in the written description that tells me what empty means?

Mr. Dunner:  I am saying ...

Judge Clevenger:  Where in the written description?

Mr. Dunner:  A144, column 7, lines 29-35, and what you will see there at that point ...

Judge Clevenger:  There is a bit rate.

Mr. Dunner:  It says, "this train." It is talking about empty payload fields. "This train 10 has a bit rate." In other words, it's empty, but it has a bit rate. Because in order to have ... sometimes there won't be a packet ready. The stream must continue. There must be a bit in the stream. It just won't be a data bit, it won't be a source data bit.

TELC2946872

It will be a bit. And it will have information in it, but it won't be the source information.

Judge Bryson: It would just be garbage, I take it. I mean it will just be 1's and 0's that have no relationship to the stream of any information that's coming in from the source.

Mr. Dunner: Exactly, Your Honor. Now, I don't have a lot of time, but I would like to go into the '768 patent issues. There are three basic issues there. One is demultiplexing. The court held that there had to be frame demultiplexing. Using the analogy of the court, it said that if you had an STS-3 multiplex deposit, you had to break it down to three STS-1's, just to simplify it. What the court misunderstood is, and the best example of this is in column 3, lines 2-19, and also at column 9, lines 41-54, makes incontrovertibly clear that there are two kinds of demultiplexing. There is bit stream demultiplexing that this invention is all about—converting from serial to byte parallel format. And there is frame demultiplexing, which this invention is not at all about. The frame demultiplexing takes place after step g, in claim 13. Step g is the last step of claim 13.

Judge Bryson: On claim 13, I think maybe FORE characterized it as daunting, which I think is a fair characterization.

Mr. Dunner: Characterized as what?

Judge Bryson: "Daunting." It's difficult claim language to get into. But the part, after laboring over it, the part that I had the most trouble with was

8

TELC2946873

|  | "subpart e." Can you explain what subpart e really means, because the briefs didn't lay this out for me, and I need help. |
|---|---|
| Mr. Dunner: | Yes, subpart e, if you will visualize that the overhead of the frame has a series of bits, F1, F1, F1, F2, F2. |
| Judge Bryson: | Right. |
| Mr. Dunner: | And the goal is to identify, to compare what you have with a known set of bits, which tells you where the start of the frame is. |
| Judge Bryson: | Right. |
| Mr. Dunner: | So, when you find the F1 byte and you immediately thereafter find an F2 byte, you have found your benchmark. |
| Judge Clevenger: | But you've only found it on a higher-level frame, right? |
| Mr. Dunner: | Yes. |
| Judge Clevenger: | The lower-level, the STS-1 frames have got basically the first bit pattern F1. So, if you look at e, my problem was, if you look at e, your contiguous plurality … that's F1, F2, F2, isn't it? Comparing bit patterns for the contiguous plurality. |
| Mr. Dunner: | If you look at e … well, what you have is a stream which says F1, F1, F1, F2, F2, F2, because you interleaved these things. Well, I'm … |
| Judge Clevenger: | What I'm trying to get at is, when you talk about … you get down there and it says, of each of said contributory frames … |
| Mr. Dunner: | Yes. |

9

TELC2946874

| | |
|---|---|
| Judge Clevenger: | It began to look to me like the contributory frames have to be higher-level frames. |
| Judge Bryson: | That was my ... that was my concern, exactly.  Why is that not so? |
| Mr. Dunner: | Your Honor, what you have is ... you have F1 from the first frame, you have F1 from the second frame, you have F1 from the third frame.  And then you will have F2 from the first frame, F2 from the second, and F2 from the third.  And when you have the interface between the last F1 and the first F2, you know that you have reached the beginning of a frame.  And so, the plurality of bytes of each of said contributory frames, the three F1's are from three different contributory frames.  The three F2's are from three contributory frames. |
| Judge Clevenger: | There aren't.  Those aren't contiguous.  They are contiguous if they're F1, F2, F2.  The three separate F1's aren't contiguous.  Contiguous, I think has to mean F1, F2, F2. |
| Mr. Dunner: | Your Honor, it does, because the third F1 ... |
| Judge Clevenger: | But, if that's so, then when the claim goes on to say "of each of said contributory frames," now doesn't that mean that the contributory frames have to be higher-level frames, not the lower-level STS-1? |
| Mr. Dunner: | No, the contributory frames are clearly lower-level frames. |
| Judge Clevenger: | Why?  Wherein does the patent say that? |
| Mr. Dunner: | Well, that's the definition of a contributory frame. |

TEL C2946875

Judge Clevenger:    Where in the patent?

Mr. Dunner:    Uh ... I would assume right at the beginning of the patent, where it discusses the concept ...

Judge Clevenger:    Well, the claim limiting preamble ...

Mr. Dunner:    ... of the frames ...

Judge Clevenger:    Right, simply talks about contributory frames.

Mr. Dunner:    Uh ... Your Honor, I cannot at this point, tell you exactly where it is.

Judge Mayer:    Well, why don't we hear from the other side now, and you can maybe look for it, and when you comeback for your rebuttal.

Mr. Dunner:    Fine.

Judge Mayer:    Mr. Hillman.

Mr. Hillman:    Good morning, Your Honors. I agree with Mr. Dunner that the contributory frames have to be the lower-level frames. And I hadn't focused on the point that you raise. And I see that there may be a slight glitch in the claim. But ...

Judge Clevenger:    Why is it so? Why do they have to be lower-level frames?

Mr. Hillman:    Well, the claim itself talks about interleaving the data bytes from the contributory frames into this interleave.

Judge Clevenger:    Why can't you interleave a whole mass of higher-level frames?

Mr. Hillman:    Well ...

TELC2946876

Judge Clevenger:     That's what the science does. Science mixes up the higher-level frames. And you then demultiplex. You take them apart as it comes through later.

Mr. Hillman:     Well, let's put it this way. The claim is talking about two levels. The contributory frames, and then something that is byte multiplexed from those frames. And what I would submit is that within the relativity of the claim, the contributory frames are lower in level than the multiplex stream that is formed by interleaving the frames.

Judge Clevenger:     How do you explain step e in the claim then, in claim 13?

Mr. Hillman:     Focusing on what you all just proposed, I think it's a glitch in the claim that makes it inapplicable if you read it literally that way.

Judge Bryson:     I'm having a hard time with the glitch, here. What ...

Mr. Hillman:     Mistake I think in draftsmanship.

Judge Bryson:     ... a mistake that leads us to what conclusion about how the claim should be read, that's ...

Mr. Hillman:     And, if you read it the way you are suggesting it wouldn't read on anything here, including any of the embodiments, because although F1 and F2 is a pattern that could be said to occur in each of the contributory frames ...

Judge Bryson:     When you say contributory frame, tell us what exactly you mean by contributory frame in this context. Do you mean an STS-1 frame?

12

TELC2946877

| | |
|---|---|
| Mr. Hillman: | Yes, each STS-1 frame would have an F1 and an F2. |
| Judge Bryson: | Right. |
| Mr. Hillman: | But, what it wouldn't have is an F1, F2, and F2. It's that second F2. |
| Judge Clevenger: | Does it have to have the F2? |
| Mr. Hillman: | I don't think … |
| Judge Clevenger: | The STS frame only has to have the F1, right? |
| Mr. Hillman: | The STS-1 frame has the F1. |
| Judge Clevenger: | It doesn't have to have an F2? |
| Mr. Hillman: | But, in any event … |
| Judge Clevenger: | You said a minute ago, that the STS frame has an F1 and an F2. I didn't understand it to have anything more than an F1. |
| Mr. Hillman: | No, I think that each STS-1 frame has an F1 and an F2. And then what happens is all the F1's are taken out and interleaved. And then all the F2's, and then the third byte from each of the contributory frames, and so on down the line. What I would like to point out with respect to this claim, is that it actually tracks what's going on in the embodiment. And what happens is that first you accomplish what's called byte synchronization to make sure you've got the right eight bits that make up a byte. And that's done in the embodiment by looking for F1 by itself. And then, after that, in order to accomplish the ultimate demultiplexing back |

13

TELC2946878

into the contributory frames, you need to find out where the boundaries of the higher-level frames are. And to do that, the patent, in the embodiment, goes to the F1, F2, and F2. So that there are two steps here. First, byte synchronization, and second, frame synchronization. Now, what ... and the byte synchronization in the embodiment includes the serial to parallel conversion ...

Judge Bryson:     Right.

Mr. Hillman:      ... that my opponent says is what the claim means by demultiplexing.

Judge Bryson:     Right.

Mr. Hillman:      But what I would like to point out, first of all, is this section in column 5 that we have emphasized in our brief, which says that "Upon completion of the formatting," I'm down to line 41, "the formatting of the high-speed input serial data stream to a low-speed, properly synchronized byte parallel data stream." By "completion of that," and that's what he says is the demultiplexing of the claim. There remains the problem of identifying the boundaries of each frame of the original transmission, in order that the payload, as well as the relevant overhead information bytes, may be demultiplexed ...

Judge Clevenger:  Is that identifying the benchmark?

Mr. Hillman:      That's identifying the benchmark, so it says . . .

14

TELC2946879

Judge Clevenger:  I don't think Mr. Dunner means to say that the '768 doesn't require

the identification of a benchmark.

Mr. Hillman:  That's right, I know he doesn't say that. But, here is what I would

like to point out. That section of column 5 talks about, first, the

byte synchronization and serial to parallel, which he says is

demultiplexing. And then goes on and he says you've got to do the

benchmark in order to demultiplex these into the separated frames.

Now, if we look at the pattern in the claim, we find that it tracks

very much the section in column 5 that I just read. It has steps a to

d, which complete the job of the byte synchronization and the

serial to parallel conversion. But then the claim goes on with three

more steps which have to do only with the benchmark, which has

as its only purpose the actual separation of the frames into the sub

frames. And so, when the claim starts out by saying, hey, we are

talking about a method of demultiplexing, and then it goes on to

list seven steps that are part of that method, it's plain that the

demultiplexing they're talking about must not be the

demultiplexing that he says stops at step d, but includes the other

steps that have nothing to do with the serial to parallel, but

everything to do with the ability to ultimately separate the frames.

And so, we argue two things with respect to this patent. Number

one, the signal train needs to be made up of interleaved bytes from

TELC2946880

15

actual contributory frames. That's what the claim says. And it

refers to those contributory frames over and over again. It ...

Judge Bryson:     And your accused device does not, you say?

Mr. Hillman:      That's right.

Judge Bryson:     So we have interleaving at the front end ...

Mr. Hillman:      We don't have any interleaving ...

Judge Bryson:     I understand, you don't do that. So if this requires interleaving at

the beginning, at the front end, regardless of what the claim reads

on with respect to demultiplexing, you say you are out, anyway.

Mr. Hillman:      All of it.

Judge Bryson:     But, so go ahead, you were going to say?

Mr. Hillman:      And what I would say with respect to interleaving is that it has to

actually occur. These contributory frames are referred to five or

six times in the actual claim itself. It talks about their containing

bytes. It talks about the beginning byte of each contributory frame.

It talks about the boundaries of those frames. It talks about those

frames ... about a bit pattern known to have been in the frame. It

talks about a bit pattern known to correspond to a contiguous

plurality of bytes in the frames. How can we possibly say that this

claim can read on a situation when we don't have real contributory

frames that are actually interleaved? That's basically our position,

as well as on the demultiplexing, I've given you our position as to

why the sense of demultiplexing, as used in the claim, which

16

|  | includes steps e through g, must be the demultiplexing that relates |
|---|---|
|  | to the separation of the frames. I would like to go on ... |
| Judge Clevenger: | On the '306 patent, sir, what's wrong with Mr. Dunner's argument |
|  | for his client that empty can't mean totally devoid of anything, |
|  | which seems to be the meaning the trial court put on it? Because |
|  | by definition there are 0's and 1's, just what I would call junk |
|  | signals, trash, in the box. |
| Mr. Hillman: | What I would say Your Honor, is what the trial court said, is that |
|  | it's empty of data. It says that there is zero data. Garbage bits do |
|  | not represent data. And I think Mr. Dunner, himself, said that in |
|  | his remarks up here. So, yes there can be garbage bits there. They |
|  | might not even be bits, they might just be uncontrolled voltage |
|  | levels that don't precisely correspond to either a 0 or a 1. It's like |
|  | having static on a radio station when there is no data being |
|  | transmitted. They are basically place holders for time slots for the |
|  | actual data to be put in. |
| Judge Bryson: | So the frame is just a period of time, really? |
| Mr. Hillman: | The frame is ... there is nothing in there that says exactly what it |
|  | is. But in some way there must be place holders in there for the |
|  | period of time. And, most likely, what it is is garbage bits that are |
|  | just in there. And, again if we go through the classic ... |
| Judge Clevenger: | Well now, if you interpret the claim to say that you can have the, |
|  | what I call the garbage bits, and you would still have zero data ... |

TELC2946882

| | |
|---|---|
| Mr. Hillman: | That's right. |
| Judge Clevenger: | Then is the concession from Bellcore of noninfringement still upholdable? |
| Mr. Hillman: | Yes it is, absolutely. |
| Judge Clevenger: | Because the accused device does what? |
| Mr. Hillman: | The accused device never generates frames as a first step. It simply assembles these packets of information, without having contributory frames, without any sort of thing, except that it has these F1's and F2's, in order to be compatible with existing transmissions systems. That's the only reason for it. |
| Judge Clevenger: | You never have anything that's empty? |
| Mr. Hillman: | No, none whatsoever. Nothing that's empty. And, again empty has a plain meaning. Mr. Dunner says, well the court is reading words into the claim. I think the situation is exactly the opposite. A frame is a frame. If you look at figure 1, it shows you what a frame is. It has the overhead information. It has the payload field. He's reading ... What he's ... |
| Judge Bryson: | What? Go ahead. |
| Mr. Hillman: | What he's trying to read in is partial frame, or beginning to generate a frame. Those are the words that he is reading in. We don't need to read the word "complete" in, because a frame is a frame. |

18

TELC2946883

| | |
|---|---|
| Judge Bryson: | But, when … in your device, when the generator of data, whatever the device is that's packetized, or whatever it is that's generating data, wants to insert data into the multiplex stream, does it detect that there is a space which is available for insertion? How does it … |
| Mr. Hillman: | There is no such thing as a multiplexed stream or space. All that happens is that we've got packets of information and they get assembled one after the other. |
| Judge Bryson: | Right, and … |
| Mr. Hillman: | There are no … there is no train coming along with spaces or anything. |
| Judge Bryson: | You're not inserting something into a stream of data? |
| Mr. Hillman: | We are not. |
| Judge Bryson: | You're just packetizing … |
| Mr. Hillman: | We're just creating the stream as we go along. |
| Judge Bryson: | Well, when you say creating the stream … |
| Mr. Hillman: | You have a packet, you put it onto the stream … |
| Judge Bryson: | Right, suppose you take the model that's in the '306 patent, figure 2. You've got three different streams of data coming in at different speeds. And you're going to have an output. You do that, right? You have three data coming in, three different types of data, and you have one output, right? |

19

TELC2946884

Mr. Marchese:     [Inaudible] coming in, and the frames are assembled while

                  [inaudible] packeting.

Mr. Hillman:      So there is nothing that corresponds to what's on the right hand

                  side of figure 2.

Judge Bryson:     At the top.

Mr. Hillman:      That's right.

Judge Bryson:     But there is something that corresponds to the right hand figure at

                  the bottom, I take it?

Mr. Hillman:      That's right,

Judge Bryson:     So, you're ... but still, to the extent that Mr. Dunner is correct that

                  the proper reading of this patent is that, when they say, when we

                  speak of generating frames, that all that means is that you detect

                  the fact that there is an opportunity to insert data for the next X

                  period of time.  If that's fair to say that that's generating the frame.

                  You do that?

Mr. Marchese:     [Inaudible.]

Judge Mayer:      If you are going to answer the question ...

Mr. Hillman:      He knows more about what our system is.

Judge Mayer:      Well, that's ... but please come over to the microphone so we can

                  get it down.

Judge Bryson:     I'm trying to understand how far apart your accused device is from

                  the construction we're debating here with respect to the '306

20

TELC2946885

patent. Let me put it this way. If you take away the top right hand

side of figure 2, and you assume that what's happening is that the

DTDM assembler is simply putting together all of the packets that

come in from the three sources on the fly, so to speak. And, then

putting then putting them into a single stream, then that would be

your device, I take it?

Mr. Marchese:    Actually, not quite. Our device on the left, what's coming in is

frame packets. And the packets are ... the frames are stripped off

the packets. The packets are switched through what is called a

switching fabric, and then they are actually ... what you do is just

pop byte, byte frame overhead, byte packet, byte packet, byte

packet, byte frame overhead, byte packet, byte packet.

Judge Bryson:    So, it has been packetized prior to the time it gets framed?

Mr. Marchese:    Framed and packetized, received and switch, and then the frames

are thrown away. The packets are switched around, and then they

end up to where ever the output is. And then you build a frame

and put packets ... basically, you just do it all on the fly.

Judge Bryson:    Okay.

Mr. Hillman:    [Inaudible] looks for opportunity. And I would like to call

attention again to the prosecution history, which I think is very

compelling here. It's on page 31 of our brief, where in

distinguishing prior art they said that the invention consists of first

generating a bit stream comprised of frames with empty payload

21

TELC2946886

fields, the packets are then inserted into the empty payload fields
of the frames. This corresponds to what is shown in the upper
right hand section of the figure we were just talking about. It
corresponds to the text on top of 7 describing that figure. It
corresponds to the analogy of the train with box cars, as set forth in
the patent. Now, maybe they don't like the claim. It's read that
way. They don't like the specification, but, and maybe that means
that you've got to have a memory or a buffer, if we're operating
this system all within a close confine. But, of course, there is
nothing in the patent that says that that's what we are doing. In
fact, if you look at column 1, this patent is a visionary it says, well,
the whole copper network on the telephone system is going to go
by the boards, and we're looking for migration into the future.
And who knows what we're going to have. And what we are
going to do is generate this backbone signal, which is the train of
empty frames. And there is no reason in the world why we
couldn't expect that backbone signal to be generated at a central
station, sent out to a wide variety of sources for putting
information on to the train. These things could be separated by
hundreds of miles, let alone .85 miles.

Judge Clevenger:     Well, the question is whether or not the language of the claim
requires the complete generation of a frame before you begin to fill
it.

22

TELC2946887

Mr. Hillman:        That's right, Your Honor.

Judge Clevenger:    There may be language in the written description that's a preferred

                    embodiment or suggests that that's what they think is a cool thing

                    to do.  But unless the claim language itself so limits, we wouldn't

                    narrow the claim.

Mr. Hillman:        That's right, and what I would argue is number one, when the

                    claim says generate a sequence of empty frames, it means frames,

                    not partial frames.  Number two, there is no hint anywhere in the

                    specification of doing it any other way.  That's not by itself

                    controlling, but it is consistent with what I'm suggesting for the

                    plain meaning.  And, number three, the prosecution history is very

                    explicit about the sequence of events here.  It says, first generate

                    the sequence of empty frames, then fill them.  So on all three

                    counts, I would urge that the claim is properly construed the way

                    the district court did construe it.  One word on ...

Judge Clevenger:    The frame is not like a box car, I mean a box car in which you're

                    going to put coal or wheat or something like that has to have four

                    sides and at least a bottom, all bonded so it doesn't leak. You can

                    pour data into this frame before it has all four walls, if you will, on

                    the bottom formed and connected.

Mr. Hillman:        The frame doesn't have any walls, I would agree with that.

Judge Clevenger:    That's what I mean, so ...

23

Mr. Hillman:     But what the frame does have is what is shown in figure 1. It has an overhead field, and it has a payload field. And until we have those two fields, we don't have a frame. And therefore, these empty bytes, whether they are noise or garbage ...

Judge Clevenger:     The disagreement is what how fully constructed your payload field has to be before you can start filling data into it?

Mr. Hillman:     Well, I would say at the very minimum we've got to have some of the payload field. But even then it's ... that would be a partial frame. Uh, and the claim says a frame. And then, again, the prosecution history says that we've got to have more than one of these empty frames as our first step.

Judge Mayer:     Alright, let's hear from Mr. Dunner. We have given you extra time as well, so that we can be fairly even here.

Mr. Dunner:     Thank you, Your Honor. I appreciate that. Just to make sure that we have the paragraph e issue resolved in the '768 patent. The patterns of each contributory frame, like STS-1 frame, is F1, F1, F1, F2. When you put an STS-3 frame in place of that, that is you have three STS-1 frames interleaved, you will have F1, F1, and then F2, F2, F2. And what the equipment looks for, it looks for the F1 byte next to the F2 byte, and it confirms that by finding a second F2 byte following that. So, the F1 next to F2 is also with the STS-1, in each contributory frame. And, I think that explains paragraph e, hopefully to your satisfaction. If not ...

TELC2946889

Judge Bryson:          That's fine, thank you.

Judge Clevenger:       Mr. Dunner, what is your response on the empty question in the

                       '768, if we're talking about empty data, and we're agreed that what

                       we call junk electricity isn't data?

Mr. Dunner:            My response is that there has to be something there as what we

                       called place holder or something. There has to be something there

                       in order to have a transmission stream moving along to have a

                       backbone transmission rate. There has to be something. And

                       whether it's junk or something else, it's not very important as long

                       as you can maintain your backbone transmission rate. What the

                       claim is talking about is the absence of source data—the absence

                       of data from one of your transmission streams from a telephone,

                       from a computer, or what have you.

                       Now, the argument has been made that interleaving must occur.

                       This invention ... the claims do not exclude creating these

                       interleaved patterns on the fly. The claim merely talks of the

                       multiplicity of data bytes being derived from a plurality of

                       identically formatted contributory frames. And if you look at

                       claim 21, you will see it's referring to "derived from the format."

                       It doesn't make any difference whether they are pre-existing or

                       not. When you look at a data stream created from pre-existing

                       frames, or on the fly, you will see exactly the same thing. There is

                       no difference based on that.

TELC2946890

And I guess my last point, reference was made to column 5 of the '768 patent the "upon completion" paragraph, on lines 41 to 47. That paragraph does not say that the invention includes framed demultiplexing. In fact, it says that the first steps are done converting from serial to synchronized byte parallel data stream, in order that these other things could happen. Those other things happen downstream after the invention is complete, after step two.

Thank you, Your Honor.

Judge Mayer:        Thank you Mr. Dunner. The case is submitted.

482292_5.DOC

TELC2946891

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BELL COMMUNICATIONS RESEARCH, INC.          )
   (now Telcordia Technologies, Inc.),                      )
                                )
              Plaintiff,                             )          Civil Action No. 01-0401 SLR
                                  )          98-586 JJF
           v.                                            )
                                  )
FORE SYSTEMS, INC                                        )
   (now Marconci Communications, Inc.),                 )
                                )
             Defendant.                          )

## DECLARATION OF ERIK R. PUKNYS

    1.    I am an associate with Finnegan, Henderson, Farabow, Garrett & Dunner,

and a member in good standing of the bars of the State of California and the District of

Columbia.

    2.    I have listened to a tape recording of the oral argument before the United

States Court of Appeals for the Federal Circuit in *Bell Communications Research, Inc.*

*(now known as Telcordia Technologies, Inc.) v. FORE Systems, Inc. (now known as*

*Marconi Communications, Inc.),* App. Nos. 02-1083, -1084, which was conducted on

February 3, 2003. The tape was obtained from the Clerk of Court of the Federal Circuit.

    3.    Attached to this declaration as Exhibit A is a transcript of the oral

argument, which was prepared by Finnegan, Henderson. I have read the transcript and

compared it to the tape, and I believe that the transcript is accurate.

    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct. Executed on this 31st day of July, 2003.

TELC2946864

## CERTIFICATE OF SERVICE

It is hereby certified this 1st day of August, 2003 that two copies of the foregoing document, **DECLARATION OF ERIK R. PUKNYS**, were served on counsel as indicated:

**VIA HAND DELIVERY**
William J. Marsden, Jr., Esq.
Fish & Richardson P.C.
919 Market Street, Suite 1100
Wilmington, Delaware 19801

**VIA FEDERAL EXPRESS w/ a courtesy copy via facsimile**
John E. Gartman, Esq.
Fish & Richardson P.C.
4350 La Jolla Village Drive, Suite 500
San Diego, CA 92122



Richard K. Herrmann

TELC2946892

# EXHIBIT C



*The*

# AMERICAN
# HERITAGE
# College
# *dic·tion·ar·y*

- **COMPLETELY** Revised and Updated
- **7,500 New** Words and Senses
- **EXPERT** Usage Guidance
- **UP-TO-DATE** Biographical and Geographical Entries
- **MORE THAN 2,500** Photographs, Drawings, and Maps

Words are included in this Dictionary on the basis of their usage. Words that are known to have current trademark registrations are shown with an initial capital and are also identified as trademarks. No investigation has been made of common-law trademark rights in any word, because such investigation is impracticable. The inclusion of any word in this Dictionary is not, however, an expression of the Publisher's opinion as to whether or not it is subject to proprietary rights. Indeed, no definition in this Dictionary is to be regarded as affecting the validity of any trademark.

American Heritage® and the eagle logo are registered trademarks of Forbes Inc. Their use is pursuant to a license agreement with Forbes Inc.

Copyright © 2002 Houghton Mifflin Company. All rights reserved.

No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or by any information storage or retrieval system without the prior written permission of Houghton Mifflin Company unless such copying is expressly permitted by federal copyright law. Address inquiries to Reference Permissions, Houghton Mifflin Company, 222 Berkeley Street, Boston, MA 02116.

Visit our website: www.houghtonmifflinbooks.com

The American Heritage college dictionary.-- 4th ed.
    p.cm.
    Based on the fourth ed. of the American Heritage dictionary.
    ISBN 0-618-09848-8 (thumb edge) --
    ISBN 0-618-19604-8 (deluxe binding)
    1. English language--Dictionaries. 2. Americanisms. I Houghton Mifflin Company. II. American Heritage dictionary.

PE1628 .A6227 2002
423--dc21
                                        2001039826

Manufactured in the United States of America

**8**

accentuate

accommodation ladder



acciaccatura
A. grace note
B. principal note

**ac·cen·tu·ate** (ăk-sĕn′chōō-āt′) *tr.v.* **-at·ed, -at·ing, -ates** 1. To stress or emphasize; intensify. 2. To pronounce with a stress or accent. 3. To mark with an accent. [Med.Lat. *accentuāre, accentuāt-* < Lat. *accentus,* accent. See ACCENT.] **—ac·cen′tu·a′tion** *n.*

**ac·cept** (ăk-sĕpt′) *v.* **-cept·ed, -cept·ing, -cepts** *—tr.* 1. To receive (something offered), esp. with gladness or approval: *accepted a glass of water; accepted their contract.* 2. To admit to a group, organization, or place: *accepted me as a new member.* **3a.** To regard as proper, usual, or right: *Such customs are widely accepted.* **b.** To regard as true; believe in: *accepted the new theory.* **c.** To understand as having a specific meaning. 4. To endure resignedly or patiently: *accept one's fate.* **5a.** To answer affirmatively: *accept an invitation.* **b.** To agree to take (a duty or responsibility). **6.** To be able to hold (something applied or inserted): *This wood will not accept oil paints.* 7. To receive officially: *accept the report.* **8.** To consent to pay, as by a signed agreement. 9. *Medicine* To receive (a transplanted organ or tissue) without rejection by the immune system. *—intr.* To receive something, esp. with favor. Often used with *of.* [ME *accepten* < Lat. *acceptāre, freq. of acipere,* to receive : *ad-, ad- + capere,* to take; see kap- in App.]

**ac·cept·a·ble** (ăk-sĕp′tə-bəl) *adj.* 1. Worthy of being accepted: *an acceptable compromise.* 2. Adequate to satisfy a need, requirement, or standard; satisfactory. **—ac·cept′a·bil′i·ty, ac·cept′a·ble·ness** *n.* **—ac·cept′a·bly** *adv.*

**ac·cept·ance** (ăk-sĕp′təns) *n.* 1. The act or process of accepting. 2. The state of being accepted or acceptable. 3. Favorable reception; approval. 4. Belief in something; agreement. **5a.** A formal indication by a debtor of willingness to pay a time draft or bill of exchange. **b.** A written instrument so accepted. 6. *Law* Compliance by one party with the terms and conditions of another's offer so that a contract becomes legally binding between them.

**ac·cep·tant** (ăk-sĕp′tənt) *adj.* Accepting willingly.

**ac·cep·ta·tion** (ăk′sĕp-tā′shən) *n.* 1. The usual or accepted meaning, as of a word or expression. See Syns at **meaning.** 2. Favorable reception; approval.

**ac·cept·ed** (ăk-sĕp′tĭd) *adj.* Widely encountered, used, or recognized: *an accepted treatment for pneumonia.*

**ac·cept·er** (ăk-sĕp′tər) *n.* One that accepts. 2. Variant of **acceptor 1.**

**ac·cep·tor** (ăk-sĕp′tər) *n.* 1. also **ac·cept·er** One who signs a time draft or bill of exchange. 2. *Chemistry* **a.** The reactant in an induced reaction that has an increased rate of reaction in the presence of the inductor. **b.** An atom, molecule, or ion that receives a component from a donor, esp. an atom that receives two electrons for the formation of a molecular bond.

**ac·cess** (ăk′sĕs) *n.* 1. A means of approaching, entering, exiting, or making use of; a passage. 2. The act of approaching. 3. The right to approach, enter, exit, communicate with, or make use of. 4. Increase by addition. 5. An outburst or onset: *an access of rage.* ❖ *tr.v.* **-cessed, -cess·ing, -cess·es** To obtain access to, esp. by computer: *accessed her bank account online.* [ME *acces,* a coming to < OFr. < Lat. *accessus,* p. part. of *accēdere,* to arrive : *ad-, ad- + cēdere,* to come.]

**ac·ces·si·ble** (ăk-sĕs′ə-bəl) *adj.* 1. Easily approached or entered. 2. Easily obtained: *accessible money.* 3. Easy to talk to or get along with. 4. Easily swayed or influenced. **—ac·ces′si·bil′i·ty, ac·ces′si·ble·ness** *n.* **—ac·ces′si·bly** *adv.*

**ac·ces·sion** (ăk-sĕsh′ən) *n.* 1. The attainment of a dignity or rank: *the queen's accession to the throne.* **2a.** Something that has been acquired or added; an acquisition. **b.** An increase by means of something added. 3. *Law* **a.** The addition to or increase in value of property by means of improvements or natural growth. **b.** The right of a proprietor to ownership of such addition or increase. 4. Agreement or assent. 5. Access; admittance. 6. A sudden outburst. ❖ *tr.v.* **-sioned, -sion·ing, -sions** To record (paintings, for example) in the order of acquisition. **—ac·ces′sion·al** *adj.*

**ac·ces·so·rize** (ăk-sĕs′ə-rīz′) *v.* **-ized, -iz·ing, -iz·es** *—tr.* To furnish with accessories. *—intr.* To wear or select accessories.

**ac·ces·so·ry** (ăk-sĕs′ə-rē) *n., pl.* **-ries** 1a. A subordinate or supplementary item; an adjunct. b. Something nonessential but desirable that contributes to an effect or result. 2. *Law* **a.** One who incites, aids, or abets a lawbreaker in the commission of a crime but is not present at the time of the crime. **b.** One who aids a criminal after the commission of a crime but was not present at the time of the crime. ❖ *adj.* 1. Having a secondary, supplementary, or subordinate function. 2. *Law* Serving to aid or abet a lawbreaker, either before or after the commission of the crime, without being present at the time the crime was committed. [ME *accessorie* < Med.Lat. *accessōrius < accessor,* helper < Lat. *accessus,* approach. See ACCESS.] **—ac′ces·so′ri·al** (-ə-sôr′ē-əl, -sōr-) *adj.* **—ac·ces′so·ri·ly** *adv.* **—ac·ces′so·ri·ness** *n.*

**accessory after the fact** *n., pl.* **accessories after the fact** *Law* See accessory 2b.

**accessory before the fact** *n., pl.* **accessories before the fact** *Law* See accessory 2a.

**accessory fruit** *n.* A fruit, such as the pear or strawberry, that develops from a ripened ovary or ovaries but includes a significant portion derived from nonovarian tissue.

**accessory nerve** *n.* Either of the 11th pair of cranial nerves,

which convey motor impulses to the pharynx and **muscles** of the upper thorax, back, and shoulders.

**access time** *n. Computer Science* The average time lag between a request for information stored on a component, such as the hard drive, and its delivery.

**ac·ciac·ca·tu·ra** (ə-chä′kə-tŏŏr′ə) *n. Music* An ornament note one half step or one whole step below a principal note, sounded at the same time as the principal note, adding dissonance to a harmony. [Ital. < *acciaccare,* to crush.]

**ac·ci·dence** (ăk′sĭ-dəns, -dĕns′) *n.* The section of morphology that deals with the inflections of words. [ME < Lat. *accidentia* < Lat. *accidēns, accident-,* accident. See ACCIDENT.]

**ac·ci·dent** (ăk′sĭ-dənt, -dĕnt′) *n.* **1a.** An unexpected, undesirable event, esp. one resulting in damage or harm. **b.** An unforeseen incident. 2. Lack of intention; chance: *met by accident.* 3. *Logic* A circumstance or attribute that is not essential to the nature of something. [ME, chance event < OFr. < Lat. *accidēns, -ent-,* pr. part. of *accidere,* to happen : *ad-, ad- + cadere,* to fall.]

**ac·ci·den·tal** (ăk′sĭ-dĕn′tl) *adj.* 1. Occurring unexpectedly, unintentionally, or by chance. 2. *Music* Of or relating to an accidental. ❖ *n.* 1. A property, factor, or attribute that is not essential. 2. *Music* **a.** A sign indicating the alteration of a note by one or two semitones or the cancellation of a previous sign. **b.** A note that has been marked with such a sign. **—ac′ci·den′tal·ly, ac′ci·dent′ly** *adv.*

**accident insurance** *n.* Insurance against bodily injury or death because of accident.

**ac·ci·dent-prone** (ăk′sĭ-dənt-prōn′) *adj.* Having or susceptible to having a greater than average number of accidents or mishaps.

**ac·cip·i·ter** (ăk-sĭp′ĭ-tər) *n.* A hawk of the genus *Accipiter,* characterized by short wings and a long tail. [Lat., hawk. See pet- in App.] **—ac·cip′i·trine′** (-trīn′, -trĭn) *adj.*

**ac·claim** (ə-klām′) *v.* **-claimed, -claim·ing, -claims** *—tr.* 1. To praise enthusiastically and often publicly; applaud. See Syns at **praise.** 2. To acknowledge or declare with enthusiastic approval: *He was acclaimed teacher of the year.* *—intr.* To shout approval. ❖ *n.* 1. Enthusiastic applause; acclamation. [< Lat. *acclāmāre : ad-, ad- + clāmāre,* to shout; see **kelə-** in App.] **—ac·claim′er** *n.*

**ac·cla·ma·tion** (ăk′lə-mā′shən) *n.* 1. A shout or salute of enthusiastic approval. 2. An oral vote, esp. an enthusiastic vote of approval without formal ballot. [Lat. *acclāmātiō, acclāmation- < acclāmātus,* p. part. of *acclāmāre,* to shout at. See ACCLAIM.] **—ac·clam′a·to′ry** (ə-klăm′ə-tôr′ē, -tōr′ē) *adj.*

**ac·cli·mate** (ə-klī′mĭt, ăk′lə-māt′) *v. & intr.v.* **-mat·ed, -mat·ing, -mates** To accustom or become accustomed to a new environment or situation; adapt. [Fr. *acclimater : a-,* to (< Lat. *ad-;* see AD-) + *climat,* climate < OFr.; see CLIMATE.]

**ac·cli·ma·tion** (ăk′lə-mā′shən) *n.* 1. The process of acclimating or of becoming acclimated. 2. Acclimatization.

**ac·cli·ma·ti·za·tion** (ə-klī′mə-tĭ-zā′shən) *n.* The physiological adaptation of an animal or plant to changes in climate or environment, such as light, temperature, or altitude.

**ac·cli·ma·tize** (ə-klī′mə-tīz′) *v.* **-tized, -tiz·ing, -tiz·es** *—tr.* 1. To acclimate. 2. To adapt (oneself), esp. to environmental or climatic changes. *—intr.* To become acclimated or adapted. **—ac·cli′ma·tiz′er** *n.*

**ac·cliv·i·ty** (ə-klĭv′ĭ-tē) *n., pl.* **-ties** An upward slope. [Lat. *acclīvitās < acclīvis,* uphill : *ad-, ad- + clīvus,* slope; see **klei-** in App.]

**ac·co·lade** (ăk′ə-lād′, -läd′) *n.* **1a.** An expression of approval; praise. **b.** A special acknowledgment; an award. 2. A ceremonial embrace, as of greeting. 3. Ceremonial bestowal of knighthood. ❖ *tr.v.* **-lad·ed, -lad·ing, -lades** To praise or honor. [Fr., an embrace, accolade < *accoler,* to embrace < OFr. *acoler* < VLat. *\*accolāre : Lat. ad-, ad- + Lat. collum,* neck; see **kel-** in App.]

**ac·com·mo·date** (ə-kŏm′ə-dāt′) *v.* **-dat·ed, -dat·ing, -dates** *—tr.* 1. To do a favor or service for; oblige. 2. To provide for; supply with. 3. To hold comfortably without crowding: *This diner accommodates 50 patrons.* 4. To make suitable; adapt. See Syns at **adapt.** 5. To allow for; consider: *a proposal that accommodates taxpayers' interests.* 6. To settle; reconcile. *—intr.* 1. To adapt oneself; become adjusted. 2. *Physiology* To become adjusted, as the eye to focusing on distant objects. [Lat. *accommodāre, accommodāt-,* to fit : *ad-, ad- + commodus,* suitable; see COMMODIOUS.] **—ac·com′mo·da′tive** *adj.* **—ac·com′mo·da′tor** *n.*

**ac·com·mo·dat·ing** (ə-kŏm′ə-dā′tĭng) *adj.* Helpful and obliging. **—ac·com′mo·dat′ing·ly** *adv.*

**ac·com·mo·da·tion** (ə-kŏm′ə-dā′shən) *n.* 1. The act of accommodating or the state of being accommodated. 2. Something that meets a need; a convenience. 3. **accommodations** *a.* Room and board; lodgings. *b.* A seat, compartment, or room on a public vehicle. 4. Reconciliation or settlement of opposing views. 5. *Physiology* The automatic adjustment in the focal length of the lens of the eye to permit retinal focus of images of objects at varying distances. 6. A financial favor.

**ac·com·mo·da·tion·ist** (ə-kŏm′ə-dā′shə-nĭst) *n.* One that compromises with or adapts to the viewpoint of the opposition. **—ac·com′mo·da′tion·ist** *adj.*

**accommodation ladder** *n.* A portable ladder hung from the side of a ship.