# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

August 25, 2006

The Honorable Gregory M. Sleet
United States District Court
844 King Street
Wilmington, Delaware 19801

**REDACTED PUBLIC VERSION**

Re: *Telcordia Technologies, Inc. v. Lucent Technologies, Inc.*, C.A. No. 04-875-GMS
*Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, C.A. No. 04-876-GMS

Dear Judge Sleet:

Pursuant to the Court's Revised Scheduling Order, plaintiff respectfully submits this letter opposing each of the defendants' requests for leave to file summary judgment motions.

I. **Non-infringement Of The '306 Patent**

Telcordia contends that the '306 patent summary judgment proceeding should be limited to the claim elements for which Telcordia concedes non-infringement, whereas the defendants wish to conduct a wide-ranging summary judgment proceeding that will confront all claim elements and all hotly disputed issues of fact. The defendants' proposal is unnecessary, wasteful, and inappropriate for several reasons.

First, Telcordia's concessions fully dispose of its claim for infringement of the '306 patent. After developing a factual record as to how and why the defendants' products do not infringe based upon Telcordia's concessions, nothing more is needed in order to enter judgment against Telcordia.

Second, in addition to being unnecessary, wide-ranging summary judgment is inappropriate because there are disputed issues of material fact as to each claim element other than those covered by Telcordia's concessions. The following are exemplary factual disputes:

- ATM cells are "data packets" having an "address header" because the VPI/VCI information in the cell header is regarded as an "address." For example, Lucent and Cisco publications refer to VPI/VCI information as an "addressing identifier" (Ex. 1) and as an "address" (Ex. 2). Although Dr. Acampora disputed the presence of an "address header" in an ATM cell in his expert report, it is clear that he artificially restricted the word "address" to be a narrow type of address, as he acknowledged that the VPI/VCI information is an "address" relating to a table existing in each ATM switch (Ex. 3).

- The accused systems do not "pre-multiplex" packets into SONET payload fields upstream of the framer. Instead, besides inserting overhead (frame alignment) bits into the frames, the framers additionally insert packet data into the payload fields of the frames, i.e., SONET framers read packets out of a FIFO at the correct times to insert them into payload fields in the frames (Exs. 4-8). The '306 patent framers insert packets into the payload fields of DTDM frames the same way (Ex. 9).

- The framers used in the accused systems perform the function of "replacing the empty payload field with data from a single source," i.e., ATM cells contain data from a single source (Ex. 10). An ATM framer divides the SONET frame into payload fields, each of which can contain an ATM cell (Exs. 11-12). When the framer fills a payload field with a cell it selects cell bytes from a FIFO instead of selecting idle cell bytes from an idle cell generator (Exs. 13-14). This "replaces" the payload field with data from a single source exactly as is done by the framer of the '306 patent (Ex. 15).

- The framers used in the accused systems operate like the '306 framers to "only put packets into frames which are empty," i.e., the framers of the '306 patent wait until the beginning of an empty payload

The Honorable Gregory M. Sleet
August 25, 2006
Page 2

field and then, if a packet is ready in the FIFO, read the packet data byte-by-byte into the payload field of the frame (Ex. 16). The framers in the accused systems also wait until the first payload field in the SONET frame begins before reading a packet, if one is present, from the FIFO (Exs. 17-19). All packets in the FIFO will be written into the frame for the duration of the frame interval (Ex. 20) whereupon, like the '306 patent, the amount of data inserted is not determinative of when insertion into the frame stops.

- The accused systems fill the payload fields in SONET frames "with a data packet from the source, among the plurality of sources, of the highest priority with a data packet ready to transmit." The Court's claim construction for "available empty payload field" applies to the Fig. 4 arrangement of the '306 patent when packets enter the FIFOs one at a time based on the order they are sent from the packetizers (Ex. 21). Dr. Acampora improperly places restrictions on how service of high priority sources must occur to assert non-infringement, as the accused systems also send packets to the FIFO one at a time in an order established in accordance with a transmission priority scheme (Exs. 22-28).

- The functions of the "generating means" of claim 4 are performed in the accused systems, i.e., framers of the accused systems generate a train of frames by first producing a sequence of "all-zero" overhead bytes which are replaced by frame alignment bytes before they exit the framer as the first bytes of a frame (Exs. 29-31). Following the overhead bytes, the framers use an idle cell generator or a flag byte generator to generate empty payload field bytes (Exs. 32-35).

- The functions of the "inserting means" are performed when the framers process received overhead and idle cell or flag signals to issue output frames that have payload fields occupied by either packet bytes or idle cell or idle flag bytes (Exs. 36-40). Inserted packets are from a plurality of sources (Ex. 41), fill "available" payload fields in accordance with a transmission priority scheme (Exs. 42-45), and can be transmitted at the source's own desired bit rate (Exs. 46-47).

Third, contrary to the defendants' suggestion, the absence of Telcordia expert reports on '306 patent infringement should not serve as a basis for finding summary judgment on claim elements as to which Telcordia does not concede. Indeed, the grant of summary judgment based on the absence of Telcordia's expert's response to defendants' contentions would be inconsistent with governing[1] Third Circuit precedent.[2] *See McMullen v. Bay Ship Mgmt.*, 335 F.3d 215, 217-18 (3d Cir. 2003); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994); *Ali v. Sims*, 788 F.2d 954, 957 (3d Cir. 1986); *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984); *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977); *ABB Air Preheater, Inc. v. Regenerative Envtl. Equip., Co.*, 167 F.R.D. 668 (D. N.J. 1996).

II.     **Presence Of Disputed Issues Of Material Fact Relating To The '306 Patent's Best Mode**

Disputed issues of material fact exist relative to each element of a best mode violation relating to the '306 patent.

**REDACTED**

---

[1] Third Circuit law governs a procedural issue such as this. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003).

[2] Telcordia is mindful of the Court's unwillingness to consider further submissions on the issue of whether Telcordia should be permitted to serve '306 patent infringement expert reports (D.I.s 221 and 209). Telcordia sets forth its positions in this letter, however, merely to preserve its rights on appeal and avoid waiver, as well as to emphasize that the Court's procedural ruling on expert reports should not, as the defendants suggest, serve as an "alternative" basis for a dispositive adverse decision against Telcordia on the merits.

The Honorable Gregory M. Sleet
August 25, 2006
Page 3

**REDACTED**

Even if the claims as construed by the Court covered the best mode, disputed issues of material fact also exist regarding whether the disclosure, coupled with the knowledge of one skilled in the art, adequately teach one skilled in the art to practice that best mode. Although defendants focus on the illustration, the full specification, not just the illustration, should be consulted to understand the operation of the delay unit (Ex. 51).

**REDACTED**

### III.  Presence Of Disputed Issues Of Material Fact Relating To '763 Patent Infringement

The claims of the '763 patent require insertion of error signals on subrate communications. The Court has required that the insertion of error signals occur "following demultiplexing" Lucent's and Cisco's expert points out that the specification of the '763 patent does no error signals to be done only following demultiplexing)(Ex. 54).

Circuitry referred to as a "pointer processor" inserts error signals into the subrate communications in the accused products following demultiplexing (Exs. 55-56). Consistent with Telcordia's position, Lucent's 30(b)(6) witness testified that the pointer processor demultiplexes a higher rate signal into subrate signals (Ex. 57). Lucent's and Cisco's expert, on the other hand, took the position that the structure underlying the pointer processor was irrelevant (Ex. 58). A disputed factual issue clearly remains concerning the demultiplexing function of the pointer processor.

Defendants attempt to distract from the key factual dispute by pointing to an additional demultiplexing element downstream of the insertion of error signals—a cross-connect—and contending that the insertion of error signals does not occur after operation of the cross-connect. But the cross-connect's downstream demultiplexing occurs in addition to, not in lieu of, the pointer processor's upstream demultiplexing. It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device.

### IV.  Presence Of Disputed Issues Of Material Fact Relating To '763 Patent Validity

A challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function. *See Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376-77 (Fed. Cir. 2001). Judged by this standard and its focus on the understanding of persons skilled in the art, it is a distorted fantasy for Defendants to assert that "[t]here is no dispute that the specification does not disclose 'circuitry at a controller.'" (D.I.s 227 and 214 at 3).

Dr. Prucnal testified that a person of ordinary skill reading the '763 patent would understand that the specification disclosed circuitry inside the controller for performing the evaluation (Exs. 59-60). Indeed, Defendants' expert, Dr. Grover, provided no response to Dr. Prucnal's analysis regarding the disclosure of monitoring circuitry in the specification, although he did address other issues (Ex. 61). While the question of definiteness is an issue of law, a jury would be in the best position to resolve the factual issues relating to the definiteness of the '763 patent. *See BJ Servs Co. v. Halliburton Energy Servs, Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003) ("[D]efiniteness . . . is amenable to resolution by the jury where the issues are factual in nature.")

The Honorable Gregory M. Sleet
August 25, 2006
Page 4

### V. '633 Patent Infringement

If summary judgment motions are permitted regarding infringement of the '633 patent, Telcordia's should be granted and defendants' denied. There is no disputed issue of material fact regarding where RTS codes of the accused products are transmitted in an ATM cell. The contemporaneous documentary evidence, including submissions to and recommendations by standards organizations, indicates that the particular portion of ATM cell overhead in which the RTS is transmitted (namely, the SAR PDU header) is part of the overhead for the SAR sublayer instead of the overhead for the convergence sublayer (CS). Repeatedly during the standardization process, it was understood that transmission of the RTS codes would occur outside of the convergence sublayer overhead (Exs. 62-67). Indeed, defendants' '633 patent, Dr. Jones, interprets use of the CSI bit to transport RTS codes as being cove claims even though the RTS is transmitted by the CSI bit in SAR PDU headers (Ex. 68). Defendants simply ignore this evidence.

Instead, Defendants attempt to create a dispute by misstating the testimony of Dr. Clark. Clark never testified that
**REDACTED**
Of course, the SAR and CS sublayers are "related"—but that is not the issue. The two layers are related because the convergence sublayer, which is above the SAR sublayer, uses the facilities of the SAR sublayer, as acknowledged by Dr. Jones (Ex. 70).

### VI.   The Named Inventors Alone Conceived The Claimed SRTS ('633 Patent) Invention

The entire claimed invention was conceived by Drs. Lau and Fleischer, who are the two named inventors on the '633 patent. In their letter request for permission to file a summary judgment motion, the defendants cite no documentary evidence and no fact witness testimony, since that evidence completely refutes defendants' position. Specifically, defendants do not even contend that anyone other than Telcordia conceived the claimed <u>residual</u> time stamp.

**REDACTED**

### VII.   Lucent Is Not Entitled To Summary Judgment Limiting Damages

Lucent contends that 35 U.S.C. § 287(a) limits the damages available to Telcordia. But 35 U.S.C. § 287(a) does not limit damages where there is no failure to mark, i.e., where the proper patent notice appears on products or where there are no products to mark. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1219-20 (Fed. Cir. 2002). There are disputed issues of material fact concerning these issues, and these questions of fact are properly resolved by a jury. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996). At the outset, Lucent cannot argue that Telcordia failed to mark under § 287(a) because
**REDACTED**
Lucent fails to mention the provisions in these licenses. Instead, Lucent points to a unique class of     **REDACTED**     and contends that Telcordia should have required defendant Lucent to mark Lucent's own products with Telcordia's patent numbers.

But § 287(a) does not apply to

**REDACTED**

an activity that is outside the scope of § 287(a) (Ex. 78), and, thus, is distinguishable from the situation in *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, No. 00-981-KAJ, 2003 WL 1606081 (D. Del. Feb. 4, 2003), where the licensee, IBM, sold unmarked products to the public. Thus, Lucent is not entitled to summary judgment limiting damages on the grounds that Telcordia did not provide actual notice to Lucent under 35 U.S.C. § 287(a).

Second, the date when Lucent received actual notice of infringement of the '633 patent is a disputed issue. When viewed under the totality of the circumstances of this case, Telcordia has provided Lucent with adequate actual notice of the '633 patent years before filing this action. For instance, although Lucent cites to **REDACTED** Lucent fails to acknowledge that it did not exist until it was created by, and spun off from, AT&T in 1996 (*see* http://www.lucent.com/investor/historical.html), **REDACTED** Against this backdrop, Telcordia provided the industry, including Lucent (and the predecessor companies making the products-in-suit), with specific letters identifying Telcordia's SRTS patent, identifying all of the patents in Telcordia's ATM portfolio, identifying the specific technologies which may infringe, and indicating Telcordia's willingness to license (Exs. 80-81). Additionally, in widely-attended industry forum meetings, Telcordia publicly discussed its patent, the applicability of the patent to specific technologies, and the availability of a license (Ex. 82).

**REDACTED**

The actions of Telcordia, taken together, demonstrate actual notice much earlier than Lucent has admitted in its letter.

Respectfully,

John G. Day

JGD/dh
Exhibits
c:   All Counsel (by electronic mail, w/exhibits)

172528.1