## UNITED STATES DISTRICT COURT
## THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-875-GMS |
| | ) | |
| LUCENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| | ) | |
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-876-GMS |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| | ) | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT
## OF NONINFRINGEMENT OF U.S. PATENT NO. 4,835,763

| | |
|---|---|
| John W. Shaw (I.D. #3362) | Jack B. Blumenfeld (I.D. #1014) |
| Monte T. Squire (I.D. #4764) | Leslie A. Polizoti (I.D. #4299) |
| YOUNG CONAWAY STARGATT & TAYLOR, LLP | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
| The Brandywine Building | 1201 North Market Street |
| 1000 West Street | Wilmington, DE 19899-1347 |
| Wilmington, DE 19801 | (302) 658-9200 |
| (302) 571-6600 | jblumenfeld@mnat.com |
| jshaw@ycst.com | lpolizoti@mnat.com |
| msquire@ycst.com | |

OF COUNSEL:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022
(212) 906-1200

David A. Nelson
Israel Sasha Mayergoyz.
David C. McKone
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606
(312) 876-7700

Attorneys for Defendant Lucent
Technologies Inc.

OF COUNSEL:

Matthew D. Powers
Edward R. Reines
Jessica L. Davis
Sonal N. Mehta
Thomas B. King
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Ryan Owens
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

Attorneys for Defendant Cisco Systems, Inc.

# TABLE OF CONTENTS

**Page**

I.  NATURE AND STAGE OF THE PROCEEDINGS ....................................................... 1

II.  SUMMARY OF ARGUMENT ..................................................................................... 1

III.  STATEMENT OF FACTS ............................................................................................ 3

    A.  The Asserted Claims ......................................................................................... 3

    B.  The Court's Claim Construction ....................................................................... 3

    C.  Relevant Operation of the Accused Products ................................................... 4

IV.  ARGUMENT ............................................................................................................... 6

    A.  LEGAL FRAMEWORK FOR SUMMARY JUDGMENT OF
       NONINFRINGEMENT ...................................................................................... 6

    B.  THE ACCUSED PRODUCTS DO NOT INFRINGE THE ASSERTED
       CLAIMS AS A MATTER OF LAW ................................................................... 7

        1.  There Is No Dispute That The Accused Products Insert Error
           Signals Before The Claimed Demultiplexer ............................................... 8

        2.  There Is No Dispute That Demultiplexing Is Not Complete Until
           After The Claimed Demultiplexer ........................................................... 10

        3.  There Is No Dispute That The Accused Products Insert Error
           Signals Before the Pointer Processor ....................................................... 13

V.  CONCLUSION .......................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................6

*Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335 (Fed. Cir. 1998).........................6

*Ecolochem, Inc. v. Southern Cal. Edison Co.*, No. 95-1320, 1996 U.S. App. LEXIS
    13330 (Fed. Cir. June 5, 1996) ....................................................................................10

*Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301 (Fed. Cir. 2006)...............6

*Johnson Worldwide Associates v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999) ............7

*Johnston v. IVAC Corp.*, 885 F.2d 1574 (Fed. Cir. 1989) ...............................................6

*Level One Communications, Inc. v. Seeq Tech., Inc.*, 987 F. Supp. 1191 (N.D. Cal. 1997) ...........9

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......................6, 8

*Netword LLC v. Centraal Corp.*, 242 F.3d 1347 (Fed. Cir. 2001) ..................................7

*Oak Tech., Inc. v. ITC*, 248 F.3d 1316 (Fed. Cir. 2001) .................................................12

*Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319 (Fed. Cir. 2002) ...........................................6

*Spectrum International v. Sterilite Corp.*, 164 F.3d 1372 (Fed. Cir. 1998)..............9, 10

## STATUTES

Fed. R. Civ. P. 56(c) .........................................................................................................6

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Telcordia filed these patent infringement lawsuits against Cisco and Lucent (collectively, "Defendants") in July 2004.  In both litigations, Telcordia is asserting U.S. Patent Nos. 4,893,306 ("the '306 patent"), RE 36,633 ("the '633 patent"), and 4,835,763 ("the '763 patent").[1]  A Claim Construction hearing was held on May 3, 2006, and the Court issued its Claim Construction Order on June 22, 2006.  D.I. 179.[2]  Fact and expert discovery closed on May 24, 2006, and August 7, 2006, respectively.  The Court granted Defendants' request to bring this motion on September 18, 2006.  D.I. 237 at 39:20-21.

## II.    SUMMARY OF ARGUMENT

Telcordia cannot prove infringement of the asserted claims of the '763 patent because the accused products do not insert error signals "following demultiplexing," as required by the Court's claim construction.  Thus, summary judgment of noninfringement should be granted in favor of Lucent and Cisco.

During the claim construction proceedings, the central dispute for the '763 patent revolved around the insertion of error signals and whether that could occur in the claimed inventions before the high-level signal is demultiplexed.  Telcordia argued that, despite the teaching of the '763 patent, the insertion of error signals *before* demultiplexing falls within the scope of the claims.  The Court rejected Telcordia's position and held that the asserted claims require the error signals to be inserted "***following*** demultiplexing."

Summary judgment of non-infringement follows logically from the Court's claim construction.  Telcordia and its expert concede that the accused products insert error signals

---

[1]    Telcordia is also asserting the '633 and '763 patents against Defendants in the parallel action it commenced before the International Trade Commission on May 15, 2006.

[2]    The D.I. numbers cited herein are in C.A. No. 04-876-GMS.

***before*** the claimed demultiplexer.  Thus, it is beyond reasonable dispute that the error signals are not inserted ***following*** demultiplexing.  Summary judgment is thus proper.

Telcordia responds to the Court's adverse construction of this central term, and the resulting fatal problem with its assertion of the '763 patent, by arguing, as a fallback, that another component in the accused devices – the pointer processor – supposedly performs an initial stage of demultiplexing.  Telcordia contends that error signals are inserted following this alleged part of the demultiplexing.  Even assuming this unsupported assertion is correct (which it is not), Telcordia's position fails as a matter of law because it is inconsistent with the Court's claim construction for three reasons.

First, Telcordia's new argument requires the Court to find that the claimed demultiplexing is performed by something other than the component the parties agree is the claimed demultiplexer.  Second, because there is no dispute that demultiplexing is incomplete until the signal reaches the claimed demultiplexer, Telcordia is asking the Court to rewrite its construction from "following demultiplexing" to "during demultiplexing" or "following a little demultiplexing."  But that is not the construction Defendants advanced nor the one the Court accepted.  Finally, it is undisputed that the accused products insert error signals on every channel within a defective high-level signal ***before*** the high-level signal reaches the pointer processor.  Thus, even under its fallback argument, Telcordia cannot show that the insertion of error signals is performed ***following*** demultiplexing as required by the Court's construction.

For the foregoing reasons, Telcordia's arguments do not raise a factual dispute, and instead constitute nothing more than attempts to reargue and attack the Court's claim construction in order to resurrect its infringement charge and force a trial.

2

## III.    STATEMENT OF FACTS

### A.    The Asserted Claims

Telcordia is asserting claims 1, 2, 7 and 8 of the '763 patent.  Independent claim 7 reads as follows:

> In a communications network having a plurality of nodes interconnected in a ring configuration by a first ring which conveys multiplexed subrate communications around the first ring from node to node in one direction and a second ring which conveys multiplexed subrate communications around the second ring from node to node in the other direction, each node including subrate transmitters with associated multiplexers and demultiplexers with associated receivers, an improved method associated with each node comprising the steps of
>
> evaluating the integrity of the multiplexed subrate communications on the first ring and the second ring with monitoring means associated with both the first ring and the second ring, and
>
> ***inserting an error signal*** on designated ones of said subrate communications in response to said monitoring means detecting a lack of integrity on said multiplexed communications on the first ring or the second ring or both the first ring and the second ring.

Exhibit 1 ['763 patent] at 6:37-57.[3]  Claim 1, an apparatus claim, includes the same limitations. Claims 2 and 8 also have the same requirements because they depend expressly from claims 1 and 7, respectively.

### B.    The Court's Claim Construction

During the claim construction proceedings, Defendants argued that the error signals must be inserted following demultiplexing while Telcordia argued that the error signals could be inserted either before or after demultiplexing.  Defendants based their construction on the entirety of the '763 patent, which uniformly describes the claimed invention as inserting an error signal on the channels only after the channels have been demultiplexed.

---

[3]    Emphasis is added in all quotations unless otherwise noted.

As Defendants explained, error signals could not be inserted on channels until after demultiplexing in the claimed invention because the system disclosed in the '763 patent is not capable of accessing or manipulating the channels until they are separated out of the high-level signal. *See, e.g.*, Exhibit 1 ['763 patent] at 3:28-31 ("Because the higher level signal arriving at node 2 on ring 100 appears normal, controller 148 demultiplexes the higher level signal into its six subrate channels."). The inventor explicitly stated in the Summary of the Invention section of the patent that, according to the invention, error signals are inserted "following the demultiplexing." *Id.* at 1:52-54.

This issue was briefed by the parties and argued at length at the Claim Construction Hearing.[4] After considering the parties' proposed constructions, the Court adopted Defendants' construction, and construed the term "inserting an error signal on designated ones of said subrate communications" to mean "inserting an error signal on the channels following demultiplexing." D.I. 179 at 2. Thus, to infringe the asserted claims, the accused products must insert error signals on the channels ***following demultiplexing*** in response to the monitoring means detecting a defective high-level signal.[5]

## C.    Relevant Operation of the Accused Products

Telcordia's expert, Dr. Paul Prucnal, and Defendants' expert, Dr. Wayne Grover, agree about the aspects of the accused products relevant to this motion. Both experts agree that the accused products consist of chasses in which different types of cards can be inserted. The

---

[4]    *See* D.I. 92 [Cisco's Opening Claim Construction Brief] at 22-24; D.I. 94 [Telcordia's Opening Claim Construction Brief] at 37-38; D.I. 122 [Defendants' Answering Claim Construction Brief] at 26-27; D.I. 121 [Telcordia's Claim Construction Brief] at 11-12; Exhibit 12 [Claim Construction Hearing Transcript] at 205:25-209:25; 221:17-225:18.

[5]    The Court construed the term "evaluating the integrity of the multiplexed subrate communications" to mean "determining whether each high-level signal is defective." D.I. 179 at 2.

Cisco cards relevant to this motion are high-speed optical line cards (also called OC-N cards) and cross-connect cards (also called XCON cards).[6] The Lucent cards relevant to this motion are called main cards.[7]

Both experts agree that the claimed demultiplexer is the cross-connect circuitry located on Cisco's cross-connect cards and Lucent's main cards.[8] Dr. Prucnal confirmed that the cross-connect circuitry is the claimed demultiplexer under Telcordia's analysis:

> Q:    The preamble requires that there be multiplexers and demultiplexers; right?
>
> A:    Yes.
>
> Q:    And you diligently went and you analyzed Cisco's products and you attempted to determine what were the multiplexers and demultiplexers of claim one; right?
>
> A:    Yes.
>
> Q:    What you included was the cross-connect circuitry; correct?
>
> A:    Yes.

Exhibit 2 [Prucnal Transcript] at 430:21-431:9.

The experts also agree that the claimed error signals are inserted prior to the cross-connect circuitry.[9] Exhibit 2 [Prucnal Transcript] at 422:11-22.

---

[6]    *See* Exhibit 3 [Grover Cisco Report] at ¶¶ 25-26; Exhibit 5 [Prucnal Cisco Report] at 15-16.

[7]    Exhibit 4 [Grover Lucent Report] at ¶¶ 26-27, 33-35, 43.

[8]    *See* Exhibit 3 [Grover Cisco Report] at ¶¶ 49, 62-67; Exhibit 4 [Grover Lucent Report] at ¶¶ 43; Exhibit 5 [Prucnal Cisco Report] at 15-16, 19, 23; Exhibit 6 [Prucnal Lucent Report] at 17, 21.

[9]    Although the experts disagree about whether the claimed error signals are inserted by the receive framer in Cisco's products and the byte processor in Lucent's products (Defendants' expert) or by the pointer processor in Cisco's and Lucent's products (Telcordia's expert), it is undisputed that the claimed error signals are inserted by circuitry prior to the cross-connect circuitry. Exhibit 3 [Grover Cisco Report] at ¶¶ 33-

IV.    **ARGUMENT**

A.    **LEGAL    FRAMEWORK    FOR    SUMMARY    JUDGMENT    OF
NONINFRINGEMENT**

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576-77 (Fed. Cir. 1989).

Telcordia bears the burden of proving infringement.  *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309-10 (Fed. Cir. 2006).  As a result, Defendants are not required to produce evidence showing the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Rather, Defendants only need to show "an absence of evidence to support the nonmoving party's case." *Id.* at 325.  Telcordia, as the nonmoving party, must "come forward with 'specific facts showing that there is a genuine issue for trial'" in order to successfully oppose this motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

As a matter of law, an accused device cannot infringe if even a single limitation is not satisfied.  *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1349 (Fed. Cir. 1998). Where there is no genuine dispute about the characteristics of the accused products relevant to a particular limitation, the question of infringement turns solely on the interpretation of that limitation, which is a matter of law for the Court.  *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1324 (Fed. Cir. 2002) ("[I]n a patent litigation action, where the parties do not dispute any relevant facts regarding the accused products but disagree over possible claim interpretations, the

_____

36, 74; Exhibit 4 [Grover Lucent Report] at 32-42; Exhibit 5 [Prucnal Cisco Report] at 21, 25; Exhibit 6 [Prucnal Lucent Report] at 19, 23; Exhibit 7 [Prucnal Cisco Reply Report] at 4; Exhibit 8 [Prucnal Lucent Reply Report] at 4; Exhibit 2 [Prucnal Transcript] at 477:13-17.

question of literal infringement collapses into claim construction and is amenable to summary judgment); *see also Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999) (summary judgment appropriate when the "relevant aspects of the accused device's structure and operation are undisputed"). In fact, "[t]he Court's construction of the claims often decides the question of infringement." *Netword LLC v. Centraal Corp.*, 242 F.3d 1347, 1350 (Fed. Cir. 2001).

### B. THE ACCUSED PRODUCTS DO NOT INFRINGE THE ASSERTED CLAIMS AS A MATTER OF LAW

There is no genuine factual dispute that the accused products do not insert error signals "following demultiplexing," as the Court construed the asserted claims to require. After extensive argument, the Court squarely rejected Telcordia's claim construction position and construed the asserted claims to require the insertion of error signals to occur "following demultiplexing." D.I. 179 at 2.

Realizing the clear import of the Court's claim construction and acknowledging that error signals are inserted in Defendants' products before the claimed demultiplexer, Telcordia now claims that another component also performs demultiplexing, and that error signals are inserted following this alleged other demultiplexing. To support its "two demultiplexer" fallback theory, Telcordia relies on its expert's testimony that the pointer processor in Defendants' products also performs demultiplexing.[10]

Telcordia argues that summary judgment is not appropriate because there is an alleged factual dispute regarding whether or not the pointer processor performs demultiplexing. Exhibit 9 [Telcordia's letter to the Court dated August 25, 2006] at 3. What Telcordia concocts

---

[10]    Exhibit 5 [Prucnal Cisco Report] at 21, 25; Exhibit 6 [Prucnal Lucent Report] at 19, 23; Exhibit 7 [Prucnal Cisco Reply Report] at 4; Exhibit 8 [Prucnal Lucent Reply Report] at 4.

as an alleged factual dispute does not satisfy its burden of showing that there is a genuine issue for trial for three reasons. *See Matsushita*, 475 U.S. at 587.

First, it is undisputed that Defendants' products insert error signals before, ***not following***, the demultiplexer (which is located after the pointer processor). Second, it is undisputed that demultiplexing is not complete until the demultiplexer. Third, it is undisputed that Defendants' products insert error signals before, ***not following***, the pointer processor, the alleged second demultiplexer identified by Telcordia. These are three independent reasons why the accused products do not insert error signals following demultiplexing even under Telcordia's fallback theory, and this motion should be granted.

### 1. There Is No Dispute That The Accused Products Insert Error Signals Before The Claimed Demultiplexer

Telcordia's expert admitted, as stated in his expert report, that the "demultiplexer" claimed in the '763 patent is the cross-connect in Defendants' products:

> Q: The preamble requires that there be multiplexers and demultiplexers; right?
>
> A: Yes.
>
> Q: And you diligently went and you analyzed Cisco's products and you attempted to determine what were the multiplexers and demultiplexers of claim one; right?
>
> A: Yes.
>
> Q: What you included was the cross-connect circuitry; correct?
>
> A: Yes.

Exhibit 2 [Prucnal Transcript] at 430:21-431:9.[11]

---

[11]    *See also* Exhibit 2 [Prucnal Transcript] at 421:19-422:15, 425:7-15, 427:7-18, 429:13-430:6, 441:1-6; Exhibit 5 [Prucnal Cisco Report] at 19, 23; Exhibit 6 [Prucnal Lucent Report] at 17, 21.

Because there is no legitimate dispute for the purposes of this motion that the cross-connect is the claimed "demultiplexer," and because there also is no dispute that the error signals are inserted before the high-level signal reaches the cross-connect, the only remaining dispute is a legal question. Specifically, the issue is whether the claimed demultiplexing could be performed by something other than the claimed demultiplexer. Common sense dictates that when the claims refer to a demultiplexer and demultiplexing is performed, it is the demultiplexer performing the demultiplexing. It simply makes no sense to argue that that the demultiplexing required by the claims is performed by something other than the claimed demultiplexer. *See Level One Communications, Inc. v. Seeq Tech., Inc.*, 987 F. Supp. 1191, 1206 (N.D. Cal. 1997) (holding that the claim term "'multiplexing' clearly corresponds to *the* multiplexer" in rejecting argument that the "multiplexing" step in a method claim was written in step-plus-function form).

Telcordia essentially argues that the asserted claims encompass an additional unclaimed element – a second demultiplexer – and the claimed demultiplexing is performed by this unclaimed element rather than the claimed demultiplexer. The Federal Circuit has rejected the argument Telcordia makes here. A patentee cannot rely on unclaimed elements to satisfy the requirements of a claim when inclusion of those additional unclaimed elements would be at odds with the language of the claim. *See, e.g.*, *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1377 (Fed. Cir. 1998). In *Spectrum*, the asserted claims were directed to a crate, and required the bottom wall of the crate to merge with the bottom portion of the front wall. In the accused crates, the bottom wall merged with a flat layer of plastic – not with the bottom portion of the front wall, as claimed. The patentee argued that the accused products satisfied the claim requirements anyway because the flat layer of plastic in the accused products constituted *both* the top and bottom portions of a front wall, and the merger with the top portion was merely an

unclaimed element.  The Federal Circuit rejected the patentee's argument, noting that the term "'comprising' [cannot] alter the scope of the merger element in the claim at issue here" and "is not a weasel word with which to abrogate claim limitations." *Id.* at 1379-81.

Likewise, Telcordia's assertions that the asserted claims somehow encompass a second, unclaimed demultiplexer cannot be squared with the proper construction of the patent. Thus, as in *Spectrum*, Telcordia's reliance on a second, unclaimed element to satisfy the demultiplexing required by the claims is nothing more than what the Federal Circuit characterized as an attempt to "weasel" out of claim limitations.  *See also Ecolochem, Inc. v. Southern Cal. Edison Co.*, No. 95-1320, 1996 U.S. App. LEXIS 13330, at *8 (Fed. Cir. June 5, 1996) (attached as Exhibit 10) ("Placement of 'comprising' before recitation of steps, however, results in a 'comprising' claim that would cover a process that includes additional steps, not one that uses an additional unrecited element for accomplishing a claimed step.").[12]

## 2. There Is No Dispute That Demultiplexing Is Not Complete Until After The Claimed Demultiplexer

Telcordia's expert also agrees that the ultimate demultiplexing, and its completion, is performed by the cross-connect.  Accordingly, the channels are not demultiplexed until they exit the agreed-upon demultiplexer, which is located in the cross-connect circuitry. When examined at his deposition, Telcordia's expert admitted that notwithstanding his opinion that the pointer processor demultiplexes, the demultiplexing is not complete until after the cross-connect:

---

[12]    In *Ecolochem*, the patentee claimed a method for removing oxygen from water using a resin "selected from the group consisting of mixed bed resin and cation resin" to remove carbon contaminants.  *Id.* at *2-*3.  The Federal Circuit rejected the patentee's argument that the claim should be construed to include an unrecited anion resin as well as the recited cation resin because the carbon contaminants could only be removed if the cation resin was used in combination with an anion resin.  *Id.* at *6-*9.

> Q:    But the completion of the demultiplexing, as you understand Cisco's products, doesn't happen until the cross-connect, where you get the dropping of the communications; correct?
>
> A:    Yes, the final stage of the demultiplexing and its completion, as you said, is -- is done at the cross-connect.

Exhibit 2 [Prucnal Transcript] at 432:19-433:3.

Faced with this unequivocal testimony from its own expert, Telcordia attempts to salvage its infringement case by arguing that the Court's construction does not actually require the high-level signal to be demultiplexed into its constituent channels. Rather, as stated during the September 18, 2006 teleconference, Telcordia now contends that it can satisfy this claim limitation by merely showing that *some* incomplete portion of demultiplexing (whatever that is) has occurred before the error signal is inserted:

> And Mr. Reines in his argument was adding limitations to the claim, such as the word ***complete*** demultiplexing. He was pointing to, you know, which particular demultiplexer is performing the process. But with respect to the simple claim language, does the error signal get inserted following the demultiplexing, there is no doubt that the defendants have a pointer processor that is doing demultiplexing and error signals are inserted following that demultiplexing.

D.I. 237 at 37:4-11.

Telcordia's interpretation is directly inconsistent with the Court's claim construction. The Court did not construe the claims to allow for insertion of error signals "when demultiplexing is initiated" or "while demultiplexing is performed." Nor did Telcordia ever proffer such constructions. Rather, the Court made clear that the claims require the insertion of error signals "***following*** demultiplexing" of the high-level signal into its constituent channels.[13]

---

[13]    It is not clear what Telcordia is referring to as "incomplete" demultiplexing. Whatever that may be, it certainly would not satisfy the "following demultiplexing" requirement.

As a result, the demultiplexing must be complete before the error signals are inserted. *See, e.g.*, *Oak Tech., Inc. v. ITC*, 248 F.3d 1316, 1323-29 (Fed. Cir. 2001). In *Oak Tech.*, the claim recited an error correction operation and an error detection operation for detecting errors after the error correction operation. *Id.* at 1323. The patentee argued that the claim language was "broad enough to cover a situation in which the error detection operation commences before the error correction operation is complete." *Id.* at 1324. Relying on the claim language itself, confirmed by the specification, the Federal Circuit rejected the patentee's argument, holding that only after the error correction operation is "complete" for an entire sector of data does the error detection operation occur. *Id.* at 1324-29.

Here, the Court's construction is likewise the only interpretation consistent with the '763 patent. The Court's claim construction is based on the patent's teaching that the channels must be extracted out of the high-level signal before the channels can be manipulated in any way. *See, e.g.*, Exhibit 1 ['763 patent] at 3:28-31 ("Because the higher level signal arriving at node 2 on ring 100 appears normal, controller 148 demultiplexes the higher level signal into its six subrate channels."). Just as the patent does not teach how one would insert error signals onto the channels while they are multiplexed together in a high-level signal, it does not teach how one would insert error signals onto the channels in a partially demultiplexed state (whatever that may be) as Telcordia is now asking the Court to re-interpret the claims to mean.

As explained above, Defendants demonstrated to the Court during the claim construction process that there is no disclosure anywhere in the patent as to how an error signal could be inserted onto a channel while it is still multiplexed into a high-level signal. Telcordia's assertion that the claims cover the insertion of error signals into a partially demultiplexed signal is nothing more than an attempt to rewrite the Court's claim construction.

### 3. There Is No Dispute That The Accused Products Insert Error Signals Before the Pointer Processor

Telcordia's "second demultiplexer" infringement theory fails for yet another independent reason. It is undisputed that the accused products insert error signals even before the alleged second demultiplexer – *i.e.*, the pointer processor. At deposition, Telcordia's expert admitted that the receive framer (in Cisco's products) or the byte processor (in Lucent's products) inserts error signals *before* any alleged demultiplexing by the pointer processor or cross-connect circuitry:

> Q: If there's a line fault coming into Cisco's ONS product, the receive framer will *insert an error signal* in the form of an AIS-L; correct?
>
> A: Yes.
>
> Q: And that's *before demultiplexing*; correct?
>
> A: Yes.

Exhibit 2 [Prucnal Transcript] at 477:13-20 (Cisco products).

> Q: Why is it that insertion of the all ones into the bit stream by the byte processor would not meet the requirement of insertion of error signals following demultiplexing?
>
> A: That's the AIS-L signal. It *precedes*, as I understand it, the *demultiplexing that occurs in the pointer processor*.

Exhibit 2 [Prucnal Transcript] at 200:12-18 (Lucent products).[14]

Telcordia's expert also admitted in his reports that the error signals inserted by the receive framer (Cisco) or byte processor (Lucent) in response to a defective high-level signal do "not meet the requirement of insertion of error signals 'following demultiplexing.'"[15]

---

[14] *See also* Exhibit 3 [Grover Cisco Report] at ¶¶ 59-61, 76; Exhibit 4 [Grover Lucent Report] at ¶¶ 35, 52-54; Exhibit 5 [Prucnal Cisco Report] at 21, 25; Exhibit 6 [Prucnal Lucent Report] at 19, 23; Exhibit 7 [Prucnal Cisco Reply Report] at 4; Exhibit 8 [Prucnal Lucent Reply Report] at 4; Exhibit 2 [Prucnal Transcript] at 137:16-138:7; 147:5-18.

Faced with this concession of noninfringement by its own expert, Telcordia yet again tries to twist the Court's construction to fit its ever-shifting infringement theory. Telcordia now argues that the error signals inserted by the receive framer (Cisco) or byte processor (Lucent) – which are undisputedly inserted prior to any demultiplexing – are not the claimed error signals because they are inserted on the high-level signal and not on the constituent channels of the high-level signal.[16]

Telcordia's attempt to distinguish the insertion of an error signal on the high-level signal from the insertion of error signals on the constituent channels of the high-level signal is a distinction without a difference. Both experts agree that when an incoming high-level signal is defective, the receive framer (Cisco) or byte processor (Lucent) inserts what is called an AIS-L error signal,[17] which both experts agree results in the insertion of all ones onto the entire defective high-level signal, including each of its subrate channels.[18] It is therefore undisputed

---

[15]    Exhibit 7 [Prucnal Cisco Reply Report] at 4; ("I agree with Dr. Grover that the initial insertion of 'all ones' into the bit steam by the Receive Framer following a line fault would not meet the requirement of insertion of error signals 'following demultiplexing.'"); Exhibit 8 [Prucnal Lucent Reply Report] at 4 (same).

[16]    *See, e.g.*, Exhibit 5 [Prucnal Cisco Report] at 21, 25; Exhibit 6 [Prucnal Lucent Report] at 19, 23; Exhibit 7 [Prucnal Cisco Reply Report] at 4; Exhibit 8 [Prucnal Lucent Reply Report] at 4.

[17]    Exhibit 3 [Grover Cisco Report] at ¶¶ 33-36, 74; Exhibit 4 [Grover Lucent Report] at ¶¶ 53; Exhibit 5 [Prucnal Cisco Report] at 21, 25; Exhibit 6 [Prucnal Lucent Report] at 19, 23; Exhibit 7 [Prucnal Cisco Reply Report] at 4; Exhibit 8 [Prucnal Lucent Reply Report] at 4; Exhibit 2 [Prucnal Transcript] at 477:13-17.

[18]    Exhibit 3 [Grover Cisco Report] at ¶¶ 17-18, 36, 75; Exhibit 4 [Grover Lucent Report] at ¶¶ 52-54; Exhibit 5 [Prucnal Cisco Report] at 21, 25; Exhibit 6 [Prucnal Lucent Report] at 19, 23; Exhibit 7 [Prucnal Cisco Reply Report] at 4; Exhibit 8 [Prucnal Lucent Reply Report] at 4. This is also consistent with Telcordia's generic requirement GR-253, which defines an AIS-L error signal as a signal with all ones in the Line Overhead, the Path Overhead, and the payload of each channel. Exhibit 11 [GR-253] at Requirement 6-167. Telcordia's expert acknowledges that "if there are ones in the entire line level, all of the paths are going to have ones as well." Exhibit 2 [Prucnal Transcript] at 201:15-17.

that the error signal inserted prior to any alleged demultiplexer – whether by the cross-connect or pointer processor – results in the insertion of an error signal onto each channel.

Accordingly, there can be no genuine dispute that the insertion of error signals onto the *entire* defective high-level signal necessarily results in the insertion of error signals onto each of the constituent channels of that high-level signal.[19] *See, e.g.*, Exhibit 3 [Grover Cisco Report] at ¶¶ 17-18, 60-61; Exhibit 4 [Grover Lucent Report] at 17-18, 52-55, 62-65. Telcordia's position is analogous to arguing that spreading icing on an entire cake does not constitute spreading icing on the individual slices of the cake. Under Telcordia's flawed reasoning, even after the entire cake has been covered with icing, the icing is not spread on a slice until after the slice has been separated from the rest of the cake. This defies reason and conflicts with the proper construction of the patent as discussed above.

In short, Defendants' products do not meet the "following demultiplexing" requirement even under Telcordia's alternative demultiplexer theory because it is undisputed that they insert error signals on every channel within a defective high-level signal *before* the high-level signal reaches any alleged demultiplexer.

---

[19]     It is undisputed that a string of ones constitutes an error signal. In fact, "a string of 1's" is the example of an error signal provided in the '763 patent. Exhibit 1 ['763 patent] at 3:11-13.

## V.     CONCLUSION

For the reasons set forth above, Lucent and Cisco respectfully request that the

Court enter summary judgment of noninfringement of the '763 patent.

| | |
|---|---|
| YOUNG CONAWAY STARGATT & TAYLOR, LLP | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
| /s/ *John W. Shaw* | /s/ *Jack B. Blumenfeld* |
| John W. Shaw (I.D. #3362) | Jack B. Blumenfeld (I.D. #1014) |
| Monte T. Squire (I.D. #4764) | Leslie A. Polizoti (I.D. #4299) |
| The Brandywine Building | 1201 North Market Street |
| 1000 West Street | Wilmington, DE  19899-1347 |
| Wilmington, DE  19801 | (302) 658-9200 |
| (302) 571-6600 | jblumenfeld@mnat.com |
| jshaw@ycst.com | lpolizoti@mnat.com |
| msquire@ycst.com | |
| | |
| OF COUNSEL: | OF COUNSEL: |
| | |
| Steven C. Cherny | Matthew D. Powers |
| LATHAM & WATKINS LLP | Edward R. Reines |
| 885 Third Avenue, Suite 1000 | Jessica L. Davis |
| New York, NY  10022 | Sonal N. Mehta |
| (212) 906-1200 | Thomas B. King |
| | WEIL, GOTSHAL & MANGES LLP |
| David A. Nelson | 201 Redwood Shores Parkway |
| Israel Sasha Mayergoyz. | Redwood Shores, CA  94065 |
| David C. McKone | (650) 802-3000 |
| LATHAM & WATKINS LLP | |
| Sears Tower, Suite 5800 | Ryan Owens |
| Chicago, IL  60606 | WEIL, GOTSHAL & MANGES, LLP |
| (312) 876-7700 | 767 Fifth Avenue |
| | New York, NY  10153 |
| Attorneys for Defendant Lucent Technologies Inc. | (212) 310-8000 |
| | |
| | Attorneys for Defendant Cisco Systems, Inc. |
| October 3, 2006 | |
| 539864 | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2006 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to Steven J. Balick, John G. Day, Tiffany Geyer Lydon, Israel S. Mayergoyz, David A. Nelson, Neilesh R. Patel, John W. Shaw, John M. Williamson, Jack B. Blumenfeld, Jessica L. Davis, Sonal N. Mehta, Leslie A. Polizoti, and Edward R. Reines.

I further certify that I caused copies of the foregoing document to be served on October 3, 2006 upon the following in the manner indicated:

**<u>BY HAND</u>**

John G. Day
ASHBY & GEDDES
222 Delaware Avenue
Wilmington, DE  19801

**<u>BY ELECTRONIC MAIL</u>**

John Day ([jday@ashby-geddes.com](mailto:jday@ashby-geddes.com))
John Williamson ([john.williamson@finnegan.com](mailto:john.williamson@finnegan.com))
York Faulkner ([york.faulkner@finnegan.com](mailto:york.faulkner@finnegan.com))
Don Burley ([don.burley@finnegan.com](mailto:don.burley@finnegan.com))

**<u>BY EMAIL on 10/3/06 and</u>**
**<u>FEDERAL EXPRESS on 10/4/06</u>**

Don O. Burley
FINNEGAN, HENDERSON,
  FARABOW, GARRETT & DUNNER
901 New York Avenue
Washington, DC  20001

*/s/ Jack B. Blumenfeld*
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
jblumenfeld@mnat.com