# Exhibit 1

**MOTION *IN LIMINE* NO. 1 RE: UNSUPPORTED DAMAGES THEORIES**

Defendants move *in limine* to exclude Telcordia from introducing into evidence, and/or relying upon at trial, unsupported damages theories.

**I.    TELCORDIA SHOULD BE PRECLUDED FROM SEEKING DAMAGES ON REVENUE FROM PRODUCTS TELCORDIA ADMITS DO NOT INFRINGE**

Telcordia seeks to put a damages number before the jury based on revenue from products that Telcordia admits do not infringe and for which there is no legally cognizable theory of recovery. For example, Telcordia intends to argue that it is entitled to royalties from Cisco for the sale of over ▉▉▉▉ switches and routers ("boxes"). However, at least ▉▉▉▉ of those boxes could not have contained the allegedly infringing SRTS technology because Cisco has sold only about ▉▉▉ of the insertable circuit cards ("cards") customers must purchase to adapt their boxes to use the allegedly infringing SRTS technology. As another example, Telcordia argues that it is entitled to royalties from Lucent based on four years of revenue from an accused platform even though Lucent did not, during that period, even offer for sale an SRTS-capable card that could enable that platform to perform the accused functionality. It would be fundamentally unfair, misleading, and prejudicial to allow Telcordia to seek tens of millions of dollars of damages based on sales of products that it admits cannot infringe the asserted patent. Courts regularly exclude this type of evidence. *See, e.g., DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1159 (N.D. Cal. 2003) (precluding evidence relating to sales of acceptable noninfringing substitute products).

The asserted claims of the '633 patent are directed to a synchronous residual time stamping ("SRTS") function. Defendants' products can be outfitted with hundreds or even thousands of different circuit cards depending on how customers want to customize their equipment. Each platform includes a chassis into which customers can insert many – sometimes

dozens – of different cards. Some cards are necessary for the machine to function; many are optional. The different cards allow the platforms to perform different functions. The accused SRTS functionality resides on optional cards, which are priced, invoiced, and sold separately from the boxes.[1]  SRTS-capable cards are rarely selected and are used only in the unique circumstance when a customer wants to perform circuit emulation.

Only ████ SRTS cards have ever been sold by Cisco. Exh. 1-A [Aug. 30, 2006 Musika Tr.] at 64:9-66:16; 174:4-176:2. Notwithstanding the fact that a maximum of ████ platforms could ever be outfitted with an SRTS-capable card, and thus a maximum of ████ platforms could potentially infringe, Telcordia seeks damages for ██████████  Telcordia intends to rely on a damages base on the order of ████ at trial even though the damages base for the platforms on which the accused SRTS functionality could conceivably be used is only on the order of ████[2]

Similarly, Telcordia seeks to offer a damages number based on all of Lucent's sales revenue for CBX platforms since April 2000 even though Lucent (1) never sold an SRTS-capable card to any customer for use with the CBX and (2) did not even offer such a card until 2004. Exh. 1-B [Feb. 22, 2006 Zhou Tr.] at 92:4-17; 95:20-25. Likewise, Telcordia seeks to offer a damages number based on all sales of the GX platform since April 2000 even though (1) only three GX customers ever bought an SRTS-capable card, (2) Lucent has not sold such a card since 2002, and (3) the card was discontinued in 2004. *Id.* at 96:9-23.

---

[1]  Although Defendants' cards that support SRTS also support other alternative, and much more common non-infringing functionalities, for ease of reference this brief refers to such cards as "SRTS-capable cards."

[2]  Defendants dispute that any revenue from the boxes and non-SRTS cards should be part of the damages base, but that issue is not before the Court in this motion.

There is no dispute that Defendants' platforms that do not include the optional SRTS-capable cards *cannot* infringe the asserted claims. "[A] device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555 (Fed. Cir. 1995); *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 225 (D. Del. 2001) ("That a device could have been made to do something else does not of itself establish infringement."). Here, there is no dispute that Defendants' platforms cannot practice the claimed inventions unless equipped with an SRTS-capable card. Telcordia's infringement expert agrees:



Exh. 1-C [Aug. 4, 2006 Clark Tr.] at 267:24-268:12.[3]

Nevertheless, Telcordia seeks damages for sales of platforms to customers *that never purchased any SRTS-capable cards and who cannot possibly infringe the asserted claims*.[4] Precluding Telcordia from seeking damages based on sales revenue to customers that never

---

[3] Telcordia's attempt to inflate the damages base by including sales to customers who never purchased an SRTS module is akin to seeking damages for sales of all computers based on a patent covering a seldom sold tax software program. While it is at least arguable that computers sold *with* the tax software program might be subject to damages, an argument that *every* computer sold is subject to damages because the purchaser could someday decide to purchase and install the tax software is patently absurd.

[4] Defendants' platforms are not interoperable with modules made by other companies. For example, Cisco platforms cannot operate with Lucent SRTS modules, and vice versa. Therefore, if a customer does not purchase an SRTS module from the Defendant providing the platform, that customer cannot practice SRTS with that platform.

bought an SRTS-capable card serves the central purpose of Rule 16 of the Federal Rules of Civil Procedure by "promoting efficiency and conserving judicial resources by identifying *real issues* prior to trial and thereby saving time and expense for everyone." Advisory Committee Notes to Rule 16 (1983). Under Rule 16, courts have broad powers to "weed out unmeritorious claims . . . before trial begins." *Smith v. Gulf Oil Co.*, 995 F.2d 638, 642 (6th Cir. 1993).

Defendants are not asking the Court to resolve the issue of the appropriate royalty rate or the royalty base if Defendants are found to have infringed the '633 patent. Rather, Defendants seek to "streamline" the issues for trial as contemplated by Rule 16. *See, e.g., A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 777 F. Supp. 1405, 1407 n.4 (N.D. Ill. 1991) ("Rule 16 . . . grants the trial judge broad discretion to shape the course of litigation.") (*rev'd on other grounds*).

## II.    TELCORDIA SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE REGARDING CISCO'S FOREIGN SALES

"[T]he right conferred by a patent under our law is confined to the United States and its territories, and infringement of this right cannot be predicated on acts wholly done in a foreign country." Exh. 1-D [*Voda v. Cordis Corp.*, -- F.3d --, No. 05-1238, 2007 WL 269431, at *13 (Fed. Cir. Feb. 1, 2007) (citation omitted)]. Thus, Cisco's foreign sales are irrelevant unless Telcordia can connect those sales to an allegedly infringing domestic activity. Telcordia has never done so.

As a result, the sales records for the accused products produced by Cisco during discovery were limited to products that were shipped to, or billed to, U.S. entities. The scope of the sales information that Cisco gave Telcordia was clear on its face (*i.e.*, the "ship to" and/or "bill to" country field for each sales order identified the United States), and Telcordia failed to seek discovery relating to any allegedly infringing activity connected to foreign sales. Only after the close of discovery did Telcordia acknowledge that it had neglected to seek foreign sales

information.  Exh. 1-E [Jun. 5, 2006 email from J. Williamson].  At that late stage, Cisco declined to produce further discovery, and Telcordia abandoned its belated effort.  Faced with no evidence of foreign sales – let alone an infringement theory that would cover such sales – Telcordia's damages expert takes Cisco's total worldwide revenue and extrapolates what he guesses to be the corresponding foreign sales revenue for the accused products.  Coincidentally, or perhaps not, Telcordia's expert "concludes" that Cisco's foreign sales for the accused products is the same as its domestic sales, and accordingly simply *doubles* his damages figure to account for these allegedly-infringing foreign sales.

Because Telcordia's figure for Cisco's foreign sales is not supported by any evidence, it would be fundamentally unfair, misleading, and prejudicial to allow Telcordia to introduce evidence on this topic.  *See, e.g.*, *Litton Sys., Inc. v. Honeywell, Inc.*, 87 F.3d 1559, 1577 (Fed. Cir. 1996) (granting a new trial on damages where theory offered by plaintiff was "predicated on speculation [and] unrealistic assertions") (*rev'd on other grounds*); *Eiben v. A. Epstein & Sons Int'l, Inc.*, 57 F. Supp. 2d 607, 612-13 (N.D. Ill. 1999) (granting motion *in limine* because damages theory was based on a "barren record" consisting solely of Plaintiff's own assertions).

## III.    CONCLUSION

For the foregoing reasons, Defendants request that Telcordia be precluded from introducing into evidence unsupported damages theories for (1) revenue from products that Telcordia admits do not infringe, and (2) Cisco foreign sales not connected to any allegedly infringing activities in the United States.

745304v1

5

# TAB A

## FULLY REDACTED

# TAB B

## FULLY REDACTED

# TAB C

## FULLY REDACTED

# TAB D

--- F.3d ----                                                                                     Page 1
--- F.3d ----, 2007 WL 269431 (C.A.Fed. (Okla.))
**(Cite as: --- F.3d ----)**

**H**
Voda v. Cordis Corp.C.A.Fed. (Okla.),2007.Only the
Westlaw citation is currently available.
United States Court of Appeals,Federal Circuit.
Jan K. VODA, M.D., Plaintiff-Appellee,
v.
CORDIS CORPORATION, Defendant-Appellant.
**No. 05-1238.**

Feb. 1, 2007.

**Background:** Patent holder brought infringement ac-
tion against competitors regarding patents directed
toward guiding catheters for use in interventional car-
diology. The United States District Court for the
Western District of Oklahoma, Tim Leonard, J., as-
sumed supplemental subject matter jurisdiction over
foreign patent infringement claims. District court cer-
tified order for interlocutory appeal and Court of Ap-
peals granted petition for interlocutory appeal, 122
Fed.Appx. 515.

**Holdings:** The Court of Appeals, Gajarsa, Circuit
Judge, held that:

(1) law of Federal Circuit, rather than law of regional
circuit, applied to issue of whether supplemental jur-
isdiction existed over foreign patent claims, and

(2) considerations of comity, judicial economy, con-
venience, fairness, and other exceptional circum-
stances constituted compelling reasons to decline
supplemental jurisdiction over patent holder's foreign
patent infringement claims.

Vacated and remanded.

Newman, Circuit Judge, filed dissenting opinion.

**[1] Patents 291 ☞0**

291 Patents
Law of Federal Circuit, rather than law of regional
circuit, applied to issue of whether supplemental jur-
isdiction existed over foreign patent claims based on
claims of United States patent infringement, since

question was unique to United States patent law. 28
U.S.C.A. § 1367.

**[2] Patents 291 ☞0**

291 Patents
Considerations of comity, judicial economy, conveni-
ence, fairness, and other exceptional circumstances
constituted compelling reasons to decline supple-
mental jurisdiction over patent holder's foreign patent
infringement claims in same case where district court
had original federal question jurisdiction over patent
holder's United States patent infringement claims. 28
U.S.C.A. § 1367(c).

**[3] Patents 291 ☞0**

291 Patents
A district court's decision to not decline supplemental
jurisdiction is reviewed under an abuse of discretion
standard. 28 U.S.C.A. § 1367(c).

**[4] Patents 291 ☞0**

291 Patents
International treaties that the United States has joined
and ratified as the "supreme law of the land" can con-
stitute an exceptional circumstance to decline supple-
mental jurisdiction over foreign patent infringement
claims, since the exercise of supplemental jurisdic-
tion could undermine the obligations of the United
States. 28 U.S.C.A. § 1367(c)(4).

**[5] International Law 221 ☞0**

221 International Law
"Comity," in the legal sense, is neither a matter of ab-
solute obligation, on the one hand, nor of mere cour-
tesy and good will, upon the other; comity is the re-
cognition which one nation allows within its territory
to the legislative, executive or judicial acts of another
nation, having due regard both to international duty
and convenience, and to the rights of its own citizens
or of other persons who are under the protection of its
laws.

**[6] Patents 291 ☞0**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.3d
Case 1:04-cv-00875-GMS   Document 308-2   Filed 02/21/2007   Page 12 of 105
--- F.3d ----, 2007 WL 269431 (C.A.Fed. (Okla.))
Page 2

(Cite as: --- F.3d ----)

291 Patents
Comity and the principle of avoiding unreasonable interference with the authority of other sovereigns dictated that the district court decline the exercise supplemental jurisdiction over foreign patent infringement claims; nothing required the United States to adjudicate such claims, it would not have been more convenient for a United States court to assume supplemental jurisdiction over such claims, foreign courts could adequately protect the foreign patent rights of the United States citizen, and the rights of foreign governments could have been prejudiced. 28 U.S.C.A. § 1367(c).

[7] Patents 291 ☜0

291 Patents
A patent right is limited by the metes and bounds of the jurisdictional territory that granted the right to exclude.

[8] Patents 291 ☜0

291 Patents
A patent right to exclude only arises from the legal right granted and recognized by the sovereign within whose territory the right is located.

[9] Patents 291 ☜0

291 Patents
District court abused its discretion by exercising supplemental jurisdiction over foreign patent infringement claims without first conducting analysis of judicial economy associated with such exercise. 28 U.S.C.A. § 1367(c)(2).

[10] Patents 291 ☜0

291 Patents
District court abused its discretion by exercising supplemental jurisdiction over foreign patent infringement claims without first conducting analysis of factors of convenience. 28 U.S.C.A. § 1367(c).

[11] International Law 221 ☜0

221 International Law
As a principle of decision binding on federal and state courts alike, the act of state doctrine requires

that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid.

Patents 291 ☜328(2)

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
5,445,625, 6,083,213, 6,475,195. Cited.

Appealed from United States District Court for the Western District of Oklahoma, Judge Tim Leonard.

Mitchell G. Stockwell, Kilpatrick Stockton LLP, of Atlanta, GA, argued for plaintiff-appellee. With him on the brief was Jonathan K. Waldrop. Of counsel was John A. Kenney, McAfee & Taft, of Oklahoma City, OK.
John M. DiMatteo, Willkie Farr & Gallagher LLP, of New York, NY, argued for defendant-appellant. With him on the brief were Kelsey I. Nix and Diane C. Ragosa.
William C. Rooklidge, Howrey LLP, of Irvine, California, for amicus curiae American Intellectual Property Law Association. With him on the brief were Christopher J. Kelly, Mayer, Brown, Rowe & Maw LLP, of Washington, DC; and Claudia Wilson Frost and Sharon A. Israel, of Houston, TX.
William M. Atkinson, Alston & Bird LLP, of Charlotte, NC, for amicus curiae The Federal Circuit Bar Association. With him on the brief was Charles F. Schill, The Federal Circuit Bar Association, of Washington, DC.
Scott R. McIntosh, Attorney, Appellate Staff, Civil Division, United States Department of Justice, of Washington, DC, for amicus curiae United States. With him on the brief were Peter D. Keisler, Assistant Attorney General. Of counsel on the brief were James A. Toupin, General Counsel, John M. Whealan, Solicitor, Cynthia C. Lynch and Joseph G. Piccolo, Associate Solicitors, United States Patent and Trademark Office, of Arlington, VA.
George L. Graff, Paul, Hastings, Janofsky & Walker LLP, of New York, NY, for amicus curiae Intellectu-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

al Property Owners Association. With him on the brief were J. Jeffrey Hawley, Intellectual Property Owners Association, of Washington, DC, and Douglas K. Norman, Eli Lilly and Company, of Indianapolis, Indiana. Of counsel was Herbert C. Wamsley, Intellectual Property Owners Association, of Washington, DC.

John R. Thomas, Georgetown University Law Center, of Washington, DC, for amici curiae Law Professors.

Before NEWMAN, GAJARSA, and PROST, Circuit Judges.

GAJARSA, Circuit Judge.

**\*1** This is an interlocutory appeal by Cordis Corp. from a decision of the U.S. District Court for the Western District of Oklahoma assuming supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 over the foreign patent infringement claims of Jan K. Voda, M.D. ("Voda"). The district court established jurisdiction over Voda's original claims of U.S. patent infringement pursuant to § 1338. In a subsequent order, the district court granted Voda leave to amend his complaint to add infringement claims based on foreign patents. Voda's amended complaint alleged infringement taking place outside the United States in violation of patents issued by various foreign countries. The district court found subject matter jurisdiction over the foreign patent claims pursuant to the supplemental jurisdiction statute § 1367. *Voda v. Cordis Corp.,* No. 03-1512, slip op. at 2 (W.D.Okla. Aug. 2, 2004). The district court certified its order for interlocutory review pursuant to § 1292(b). We agreed that the interlocutory appeal "involve[s] a controlling question of law to which there is a substantial difference of opinion and for which an immediate appeal may materially advance the ultimate termination of the litigation" and thus, granted Voda's petition for interlocutory appeal of "whether the district court has supplemental subject matter jurisdiction over Dr. Voda's five foreign patents." *Voda v. Cordis Corp.,* 122 Fed. App'x 515 (Fed.Cir.2005). This court has jurisdiction pursuant to § 1292(b) and (c).

In *Stein Associates, Inc. v. Heat & Control, Inc.,* 748 F.2d 653, 658 (Fed.Cir.1984), this court held that U.S. district courts had no discretionary power to enjoin a party from enforcing a foreign patent before a foreign tribunal. We stated unequivocally that "the issues are not the same, one action involving United States patents and the other involving British patents" and that "[o]nly a British court, applying British law, can determine validity and infringement of British patents." In this case, we are presented with a different issue but one that raises similar concerns: whether a district court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over infringement claims based on foreign patents. For the reasons discussed below, we conclude that the district court erred in granting leave to amend based on § 1367. Accordingly, we vacate the order of the district court granting leave to amend and remand for further proceedings consistent with this opinion.

# I. BACKGROUND

The plaintiff-appellee Voda is a resident of Oklahoma City, Oklahoma. The defendant-appellant Cordis is a U.S.-based entity incorporated in Florida. None of the several foreign Cordis affiliates is a party to the present action, and we note that they appear to be separate legal entities.[FN1] These foreign affiliates have not been joined to this action.[FN2] To prevent confusion, we refer to the defendant-appellant as "Cordis U.S."

**\*2** The patents at issue relate generally to guiding catheters for use in interventional cardiology. The details of the technology are not essential here. Voda's U.S. patents stem from a common continuation-in-part ("CIP") application filed in October 1992, which provides the written description common to the three U.S. patents at issue in this case: U.S. Patent Nos. 5,445,625 (the 625 patent), 6,083,213 (the 213 patent), and 6,475,195 (the 195 patent). The foreign patents issued from a common Patent Cooperation Treaty ("PCT") application. The PCT application designated the European Patent Office ("EPO") and Canada as recipients. Voda's EPO patent application eventually generated European Pat. No. 0 568 624, British Pat. No. GB 568 624, French Pat. No. FR568624, and German Pat. No. DE 69 23 20 95. The PCT application also ultimately led to the issuance of Canadian Pat. No. CA 2,100,785.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Voda sued Cordis U.S. in the United States District Court for the Western District of Oklahoma alleging infringement of his three U.S. patents: claims 1-2 and 5-7 of the 625 patent, claims 1-5 of the 213 patent, and claims 1-6 of the 195 patent. Cordis U.S. answered by asserting noninfringement and invalidity of the U.S. patents.

Voda then moved to amend his complaint to add claims of infringement of the European, British, Canadian, French, and German foreign patents. Voda's amended complaint alleges that "Cordis [U.S.] has commenced and continues acts of making, selling, offering for sale and selling at least the XB guiding catheter, which is covered by [the several foreign patents] without Dr. Voda's authority. Such acts constitute infringement, under corresponding foreign law of [these several foreign patents]." Cordis U.S. has admitted that "the XB catheters have been sold domestically and internationally since 1994. The XB catheters were manufactured in Miami Lakes, Florida from 1993 to 2001 and have been manufactured in Juarez, Mexico since 2001." Voda's amended complaint asks for damages, fees, and "such other and further relief as this Court deems just and proper." We resolve the jurisdictional issue based upon those allegations, accepting them to be true.

Cordis U.S. opposed Voda's attempt to amend its complaint to add foreign patent infringement claims on the basis that the district court lacked subject matter jurisdiction over such claims. The parties briefed the court regarding its jurisdiction over foreign patent infringement claims under 28 U.S.C. § 1367(a) and its discretion to exercise supplemental jurisdiction under § 1367(c). In a three-page order, the district court analyzed two circuit court cases discussing supplemental jurisdiction over patent claims, _Mars, Inc. v. Kabushiki-Kaisha Nippon Conlux,_ 24 F.3d 1368 (Fed.Cir.1994) (finding no jurisdiction), and _Ortman v. Stanray,_ 371 F.2d 154 (7th Cir.1967) (affirming district court's denial of a motion to dismiss foreign patent infringement claims). The district court determined that "[t]he allegations in the [proposed] amended complaint demonstrate that this case is more akin to _Ortman_ than to Mars" and thus, that "it would have supplemental jurisdiction over the foreign patent[ ] claim[s]." _Voda v. Cordis,_ No. CIV-

03-1512-L, slip op. at 2 (August 2, 2004). Therefore, the district court granted Voda's motion to file his amended complaint. _Id._

**\*3** Cordis U.S. appeals, and in light of this appeal, the proceedings with respect to the foreign patent infringement claims have been stayed.[FN3] The record indicates that an answer to the amended complaint has not been filed and that discovery has not been taken on the foreign claims. While the record therefore does not establish the defenses Cordis U.S. would raise, Cordis U.S. represents on appeal that it would raise invalidity of the foreign patents as a defense.

A proper exercise of subject matter jurisdiction pursuant to § 1367 requires both the presence of jurisdiction under subsection (a) and an appropriate decision to exercise that jurisdiction under subsection (c). For the reasons discussed below, we conclude that the district court erred under subsection (c).

## II. STANDARD OF REVIEW

[1] The existence of supplemental jurisdiction over foreign patent claims based on claims of U.S. patent infringement is a question unique to U.S. patent law, and thus, we apply the law of our circuit rather than that of the regional circuit. _Mars,_ 24 F.3d at 1371 ("The issue whether the district court had jurisdiction to hear Mars' claim of Japanese patent infringement is of importance to the development of the patent law and is clearly a matter that falls within the exclusive subject matter responsibility of this court." (quotation marks and citations omitted)); _see Lab. Corp. of Am. Holdings v. Chiron Corp.,_ 384 F.3d 1326, 1330 (Fed.Cir.2004) (applying Federal Circuit law because we "apply the law of the regional circuit ... unless the issue pertains to or is unique to patent law, in which case we will apply our own law to both substantive and procedural issues intimately involved in the substance of enforcement of the patent right" (quotation marks omitted)); _cf. Unitherm Food Sys. v. Swift-Eckrich, Inc.,_ 546 U.S. 394, 126 S.Ct. 980, 984, 163 L.Ed.2d 974 (2006) (recognizing that Federal Circuit is bound to apply procedural law of regional circuit in case where issue did not pertain uniquely to patent law).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

We have noted that "[t]his Court ... reviews jurisdiction, a question of law, de novo." *Delme v. United States,* 970 F.2d 890, 892 (Fed.Cir.1992) (citation omitted); *see also Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) ("[Q]uestion[s] of law ... must be resolved *de novo* on appeal."). "A party seeking the exercise of jurisdiction in its favor bears the burden of establishing that such jurisdiction exists." *Mars,* 24 F.3d at 1372 (citing *KVOS, Inc. v. Associated Press,* 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183 (1936)); *cf. Daimler-Chrysler Corp. v. Cuno,* ---U.S. ----, ----, 126 S.Ct. 1854, 1861, 164 L.Ed.2d 589 (2006) ("[P]arties ... asserting federal jurisdiction[ ] carry the burden of establishing their standing under Article III."). Here, Voda must carry this burden.

### III. DISCUSSION

The Supreme Court has stated many times that the "district courts of the United States ... are 'courts of limited jurisdiction. They possess only that power authorized by Constitution and statute.' " *Exxon Mobil Corp. v. Allapattah Servs.,* 545 U.S. 546, ----, 125 S.Ct. 2611, 2616-17, 162 L.Ed.2d 502 (2005) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994)). In addition, "district courts may be obligated not to decide state law claims (or to stay their adjudication) where one of the abstention doctrines articulated by [the Supreme] Court applies." *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 174, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997).

*\*4 In this case, the parties do not dispute that the Constitution may authorize district courts to hear infringement claims based on foreign patents. *See* U.S. Const. art. III, § 2 ("[J]udicial Power shall extend ... to Controversies ... between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."). Rather, the critical disputed issue is whether there is any statutory basis for such subject matter jurisdiction.[FN4]

#### A. *Asserted Statutory Basis*

Voda asserts that the district court has supplemental jurisdiction under 28 U.S.C. § 1367 of his foreign patent infringement claims.[FN5] The Supreme Court has noted that the statute "is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction." *Exxon,* 125 S.Ct. at 2620. "The presence of other claims in the complaint, over which the district court may lack original jurisdiction, is of no moment." *Id.; cf. Marshall v. Marshall,* --- U.S. ----, ----, 126 S.Ct. 1735, 1749, 164 L.Ed.2d 480 (2006) (stating in diversity context that jurisdiction "is determined by the law of the court's creation and cannot be defeated by the extraterritorial operation of a [state] statute ..., even though it created the right of action" (quotation marks and citations omitted)).

The Supreme Court has also noted that § 1367 both "authorize[s] the district courts to exercise supplemental jurisdiction" and "confirms the discretionary nature of supplemental jurisdiction." *Chicago,* 522 U.S. at 172-73. Therefore, to allow Voda to amend his complaint to add infringement claims based on foreign patents using § 1367 supplemental jurisdiction, we must evaluate (1) whether § 1367(a) authorizes such supplemental jurisdiction and (2) whether the district court's exercise of such supplemental jurisdiction was within its § 1367(c) discretion.

#### 1. *Authorization*

Section 1367(a) provides the statutory authority for district courts to exercise supplemental jurisdiction over certain claims outside their original jurisdiction. Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). This language reveals four limits on the reach of § 1367(a).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

First, § 1367(a) does not authorize supplemental jurisdiction where "expressly provided otherwise by Federal statute." In this case, none of the parties or the amicus curiae cite any statute, and we have found none, that expressly strips federal courts of supplemental jurisdiction of claims arising under either foreign patents or foreign laws.

**\*5** Second, § 1367(a) lists subsection (b) as an exception. Subsection (b) pertains to "any civil action of which the district courts have original jurisdiction founded solely on" diversity and thus, is not relevant here.

Third, § 1367(a) also lists subsection (c) as an exception. We discuss subsection (c), which enumerates the circumstances under which the "district courts may decline to exercise supplemental jurisdiction," in *infra* Part III.A.2.

Fourth, § 1367(a) authorizes supplemental jurisdiction only over claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." This statutory "case or controversy" language extends to the limits of Article III. *See, e.g., Jones v. Ford Motor Credit Co.,* 358 F.3d 205, 212 n. 5 (2d Cir.2004); *Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1299 (7th Cir.1995).

In this case, it is undisputed that the district court has original federal question jurisdiction over Voda's U.S. patent infringement claims. In addition, § 1367(a) appears to authorize supplemental jurisdiction over foreign law claims in certain limited circumstances. Specifically, § 1367(a) provides the statutory authority for federal courts to exercise supplemental jurisdiction over claims that are outside the limited original jurisdiction of federal district courts, including those within the general jurisdiction of state courts. Therefore, because the "inherent powers" of state courts "permit them to entertain transitory causes of action arising under the laws of foreign sovereigns," *Tafflin v. Levitt,* 493 U.S. 455, 470, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) (Scalia, J., concurring) (citing *McKenna v. Fisk,* 42 U.S. (1 How.) 241, 247-249, 11 L.Ed. 117 (1843)), § 1367 supple-

mental jurisdiction appears to include foreign law claims. *See also Printz v. United States,* 521 U.S. 898, 907, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) ( "[U]nlike legislatures and executives, [courts] applied the law of other sovereigns all the time."). Therefore, the § 1367(a) issue we discuss here is whether Voda's claims of foreign patent infringement "form part of the same case or controversy under Article III."

   a. "Common nucleus of operative fact"

The Supreme Court has interpreted the statutory requirement of § 1367(a) that foreign claims be "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy" as Congress's codification of the Court's principles of pendent and ancillary jurisdiction by which the federal courts' original jurisdiction over federal questions carries with it jurisdiction over state law claims that "derive from a *common nucleus of operative fact,"* such that "the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' "

*Chicago,* 522 U.S. at 164-65 (quoting *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)) (additional citations omitted) (emphasis added); *see also* 13B Wright, Miller, Cooper & Freer, *Federal Practice & Procedure* § 3567.1, at n. 42 (2d ed. Supp.2005).

**\*6** With regard to the relationship between foreign and U.S. patent infringement claims, we stated in *Stein* that "the issues are not the same" where "one action involv[es] United States patents and the other involv[es] British patents." 748 F.2d at 658. *Mars,* 24 F.3d 1368, however, is the first and only case of this court that expressly evaluates whether supplemental jurisdiction under § 1367(a) extends to infringement claims based on foreign patents. In Mars, we applied the "common nucleus of operative fact" rubric to determine whether § 1367(a) authorized supplemental jurisdiction over an infringement claim based on a Japanese patent. We held that "the district court erred in assuming that it had 'power' to hear the Japanese patent infringement claim under *section 1367(a)." Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at 1375. Based on the facts alleged in the complaint, we reasoned:

We conclude that the foreign patent infringement claim at issue here is not so related to the U.S. patent infringement claim that the claims form part of the same case or controversy and would thus ordinarily be expected to be tried in one proceeding. [1] The respective patents are different, [2] the accused devices are different, [3] the alleged acts are different, and [4] the governing laws are different. The assertion of supplemental jurisdiction over the Japanese infringement claim would in effect result in the trial court having to conduct two separate trials at one time.

*Id.* Regarding the first three factors, we noted (1) that in the U.S. patent "[a]ll three claims are method claims directed to the electronic examination and identification of coins" whereas "[i]n contrast, the sole claim of the Japanese Patent ... is an apparatus claim that does not literally contain the limitations of [the asserted] claims ... of the U.S. patent"; (2) that the claims of U.S. and Japanese patent infringement focused on different devices and that "the range of accused devices in Japan is much broader than in the United States"; and (3) that although Mars charged the defendant with acts of both direct and induced infringement of its U.S. patent, it charged the defendant with only direct infringement of the Japanese patent. *Id.*

In this case, Voda does not dispute the assertion of Cordis U.S. that the "governing laws in each of the foreign courts differ in important ways." The parties dispute whether the patents are different. Cordis U.S. asserts that the patents differ materially, while Voda asserts that they differ only in slight respects.[FN6] With respect to the other factors, however, there appear to be more commonalities than in *Mars.* Voda's amended complaint identifies Cordis U.S.'s XB guiding catheter as the accused device for the domestic and foreign infringement claims. Voda also alleges the same type of direct infringement, i.e., making, offering for sale, and selling, for all infringement claims.

In addition, it is important to note that *Mars* does not supplant the "common nucleus of operative fact" test established by the Supreme Court in *Gibbs* and codi-

fied by Congress in § 1367(a). *Mars* simply listed four differences between the claims in that particular case that were sufficient for finding no "common nucleus of operative fact." As such, while providing precedential guidance, *Mars* did not establish either an exhaustive list of the factors district courts may consider under § 1367(a) or the necessary conditions for a finding of no supplemental jurisdiction.

*7 The district court failed to articulate any such analysis. The district court correctly observed that *Mars* did not establish a per se rule preventing U.S. courts from asserting supplemental jurisdiction to adjudicate foreign patents, but then summarily concluded that the "allegations in the amended complaint demonstrate that this case [wa]s more akin to *Ortman* [, 371 F.2d 154 (7th Cir.1967),] than to *Mars.* Based on those allegations, the [district] court [found] that it would have supplemental jurisdiction over the foreign patents claims." *Voda,* slip op. at 2. Even if we agreed that this case were "more akin" to *Ortman* than *Mars,* that does not answer the legal question of whether there is a "common nucleus of operative fact" in this case.

Here, the district court did not articulate any findings regarding the *Mars* factors.[FN7] Moreover, although the determination of foreign law is a question of law, we as an appellate court cannot take any expert testimony to determine the extent of the differences in the governing laws. *See* Fed.R.Civ.P. 44.1 (governing determination of foreign law). Since the scope of a foreign patent depends on foreign law, such testimony would also inform a comparison of the patents themselves. Therefore, because we hold in *infra* Part III.A.2 that the district court abused its discretion under § 1367(c), we deem it to be the more prudent course not to decide this "common nucleus of operative fact" question in the first instance.

*b. "Ordinarily be expected to try them all in one judicial proceeding "*

Seizing on the Supreme Court's language in *Gibbs,* one of the amicus curiae asserts that in determining the existence of "the same case or controversy" under § 1367(a), we must examine not only whether there is a "common nucleus of operative fact," but also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether a district court would "ordinarily be expected to try [domestic and foreign patent infringement claims] all in one judicial proceeding."

While courts generally focus on the phrase "common nucleus of operative fact," there is an ambiguity in *Gibbs,* in which the Supreme Court stated:

The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from a *common nucleus of operative fact.* But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would *ordinarily be expected to try them all in one judicial proceeding.* then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.

383 U.S. at 725 (citation and footnote omitted) (emphasis added). From the text of *Gibbs,* it is therefore unclear how the phrases "common nucleus of operative fact" and "ordinarily be expected to try them all in one judicial proceeding" relate.

The Court's subsequent use of the *Gibbs* language indicates that the phrases could represent two separate and necessary tests or that the phrase "ordinarily be expected" is irrelevant. *Compare Exxon,* 125 S.Ct. at 2632 (Ginsburg, J., dissenting) (" '[T]here is power in federal courts to hear the whole,' the Court said, when the *state* and federal claims 'derive from a common nucleus of operative fact' and are so linked that the plaintiff 'would ordinarily be expected to try them all in one judicial proceeding.' " (emphasis added)), *and Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("The Court stated that a federal court has jurisdiction over an entire action, including *state-law* claims, whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.' " (emphasis added)), *with Chicago,* 522 U.S. at 165 ("[T]he *state* and federal claims 'derive from a common nucleus of operative fact,'.... That is all the statute requires to establish supplemental jurisdiction." (citation omitted) (emphasis added)).

*8 Similarly, this court's use of the *Gibbs* language

indicates that the phrases could represent two separate and necessary tests or that the phrase "ordinarily be expected to try them all in one judicial proceeding" merely informs the "common nucleus of operative fact" analysis. *Compare Stark v. Advanced Magnetics, Inc.,* 29 F.3d 1570, 1578 (Fed.Cir.1994) (finding § 1367 requirements met where "there is a substantial federal claim; the federal and state claims derive from common operative facts; and the plaintiff would normally expect to try all of the claims in a single proceeding"), *with Highway Equip. Co., Inc. v. FECO, Ltd.,* 469 F.3d 1027, 1037-38 (Fed.Cir.2006) ("For this relatedness requirement to be satisfied, '[t]he state and federal claims must derive from a common nucleus of operative fact' such that they would ordinarily be expected to be tried in one proceeding." (citation omitted)), *and Mars,* 24 F.3d at 1374 ("The Court further explained that the requisite relatedness between the federal and non-federal claims exists for jurisdictional purposes when the claims derive from a 'common nucleus of operative fact,' and as such, would ordinarily be expected to be tried in one proceeding.").

If the phrase "ordinarily be expected to try them all in one judicial proceeding" does play a role in the scope of § 1367(a) authorization via *Gibbs,* district courts may be unable to exercise supplemental jurisdiction over claims based on foreign patents if the norm is that patent claims are adjudicated by the courts within the jurisdiction where such patents are created. Neither the Supreme Court nor this court, however, has addressed whether the phrase "ordinarily be expected to try them all in one judicial proceeding" constitutes an independent requirement under the "same case or controversy requirement" of § 1367(a). Because the district court abused its discretion under § 1367(c), however, we need only state in this case that none of the briefs have persuaded us to hold that such an additional requirement exists.

Accordingly, we refrain from deciding whether Voda's foreign patent infringement claims fall within the scope of the "same case or controversy" requirement of § 1367(a).

*2. Discretion*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[2][3] Section 1367 "reaffirms that the exercise of supplemental jurisdiction is within the discretion of the district court." *Mars,* 24 F.3d at 1374; *see also Chicago,* 522 U.S. at 172 (stating that supplemental jurisdiction statute codifies principle "that pendent jurisdiction 'is a doctrine of discretion, not of plaintiff's right,' and that district courts can decline to exercise jurisdiction over pendent claims for a number of valid reasons" (quoting *Gibbs,* 383 U.S. at 726)). A district court's discretion, however, is not unfettered, and we review the district court's decision not to decline supplemental jurisdiction under 28 U .S.C. § 1367(c) under an abuse of discretion standard. *Mars,* 24 F.3d at 1375 n. 4; *see also Marcus v. AT & T Corp.,* 138 F.3d 46, 57 (2d Cir.1998) ("We review the decision of the district court to exercise supplemental jurisdiction over state law claims for an abuse of discretion."). We address the limits of that discretion here and conclude that the district court's exercise of supplemental jurisdiction over Voda's foreign patent infringement claims is independently limited by subsection (c).

**\*9** Section 1367(c) provides:
The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The Supreme Court has noted that the "statute thereby reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.' " *Chicago,* 522 U.S. at 173 (citation omitted).

Voda asserts that such considerations "have nothing to do with, the certified question concerning *exist-*ence of subject-matter jurisdiction." We disagree. The text of § 1367(a) indicates § 1367(c) constitutes an express statutory exception to the authorization of jurisdiction granted by § 1367(a). In this case, Cordis U.S. asserted that the district court should exercise its discretion to decline supplemental jurisdiction of Voda's foreign patent claims at the end of its opposition to Voda's motion to amend the complaint. The district court's order contained no § 1367(c) analysis. We find that considerations of comity, judicial economy, convenience, fairness, and other exceptional circumstances constitute compelling reasons to decline jurisdiction under § 1367(c) in this case and therefore, hold that the district court abused its discretion by assuming jurisdiction.

*a. Treaties as the "supreme law of the land"*

[4] Article VI of the Constitution proclaims that "all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land." U.S. Const. art. VI, cl.2. The Supreme Court has accordingly stated that "a treaty ratified by the United States is not only the law of this land, see U.S. Const., Art. II, § 2, but also an agreement among sovereign powers." *El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 167, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (citation omitted).

The United States entered into Articles 13 through 30 of the Paris Convention for the Protection of Industrial Property ("Paris Convention") on September 5, 1970 and Articles 1 through 12 of the Paris Convention on August 25, 1973. Paris Convention, art. 13-30, 21 U.S.T. 1583; *id.,* art. 1-12, 24 U.S.T. 2140. Article 4 *bis* of the Paris Convention states that U.S. patents "shall be independent of patents obtained for the same invention in other countries" and that the "foregoing provision is to be understood in an unrestricted sense, ... both as regards the grounds for nullity and forfeiture." In addition, Article 2(3) of the Paris Convention states that the "provisions of the laws of each of the countries of the Union relating to judicial and administrative procedure and to jurisdiction, ... which may be required by the laws on industrial property are expressly reserved." The Paris Convention thus clearly expresses the independence of each country's sovereign patent systems and their sys-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tems for adjudicating those patents. Nothing in the Paris Convention contemplates nor allows one jurisdiction to adjudicate the patents of another, and as such, our courts should not determine the validity and infringement of foreign patents. Accordingly, while the Paris Convention contains no express jurisdictional-stripping statute, we relied on it in *Stein* to hold that "[o]nly a British court, applying British law, can determine validity and infringement of British patents." 748 F.2d at 658.

*10 Subsequently, the United States adopted the Patent Cooperation Treaty ("PCT") on January 24, 1978. Patent Cooperation Treaty, 28 U.S.T. 7645. As with the Paris Convention, the text of the PCT maintains the independence of each country's patents. Article 27(5) states: "Nothing in this Treaty and the Regulations is intended to be construed as prescribing anything that would limit the freedom of each Contracting State to prescribe such substantive conditions of patentability as it desires."

On January 1, 1995, the United States joined the World Trade Organization by entering the Marrakesh Agreement Establishing the World Trade Organization, which through Article II § 2 binds all of its members to the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS"). 1867 U.N.T.S. 154, 33 I.L.M. 1144 (Apr. 15, 1994). The Agreement on TRIPS contains several provisions regarding the enforcement of patents. Article 41 § 1 of the Agreement on TRIPS specifies that each country "shall ensure that enforcement procedures as specified in this Part are available under their law so as to permit effective action against any act of infringement of intellectual property rights." In addition, § 4 states that "[p]arties to a proceeding shall have an opportunity for review by a judicial authority of final administrative decisions and, subject to jurisdictional provisions in a Member's law concerning the importance of a case," and § 5 states "[i]t is understood that this Part does not ... affect the capacity of Members to enforce their law in general." *See also id.,* art. 41-49. Like the Paris Convention, nothing in the PCT or the Agreement on TRIPS contemplates or allows one jurisdiction to adjudicate patents of another.[FN8] Canada, France, Germany, and the United Kingdom, which are the foreign sovereigns concerned in this case, are parties to each of these treaties. *See* World Intellectual Property Organization, "States Party to the PCT and the Paris Convention and Members of the World Trade Organization" (2006), *available at* http:// www.wipo.int/pct/en/texts/pdf/pct_paris_wto.pdf.

Voda asserts and one of the amicus curiae briefs suggests that these international treaties evince a trend of harmonization of patent law and thus, that allowing the exercise of supplemental jurisdiction over Voda's foreign patent infringement claims furthers the harmonization goals underlying the treaties. Regardless of the strength of the harmonization trend, however, we as the U.S. judiciary should not unilaterally decide either for our government or for other foreign sovereigns that our courts will become the adjudicating body for any foreign patent with a U.S. equivalent "so related" to form "the same case or controversy." *Cf. F. Hoffman-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 166-67, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004) (finding "no convincing justification" for providing such subject matter jurisdiction in antitrust context). Permitting our district courts to exercise jurisdiction over infringement claims based on foreign patents in this case would require us to define the legal boundaries of a property right granted by another sovereign and then determine whether there has been a trespass to that right.

*11 Based on the international treaties that the United States has joined and ratified as the "supreme law of the land," a district court's exercise of supplemental jurisdiction could undermine the obligations of the United States under such treaties, which therefore constitute an exceptional circumstance to decline jurisdiction under § 1367(c)(4). Accordingly, we must scrutinize such an exercise with caution.[FN9]

*b. Comity and relations between sovereigns*

[5] "Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Société é Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S.D. of Iowa,* 482 U.S. 522, 543 n. 27, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2007 WL 269431 (C.A.Fed. (Okla.))
(Cite as: --- F.3d ----)

Comity, in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to *international duty* and *convenience,* and to the *rights of its own citizens* or of other persons who are under the protection of its laws.

*Id.* (quoting *Hilton v. Guyot,* 159 U.S. 113, 163-64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)) (quotation marks omitted) (emphasis added). Courts must also bear in mind that "whatever laws are carried into execution, within the limits of any government, are considered as having the same effect every where, so far as they do not occasion a *prejudice to the rights of the other governments,* or their citizens." *Id.* (quoting *Emory v. Grenough,* 3 U.S. (3 Dall.) 369, 370, 1 L.Ed. 640 (1797) (quotation marks and citation omitted)) (emphasis added). *Société* provides us with these considerations to guide our determination of whether an exercise of comity supports extending or declining jurisdiction over the foreign patent infringement claims at issue here. *See id.* at 543-44 (stating that international comity concept in evidence-gathering context requires particularized analysis of facts and sovereign interests).

[6] In this case, these considerations of comity do not support the district court's exercise of supplemental jurisdiction over Voda's foreign patent infringement claims. First, Voda has not identified any international duty, and we have found none, that would require our judicial system to adjudicate foreign patent infringement claims. As discussed *supra* Part III.A.2.a, while the United States has entered into the Paris Convention, the PCT, and the Agreement on TRIPS, nothing in those treaties contemplates or allows one jurisdiction to adjudicate the patents of another. Second, as discussed *infra* Part III.A.2.d, Voda has not shown that it would be more convenient for our courts to assume the supplemental jurisdiction at issue. Third, with respect to the rights of our citizens, Voda has not shown that foreign courts will inadequately protect his foreign patent rights. Indeed, we see no reason why American courts should supplant British, Canadian, French, or German courts in interpreting and enforcing British, Canadian, European, French, or German patents. *Cf. Empagran,* 542 U.S. at 165 (finding no reason to allow "American [antitrust] law [to] supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct").

*12 Fourth, assuming jurisdiction over Voda's foreign patent infringement claims could prejudice the rights of the foreign governments. None of the parties or amicus curiae have demonstrated that the British, Canadian, French, or German governments are willing to have our courts exercise jurisdiction over infringement claims based on their patents. *Cf.* 28 U.S.C. § 1338(a) (granting federal courts exclusive jurisdiction of claims relating to U.S. patents).

In addition, the local action doctrine informs us that exercising supplemental jurisdiction in this case appears to violate our own norms of what sovereigns ordinarily expect. Courts derived the local action doctrine from the distinction between local and transitory actions beginning with *Livingston v. Jefferson,* written by Justice John Marshall riding Circuit. 15 F. Cas. 660 (C.C.D.Va.1811). In *Livingston,* the plaintiff sued in a Virginia court for trespass to land located in Louisiana. The court dismissed the action, holding that it could be brought only in a Louisiana court. The Supreme Court subsequently held that "an action for trespass upon land, like an action to recover the title or the possession of the land itself, is a local action, and can only be brought within the State in which the land lies." *Ellenwood v. Marietta Chair Co.,* 158 U.S. 105, 107, 15 S.Ct. 771, 39 L.Ed. 913 (1895). The Court concluded that a federal court sitting in another state had no jurisdiction to hear the trespass claim. *Id.* In short, the local action doctrine served to prevent courts from adjudicating claims for trespass or title to real property.

[7][8] The territorial limits of the rights granted by patents are similar to those conferred by land grants. A patent right is limited by the metes and bounds of the jurisdictional territory that granted the right to exclude. *See Dowagiac Mfg. Co. v. Minn. Moline Plow Co.,* 235 U.S. 641, 650, 35 S.Ct. 221, 59 L.Ed. 398 (1915) ("The right conferred by a patent under our

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

law is confined to the United States and its territories." (citation omitted)); *NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282, 1313 (Fed.Cir.2005) ("The territorial reach of section 271 is limited. Section 271(a) is only actionable against patent infringement that occurs within the United States." (citations omitted)). Therefore, a patent right to exclude only arises from the legal right granted and recognized by the sovereign within whose territory the right is located. It would be incongruent to allow the sovereign power of one to be infringed or limited by another sovereign's extension of its jurisdiction. Therefore, while our Patent Act declares that "patents shall have the attributes of personal property," 35 U.S.C. § 261, and not real property, the local action doctrine constitutes an informative doctrine counseling us that exercising supplemental jurisdiction over Voda's foreign patent claims could prejudice the rights of the foreign governments.

Therefore, the four considerations enunciated by the Supreme Court in *Société* demonstrate that extending our jurisdiction through § 1367(a) in this case could undermine "the spirit of cooperation" underlying the comity doctrine. Because the purpose underlying comity is not furthered and potentially hindered in this case, adjudication of Voda's foreign patent infringement claims should be left to the sovereigns that create the property rights in the first instance.

**\*13** In addition, as a rule of statutory construction, the Supreme Court "ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations." *Empagran,* 542 U.S. at 164; *cf. Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 60, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) ("[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in [civil actions against tribal officers] cautions that we tread lightly in the absence of clear indications of legislative intent."). As discussed, there is no explicit statutory direction indicating that the district courts should or may exercise supplemental jurisdiction over claims arising under foreign patents, and the Paris Convention, PCT, and Agreement on TRIPS neither contemplate nor allow the extraterritorial jurisdiction of our courts to adjudicate patents of other sovereign nations. We have also noted the territorially limited nature of patent rights. *See Pellegrini v. Analog Devices, Inc.,* 375 F.3d 1113, 1117 (Fed.Cir.2004) ("[As] the U.S. Supreme Court explained nearly 150 years ago in *Brown v. Duchesne,* 60 U.S. (19 How.) 183, 15 L.Ed. 595 (1857), ... the U.S. patent laws 'do not, and were not intended to, operate beyond the limits of the United States.' "); *Rotec Indus., Inc. v. Mitsubishi Corp.,* 215 F.3d 1246, 1251 (Fed.Cir.2000) (" '[T]he right conferred by a patent under our law is confined to the United States and its territories, and infringement of this right cannot be predicated on acts wholly done in a foreign country.' " (quoting *Dowagiac,* 235 U.S. at 650)). Therefore, the principle that we should "avoid unreasonable interference with the sovereign authority of other nations" applies analogously here. *Empagran,* 542 U.S. at 164.

We would risk such interference by exercising supplemental jurisdiction over Voda's foreign patent infringement claims. Patents and the laws that govern them are often described as complex. Indeed, one of the reasons cited for why Congress established our court was because it "felt that most judges didn't understand the patent system and how it worked." Judge Pauline Newman, *Origins of the Federal Circuit: The Role of Industry,* 11 Fed. Cir. B.J. 541, 542 (2002). As such, Cordis U.S. and one of the amicus curiae assert, and Voda does not dispute, that the foreign sovereigns at issue in this case have established specific judges, resources, and procedures to "help assure the integrity and consistency of the application of their patent laws." Therefore, exercising jurisdiction over such subject matter could disrupt their foreign procedures.

By analogy, Congress unified our patent jurisprudence by creating the Federal Circuit and granting exclusive jurisdiction of appeals on patent claims. 28 U.S.C. § 1295. Foreign courts exercising jurisdiction over claims based on U.S. patents would destroy Congress's intent to foster uniformity and to preclude forum shopping. *Cf. Empagran,* 542 U.S. at 168-69 (finding in antitrust context that "legally and economically technical nature of [examining foreign law, compared with American law] means lengthier proceedings, appeals, and more proceedings-to the point where procedural costs and delays could themselves

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.3d
Case 1:04-cv-00875-GMS    Document 308-2    Filed 02/21/2007    Page 23 of 105
--- F.3d ----, 2007 WL 269431 (C.A.Fed. (Okla.))

(Cite as: --- F.3d ----)

threaten interference with a foreign nation's ability to maintain the integrity of its own antitrust enforcement system").

**\*14** Accordingly, comity and the principle of avoiding unreasonable interference with the authority of other sovereigns dictate in this case that the district court decline the exercise supplemental jurisdiction under § 1367(c).

### c. Judicial economy

[9] Because of our lack of institutional competence in the foreign patent regimes at issue in this case, more judicial resources could be consumed by the district court than the courts of the foreign patent grants. Indeed, adjudication of Voda's British, Canadian, European, French, and German patent claims may substantially predominate his U.S. patent claims. *Cf.* § 1367(c)(2) (stating that district courts may decline exercising supplemental jurisdiction where "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction").

In addition, the likelihood of jury confusion in applying different patent regimes could result in separate trials. *Cf. Gibbs*, 383 U.S. at 726 ("Finally, there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial, Fed.Rule Civ.Proc. 42(b)."). Therefore, exercising supplemental jurisdiction in this case could result in at least the same magnitude of litigation as Voda filing patent infringement claims in each respective sovereign's court.

Voda and one amicus curiae point out that consolidated multinational patent adjudication could be more efficient. While there may be merit in that argument, no international treaty establishes full faith and credit, nor have we found any analogous agreement that would require foreign countries to recognize or obligate the enforcement of our judgments regarding foreign patents. In this case, Voda's amended complaint asks not only for damages and fees but also for "such other and further relief as this Court deems just and

proper." Therefore, the additional time and resources required by our courts may result in incomplete adjudication of the claims, prolonging and extending the expenditures by all.

The district court did not articulate any such judicial economy analysis, and accordingly, this absence of analysis supports our finding that the district court abused its discretion in this case.

### d. Convenience

[10] Similarly, factors of convenience may provide additional reasons to decline exercising supplemental jurisdiction in this case. Again, the district court did not articulate any such analysis, further supporting our finding that it abused its discretion.

We note that the Supreme Court does not appear to have defined convenience in the context of discretionary exercises of supplemental jurisdiction. While the parties have structured their arguments in this case around forum non conveniens, they have provided no case law justifying incorporation of that doctrine into the consideration of convenience under § 1367(c). *Cf. Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 248 n. 13, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (noting that Supreme Court first indicated that motions to dismiss on grounds of forum non conveniens could be made in federal diversity actions in *Williams v. Green Bay & W.R. Co.*, 326 U.S. 549, 66 S.Ct. 284, 90 L.Ed. 311 (1946)); *Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 606 (2d Cir.1998) (stating that Supreme Court explicitly recognized applicability of forum non conveniens in federal question cases in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). Where the doctrine does not duplicate other factors already considered, however, forum non conveniens is a useful doctrine to reference. For example, on one hand, the cost of obtaining and translating evidence, especially experts in foreign patent law pursuant to Fed.R.Civ.P. 44.1 (governing determination of foreign law), cuts against exercising supplemental jurisdiction. On the other hand, deferring to the plaintiff's choice of forum would support such an exercise.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### e. Fairness

*15 [11] Lastly, the act of state doctrine may make the exercise of supplemental jurisdiction over foreign patent infringement claims fundamentally unfair. As "a *'principle of decision* binding on federal and state courts alike,' " the act of state doctrine "requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l,* 493 U.S. 400, 406, 409, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (citation omitted). In this case, none of the parties or amicus curiae have persuaded us that the grant of a patent by a sovereign is not an act of state. *But see Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1293-94 (3d Cir.1979) (stating that Third Circuit was "unable to accept the proposition that the mere issuance of patents by a foreign power constitutes [ ] an act of state" under abstention analysis). Therefore, assuming arguendo that the act of state doctrine applies, the doctrine would prevent our courts from inquiring into the validity of a foreign patent grant and require our courts to adjudicate patent claims regardless of validity or enforceability. Given the number of U.S. patent cases that we resolve on validity or enforceability as opposed to infringement grounds, exercising such jurisdiction could be fundamentally unfair to the alleged infringer where, as one amicus curiae points out, "the patent is in fact invalid and the defendant would be excused from liability on that basis in a foreign forum." Voda has not shown in this case that the validity of the foreign patents would not be at issue. Indeed, Cordis U.S. asserts otherwise.

### f. Section 1367(c) abuse of discretion

In summary, several reasons in this case would compel the district court to decline supplemental jurisdiction under § 1367(c): limitations imposed by treaties that are the "supreme law of the land" and considerations of comity, judicial economy, convenience, and fairness. The district court undertook none of this analysis. Accordingly, we hold that the district court abused its discretion in exercising supplemental jurisdiction.

As with the § 1367(a) factors of *Mars,* this is a non-

exhaustive list, not a test, for district courts to consider under § 1367(c). In addition, we emphasize that because the exercise of supplemental jurisdiction under § 1367(c) is an area of discretion, the district courts should examine these reasons along with others that are relevant in every case, especially if circumstances change, such as if the United States were to enter into a new international patent treaty or if events during litigation alter a district court's conclusions regarding comity, judicial economy, convenience, or fairness. However, "[d]iscretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike ... a page of history is worth a volume of logic." *eBay,* 126 S.Ct. at 1841-42 (Roberts, C.J., concurring) (quotation marks and citations omitted).

### B. Alternate Statutory Basis

*16 The parties also dispute on appeal whether diversity jurisdiction under § 1332 provides an alternate and independent basis for the district court to hear Voda's claims of foreign patent infringement. However, Voda has not pled diversity, and it is not clear whether the district court would permit such a pleading to be made at this stage in the proceedings. We therefore decline to decide whether the district court could properly exercise jurisdiction based in diversity.

### B. Abstention

The "district courts may be obligated not to decide" claims arising under foreign patents "where one of the abstention doctrines articulated by [the Supreme] Court applies." *Chicago,* 522 U.S. at 174. Abstention doctrines "embody the general notion that federal courts may decline to exercise their jurisdiction, in otherwise exceptional circumstances, where denying a federal forum would clearly serve an important countervailing interest, for example where abstention is warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration." *Id.* (quotation marks and citation omitted). Because we resolve the district court's jurisdiction on statutory grounds, we do not discuss or make any holdings regarding abstention

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

here.

## IV. CONCLUSION

We vacate the order of the district court granting Voda leave to amend his complaint to add infringement claims based on foreign patents pursuant to the supplemental jurisdiction statute 28 U.S.C. § 1367 and remand for further proceedings consistent with this opinion.

*VACATED* and *REMANDED*

No costs.

Dissenting opinion filed by Circuit Judge NEWMAN.

NEWMAN, Circuit Judge, dissenting.
I respectfully dissent, for the question here presented is not related to federalism and the federal/state relationship, or to pendent jurisdiction of state law issues; nor are disputes about foreign patents so unique as to call up the other theories collected by the panel majority to support this ousting of United States parties from access to United States courts. The certified question is concerned solely with the authority of a United States court, having personal jurisdiction of the parties, to exercise its discretion to accept the amended complaint concerning the foreign patents corresponding to the United States patent in suit.<sup>FN1</sup>

A foreign country is not a "state" in the constitutional context, and the judicial application of foreign law plays no role in the jurisdictional balance represented by federalism. The rules governing federal jurisdiction of supplemental state claims are irrelevant to whether a United States court has the authority and can exercise its discretion to decide questions that require the application of foreign law. Courts in the United States have always had the authority to decide questions that require application of foreign law. Federal Rule of Civil Procedure 44.1 ("Determination of Foreign Law") provides procedural guidance. In *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) the Court, comparing the judicial and other branches of government, remarked that courts "applied the law of other sovereigns all the time." *Id.* at 907. Yet the panel majority holds that a United States court cannot do so, in its sound

discretion, when the issue concerns patents. Thus this court rules that the district court is precluded from considering the issues concerning the four foreign counterparts of the United States patent that is in suit between these parties.

*17 The district court had agreed to receive the amended complaint. Our role, at this pleading stage, is to determine whether that action is supportable. My colleagues hold that the district court abused its discretion in exercising supplemental jurisdiction of the foreign patent issues, indeed holding that the district court has no discretion to accept this amended complaint because it involves foreign patents. I cannot agree. It is inappropriate for the Federal Circuit to create this unique exception to the authority of American courts to resolve controversies that require the application of foreign law.

Access of a nation's citizenry to dispute resolution in the nation's courts is fundamental to a nation ruled by law. This court's new rule carves an inapt exception into judicial authority, judicial obligation, and judicial discretion. Such special treatment of patent issues is flawed as a matter of precedent, procedure, and policy.

### *Courts Routinely Apply Foreign Law*

Precedent illustrates myriad situations in which the courts have determined and applied foreign law, and also illustrates those few situations in which a court has declined to resolve a specific foreign-based issue. Today's extreme barrier to exercise of the district court's discretion when foreign patents are involved stands alone among the vast variety of causes in which such determinations have been made.

United States courts have determined and applied foreign commercial law, foreign property law, foreign inheritance law, foreign citizenship law, foreign copyright law, foreign trademark law, foreign liability and negligence law, and other foreign law as appropriate to resolution of the dispute between the parties before the court. The principle is that a court should apply the same law that would be applied in the nation where the event occurred, or the law having the most significant relationship to the event in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dispute. For example, in _Smith v. Condry_, 42 U.S. (1 How.) 28, 11 L.Ed. 35 (1843), concerning liability for a collision between American vessels in the port of Liverpool, the Court held that the British statutes should be applied to determine fault, and that liability and damages should be decided under British law. In _Nashua Savings Bank v. Anglo-American Land, Mortgage & Agency Co._, 189 U.S. 221, 230, 23 S.Ct. 517, 47 L.Ed. 782 (1903) the Court discussed various methods of proving foreign law, then viewed as a question of fact, in an action by an English corporation to recover an assessment on its capital stock; the Court explained that: "By subscribing to stock in a foreign corporation, defendant subjects itself to the laws of such foreign country in respect to the powers and obligations of such corporation." In _Uebersee Finanz-Korporation, A.G. v. McGrath_, 343 U.S. 205, 72 S.Ct. 618, 96 L.Ed. 888 (1952) the Court held that it was appropriate to determine property ownership of a usufructuary under German law, predicate to application of the Trading with the Enemy Act.

A sampling of recent cases yields further illustration of judicial authority and dispute-resolution obligation when foreign law is involved: In _Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co._, 295 F.3d 59 (1 st Cir.2002) the court observed that the district court may apply United States copyright law, German contract law, and Austrian inheritance law, to resolve all of the issues in the case. In _Abogados v. AT & T, Inc._, 223 F.3d 932 (9th Cir.2000) the court applied California choice of law analysis to hold that the law of Jalisco, Mexico should be applied by the district court to an issue of tortious interference with a contract made in Mexico between the Mexican plaintiffs and the Mexican subsidiary of AT & T. In _Tschira v. Willingham_, 135 F.3d 1077 (6th Cir.1998) the court applied German law to decide whether a letter created a fiduciary duty, and then applied Tennessee law to a fraudulent misrepresentation concerning property in Tennessee. In _Curley v. AMR Corp._, 153 F.3d 5, 12 (2nd Cir.1998) the court compared the laws of Mexico and New York as to various torts including false imprisonment and negligence, and stated its "agreement with the concept that appellate courts, as well as trial courts, may find and apply foreign law"; the court

held that foreign law should be applied to the acts that occurred in Mexico unless "violative of fundamental notions of justice and prevailing concepts of good morals." _See generally_ 9 Charles Alan Wright and Arthur R. Miller, _Federal Practice and Procedure_ §§ 2444-446 at 644-58 (2d ed.1995) (discussing application of foreign law in federal courts).

**\*18** In _Dorman v. Emerson Electric Co._, 23 F.3d 1354 (8th Cir.1994) the court applied the "most significant relationship" test to determine that Canadian law applied to a personal injury claim against a product that was designed in Missouri, manufactured in Taiwan, and sold and used in Canada. In _Indasu Int'l, C.A., v. Citibank, N.A._, 861 F.2d 375, 379 (2nd Cir.1988) the court determined the applicable Ecuadorian law of contracts and guaranty, then applied that law to the obligation between the United States guarantor and a Panamanian corporation as to a contract to be performed in Ecuadorian waters. In _Mathews v. ABC Television, Inc._, 776 F.Supp. 821 (S.D.N.Y.1991) a Kenyan film-maker sued ABC Television in New York for injuries by a rhinoceros in Kenya, alleging that an ABC employee's reckless conduct caused the attack; the district court applied the Kenyan comparative negligence law and case law of the East African Court of Appeals. In _In re Houbigant, Inc._, 914 F.Supp. 964 (S.D.N.Y.1995) the district court applied various provisions of the Canadian Trade-Marks Act, and also applied the laws of the Province of Quebec and the State of New York to the interpretation of a licensing arrangement. In _Armstrong v. Virgin Records, Ltd._, 91 F.Supp.2d 628 (S.D.N.Y.2000) the district court exercised jurisdiction of the United States and foreign copyright claims, stating that "there is no principled reason to bar, in absolute fashion, copyright claims brought under foreign law for lack of subject matter jurisdiction," and that "subject matter jurisdiction over any claims properly arising under United States copyright law, potentially allowing the Court to exercise pendent jurisdiction over claims arising under foreign law." _Id._ at 637.

As for cases involving foreign patents, in _Ortman v. Stanray_, 371 F.2d 154 (7th Cir.1967) the court approved the exercise of supplemental jurisdiction of counts concerning the corresponding Canadian,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Brazilian, and Mexican patents. In *Mars, Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1369 (Fed.Cir.1994), this court declined to decide the Japanese patent issues, explaining that the accused devices, the scope and class of the claims, and the charges of infringement were different in Japan and the United States. In *Medigene AG v. Loyola Univ. of Chicago*, No. 98 C 2026, 2001 WL 1636916 (N.D.Ill.Dec.19, 2001) the district court declined to dismiss the issue of inventorship of foreign patent applications, stating that "[*Mars* ] makes clear that in appropriate circumstances Section 1367 permits exercise of supplemental jurisdiction over a claim for infringement of a foreign patent." *Id.* at *1. In *Forbo-Giubiasco S.A. v. Congoleum Corp.*, 516 F.Supp. 1210 (S.D.N.Y.1981), the court observed that "[a] finding against Congoleum on this point [inequitable conduct in obtaining the foreign patents] would affect only the rights between Congoleum and Giubiasco, not Congoleum's foreign patent rights generally." *Id.* at 1218. In *Distillers Co. v. Standard Oil Co.*, 150 USPQ 42 (N.D.Ohio 1964), in a dispute involving various patents on the manufacture of acrylonitrile, the court stated that "It cannot be doubted, nor does the plaintiff question, that this Court is empowered to consider claims arising under foreign patents." *Id.* (citing *Aluminum Co. of Am. v. Sperry Products, Inc.*, 285 F.2d 911 (6th Cir.1950) and *Nat'l Latex Products Co. v. Sun Rubber Co.*, 274 F.2d 224 (6th Cir.1960)).

**\*19** In no case did the court hold that it had no power or authority to receive the foreign issue, reciting various reasons in a few situations where the court declined the foreign issue. An example is *Bonzel v. Pfizer, Inc.*, 439 F.3d 1358 (Fed.Cir.2006), where this court sustained the district court's discretion in dismissing, on the ground of *forum non conveniens*, an action that required application of German contract law to interpret a patent license agreement that was made in Germany between a German national and the Swiss subsidiary of a United States company. Other cases are: *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 645 (2nd Cir.1956) ("the district court did not abuse its discretion in declining to exercise its jurisdiction over that portion of the case arising in Canada and governed by Canadian trade-mark law"); *Torah Soft Ltd. v. Drosnin*, 136 F.Supp.2d 276

(S.D.N.Y.2001) (district court declined to exercise jurisdiction over foreign copyright claims because the United States copyright claim had been dismissed); *Berkshire Furniture Co. v. Glattstein*, 921 F.Supp. 1559, 1562 (W.D.Ky.1995) (district court stated that on principles of international comity it was "disinclined to decide issues related to the designs that arise under U.K. and Malaysian law"); *Packard Instrument Co. v. Beckman Instruments, Inc.*, 346 F.Supp. 408 (N.D.Ill.1972) (district court declined to resolve patent infringement in nine foreign countries, stating that the patentee could obtain effective relief by enforcement of its United States patent). In none of these cases was there any assertion of judicial incapacity to resolve the foreign issues, or of any prohibition on the exercise of discretion to accept the case.

The district court herein, in exercising its discretion to accept the Voda amended complaint, explained that the factual situation in *Ortman, supra*, was more akin to this case than the factual situation in *Mars, supra*. In *Ortman* the court had accepted the foreign patent issues, stating that "all of the actions of defendant of which complaint is made are the result of defendant doing similar acts both in and out of the United States," 371 F.2d at 158, whereas in *Mars*, citing the differences in the patents and the products this court held that the Japanese issues would more appropriately be resolved by a Japanese court. In contrast to the case-specific analyses in precedent, my colleagues now hold that it would always be an abuse of discretion for the district court to decide foreign patent issues, unless some sort of new treaty is produced. However, it is inappropriate to compel the district court to decline the adjudicative authority available in all other areas of law.

In explaining this unique inroad on discretion when foreign patents are involved, my colleagues rely heavily on the criteria of supplemental jurisdiction as codified in 28 U.S.C. § 1367. However, judicial authority to determine and apply foreign law does not require that the foreign issue is supplemental to a domestic issue. Further, even if the criteria of § 1367 are applied they support, rather than negate, the district court's decision herein.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 269431 (C.A.Fed. (Okla.))

**(Cite as: --- F.3d ----)**

**\*20** Judicial authority to decide questions of foreign law is not a matter of the federal/state relationship codified at 28 U.S.C. § 1367. Nonetheless, the elaboration in _United Mine Workers of America v. Gibbs._ 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) concerning federal supplemental jurisdiction of state law causes that have "a common nucleus of operative fact" is a useful analogy to the Voda/Cordis situation, for the "considerations of judicial economy, convenience and fairness to litigants" that are served by supplemental jurisdiction, 383 U.S. at 726, are relevant to considerations of the exercise of judicial discretion. If these criteria are applied they reinforce, rather than negate, the district court's exercise of discretion to accept Voda's amended complaint.

The principles of supplemental jurisdiction as applied to federal/state issues, 28 U.S.C. § 1367, weigh on the side of the exercise of jurisdiction absent compelling reason:

§ 1367(a). Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts _shall have supplemental jurisdiction_ over all other claims that are so related to claims within such original jurisdiction that they form _part of the same case or controversy_ under Article III of the United States Constitution....

A district court may decline to exercise supplemental jurisdiction over such a related claim:§ 1367(c). The district courts _may decline_ to exercise supplemental jurisdiction over a claim under subsection (a) if-
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other _compelling reasons_ for declining jurisdiction.

(All emphases added). Although my colleagues fault the district court for "not making a Section 1367(c) analysis," this is an inapt criticism, for the district court did not decline jurisdiction by invoking §

1367(c); instead, the court applied the principle of § 1367(a) and accepted the claim, exercising its authority and recognizing its dispute-resolution obligation. Indeed, in _Exxon Mobil Corp. v. Allapattah Services, Inc.,_ 545 U.S. 546, 125 S.Ct. 2611, 2620, 162 L.Ed.2d 502 (2005) the Court counseled against unduly narrowing the application of § 1367(a). The Federal Circuit in _Mars_ applied the principles of § 1367(c) and held that the Japanese patent issues should be litigated in Japan because the "common nucleus of operative fact" required by _Gibbs_ was not present, but this court also stated that § 1367(c) "reaffirms that the exercise of supplemental jurisdiction is within the discretion of the district court." 24 F.3d at 1374.

The court's ruling today essentially eliminates this discretionary option in foreign patent cases; the court makes no mention of the common nucleus of operative facts among Voda's United States and foreign patent issues, and does not review the district court's ruling on the ground of abuse of discretion. In _eBay Inc. v. MercExchange L.L.C.,_ --- U.S. ----, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) the Court discouraged the carving out of an exception uniquely for patent cases, and required that the equitable discretion of the district court be as available in patent cases as in other cases. The panel majority strays from precedent, policy, and prudence, in ruling that the discretionary authority of the district court cannot or should not be exercised to resolve foreign patent disputes between parties properly before the court. My colleagues' reliance on the rules of supplemental jurisdiction does not support their restraint on this exercise of discretion.

**\*21** I respond to the several other justifications offered in the majority opinion, for they also are flawed:

### The Facts as Pled Support the District Court's Action

The district court followed the Seventh Circuit's decision in _Ortman,_ the closest precedent. The commonality of issues in the five countries of the Voda patents, including the United States, was before the district court. The accused catheter is the same in all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00875-GMS   Document 308-2   Filed 02/21/2007   Page 29 of 105
Page 19

five countries; it is manufactured by Cordis Corporation in a single plant, initially at Miami Lakes, Florida and now in Mexico. Cordis manages the Mexican plant and arranges for shipment to the Cordis companies in the five countries where infringement is charged, *viz .,* Cordis Corporation (US), Cordis S.A. (France), Cordis G.m.b.H (Germany), Cordis UK Limited, and Cordis in Canada. All of the Cordis companies are related to the Johnson & Johnson Company.

The patents in the five countries show that they are of common origin. A PCT (Patent Cooperation Treaty) application, based on the United States application, was filed in the Canadian and European Patent Offices. All of the patents have identical drawings, and the specifications are the same with additional text in the United States. The European patent application was filed and prosecuted in English, and the French and German patents are translations of the European patent. The British, French, and German patents have the specification and claims of the European patent grant.[FN2]

Cordis says in its brief that there are differences among the patents, although no details were provided and differences are not apparent. But accepting this statement, I doubt that any differences are beyond the understanding of a United States court, with appropriate explanation if needed. Cordis also says that it intends to challenge the validity of all of the patents based on a reference that was not cited in any examination; it is not explained why a new reference cannot be considered as to not only the United States patent, but the foreign patents.

My colleagues, supporting their ruling that the district court should not and can not in its discretion accept cases that raise issues of foreign patent validity and infringement, state that "more judicial resources could be consumed by the district court than the courts of the foreign patent grants." Maj. Op. at 26. This reason is unsupported by the pleaded facts. Nor should a court ignore the consumption of private as well as judicial resources in duplicative litigation between the same parties in five countries, in three languages, with five sets of lawyers and the other trappings and burdens of trial.

My colleagues unfairly criticize the district court for not making any findings regarding the differences between the domestic and foreign patents, and equally unfairly criticize the absence of expert analysis of the foreign patent laws. It is surely inappropriate to criticize the judge for not making findings or taking evidence at the pleading stage. On a motion to amend the pleadings the court shall accept the well-pled allegations, Fed.R.Civ.P. 12(b)(6), and indeed no challenge to the premises has been presented.

**\*22** Discretionary authority is of broad scope, as is the judicial obligation to resolve disputes between litigants who are properly before the court. The district court's action reflects the "balance of conveniences," *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255 n. 23, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), for the court could have considered the convenience to Dr. Voda, a citizen of Oklahoma, and balanced it against the convenience of multiple litigation in foreign countries. Cordis does not argue that it would be more "convenient" for it to litigate in five countries instead of one.

Although a district court may decline to exercise its jurisdiction when it appears that the convenience of the parties and the court and the interests of justice are such that the action should be tried in another forum, *id.* at 249-50, this determination is committed to the sound discretion of the district court. *See, e.g., Leetsch v. Freedman,* 260 F.3d 1100, 1102-03 (9th Cir.2001) ("When we review a forum non conveniens determination, we give less deference to a foreign plaintiff's choice of a United States forum than to a domestic plaintiff's choice" and "[w]hether to dismiss an action on forum non conveniens grounds require the district court to consider the availability of an adequate alternative forum, and then to consider whether several 'private' and 'public' interest factors favors dismissal."). Cordis has the burden of persuasion that the district court abused its discretion in choosing to receive the amended complaint. Our appellate role is to determine whether Cordis has met this burden and has shown that the district court's exercise of discretion is not sustainable in this case; it is an improper appellate ruling to remove that discretion.

**Complexity of Law or Fact**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

I turn to the matter of complexity, for this aspect is also pressed in the panel majority's reasoning. My colleagues propose that in view of the complexities that may arise in connection with foreign patents, United States courts should not or can not exercise their discretion to enter the arena. Such a sweeping elimination of judicial authority contravenes the fundamentals of judicial responsibility, for judges cannot avoid cases because they may be complex. The complexity of patent law does not evict the district court from its discretionary authority.

My colleagues appear to believe that each nation's patent on Dr. Voda's invention covers a different scope of subject matter. The proposition that the scope of counterpart patents, particularly those having identical claims, will usually vary significantly will come as a surprise and shock to the holders of literally millions of counterpart patents. In this case all five patents are of common origin and text, and the patents in Great Britain, France, and Germany are identical as granted by the European Patent Office. It is well recognized that most inventions receive consistent protection under the patent laws of the major industrial nations. The few areas of difference are well understood by practitioners.[FN3] The international structure of patent laws, patent practitioners, and patent treaties, is bottomed on this commercial premise. International business depends on this expectation and reality.

**\*23** There is no assertion that the Voda catheter is so complicated as to test the nuances of comprehension and law. The panel majority states that its concern about "construing" different claims or even the same claims in different countries, and that expert testimony might be required. Expert testimony is not unusual in patent litigation, and experts on the meaning and scope of the claims in these countries are undoubtedly available if needed. *See* Fed.R.Civ.P. 44.1.[FN4]

"The parties, therefore, carry the burden of proving foreign law; where they do not do so, we 'will ordinarily apply the forum's law.' " *Ferrostaal, Inc. v. M/V Sea Phoenix,* 447 F.3d 212, 216 (3rd Cir.2006) (quoting *Bel-Ray v. Chemrite Ltd.,* 181 F.3d 435, 440 (3d Cir.1999)); *Banco de Credito Industrial, S.A. v.*

*Tesoreria Gen.,* 990 F.2d 827, 836 (5th Cir.1993) (analyzing Spanish and French law and holding that "[w]hen the parties have failed to conclusively establish foreign law, a court is entitled to look to its own forum's law in order to fill in any gaps.").

We do not know whether the accused Cordis device is a simple copy of the Voda invention or whether it embodies significant changes; that is, we do not know whether claim "construction," under any law, will be necessary. As for foreign languages, about which my colleagues also express concern, the Canadian and British patents are in English, as is the European patent of which the German and French patents are translations. The prosecution history in the European Patent Office is in English, as of course in Canada and the United States. It surely is not apparent that multiple litigation of the same issues in five countries and three languages is likely to be more economical of judicial time and litigation expense, and more likely to achieve a correct and just result, than resolving all of the issues before one judge in one case and one language. This aspect cannot serve to negate the district court's exercise of discretion to receive these issues.

My colleagues also express concern about "jury confusion" when proving infringement of patents written in other languages and under foreign law. I take note that the Uniform Interstate and International Procedure Act, Article IV § 4.03, states that "the court, not the jury, shall determine foreign law." *See also* Fed.R.Civ.P. 44.1. It need not be ignored that the extent to which the question of infringement is presented to a jury is diminished in the United States since the advent of the *Markman* practice; and whether a corresponding foreign question under the laws of a country that does not have a jury system would avoid any Seventh Amendment obligation is not here at issue.

The panel majority also states its concern that issues of foreign patents may not be correctly decided by a United States court. Undoubtedly this concern fits all of the areas in which courts have applied foreign law, and could be a factor in a district court's determination of whether to exercise jurisdiction in a particular case. However, such a discretionary determination is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

quite different from the panel majority's ruling that discretion should not be exercised to accept and decide foreign patent issues.

**\*24** My colleagues propose that permitting exercise of the district court's discretion to accept jurisdiction "could be fundamentally unfair to the alleged infringer." Indeed, fairness is an important aspect of discretionary rulings, and fairness to both sides must be considered. The panel majority does not explain its apparent balance of fairness in its holding that the alleged infringer is always more disadvantaged and can only be sued in the situs of the infringement. Such considerations would have evicted American courts in many areas of law, as in the representative cases cited earlier in this opinion. This concern does not warrant treating patent cases differently from all other causes of action.

In this case, the district court was willing to take on the foreign issues. Perhaps the district court gave weight to the fact that the United States patent was being litigated anyway, on the same grounds and against the same device that is at issue in all five countries. Perhaps the court gave weight to equitable considerations, for they are always relevant to judicial discretion. None of the aspects here raised supports departing from the authority of courts to resolve disputes between parties that are properly before them, whether or not foreign law is involved. The fundamental question now presented is whether a district court will be permitted to retain its judicial authority, or will this specific area be uniquely limited, whatever the position of the district court as to its discretion and its obligation.

### The Local Action Doctrine

My colleagues also refer to the "local action" doctrine as barring the district court's jurisdiction of foreign patent issues. This "doctrine" arose in United States jurisprudence in the early days of the Republic, clarifying the jurisdiction of the state courts with respect to each other. In _Livingston v. Jefferson,_ 15 F. Cas. 660 (C.C.D.Va.1811), the court recognized the common law concept of local action and established that an action involving real property can be brought only within the state of the United States where the

land is located. Such rulings have no relation to whether a United States court can resolve a dispute between persons personally before the tribunal by applying the law of a foreign country, whatever the issue. _See generally_ 14D Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, _Federal Practice and Procedure: Jurisdiction and Related Matters 2d_ § 3822, at 451-54 (2007). It is obscure how this "doctrine" supports my colleagues' ruling that a United States court cannot resolve disputes that raise questions of foreign patent law.

### The Act of State Doctrine

The panel majority also invokes the "Act of State" doctrine as justification for barring the district court from choosing to decide the issues of Voda's foreign patents. The theory appears to be that the grant of a foreign patent is a governmental act of state, and thereby untouchable by a United States court. Thus the panel majority proposes that the district court's discretionary act would "prejudice the rights of other governments" to decide the validity and enforceability of their patents. That proposition is unsupported. In _Mannington Mills, Inc. v. Congoleum Corp.,_ 595 F.2d 1287, 1293-94 (3rd Cir.1979) the court rejected the theory that "the mere issuance of patents by a foreign power constitutes either an act of state, as that term has developed under case law, or an example of governments' compulsion." In _Forho-Giubiasco,_ 516 F.Supp. at 1217 the court explained that "it cannot be said that a determination by an American court that a private company failed to present relevant information to a foreign patent office could interfere with our government's conduct of foreign affairs."

**\*25** In _Banco National de Cuba v. Sabbatino,_ 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1963) the Court explained that "[t]he act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory," and that the doctrine precludes judicial determination of the legality of acts of foreign states within their own territories which might embarrass the executive department in its conduct of foreign affairs. _Id._ at 427-49. Not every governmental action is an act of state, and not every min-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

isterial activity carries the political and international implications of that usage.

Whether a particular governmental action is properly viewed as an act of state has been explained in a variety of contexts; the common thread is whether the issue is one that is normally consigned to the executive branches, such that an international dispute is resolved by political negotiations between diplomats; or whether the issue is more suitable to the individual review that is given to litigants in judicial proceedings dealing with specific facts. *See generally* 12 A.L.R. Fed. 707 (2006) ("Modern Status of the Act of State Doctrine"). The fundamental criterion is whether the governmental action is a significant public act or whether it is a ministerial function, accompanied by whether the proposed judicial review is directed to the public interests of the nation as served by the governmental act, or is a private effort to enforce a private claim.

Clearly, the grant of a patent is not an Act of State, whether done by the United States or by a foreign country. No support has been offered for so creative an application of international law; this "doctrine" provides no support for this court's removal of judicial discretion of United States courts to resolve a commercial dispute between private parties involving private patent rights. The Act of State doctrine is not relevant to judicial review of the Voda foreign patents; patent validity and infringement are legal and commercial issues, not acts of state. This doctrine does not create an exception that excludes foreign patents from access to dispute resolution in our courts.

### Enforcement Is Not An Issue

There is no issue raised by either party concerning enforcement by a foreign court of the district court's potential decision concerning any of the Voda foreign patents. This case does not raise issues of comity, treaty, and diplomacy, when judgments are sought to be enforced in another country. The complexities of enforcement of foreign judgments, at which my colleagues hint, indeed serve to protect litigants from abusive procedures, and under the various protocols and treaties that relate to foreign judgments, a foreign

court can refuse to accept a decision of another nation's tribunal. *See Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937-38 (D.C.Cir.1984) ("No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum."); *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 60 (2d Cir.2004) ( "orders of foreign courts are not entitled to comity if the litigants who procure them have 'deliberately courted legal impediments' to the enforcement of a federal court's orders") (citation omitted); *Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 246 (2d Cir.1999) (judicial proceedings may receive comity to the extent that the "foreign court had proper jurisdiction and enforcement does not prejudice rights of United States citizens or violate domestic public policy"). See *generally* Restatement (Third) of Foreign Relations Law of the United States §§ 481-82 (1987) (recognition and enforcement of foreign judgments and grounds for non-recognition of such judgments).

**\*26** The enforcement aspect was not raised by either party. The district court may have recognized that both Dr. Voda and Cordis Corporation, the manufacturer for all five countries, are within the district court's personal jurisdiction. In *Forbo-Giubiasco, supra,* the court explained that its findings with respect to the foreign patents were directed to the obligations of the parties to each other, and not to whether or how a foreign tribunal would view the decision.

The issues and relationships herein reinforce the district court's exercise of discretion to accept the amended complaint, and further impugns this court's withdrawal of the district court's discretion as to foreign patents. There is no sound reason why speculative concerns of enforcement in foreign countries warrant depriving the district court of its discretion to resolve this dispute between these United States parties. While we do not know the extent to which the district court might find liability and impose constraints in this case, the answer to this dispute is not to bar the court from hearing it.

### The Role of Patent Treaties

The panel majority proposes that it would violate the

--- F.3d ----
Case 1:04-cv-00875-GMS    Document 308-2    Filed 02/21/2007    Page 33 of 105
--- F.3d ----, 2007 WL 269431 (C.A.Fed. (Okla.))

(Cite as: --- F.3d ----)

Paris Convention for the Protection of Industrial Property, the Patent Cooperation Treaty, and the TRIPS Agreement of the World Trade Organization, if the United States were to consider the validity and infringement of Dr. Voda's foreign patents. None of these treaties prohibits resolution by a national court of private disputes that include foreign patent rights. The question is not as presented by the panel majority, whether any treaty imposes "an international duty" on a nation's courts to render decision concerning foreign patents. The question is whether any treaty prohibits a national court from resolving a dispute between entities under the personal jurisdiction of the court. No treaty bars such dispute resolution.

### Dispute Resolution is an Obligation of Courts

The ruling of the panel majority departs not only from judicial precedent, but from judicial obligation. Although the court appears to concede that the district court may have "jurisdiction" to resolve the foreign aspects of this dispute, my colleagues hold that this authority cannot be exercised to resolve this dispute. This holding contravenes the judicial role. The district court has both the power and the obligation to resolve the dispute between the parties. *See Cheney v. U.S. District Court for the District of Columbia,* 542 U.S. 367, 370, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (referring to the district court's constitutional responsibility to resolve cases and controversies within its jurisdiction); *Kirkpatrick & Co. v. Env't'l Tectronics Corp. Int'l,* 493 U.S. 400, 409, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) ("Courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them.").

The majority postulates that discretion perhaps could be exercised "especially if circumstances change, such as if the United States were to enter into a new international patent treaty or if events during litigation alter a district court's conclusion regarding comity, judicial economy, convenience, or fairness." This is at best a confusing wrap-up to this important question, for no new international treaty is at hand, and the proposal that events during litigation may change the conclusion is not helpful, for the question is whether this litigation will be conducted at all.

**\*27** The question here is simply whether, in a dispute between United States entities of whom the district court has personal jurisdiction, does the court have discretion to resolve aspects that concern foreign patents. The panel majority's conclusion that the court cannot exercise its discretion to do so is contrary to principle, practice, and judicial obligation.

### Comity, Harmonization, and the Future

Comity is a complex concept of international law, and its generalization to evict United States courts from their dispute-resolution obligation is not supported on any theory of comity. *See Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895) (defining comity as "neither of absolute obligation ... nor of mere courtesy and good will" but "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both the international duty and convenience, and to the rights of its own citizens ... who are under the protection of its laws."). Comity has no relevance to the need to apply foreign law and the obligation and authority to meet that need. In *Piper Aircraft,* 454 U.S. at 260 n. 29, the Court observed that "[t]he need to apply foreign law ... alone is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate."

The panel majority raises the specter that foreign courts might adjudicate United States patent rights, proposing that if our courts are permitted to decide questions under foreign patent law, other countries will feel free to decide questions of United States patent law. Cordis too sounds the alarm, stating that creative litigants will choose exotic foreign forums to resolve complex patent issues, and that the district court's decision will open the door to international chaos. I doubt that a United States district court is an exotic foreign forum; and it is not new for courts in other countries to apply the law of other nations when warranted. Courts in other countries have not refrained from applying foreign patent law, including United States law. A Japanese court recently applied the United States doctrine of equivalents in a suit between Japanese companies that included questions of infringement of United States patents, in *K.K. Cor-*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

al Corp. v. Marine Bio K.K., Case No.1943(wa)/2002 (Tokyo District Court, Oct. 16, 2003). All nations have recognized their obligation to provide a judicial forum to address disputes involving their citizens; no warrant has been shown to remove foreign patents from this purview.

Proponents of patent "harmonization" point to the similarity of the policies that underlie patent law of all industrialized nations, and stress that for most technologies the same scope of practical protection is available to industrial development in all nations. It would be anomalous indeed for the United States now to rule that the courts cannot understand patent principles as applied in other nations.

*28 Preclusion and prejudgment are inappropriate and unnecessary. From my colleagues' extreme limitation and bar on the district court's exercise of discretion to receive and resolve foreign patent issues, I respectfully dissent.

> FN1. For example, in addition to Cordis (U.S.), there are Cordis U.K ., Ltd., Cordis S.A. (France), Cordis G.m.b.H. (Germany), Cordis S.p.A. (Italy), and Cordis Benelux (Netherlands). All of the Cordis companies, both U.S. and foreign, are members of the Johnson & Johnson family of companies.

> FN2. Therefore, to the extent that the dissent suggests that the district court has personal jurisdiction of the foreign Cordis entities, it is incorrect. See Dissent 1, 10, 19.

> FN3. It appears that the district court conducted a jury trial on Voda's U.S. patent infringement claims, and that the jury found in favor of Voda on May 25, 2006. (Jury Verdict, May 25, 2006.) None of the parties or amicus curiae informed the court of this event, and we do not consider it necessary to our ultimate holding.

> FN4. The dissent broadly states that no court has held "that it had no power or authority to receive the foreign issue." Dissent 6. Yet, the first case cited by the dissent to support this broad proposition, written by the dis-

senting author, held that there was no jurisdiction and alternatively, affirmed the dismissal based on forum non conveniens. See Bonzel v. Pfizer, Inc., 439 F.3d 1358, 1362-65 (Fed.Cir.2006); see also Mars, 24 F.3d at 1373-75 (holding that no federal question or supplemental jurisdiction existed).

> FN5. Voda has asserted no other statutory basis for subject matter jurisdiction. Therefore, the dissent's assertion that "judicial authority to determine and apply foreign law does not require that the foreign issue is supplemental to a domestic issue," Dissent 8, is irrelevant in this case. Similarly, the cases cited by the dissent that rely on federal question jurisdiction or diversity jurisdiction are inapposite. See, e.g., Uebersee Finanz-Korporation, A.G. v. McGrath, 343 U.S. 205, 206, 72 S.Ct. 618, 96 L.Ed. 888 (1952) (claim under U.S. law, Trading with the Enemy Act of 1917); Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G .m.b.H. & Co. Kg., 295 F.3d 59, 61-63 (1st Cir.2002) (claim under U .S. copyright law); Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir.1998) (diversity jurisdiction); see also Dissent 3-5.

> FN6. Therefore, none of the parties would agree with the dissent's conclusions that "the specifications are the same" or that the patents "are identical." Dissent 10, 13. Moreover, it is unclear how the dissent arrives at these conclusions when the French and German patents are in different languages, and the record on appeal provides no translations.

> FN7. The Supreme Court has stated that "where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 n. 13, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) (citation omitted). The dissent cites no authority to the contrary to support its position

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that it is "unfair" and "inappropriate to criticize the judge for not making findings or taking evidence at the pleading stage." Dissent 11.

FN8. While the European Patent Convention ("EPC") states nothing of our government's intent because the United States is not a party, it may inform us on how other sovereigns treat foreign patent adjudication. Regarding claims "to the right to the grant of a European patent," the EPC has enumerated rules specifying courts of exclusive jurisdiction. European Patent Convention, Protocol on Recognition, art. 1-8, October 5, 1973. None of the treaties entered into by the United States contain such language. Moreover, while there have been working parties and draft agreements and statutes, even the members of the EPC have not yet agreed on a centralized European patent court. *See* European Patent Office, "Legislative Initiatives in European Patent Law" (July 26, 2006), *available at* http://patlaw-reform.european-patent-office.org/epla/.

FN9. In addition, even assuming that Cordis U.S. is responsible for manufacturing the allegedly infringing devices in Juarez, Mexico, and selling them in foreign countries, the dissent's assertion that we could adjudicate a foreign patent infringement action and enforce the judgment against Cordis U.S. for its foreign manufacturing and foreign sales, Dissent 1 n. 1, would be an end-run around the territorial limits of 35 U.S.C. § 271. *See Dowagiac,* 235 U.S. at 650 ("The right conferred by a patent under our law is confined to the United States and its territories." (citation omitted)); *cf. AT & T Corp. v. Microsoft Corp.,* 414 F.3d 1366 (Fed.Cir.2005), *cert. granted,* --- U.S. ----, 127 S.Ct. 467, 166 L.Ed.2d 333 (2006).

FN1. Contrary to the statements of the panel majority, my position is not that the district court has or needs personal jurisdiction of Cordis' foreign subsidiaries; my premise is

that the district court has authority and power to provide Voda with the requested relief through Cordis US, the manufacturer and provider of the accused catheters for all five countries. Further, both the *Bonzel* and *Mars* cases, flagged by the majority, were discretionary decisions. In *Bonzel* the contract was made in a foreign country between foreign nationals under foreign law, and was declined on the discretionary ground of *forum non conveniens.* In *Mars* the count against a Japanese company was declined on the discretionary ground that the kinds of patents and the structure of the devices differed significantly between the United States and Japan.

FN2. As for the majority's challenge to our knowledge of the content of the foreign-language patents, the record contains all five patents, and states, without challenge, that the German and French patents are translations of the European patent (the French patent is headed "Traduction de Brevet Europeen").

FN3. Voda's catheter is a mechanical device, and does not raise new policy issues based on evolving areas of technology, such as the role of patents on computer software or genetic products.

FN4. **Rule 44.1. Determination of Foreign Law.** A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

C.A.Fed. (Okla.),2007.
Voda v. Cordis Corp.
--- F.3d ----, 2007 WL 269431 (C.A.Fed. (Okla.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB E

## FULLY REDACTED

# Exhibit 2

**MOTION *IN LIMINE* NO. 2 RE: UNCORROBORATED EVIDENCE OF CONCEPTION**

 Defendants move *in limine* to preclude Telcordia from arguing that the invention claimed in U.S. Patent No. Re. 36,633 ("the '633 patent") was conceived before November 4, 1991, and from introducing uncorroborated evidence of prior invention.

**I. INTRODUCTION**

 After Telcordia refused to voluntarily reveal the earliest date of conception for the '633 patent, this Court ordered it to do so. D.I. 54 [Oct. 11, 2005 Tr.] at 41:4-14.[1]  In compliance with that Order, Telcordia identified November 4, 1991 as the date of invention that it believed it could corroborate.  This position was unqualified.  Indeed, subsequent to this Court's order, Telcordia represented in a supplemental interrogatory response that it would not assert a conception date earlier than November 4, 1991.  Exh. 2-A [Jan. 20, 2006 Sixth Supp. Resp. to Cisco] at 5-7.  Telcordia re-confirmed this position just weeks before the close of fact discovery, when its 30(b)(6) designee on conception testified that he had no information suggesting that the subject matter claimed in the '633 patent was conceived before November 4, 1991.  Exh. 2-B [May 18, 2006 Sincoskie Tr.] at 227:16-21.

 Now, however, Telcordia is trying to claim an earlier conception date to avoid invalidation.  Information that Bellcore (Telcordia's predecessor) has had from the outset of this case shows that someone other than the named inventors conceived of the '633 invention prior to November 4, 1991.  Specifically, on August 26, 1991, Pierre Adam (who is not named as an inventor on the '633 patent and who never worked at Bellcore) sent a fax to Bellcore disclosing the key ideas claimed in the '633 patent.  By response letter dated September 4, 1991, named inventor Chi-Leung Lau confirmed that he was basing his SRTS work on the ideas conceived of

---

[1] All D.I. numbers are from *Telcordia v. Lucent Technologies Inc.*, C.A. No. 04-875-GMS.

by Pierre Adam. This September 4, 1991 letter is the first corroborated material from the named inventors in the record, and it shows derivation – not invention.

Correctly recognizing that its case is in serious jeopardy unless it can somehow prove invention before Mr. Adam's August 26, 1991 fax, Telcordia submitted – long after the completion of fact discovery – a supplemental interrogatory response making clear that it would attempt to rely on an invention date before its claimed November 4, 1991 date (and before the August 26, 1991 Pierre Adam invention date). Exh. 2-C [Sept. 8, 2006 Supp. Resp. to Cisco].

Telcordia should not be permitted to do this for two reasons. First, Telcordia's belated attempt to claim an invention date before November 4, 1991 is in blatant disregard of this Court's order, is without substantial justification, and is not harmless. Second, Telcordia's "evidence" of a pre-August 1991 conception is not corroborated and is thus legally improper. Its presentation to the jury would invite error and is grossly prejudicial in view of the long-respected rule requiring corroboration of invention dates.

## II.    TELCORDIA'S ATTEMPT TO ESTABLISH A CONCEPTION DATE EARLIER THAN NOVEMBER 4, 1991 IS IMPROPER IN VIEW OF THIS COURT'S ORDER

Up until October 11, 2005, Telcordia waffled as to the conception date for the invention claimed in the '633 patent, stating only that it was "*at least* as early as November 4, 1991." However, on October 11, this Court attempted to end the uncertainty by definitively ordering Telcordia to provide a conception date. It did so, and chose November 4, 1991. Then, on September 8, 2006, almost 11 months later, and after fact and expert discovery closed, Telcordia served a supplemental interrogatory response claiming that Dr. Fleischer's uncorroborated testimony established a conception date ███████████████████ and that the Lau memorandum with a 1991 date shows that the inventors were in possession of subject matter

corresponding to the invention on June 6, 1991. Exh. 2-C [Sept. 8, 2006 Supp. Resp. to Cisco]. The Court should hold Telcordia to its November 4, 1991 conception date.

Disturbingly, Telcordia continues to maintain, even after serving its supplemental interrogatory response, that ███████████████████████████████████ ████████████████████████████████████████████████ Exh. 2-D [Sept. 13, 2006 email from Don Dunner]. It does so through an illogical shell game. For example, with regard to the Lau memo, Telcordia maintains that, although it may not rely on that memo to show conception, it may rely on it to show that Mr. Adam's August 26, 1991 fax is not prior art. In fact, these two purposes are one in the same, and the Court should not permit Telcordia's attempt to camouflage the uncorroborated and dubious evidence of conception it plans to introduce. Telcordia has repeatedly represented to the Court that "[t]here is going to be no change in our conception date." Exh. 2-E [Sept. 18, 2006 Tr.] at 54:3-4. That date is November 4, 1991, and the Court should not permit Telcordia's attempted end-run around this Court's order.

## III.    TELCORDIA CANNOT RELY ON UNCORROBORATED INVENTOR EVIDENCE TO ESTABLISH A CONCEPTION DATE

The strength of this Court's order is sufficient to preclude Telcordia from introducing evidence of conception prior to November 4, 1991. However, this Court should also exclude Telcordia's evidence because it consists only of legally improper uncorroborated inventor claims.

Corroboration is required "where a party seeks to show conception through the oral testimony of an inventor. This requirement arose out of a concern that inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d

3

1572, 1577 (Fed. Cir. 1996) (internal citations omitted). "Even the most credible inventor testimony is a *fortiori* required to be corroborated by independent evidence, which may consist of documentary evidence as well as the testimony of non-inventors." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171-72 (Fed. Cir. 2006). In fact, "[i]t is well established that joint inventors cannot corroborate each others' testimony as to conception and reduction to practice." *Marketel Int'l, Inc. v. Priceline.com*, 138 F. Supp. 2d 1210, 1213 (N.D. Cal. 2001) (internal citations omitted). These principles apply also to uncorroborated documents originating from an inventor. *See Stern v. Trs. of Columbia Univ.*, 434 F.3d 1375, 1378 (Fed. Cir. 2006) ("[R]egardless of the contents of the notebooks, unwitnessed laboratory notebooks on their own are insufficient to support [the inventor's] claim of co-inventorship.") (internal citations omitted). Simply put, an inventor's own unwitnessed account lacks the vital independence and impartiality needed to corroborate a conception date, regardless of whether it is on paper.

Nevertheless, Telcordia has suggested that it intends to rely heavily on such uncorroborated inventor materials. Specifically, Telcordia has stated that evidence establishing a conception date in the ▮▮▮▮▮ is the ▮▮▮▮▮ ▮▮▮ Telcordia has alternatively stated that an uncorroborated memorandum, supposedly from June 6, 1991 and supposedly from the named inventor, Chi-Leung Lau, shows that he was ▮▮▮▮▮ of the disputed concepts. Exh. 2-C [Sept. 8, 2006 Supp. Resp. to Cisco] at 3.

Telcordia has identified no documents, no third party testimony, or any other independent physical exhibits – nothing – to corroborate Dr. Fleischer's testimony. Although Dr. Fleischer testified that he did his best to fulfill Bellcore requirements that patentable ideas be recorded in a signed witnessed lab notebook, no such laboratory notebooks were produced in this case. Exh.

4

2-F [May 11, 2006 Fleischer Tr.] at 194:12-195:5.    For this reason, Dr. Fleischer's uncorroborated testimony regarding conception before September 4, 1991 should be excluded. With regard to the Lau memorandum, Telcordia wrongly suggests that the following material provides corroboration: (1) expert witness testimony given more than 15 years after the Lau memorandum by individuals entirely unconnected to the alleged inventive acts; (2) Pierre Adam's August 26, 1991 fax (which makes no mention whatsoever of the Lau memo and, on the contrary, proves that Lau derived his ideas from France Telecom); (3) deposition testimony from two former France Telecom employees that includes no discussion of Lau's memo; (4) the deposition testimony of Bruce Kittams, who stated that he does not ▮▮▮▮▮▮▮▮▮▮▮▮▮ of the Lau memo; and (5) the self-serving inventor testimony and unwitnessed documents.[2]

In short, Telcordia's supplemental interrogatory response points to no independent evidence tied to the alleged 1991 inventive acts that can corroborate either Fleischer's testimony or Lau's memorandum.    Telcordia appears to understand this, because it has stated that introduction of the Lau memo "is not a change in Telcordia's contention regarding the conception date of the claimed invention that it believes it can provide with *corroborated* evidence." Exh. 2-D [Sept. 13, 2006 email from Don Dunner] (emphasis added).

## V.    CONCLUSION

For the foregoing reasons, Telcordia should be precluded from introducing any evidence suggesting a conception date for the '633 patent before November 4, 1991.

---

[2]    Even if these impermissible "corroboration" materials were considered, they demonstrate, on the contrary, that the Lau memorandum is *un*corroborated.    For example, co-inventor Fleischer  admitted  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exh. 2-G [May 12, 2006 Fleischer Tr.] at 409:14-410:7.  Indeed, after  reviewing  the  subject  matter  of  the  '633  patent  for  three  days,  Fleischer  had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [May 12, 2006 Fleischer Tr.] at 420:22-421:12.

A

REDACTED

B

REDACTED

C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,    )
                                 )
            Plaintiff,           )
      v.                         )        Civil Action No. 04-876-GMS
                                 )
CISCO SYSTEMS, INC.,             )
                                 )
            Defendant.           )

## TELCORDIA TECHNOLOGIES, INC.'S SUPPLEMENTAL RESPONSE TO CISCO'S INTERROGATORY NO. 8

Plaintiff Telcordia Technologies, Inc. ("Telcordia") provides this supplemental response

to Defendant Cisco Systems, Inc.'s Interrogatory No. 8, subject to and without waiving any of its

previously stated general and specific objections.

## INTERROGATORY NO. 8:

For each Claim-in-Suit, state the dates on which the claimed invention was conceived and
reduced to practice, and identify all evidence corroborating such conception and reduction
practice, including without limitation, any acts of diligence leading to such reduction to practice,
and including the identification of each person and all documents that can corroborate such
conception, reduction to practice and/or diligence.

## SUPPLEMENTAL RESPONSE:

Telcordia incorporates by reference each of the applicable general objections as though

fully set forth herein. Telcordia objects to this interrogatory to the extent it seeks information

that is protected by the attorney-client privilege or the attorney work product immunity.

Pursuant to an agreement between the parties, the discovery requests of both Cisco and

Telcordia that are directed to the '306 patent and/or the '633 patent, or to the "Patents-In-Suit,"

shall be interpreted to cover not only the '306 patent and/or the '633 patent, but also the '763

patent. Telcordia's supplementation of this interrogatory with information regarding the '763

patent incorporates and is subject to all of the General and Specific Objections already asserted as to this interrogatory.

Subject to and without waiving any of these general and specific objections and reserving its right to supplement its response as discovery proceeds, Telcordia responds to this interrogatory as follows:

### '306 Patent

Based upon information currently available to Telcordia and subject to updating, dynamic time division multiplexing (DTDM) concepts were conceived by one or more of the named inventors of the '306 patent at least as early as September 17, 1986. *See* BEL 16804-16821. The earliest corroborated conception of the subject matter claimed in the claims of the '306 patent is at least as early as November 19, 1986. *See* BEL 134457-134463. Other documents reflect the conceived subject matter of the claims of the '306 patent, including BEL 040206-040227; BEL 048208-408233; and "Dynamic TDM – A Packet Approach to Broadband Networking," IEEE Int'l Conf. on Comm. '87 (June 10, 1987).

The earliest reduction to practice of the subject matter of the claims of the '306 patent currently known to Telcordia was constructive and occurred on November 10, 1987, the filing date of the '306 patent. Telcordia is not relying on diligence between its conception of the subject matter of the claims of the '306 patent and the filing date of the '306 patent.

Hung-Hsiang J. Chao, Sang H. Lee, and Liang T. Wu, the named inventors of the '306 patent, and Kenneth Rubenstein, the patent attorney associated with the constructive reduction to practice, are individuals likely to have knowledge regarding dates of conception and reduction to practice of the claims of the '306 patent.

*'633 Patent*

Telcordia currently contends that the independently corroborated conception date of the subject matter claimed in the asserted claims of the '633 patent by the named inventors is Friday, November 1, 1991. *See* Lau and Fleisher, "Synchronous Residue-TS: A Compromise For SFET/TS" (Nov. 4, 1991); Declaration of Kittams, TELC 0006122-25; Kittams deposition testimony; Lau deposition testimony; Fleischer deposition testimony. Later documents reflecting conception of the subject matter claimed in the asserted claims of the '633 patent by the named inventors include "Synchronous Residue-Time Stamp: A Combination of SFET/TS" (Dec. 1991); and Lau and Fleischer, "Synchronous Techniques for Timing Recovery in BISDN" (Feb. 27, 1992). The earliest conception date of the subject matter claimed in the asserted claims of the '633 patent by the named inventors is the first quarter of 1991. The evidence reflecting this earliest conception date is the deposition testimony of Dr. Fleischer.

In view of an expert opinion and expert testimony recently offered by Cisco, Lucent, and Alcatel in district court litigation concerning a private communication from France Telecom to Dr. Kittams dated August 26, 1991, Telcordia further contends that June 6, 1991, is the independently corroborated date on which the named inventors of the '633 patent were clearly in prior possession of subject matter which corresponds to the subject matter that defendants argue is supposedly disclosed in that private communication. Documents and evidence reflecting prior possession of that subject matter by the named inventors include the deposition testimony of Dr. Jones, the validity expert for Cisco, Lucent, and Alcatel on the '633 patent in the district court litigation; the text of the private communication from France Telecom to Dr. Kittams dated August 26, 1991, TELC 0006512; Dr. Lau's June 6, 1991, memo, TELC 0373769-71; Dr. Fleischer's handwritten notes, TELC 3150179-82; TELC0006716-TELC0006727; U.S. Patent

No. 4,961,188; the Expert Report of Dr. Clark, July 21, 2006; the deposition testimony of Mr. Adam; the deposition testimony of Mr. Houdoin; the deposition testimony of Dr. Kittams; the deposition testimony of Dr. Lau; and the deposition testimony of Dr. Fleischer.

Discovery and Telcordia's investigation is continuing, and if additional evidence is discovered that demonstrates earlier dates of corroborated conception or prior possession of relevant subject matter by the named inventors, such as any of the records identified by Dr. Fleischer during his deposition, Telcordia will supplement its interrogatory response as required by Fed. R. Civ. P. 26(e).

The reduction to practice of the subject matter claimed in the asserted claims of the '633 patent was constructive and occurred on October 30, 1992, i.e., the filing date of the patent application that issued as the '978 patent. Telcordia is not relying on diligence between the corroborated date of conception of the subject matter claimed in the asserted claims of the '633 patent and the filing date of the '978 patent.

Paul E. Fleischer and Chi-Leung Lau, the named inventors of the '633 patent, and Stephen M. Gurey, the patent attorney associated with the constructive reduction to practice, are individuals likely to have knowledge regarding dates of conception and reduction to practice of the asserted claims of the '633 patent.

### '763 Patent

Telcordia currently contends that the independently conception date of the subject matter for the '763 patent is September 30, 1986. *See* Lau, "Survivable Architectures and Implementations for a High Speed SONET Ring" (Sept. 30, 1986). Later documents reflecting conception of the subject matter claimed in the asserted claims of the '763 patent by the named

ASHBY & GEDDES

*/s/ John G. Day*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
220 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc.*

*Of Counsel:*

Donald R. Dunner
Richard H. Smith
Don O. Burley
Houtan K. Esfahani
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

York M. Faulkner
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
11955 Freedom Drive
Reston, Virginia 20190-5675
(571) 203-2700

Dated:  September 8, 2006

173014.1

D

```
----- Original Message -----
From: "Williamson, John" [John.Williamson@finnegan.com]
Sent: 09/13/2006 09:33 PM
To: Edward Reines
Cc: <Steven.Cherny@lw.com>; <david.nelson@lw.com>; Jessica Davis; Sonal
Mehta; Dunner, Don" <Don.Dunner@finnegan.com>
Subject: RE: Telcordia v. Lucent, C.A. No. 04-875-GMS;  Telcordia v. Cisco,
C.A. No. 04-876-GMS
```

Ed,

Don is in London at a meeting of the American College of Trial Lawyers, but he has asked me to send the email below.

Ed:

I am writing in response to your request that we withdraw our supplemental interrogatory response on invention dates. Your characterization of our supplement as an "attempt to change the invention date" is incorrect. As a result, we will not withdraw our supplemental response.

At the outset, your interrogatory no. 8 asks for, and Telcordia's answer provides, "the dates on which *the claimed invention* was conceived and reduced to practice." The supplemental response states that "Telcordia currently contends that the independently corroborated conception date of the subject matter claimed in the asserted claims of the '633 patent by the named inventors is Friday, November 1, 1991." I have been advised that this date reflects the facts as explained by Dr. Kittams during his April 28, 2006, deposition. While this date differs by three days from the November 4, 1991, date set forth in our earlier response, I did not appreciate until this evening that the two dates were different, and accordingly we will rely only on the original November 4, 1991, date set forth in the earlier interrogatory response. As so changed, Telcordia's contentions on conception and reduction to practice of *the claimed invention* of the asserted '633 patent claims remain unchanged.

Telcordia's supplemental response further states that there is uncorroborated deposition testimony from Dr. Fleischer wherein he states, in response to your questions, that "the clear and definite concept of SRTS" was known to the inventors in the first quarter of 1991 (*see* May 11, 2006, Fleischer Dep. at 119-22). That is not a change in Telcordia's contention regarding the conception date of the claimed invention that it believes it can prove with corroborated evidence . It is merely an observation regarding existing deposition testimony elicited by Cisco after the October 11, 2005, hearing.

The supplemental interrogatory also explains that on June 6, 1991, the inventors were in possession of the subject matter allegedly provided to them in an August 26, 1991, France Telecom communication . This is not a new invention date because the June 6, 1991, date is not a date of conception of *the claimed invention* but only relates to features of the claimed invention . In fact, it is questionable whether Telcordia is even required to disclose that information in response to Interrogatory No. 8. However, in light of opinions and testimony offered by defendants' expert regarding the August 26, 1991, France

Telecom communication, Telcordia thought it prudent to provide its contention that the inventors were already in possession of the information defendants contend was disclosed in the August 26 communication. In other words, without changing any dates of invention of the claimed invention, Telcordia's supplemental answer merely provides its contention that the August 26, 1991, France Telecom communication cannot support an invalidity defense because the inventors were already in possession of that information. *See, e.g.*, *In re Stryker*, 435 F.2d 1340 (C.C.P.A 1971); *In re Stempel*, 241 F.2d 755 (C.C.P.A. 1957).

To be clear, Telcordia is not contending that it has corroborated evidence that *the claimed invention* was conceived on June 6, 1991. As such, there has been no violation of Judge Sleet's instructions during the October 11, 2005, hearing, and Telcordia fully intends to comply with its prior representation that it will not rely on a conception date of the claimed invention prior to November 4, 1991, in this proceeding.

Sincerely,

Don Dunner

---

**From:** edward.reines@weil.com [mailto:edward.reines@weil.com]
**Sent:** Tuesday, September 12, 2006 8:26 PM
**To:** Dunner, Don
**Cc:** Steven.Cherny@lw.com; david.nelson@lw.com; Williamson, John; jessica.davis@weil.com; Sonal Mehta
**Subject:** Telcordia v. Lucent, C.A. No. 04-875-GMS; Telcordia v. Cisco, C.A. No. 04-876-GMS

Don,

We are in receipt of Telcordia's "supplemental" interrogatory responses in the above-captioned matters in which Telcordia purports to change its claimed invention date. This is improper, as explained in our letter to the Court last Friday. Among other things, it violates the Court's Order at the October 11, 2005 hearing, as well as Telcordia's written commitment not to attempt to change the invention date.

Because Telcordia has not withdrawn this supplement, we will raise this issue with the Court.

Sincerely,

Ed

Edward R. Reines
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel (650) 802-3022
Fax (650) 802-3100

< END >

---

**The information contained in this
email message is intended only for use of the individual or entity
named above. If the reader of this message is not the intended
recipient, or the employee or agent responsible to deliver it to
the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this communication in
error, please immediately notify us by email (postmaster@weil.com),
and destroy the original message. Thank you**

This e-mail message is intended only for individuals to whom it is addressed and may contain
information that is privileged, confidential, proprietary, or otherwise exempt from disclosure
under applicable law. If you believe you have received this message in error, please advise the
sender by return e-mail and delete it from your mailbox Thank you.

E

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                IN AND FOR THE DISTRICT OF DELAWARE
 2
                         -   -   -
 3   TELCORDIA TECHNOLOGIES INC.,      :    Civil Action
                                       :
 4              Plaintiff/Counterclaim :
                Defendant,             :
 5                                     :
                                       :
 6       v.                            :
                                       :
 7   LUCENT TECHNOLOGIES, INC.,        :
                                       :
 8              Defendant/Counterclaim :
                Plaintiff.             :    No. 04-874-GMS
 9                       -   -   -
     TELCORDIA TECHNOLOGIES, INC.,     :    Civil Action
10                                     :
                Plaintiff/Counterclaim :
11              Defendant,             :
                                       :
12       v.                            :
                                       :
13   LUCENT TECHNOLOGIES INC.,         :
                                       :
14              Defendant/Counterclaim :
                Plaintiff.             :    No. 04-875-GMS
15                       -   -   -
     TELCORDIA TECHNOLOGIES, INC.,     :    Civil Action
16                                     :
                Plaintiff/Counterclaim :
17              Defendant,             :
                                       :
18       v.                            :
                                       :
19   CISCO SYSTEMS, INC.,              :
                                       :
20              Defendant/Counterclaim :
                Plaintiff.             :    No. 04-876-GMS
21                       -   -   -

22                   Wilmington, Delaware
                  Monday, September 18, 2006
23                       10:00 a.m.
                    TELEPHONE CONFERENCE
24                       -   -   -
     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
25
```

54

1  So there is no change in our interrog response,
2  particularly in view of the discussions we had or e-mails we
3  sent to counsel prior to this weekend. There is going to be
4  no change in our conception date. There will be no change
5  in our reduction to practice date. To the extent defendants
6  are now arguing that this August 26th letter is not a 102
7  reference but it discloses pieces of the invention, we are
8  allowed to show that the inventors in fact communicated
9  those pieces to France Telecom beforehand.
10  So we believe the discovery supplementation was
11  warranted in view of the circumstances. We are willing to
12  stand by the conception date. We are willing to stand by
13  the reduction to practice date. And we also, however,
14  believe we are entitled to bring out facts which clearly
15  were disclosed and in evidence. The deposition of Mr.
16  Kittams, the deposition of Mr. Lau, the deposition of Dr.
17  Fleischer, the deposition of the three people from France
18  Telecom all happened after the interrog response.
19  We only got their expert contentions on
20  invalidity recently, and the deposition of their '633
21  invalidity expert only happened on August 15. That is the
22  reason for the supplementation now and that is the reason we
23  are pointing out that under Section 103 and under the
24  Stryker case they don't have a case with respect to this
25  August 26 letter, just as the Patent Office found when it

55

1  allowed the claims over it.
2  MR. REINES: Your Honor, may I respond briefly?
3  THE COURT: Yes. I am trying to fathom where
4  the issue here is. Go ahead.
5  MR. REINES: The first thing is, the
6  supplemental interrog response is Exhibit 11 to our
7  submission, that is Cisco's and Lucent's submission of
8  September 11.
9  THE COURT: I don't have that in front of me.
10  MR. REINES: As the Court --
11  THE COURT: Counsel, counsel -- Mr. Reines, you
12  got to listen up. I don't have that in front of me. Unless
13  you can tell me -- I don't think I have that in any of the
14  attachments for today's summary judgment discussion. Do I?
15  MR. REINES: Yes. It is Exhibit 11 to the
16  September 11 letter.
17  THE COURT: Okay.
18  MR. REINES: I am sorry, sometimes the phones
19  cut out. I apologize for that.
20  THE COURT: Go ahead.
21  MR. REINES: So what is undisputed is that their
22  original conception date, if you turn to the '633 patent,
23  that is the subject matter here, is November 1, 1991. I
24  think it was originally November 4, 1991. That is a minor
25  issue.

56

1  If you look down three sentences or four
2  sentences, it states, the earliest conception date of the
3  subject matter claimed in the asserted claims of the '633
4  patent.
5  THE COURT: I see the sentence. Slow down for
6  Mr. Maurer's sake.
7  The earliest conception date..., let's go from
8  there.
9  MR. REINES: The earliest conception date of the
10  subject matter claimed in the asserted claims of the '633
11  patent by the named inventors is the first quarter of 1991.
12  That's different than November 1991. I don't know what Mr.
13  Anzalone's basis is for talking about Section 103 and Oddzon
14  and everything else. There is no reference to any of those
15  things in here.
16  MR. ANZALONE: That is in the next paragraph,
17  Evidence.
18  MR. REINES: What the reference is is an attempt
19  to -- in black and white, we are all looking at the
20  paragraph, what was originally a November 1991 conception
21  date. That is what Telcordia said it was presenting and
22  that's what it said it wasn't going to move from. Here,
23  they include a number of different changes. One of them is
24  the attempt to change the conception date to first quarter
25  of 1991.

57

1  THE COURT: Well, he says, to the extent that
2  that may contradict this writing, Mr. Anzalone has indicated
3  on the record here that that is not plaintiff's intention.
4  MR. ANZALONE: That's correct, Your Honor. We
5  have indicated and we did send an e-mail before this call,
6  we indicated we will stick with the November 4 conception
7  date. We did add this paragraph and we said right in there,
8  there is no reason to speculate as Mr. Reines did and assign
9  other motives that would be put in the response in view of
10  an expert opinion and expert testimony recently offered
11  (inaudible) Alcatel.
12  And that explains why we went into this because
13  we are now making a 103 contention. They changed their
14  contentions. And we are entitled to rely on Stryker, which
15  is controlling case law, and show pieces of the claim --
16  THE COURT: Counsel, what I need to do is this
17  on this one. I have actually a sentencing scheduled that
18  was supposed to start at 11. Are you able to continue and
19  possibly resolve this on your own?
20  UNIDENTIFIED SPEAKER: I believe so, Your Honor.
21  UNIDENTIFIED SPEAKER: We will put our best
22  effort to do so, Your Honor.
23  THE COURT: There is that motion to preclude
24  something. What is that all about?
25  MR. ANZALONE: Yes, Your Honor. We filed a

F

REDACTED

G

REDACTED

# Exhibit 3

## MOTION *IN LIMINE* NO. 3 RE: ADVICE OF COUNSEL

Defendants move *in limine* to preclude Telcordia from introducing evidence of Defendants' decision not to disclose advice of counsel pertaining to the '763 or '633 patents, or to argue that Defendants did not properly seek legal counsel.

## I.     TELCORDIA SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE RELATING TO CISCO'S RELIANCE ON PRIVILEGE FOR ADVICE OF COUNSEL

Pursuant to this Court's scheduling order, Cisco was required to disclose within 14 days after issuance of the claim construction order whether it intended to rely on advice of counsel as a defense to patent infringement. D.I. 20.[1] Cisco declined this election, choosing to invoke the attorney-client privilege instead.  The Court's scheduling order then barred Telcordia from taking discovery on any advice of counsel that Cisco may have obtained. *Id.*

Consistent with its decision, Cisco asserted privilege in response to discovery requests seeking advice of counsel and served a privilege log with over 400 entries.  Such documents include legal advice provided by Cisco's then in-house patent counsel, Robert Barr.  In addition, it is a matter of record that, before this case even started, Cisco retained Baker & Botts to provide advice relating to Telcordia's infringement claims.  Indeed, over a multi-year period prior to the initiation of this lawsuit, Telcordia negotiated with Baker & Botts about the patent infringement claims against Cisco at issue here.[2]

Telcordia has now made clear that it will attempt to use Cisco's decision to rely on

---

[1]    All D.I. numbers are from *Telcordia v. Cisco Systems, Inc.*, C.A. No. 04-876-GMS.

[2]    In its trial brief, Telcordia asserts that Cisco failed to "identify any legal advice – even on its privilege log – during discovery in this case."  Telcordia Trial Br. at 10.  As noted above, Telcordia's assertion is incorrect.  Furthermore, to the extent that Telcordia alleges that Cisco failed to log any formal opinion letters, Cisco did in fact log all legal advice save post-suit communications which were excluded per the parties' agreement.  Thus, any argument that Cisco failed to identify formal opinion letters is moot.

privilege for advice of counsel to ████████████████████████████████████

████████████████████████ [3]  Telcordia Trial Br. at 10.  Asking the jury to infer willfulness

based on the absence of evidence of advice of counsel is contrary to the policy behind the

attorney-client privilege and prohibited by *Knorr-Bremse*.  More importantly, it is unfairly

prejudicial because it invites the jury to speculate blindly as to the content of any advice.

### A.  RECENT CASE LAW SEVERELY LIMITS THE WEIGHT ATTACHED TO A DEFENDANT'S DECISION NOT TO IDENTIFY ADVICE OF COUNSEL

The Federal Circuit has been clear that "no adverse inference that an opinion of counsel

was or would have been unfavorable flows from an alleged infringer's failure *to obtain or*

*produce* an exculpatory opinion of counsel." *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH*

*v. Dana Corp.*, 383 F.3d 1337, 1341 (Fed. Cir. 2004).[4]  It is Telcordia's burden, as the patentee,

to present threshold evidence of culpable behavior on the part of the alleged infringer, and it

cannot do this "merely by proof that the accused is asserting the attorney-client privilege to

withhold an opinion of counsel."  *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354,

1368 (Fed. Cir. 2006); *see also Knorr*, 383 F.3d at 1344 ("[N]o adverse inference shall arise

from invocation of the attorney-client and/or work product privilege.").  Thus, according to the

Federal Circuit, a defendant's failure to rely on advice of counsel has no probative value.

As Judge Jordan has noted, in light of *Knorr-Bremse*, there is no reason why a patentee

should be permitted to introduce evidence at trial about an opinion of counsel that was not

disclosed:

> I have never yet heard anybody make a reasoned argument to me

---

[3]  Indeed, Telcordia has designated portions of deposition transcripts where Cisco's attorneys instructed Mr. Barr on the basis of privilege. *See, e.g.*, Exh. 3-A [May 27, 2006 Barr Tr.] at 32-33, 35-38, 76, 78, 88.

[4]  Emphases supplied throughout.

2

> why it could be put before a jury after the *Knorr-Bremse* opinion
> that an opinion was received but not tendered. And in the absence
> of that, I'm inclined to think there probably isn't a reasoned
> argument. That the only reason for putting it in front of a jury
> would be so that they draw an adverse inference, which was what
> *Knorr-Bremse* says could not happen.

Exh. 3-B [*Pharmacia & Upjohn Co. v. Sicor Inc.*, C.A. No. 04-833 (D. Del.), Transcript of

October 11, 2005 Telephone Conference] at 38:8-16. For the exact same reasons, the Model

Patent Jury Instructions for the Northern District of California explicitly exclude from

consideration reliance on advice of counsel *unless* the accused is relying on advice of counsel as

a defense. Exh. 3-C [N.D. Cal. Model Patent Jury Instructions] at 22 n.7.

It is inappropriate for Telcordia to attempt to have the jury – even tacitly – draw a

negative inference of willfulness from Cisco's invocation of the privilege. Indeed, *Knorr-*

*Bremse* specifically condemns any adverse inference from "an alleged infringer's failure *to*

*obtain*" advice. *Id.* at 1341. Any suggestion that Cisco did not seek legal advice is further

improper because it would require Cisco to invoke the privilege in front of the jury, which itself

is unfairly prejudicial. *See United States v. Tomaiolo*, 249 F.2d 683, 690 (2d Cir. 1957).

## B.    INVITING THE JURY TO SPECULATE AS TO THE ADVICE OF COUNSEL IS UNFAIRLY PREJUDICIAL

It is a long-standing principle that evidence that invites the jury to speculate is generally

excluded as unfairly prejudicial under Federal Rule of Evidence 403. *See, e.g., McAvey v. Lee*,

260 F.3d 359, 374 (5th Cir. 2001).

In this case, the danger from jury speculation is particularly acute. In *McKesson Info.*

*Solutions, Inc. v. Bridge Med., Inc.*, 434 F. Supp. 2d 810 (E.D. Cal. 2006), the accused infringer

received advice of counsel as to infringement, but invoked the privilege regarding the contents of

that advice. *Id.* at 811. As is the case here, plaintiff attempted to introduce evidence of

defendant's position to show willful infringement. The defendant moved *in limine* to prevent the

3

introduction of such evidence.  The court weighed the interests of the parties, "consider[ed] the

dictates of *Knorr-Bremse* and its emphasis on the sanctity of the privilege," and ultimately held:

> Were the court to permit such evidence, even with a cautionary
> instruction imposing *Knorr's* limitations (of no adverse inference),
> the jury would nevertheless be left to speculate why [defendant]
> would not reveal its counsel's opinion. It is inescapable that the
> jury would likely conclude that [defendant] received an
> unfavorable opinion, otherwise [defendant] would reveal it. This is
> precisely the negative inference *Knorr* prohibits.

*Id.* at 812.  Telcordia is trying to do the same thing that the plaintiff in *McKesson* tried, and there

is the same risk that the jury will draw a prohibited inference based on speculation.  Accordingly,

any and all evidence and argument pertaining to Cisco's alleged failure to seek advice of counsel

or decision to assert the privilege should be excluded.

## II.    TELCORDIA SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE THAT LUCENT DID NOT OBTAIN ADVICE OF COUNSEL

Telcordia does not allege that Lucent willfully infringed the '763 patent.  Any reference

by Telcordia to the fact that Lucent does not rely upon advice of counsel regarding the '763

patent is therefore irrelevant and highly prejudicial.

Although Telcordia alleges that Lucent willfully infringed the '633 reissue patent and

bears the burden of proving this allegation by clear and convincing evidence, at this late stage of

submitting a Pretrial Order, Telcordia still cannot identify a date on which it contends Lucent

first had notice of the '633 patent prior to the commencement of this lawsuit.  *See* Exh. 3-D [May

4, 2006 DePinho Tr.] at 199:4-200:3.  Indeed, consistent with the testimony of Telcordia's own

Rule 30(b)(6) witness, Lucent did not have notice of the '633 patent until shortly before

Telcordia amended its complaint to assert that patent – almost a year after it filed the original

complaint asserting only the '306 patent.[5]  By the time Telcordia amended its complaint, Lucent

---

[5]    Though Lucent was aware of the '633 patent after Telcordia originally asserted the patent

4

had retained litigation counsel to defend against the original complaint. It is both misleading and prejudicial for Telcordia to argue to the jury that Lucent did not have advice of counsel when Lucent was nearly a year into this litigation before having notice of the '633 patent.

Telcordia bears the burden of establishing a *prima facie* case of when Lucent had actual notice of the '633 patent. *See Imonex Servs. v. Munzprufer DietmarTrenner GmbH*, 408 F.3d 1374, 1377 (Fed. Cir. 2005). "'The patentee must present threshold evidence of culpable behavior' before the burden of production shifts to the accused to put on evidence that it acted with due care." *Golden Blount*, 438 F.3d at 1368. Accordingly, the Court should preclude Telcordia from making any reference that Lucent did not obtain advice of counsel when Telcordia cannot establish a *prima facie* case of notice of the '633 patent.

Under such circumstances any reference that Lucent did not obtain advice of counsel should be deemed inadmissible under Federal Rule of Evidence 403.

## III.    CONCLUSION

For the foregoing reasons, Defendants request that Telcordia be precluded from introducing evidence of Defendants' decisions not to disclose advice of counsel, to argue that Defendants did not properly seek legal counsel, or to introduce evidence that Defendants asserted the attorney-client privilege.

---

against Cisco, because Lucent was selling the accused products at that time but was not accused of infringement, Telcordia's conduct indicated that it would not assert the patent against Lucent.



A

# REDACTED

B

REDACTED

C

Model Patent Jury Instructions
for the Northern District of California

September 20, 2004

Working Committee

Martin Fliesler – Chair
Professor Mark Lemley
David McIntyre
James Pooley
Matthew Powers
Honorable Ronald Whyte
James Yoon

*B.3. Infringement*

## 3.11 WILLFUL INFRINGEMENT

In this case, [patent holder] argues both that [alleged infringer] infringed and that [alleged infringer] infringed willfully. To prove willful infringement, [patent holder] must persuade you that it is "highly probable" that [alleged infringer] willfully infringed.

Specifically, [patent holder] must demonstrate that it is highly probable that:

      A.     [Alleged infringer] had actual knowledge of the [   ] patent; and

      B.     [Alleged infringer] had no reasonable basis for believing (1) that [alleged infringer]'s [product] [method] did not infringe the [   ] patent or (2) that the [   ] patent was invalid [or unenforceable].[6]

In deciding whether [alleged infringer] committed willful infringement, you must consider all of the facts, which include but are not limited to:

      A.     Whether [alleged infringer] intentionally copied a product of [patent holder] covered by the [   ] patent;

      B.     Whether [alleged infringer], when it learned of [patent holder]'s patent protection, investigated the scope of the patent and formed a good-faith belief that the patent was invalid [or unenforceable] or that it was not infringed;

      C.     Whether [alleged infringer] had a substantial defense to infringement and reasonably believed that the defense would be successful if litigated;

      D.     Whether [alleged infringer] made a good faith effort to avoid infringing the patent; and

      E.     [Whether [alleged infringer] relied on a legal opinion that appeared to it to be well-supported and believable and that advised [alleged infringer] (1) that the [product] [method] did not infringe the [   ] patent or (2) that the [   ] patent was invalid [or unenforceable].][7]

---

[6] If unenforceability is an issue, the court will need to give further instruction to the jury explaining the requirements for the particular theory of unenforceability relied on by [alleged infringer].

[7] Factor E should be included only if the alleged infringer relies on a legal opinion as a defense to an allegation of willful infringement. "[I]t is inappropriate to draw an adverse inference that undisclosed legal advice for which attorney-client privilege is claimed was unfavorable . . . (and) it is (also) inappropriate to draw a similar adverse inference from failure to consult counsel." *Knorr-Bremse v. Dana Corporation*, 2004 WL 2049342 *5 (Fed.Cir. (Va.)).

September 20, 2004

<u>Authorities</u>

*35 U.S.C. § 284; Knorr-Bremse v. Dana Corporation*, 2004 WL 2049342 *5 (Fed.Cir. (Va.)); Crystal *Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.,* 246 F.3d 1336, 1346 (Fed. Cir. 2001); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1354 (Fed. Cir. 1999); *Read Corp. v. Portec, Inc.,* 970 F.2d 816 (Fed. Cir. 1992); *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.,* 897 F.2d 508, 510 (Fed. Cir. 1990).

September 20, 2004

D

REDACTED

# Exhibit 4

## MOTION *IN LIMINE* NO. 4
## RE: *TELCORDIA V. FORE SYSTEMS* LICENSE AND SETTLEMENT AGREEMENTS

Defendants move *in limine* to exclude Telcordia from introducing into evidence, and/or relying upon at trial, the license and settlement agreements resulting from its litigation of *Bell Communications Research Inc. v. Fore Systems, Inc.*, 113 F. Supp. 2d 635 (D. Del. 2000) (hereinafter "the *Fore Systems* license and settlement agreements").

## I.    STATEMENT OF FACTS

In 1998, Telcordia (then Bell Communications Research) sued Fore Systems, Inc. (which later merged with, and became, Marconi Corporation, PLC), alleging infringement of U.S. Patent No. 4,893,306 ("the '306 patent"), along with other patents not asserted in this litigation. When Marconi and Telcordia settled the litigation in 2004, the '306 patent was the only remaining asserted patent. The settlement agreement included a license to Marconi for the '306 patent as well as numerous other patents from Telcordia's various portfolios.

During the course of this litigation, Defendants repeatedly requested production of the *Fore Systems* license and settlement agreements. Exh. 4-A [Correspondence between Counsel]. Telcordia, however, refused to do so and instead claimed that the license and settlement agreements were not discoverable because such agreements included Marconi confidential information. *See* Exh. 4-B [May 4, 2006 DePinho Tr.] at 244:17-245:4; 248:7-249:2; Exh. 4-C [May 22, 2006 DePinho Tr.] at 229:24-233:2; Exh. 4-D [May 18, 2006 DePinho Tr.] at 541:3-18. Telcordia refused to produce these agreements or related evidence requested by Defendants in discovery and blocked questioning on the terms of these agreements in depositions.[1]

---

[1] Following Telcordia's refusal to produce the *Fore Systems* license and settlement agreements, Defendants obtained a copy of just the license agreement from Marconi's public filings with the Securities and Exchange Commission ("SEC") from the Edgar website. Defendants then attempted to depose Telcordia's Rule 30(b)(6) designee regarding the terms

Despite Telcordia's refusal to produce the *Fore Systems* license and settlement agreements and answer questions regarding such agreements, Telcordia's damages expert relied on these agreements in his expert report and identified such agreements as material considered in forming his opinions. *See* Exh. 4-E [Jun. 28, 2006 Expert Report of James Nawrocki] at 17.

II.    **GIVEN TELCORDIA'S FAILURE TO PRODUCE THE *FORE SYSTEMS* AGREEMENTS AND ALLOW DISCOVERY ON THOSE AGREEMENTS, TELCORDIA SHOULD NOT BE PERMITTED TO RELY ON THE AGREEMENTS AT TRIAL**

Federal Rule of Civil Procedure 26 requires that a party disclose and produce information that it will use to support its claims or defenses and/or its computation of damages. If the party does not disclose such information, the Court may prohibit that party from producing or relying on that evidence at trial pursuant to Federal Rule of Civil Procedure 37(c)(1). Telcordia steadfastly refused to provide Defendants with any discovery regarding the *Fore Systems* license and settlement agreements. Telcordia failed to produce such agreements and instructed its witnesses not to answer any questions concerning the agreements. *See* Exh. 4-D [May 18, 2006 DePinho Tr.] at 660:10-672:16; Exh. 4-C [May 22, 2006 DePinho Tr.] at 229:24-233:2. Given Telcordia's position during discovery, Defendants asked Telcordia to confirm it would not affirmatively rely upon the *Fore Systems* license and settlement agreements at trial. Telcordia responded by stating that "it reserves its right to rely upon agreements with FORE Systems and, presently, *it seems likely that such agreements would be part of our case*." Exh. 4-F [Jan. 26, 2007 email from J. Williamson to E. Reines] (emphasis added).

---

of the *Fore Systems* license and settlement agreements. Telcordia, however, obstructed Defendants' efforts to obtain such discovery by objecting to such questioning and instructing its witness not to answer any questions regarding the *Fore Systems* license and settlement agreements *on the anomalous ground that the publicly-available document contained Marconi confidential information*. *See* Exh. 4-D [May 18, 2006 DePinho Tr.] at 660:10-672:16; Exh. 4-C [May 22, 2006 DePinho Tr.] at 229:24-233:2.

2

Rule 37(c)(1) addresses this precise situation: "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial . . . or information not so disclosed." Having refused to provide any discovery on the *Fore Systems* license and settlement agreements, Rule 37, as well as fundamental fairness, precludes Telcordia and its expert from introducing any evidence of and/or relying upon the *Fore Systems* license and settlement agreements.

## III.   FEDERAL RULE OF EVIDENCE 408 ALSO PRECLUDES TELCORDIA FROM RELYING UPON THE *FORE SYSTEMS* LICENSE AND SETTLEMENT AGREEMENTS

Even if Telcordia had produced the *Fore Systems* license and settlement agreements, such agreements would not be admissible under Federal Rule of Evidence 408. Rule 408 excludes from evidence a license agreement that "(1) was reached under the threat of litigation, (2) arose in a situation where litigation was threatened or probable, or (3) was negotiated against a backdrop of continuing litigation." Exh. 4-G [*PharmaStem Therapeutics, Inc. v. Viacell, Inc.*, No. 02-148 (GMS), 2003 WL 22387038, at *2 (D. Del. October 7, 2003)]; *see also Studiengesellschaft Kohle, M.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1572 (Fed. Cir. 1988). In *PharmaStem*, this Court analyzed various precedent regarding use of settlement agreements at trial for purposes of determining a reasonable royalty, and concluded that "[g]iven its discretion to determine the methodology for calculating a reasonable royalty, the court finds that it is better practice to exclude [settlement] licenses in view of the policy considerations behind Rule 408." Exh. 4-G [*PharmaStem*, No. 02-148 (GMS), 2003 WL 22387038] at *3.

The *Fore Systems* license and settlement agreements are a direct result of the settlement of the *Bell Communications Research Inc. v. Fore Systems, Inc.*, 113 F. Supp. 2d 635 (D. Del.

3

2000) litigation. As such, Telcordia cannot introduce any evidence of or rely upon the *Fore Systems* license and settlement agreements.[2]

## IV.    FEDERAL RULES OF EVIDENCE 401-403 ALSO PRECLUDE TELCORDIA FROM RELYING UPON THE FORE SYSTEMS LICENSE AND SETTLEMENT AGREEMENTS

Telcordia's Rule 30(b)(6) witness testified that the settlement with Marconi ████ ████████████████████████████ Exh. 4-D [May 18, 2006 DePinho Tr.] at 541:1-2. That settlement was driven by Telcordia's infringement claims concerning the '306 patent, while the unasserted '633 and '763 patents (the only patents for which Telcordia still has an infringement theory in this litigation) were essentially thrown in together with a long list of other patents. As Telcordia's Rule 30(b)(6) witness explained: ████████████████████████████████ ████████████████████████████████ *See id.* at 542:16-18. The marginal relevance, if any, of the *Fore Systems* license and settlement agreements is further underscored by the fact that the agreements provided a license for over 75 patents. Exh. 4-D [May 18, 2006 DePinho Tr.] at 665:13-666:20.

Telcordia agrees that issues of infringement and damages regarding the '306 patent will not be tried to the jury in this case. Because the *Fore Systems* license and settlement agreements have little, if anything, to do with the patents remaining in suit, they will have little probative value regarding damages for the alleged infringement of those patents. The *Fore Systems* license and settlement agreement could only mislead and confuse the jury regarding the value of the

---

[2]    Further, simply because Telcordia's expert relied on the *Fore Systems* license and settlement agreements does not require that such agreements be admitted into evidence. Rather, courts are not obliged "to allow otherwise inadmissible settlement agreements into evidence simply because one party's expert relies on them in reaching a reasonable royalty." Exh. 4-G [*PharmaStem*, 2003 WL 22387038] at *3.

'633 and '763 patents, especially when the record evidence will include license agreements specific to these two patents, which are probative of the disputed issues.

Put simply, Telcordia will use this *Fore Systems* license and settlement agreement to artificially inflate its damages calculation. Accordingly, the *Fore Systems* license and settlement agreements should not be allowed into evidence because their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

## V.     CONCLUSION

For the foregoing reasons, Defendants request that Telcordia be precluded from introducing any evidence of, and/or relying upon, the *Fore Systems* license and settlement agreements.

5



REDACTED

B

REDACTED

C

REDACTED

D

# REDACTED

E

REDACTED

F



"Williamson, John"
<John.Williamson@finnegan.com>

01/26/2007 03:56 PM

To   <edward.reines@weil.com>

cc   <steven.cherny@lw.com>

Subject   Telcordia v. Cisco / Lucent

Ed,

I write in response to your January 24 email to Don Dunner. You have asked that we "respond to each point with []our position." In your email you said that your positions "should not be perceived as final." We echo that point as to our responses below.

Point 1

You wrote:

"(1) Fore settlement -- The parties agreed that the defendants should file a motion if they want because Telcordia plans to rely on this material."

We are unsure exactly how to interpret your statement. That said, Telcordia reserves its right to rely upon agreements with FORE Systems and, presently, it seems likely that such agreements would be part of our case.

Point 2

You wrote:

"(2) Uncorroborated '633 conception date -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on pre-September 1991 events on the inventorship issue."

Again, we are unsure exactly how to interpret your statement, and we disagree with your characterization of the issue entirely. If what you are referring to is the answer that Telcordia provided in response to Cisco interrogatory no. 8, we intend to rely upon that answer.

Point 3

You wrote:

"(3) Willfulness opinion -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on the absence of a disclosed opinion of counsel."

Again, we are unsure exactly how to interpret your statement and disagree with your characterizations. Telcordia reserves the right to address the fact that the defendants did not identify any opinion of counsel during discovery, on their privilege logs or otherwise.

Point 4

You wrote:

"(4) Exclude undeposed witnesses for which timely depositions are not offered -- Telcordia does not want to take a position on the issue until defendants serve their witness list. Defendants plan to file a limine motion."

Again, we are unsure exactly how to interpret your statement. You are correct to note that it is premature to ask Telcordia to agree to offer and conduct additional depositions of potential trial witnesses before Telcordia has seen the defendants' proposed witness list (i.e., before Telcordia has any understanding of the number and identity of potential additional deponents).

If you are asking for an agreement to continue deposition discovery between now and the trial, we do not believe that the parties would be able to so agree. Discovery has long been closed and reopening depositions at this stage would violate the Court's scheduling order. Moreover, the Court's pretrial order requires each party to state that it has completed discovery, and indicates that absent good cause shown no further discovery will be permitted. As such, if we were to propose the continuation of deposition discovery at this stage it seems that leave of Court would be required. In sum, while we certainly are not foreclosing the possibility of agreement on this issue, we note that there are logistical hurdles, and that it is premature to consider the issue before Telcordia has had a chance to evaluate the defendants' witness list.

Point 5

You wrote:

"(5) Exclude FTI witnesses -- Telcordia reserves the right to call the FTI witnesses and does not know yet if it will do so. The parties agreed that the defendants should file a motion if they want."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. The proposed FTI witnesses would be offered only to authenticate summaries under Fed. R. Evid. 1006. That would be the entire scope of their testimony.

The testimony would be tailored to allow for the expeditious and smooth presentation of voluminous sales data.

Point 6

You wrote:

"(6)  Reliance on sales of platforms beyond accused modules -- Defendants are interested in precluding Telcordia from arguing that "boxes" are infringing and properly in the royalty base beyond the number of SRTS capable cards.  You will look into this and get back to us with your position."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  Additionally, we have been unable to address this issue fully with all of the necessary members of our team.  We will get back to you as soon as possible.

Point 7

You wrote:

"(7) References to Cisco's size / finances beyond products at issue -- Cisco is interested in precluding Telcordia from referencing Cisco's size or finances, except as it relates to the accused products.  Please let us know your position."

Again, we are unsure exactly how to interpret your statement.  Telcordia reserves its right to reference Cisco's size and finances.

Point 8

You wrote:

"(8) Alleged 'illegal boycott' by Cisco in the SRTS standardization process -- Cisco is interested in precluding Telcordia from arguing that it was involved in an 'illegal boycott.' Telcordia used this phrase in its trial brief.  Please confirm you will not reference any alleged illegal conduct or boycott or similar language at trial."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  Specifically, we don't know what you mean by "or similar language." Telcordia's identification of a "self styled illegal boycott" is based upon contemporaneous emails drafted by and circulated among Cisco employees.  Telcordia reserves all rights to use that evidence.

Point 9

You wrote:

"(9)  Foreign sales -- Cisco is interested in precluding Telcordia from seeking royalties

for foreign sales.  Please let us know your position."

Cisco has no basis to preclude Telcordia from seeking royalties from foreign sales, and the matter would be properly before (and decided by) a jury.

Point 10

You wrote:

"(10)  Alcatel-Lucent merger -- Lucent is interested in precluding Telcordia from referencing the Lucent-Alcatel merger.  Please let us know your position."

Telcordia reserves its right to reference the Alcatel-Lucent merger.

Regards,

John


This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

G

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2003 WL 22387038 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
PharmaStem Therapeutics, Inc. v. Viacell Inc.D.Del.,2003.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PHARMASTEM THERAPEUTICS, INC., Plaintiff,
v.
VIACELL INC., Cryo-Cell International, Inc., Corcell, Inc., Stemcyte, Inc., Cbr Systems, Inc. f/k/a Cord Blood Registry, Inc., Birthcells Technology, Inc., Nustem Technologies, Inc., and Bio-Cell, Inc., Defendants.
**No. C.A. 02-148 GMS.**

Oct. 7, 2003.

Philip A. Rovner, Potter Anderson & Corroon, LLP, Wilmington, DE, for Plaintiff.
Jeffrey L. Moyer, David Allan Felice, Richards, Layton & Finger, Robert F. Stewart, Jr., Dilworth, Paxson LLP, Richard D. Kirk, Morris, James, Hitchens & Williams, Wilmington, DE, for Defendants.

*MEMORANDUM AND ORDER*
SLEET, J.

**I. INTRODUCTION**

**\*1** On August 5, 2003, PharmaStem Therapeutics, Inc. ("PharmaStem") filed a motion *in limine* to exclude from evidence all discovery relating to settlement negotiations regarding patent licensing agreements. On August 12, 2003, Viacell Inc., Cryo-Cell International, Inc., Corcell, Inc., Stemcyte, Inc., CBR Systems, Inc. f/k/a Cord Blood Registry, Inc., Birthcells Technology, Inc., Nustem Technologies, Inc., and Bio-Cell, Inc. (collectively "Viacell") filed an answer requesting that PharmaStem's motion be denied. Alternatively, Viacell moved to exclude from evidence the license agreements between PharmaStem and third parties, Anthrogenesis Corporation ("Anthrogenesis") and Stembanc, Inc. ("Stembanc"), and to preclude PharmaStem's expert, Russell Parr, from relying on those licenses as a factor in determin-

ing a reasonable royalty rate. On August 15, 2003, PharmaStem filed a reply. The court conducted a pre-trial conference on September 8, 2003 in which it heard oral argument from the parties on PharmaStem's motion. Upon consideration of the arguments raised at the pretrial conference and in the parties' briefs, the court will grant PharmaStem's motion *in limine* to exclude from evidence all discovery relating to settlement negotiations regarding the Anthrogenesis and Stembanc licenses and with any of the defendants in this case. The court will also grant Viacell's cross-motion *in limine* to exclude from evidence the Anthrogenesis and Stembanc license agreements themselves and to preclude Mr. Parr from relying on those licenses as a factor in determining a reasonable royalty rate. The court bases its ruling on the following reasons.

**II. DISCUSSION**

After the commencement of the present litigation, PharmaStem licensed the patents-in-suit to two, non-defendant companies, Anthrogenesis and Stembanc. PharmaStem entered into licensing agreements with Anthrogenesis and Stembanc in the context of settling a claim of infringement against each of those companies. PharmaStem also has held settlement negotiations with several of the defendants. In all instances, PharmaStem and the various parties entered into a negotiation agreement containing the following clause:

All offers, promises, conduct and statements, whether oral or written made in the course of negotiations relating to the Patents by either of the parties, their attorneys, agents or representatives are "Confidential Statements." Confidential Statements may not be disclosed by the receiving party without the consent of the disclosing party. Confidential Statements are subject to Rule 408 of the Federal Rules of Evidence may not be used by the receiving party in litigation for any purpose including, without limitation, impeachment. However, evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its presentation or use in connection with this Agreement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PharmaStem claims that evidence related to the negotiations underlying the Anthrogenesis and Stembanc license agreements is inadmissible under Rule 408 of the Federal Rules of Evidence. PharmaStem maintains, however, that the Anthrogenesis and Stembanc license agreements themselves are admissible to establish the appropriate reasonable royalty calculation. Accordingly, PharmaStem's damages expert, Russell Parr, relied on the license agreements in reaching his opinion that PharmaStem is entitled to a high royalty rate for the patents-in-suit.

**\*2** Conversely, Viacell takes an "all-or-nothing" position, arguing that if the underlying negotiations are inadmissible because of Rule 408, then the license agreements themselves are also inadmissible for the same reason. If Mr. Parr is nonetheless permitted to rely on the Anthrogenesis and Stembanc licenses, Viacell argues that it then should be permitted to introduce the underlying negotiations to show that the final agreements were not the product of a freely negotiated, bargained-for exchange. Indeed, Viacell's damages expert, David E. Yurkerwich, relied on evidence of the underlying negotiations to reach his conclusion that the reasonable royalty rate should be much lower than the one Mr. Parr calculated. The court agrees that PharmaStem is not permitted to have it both ways.

"[T]he methodology for determining a 'reasonable royalty' is consigned to the district court's discretion and is reviewed only for abuse of that discretion." Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc., 898 F.Supp. 1334, 1336 (N.D.Iowa 1995) (citing Wang Labs., Inc. v. Toshiba Corp., 993 F.2d 858, 869 (Fed.Cir.1993); SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1164 (Fed.Cir.1991); Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568, 1576 (Fed.Cir.1988)). It is well established that a patent holder's license agreements with third parties are permissible considerations in a reasonable royalty calculation. See, e.g., Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y.1970). However, notwithstanding their relevance to a reasonable royalty calculation, the court may exclude license agreements between a patent holder and third parties under Rule 408 of the Federal Rules of Evidence.

Rule 408 states in pertinent part:
Evidence of (1) furnishing or offering or promising to furnish, (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromising negotiations is likewise not admissible.

Fed.R.Evid. 408. Specifically, a license agreement may be excluded from evidence under Rule 408 where it (1) was reached under a threat of litigation, (2) arose in a situation where litigation was threatened or probable, or (3) was negotiated against a backdrop of continuing litigation infringement. See Century Wrecker, 898 F.Supp. at 1340 (citing Studiengesellschaft Kohle, M.b.H. v. Dart Indus., Inc., 862 F.2d 1564, 1572 (Fed.Cir.1988) (synthesizing the teachings of Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1164 n. 11 (6th Cir.1978), Rude v. Westcott, 130 U.S. 152, 164, 9 S.Ct. 463, 32 L.Ed. 888 (1889), Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078-79 (Fed.Cir.1983), and Deere & Co. v. Int'l Harvester Co., 710 F.2d 1551, 1557 (Fed.Cir.1983), respectively)). The court must look carefully at the context in which the license agreement was reached to determine whether it meets any of these requirements. See Dart Indus., 862 F.2d at 1572; Century Wrecker, 898 F.Supp. at 1340.

**\*3** The license agreements between PharmaStem and third parties Anthrogenesis and Stembanc arose in a context where litigation was threatened or at least probable. PharmaStem in fact states, "With respect to Anthrogenesis and Stembanc, discovery obtained unambiguously refers to the amounts contemplated to settle PharmaStem's claim of infringement against them." (PharmaStem Therapeutics, Inc's Motion In Limine to Exclude All Discovery Relating to Settlement Agreement Negotiations Regarding Patent License Agreements, at 3). Additionally, PharmaStem's negotiation agreements with Anthrogenesis and Stembanc specifically reference Rule 408, indicating that the parties involved must consider the licenses to have arisen out of settlement negotiations over the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22387038 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

validity or amount of an infringement claim. A "dispute" under Rule 408 includes "both litigation and less formal states of a dispute." In view of the term's broad construction, it is clear that the Anthrogenesis and Stembanc license agreements arose from a dispute within the meaning of Rule 408.

Both PharmaStem and Viacell cite *Century Wrecker* in support of their respective positions. In *Century Wrecker,* the court admitted evidence of license agreements between the plaintiff and third parties, which arose out of the threat of litigation. Although the court noted that the agreements were inadmissible under Rule 408, it nonetheless allowed the defendants to introduce the agreements into evidence because the plaintiff's expert had relied on them in his reasonable royalty calculations. The court reasoned that the defendants were entitled to use the settlement agreements to challenge the basis of the plaintiff's expert's conclusions.

*Century Wrecker,* however, is not binding precedent on this court. Moreover, *Century Wrecker* held only that the actual settlement agreements were admissible to challenge the basis of the expert's opinion. The case, therefore, does not dictate Viacell's position that evidence of negotiations *underlying* the license agreements must be admitted to challenge Mr. Parr's report. Nor does *Century Wrecker* mandate PharmaStem's conclusion that the Anthrogenesis and Stembanc licenses are automatically admissible because Mr. Parr used them to calculate a reasonable royalty.

The court is not required to allow otherwise inadmissible settlement agreements into evidence simply because one party's expert relies on them in reaching a reasonable royalty. This is particularly true where other options, such as excluding the licenses altogether, are available to the court. The purpose of Rule 408 is "to encourage full and frank disclosure between parties in order to promote settlements, rather than protracted litigation." *See* Fed.R.Evid. 408 (citing *Olin Corp. v. Ins. Co. of N. Am.,* 603 F.Supp. 445, 449 (S.D.N.Y.1985)). Given its discretion to determine the methodology for calculating a reasonable royalty, the court finds that it is the better practice to exclude the Anthrogenesis and Stembanc licenses in view of the policy considerations behind Rule 408. *See Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356, 1364 (10th Cir.1987) ("[W]hen the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers.").

**\*4** Finally, although Viacell does not appear to seek the introduction of such evidence, to the extent PharmaStem requests the exclusion of settlement negotiations between itself and any of the defendants in this case, that evidence is plainly inadmissible under Rule 408. *See* Fed.R.Evid. 408 ("Evidence of conduct or statements made in compromising negotiations is likewise not admissible.").

### III. CONCLUSION

Because the agreements arose in a context where litigation was threatened or at least probable, the court will exclude all evidence relating to negotiations of the Anthrogenesis and Stembanc licenses, including the license agreements themselves.

Therefore, IT IS HEREBY ORDERED that:
1. PharmaStem Therapeutics, Inc.'s motion *in limine* to exclude from evidence all discovery relating to settlement negotiations regarding the Anthrogenesis and Stembanc licenses and with any of the defendants in this case is GRANTED.
2. Viacell's cross-motion *in limine* to exclude from evidence the Anthrogenesis and Stembanc license agreements and to preclude Russell Parr from relying on those licenses as a factor in determining a reasonable royalty rate is GRANTED.
3. The parties' experts may not rely on the Anthrogenesis and Stembanc licenses or any documents or other evidence pertaining to negotiations of the those licenses to calculate a reasonable royalty rate or to challenge the opposing party's calculation of a reasonable royalty rate.

D.Del.,2003.
PharmaStem Therapeutics, Inc. v. Viacell Inc.
Not Reported in F.Supp.2d, 2003 WL 22387038 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 3333202 (Trial Motion, Memorandum and Affidavit) Pharmastem Therapeutics, Inc.'s Mo-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22387038 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

tion to Dismiss Defendant CBR's First, Second, Third, Fourth, Fifth and Sixth Counterclaims (Sep. 14, 2004) Original Image of this Document (PDF)
• 2003 WL 23310808 (Verdict and Settlement Summary) (Oct. 29, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.