# Exhibit 5

# Exhibit A

**MOTION *IN LIMINE* NO. 5A [FOR CISCO ONLY]**
**RE: HYPERBOLIC AND PREJUDICIAL ARGUMENT OR EVIDENCE**

Defendant Cisco moves *in limine* to exclude Telcordia from discussing Cisco's total worth, revenue, profitability, or market cap or characterizing Cisco's alleged conduct before the ATM Forum with inflammatory language such as "illegal boycott."

## I.    INTRODUCTION

At trial, Telcordia intends to introduce hyperbolic argument and/or evidence concerning Cisco that is irrelevant and unfairly prejudicial because it risks inflaming the jury and has little probative value. First, Telcordia has stated that it may introduce evidence of Cisco's overall revenues or net worth. This appears to be an attempt to suggest that Cisco can and should pay a large judgment. Cisco's overall sales and profitability include the enormous contributions of *non*-accused products which are entirely *unrelated* to this case. Further, any probative value of such evidence is clearly outweighed by the danger of unfair prejudice that would be created by presenting such evidence to a jury. Second, Telcordia has characterized Cisco's activities at the ATM Forum in 1995 as an "illegal boycott." Such derogatory language is unfounded and unfairly prejudicial and should be excluded at trial.

## II.    TELCORDIA SHOULD BE PRECLUDED FROM PRESENTING HYPERBOLIC ARGUMENT OR EVIDENCE CONCERNING CISCO'S TOTAL WORTH, REVENUE, PROFITABILITY, OR MARKET CAP

During pretrial negotiations with Cisco, Telcordia has stated that it may introduce hyperbolic argument and evidence of Cisco's overall sales and profitability to the jury. Exh. 5A-A [Jan. 26, 2007 email from J. Williamson] ("Telcordia reserves its right to reference Cisco's size and finances" without qualification or limitation.).

Cisco's overall financial performance necessarily includes the revenues of products *not* accused of infringement here. Basic principles of patent law (and common sense) dictate that

Telcordia is not entitled to damages on noninfringing products. *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 799 (Fed. Cir. 1988) (affirming a district court's award of damages for infringing sales). Indeed, this district has precluded evidence about revenue that is not connected to the accused infringing products in granting previous *in limine* motions. *See, e.g.*, Exh. 5A-B [*Inline Connection Corp., v. AOL Time Warner Inc.*, Nos. 02-272, 02-477, 2007 WL 108382, at *6 (D. Del. Jan. 16, 2007)].

Courts also have excluded evidence of overall profitability under Federal Rule of Evidence 403 because of the risk of juror confusion and unfair prejudice. In *Fournier v. Erickson*, 242 F. Supp. 2d 318, 327 (S.D.N.Y. 2003), the court properly excluded evidence of overall profits for non-accused product lines under Rule 403. The court also held that the size of the sales goals for even the accused products, including references to "revenue growth in the billions of dollars, are likely to significantly prejudice the jury *despite* the Defendant's burden of establishing what portion of the overall gross revenues are actually attributable to factors other than the alleged infringement." *Id.* at 330.

The facts at hand are even more stark than those in *Fournier*. Here, there is no connection between Cisco's overall sales and profitability and the damages Telcordia claims. Telcordia's damages theory is based on ███████ of sales over five years, whereas Cisco's total revenues exceed ███████ a year, consisting overwhelmingly of revenues generated from non-accused products.

In short, evidence of Cisco's overall sales and profitability is irrelevant to Telcordia's damages theory and creates a dangerous risk of misleading the jury otherwise. Accordingly, the Court should preclude Telcordia from presenting argument and evidence about Cisco's total worth, revenue, profitability, or market cap.

### III. TELCORDIA SHOULD BE PRECLUDED FROM PRESENTING HYPERBOLIC ARGUMENT OR EVIDENCE CONCERNING CISCO'S ALLEGED BOYCOTT CAMPAIGN

Telcordia should also be precluded under Federal Rule of Evidence 403 from characterizing Cisco's activities at the ATM Forum as an "illegal boycott."[1]  In its trial brief, Telcordia alleges that Cisco held "a self-styled illegal boycott" in the ATM Forum in 1995:



Telcordia Trial Br. at 2 (emphasis added).  There is no support in the record for Telcordia's characterization of Cisco's conduct.

There is ample precedent holding that parties should be precluded from describing conduct in derogatory terms before a jury.  For example, in *Schwab v. Philip Morris USA*, the court held that "conclusory and derogatory words such as 'monopoly,' 'oligopoly,' 'collusion,' and the like shall be omitted [as] [t]hese are terms likely to be viewed by the jury as pejorative." 449 F. Supp. 2d 992, 1221 (E.D.N.Y. 2006) (excluding derogatory words pursuant to Fed. R. Evid. 403).  This was true even though an alleged "collusion" was "a central part of the plaintiffs' case." *Id.* at 1221.  Where – as here – Telcordia's case concerns patent infringement and validity, and not boycotts, it is particularly important that highly charged and confusing phrases like "illegal boycott" be kept from the jury.  To permit such inflammatory accusations

---

[1]   To attempt to avoid the need for this motion, Cisco met and conferred regarding Telcordia's use of the phrase "illegal boycott."  Telcordia stated that its support for this allegation was in documents, but refused to identify the supposedly supporting documents, citing "trial strategy."  Exh. 5A-C [Jan. 30, 2007 email from E. Reines].  Cisco is not aware of any documents that would support such an extreme allegation, even if an illegal boycott was an element of a claim in this case, which it is not.

3

would create the risk of a satellite dispute concerning the unplead allegation that Cisco is guilty of an "illegal boycott."

## V.    CONCLUSION

For the foregoing reasons, Cisco requests that Telcordia be precluded from presenting hyperbolic argument or evidence by (1) discussing Cisco's total worth, revenue, profitability, or market cap, or (2) characterizing Cisco's alleged conduct before the ATM Forum with inflammatory language.

A

<John.williamson@finnegan.c    To  <edward.reines@weil.com>
om>                            cc  steven.cherry@lw.com>
01/26/2007 03:56 PM       Subject  Telcordia v. Cisco / Lucent

Case 1:04-cv-00875-GMS    Document 308-3    Filed 02/21/2007    Page 8 of 88

Ed,

I write in response to your January 24 email to Don Dunner.  You have asked that we "respond to each point with []our position."  In your email you said that your positions "should not be perceived as final."  We echo that point as to our responses below.

Point 1

You wrote:

"(1) Fore settlement -- The parties agreed that the defendants should file a motion if they want because Telcordia plans to rely on this material."

We are unsure exactly how to interpret your statement.  That said, Telcordia reserves its right to rely upon agreements with FORE Systems and, presently, it seems likely that such agreements would be part of our case.

Point 2

You wrote:

"(2) Uncorroborated '633 conception date -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on pre-September 1991 events on the inventorship issue."

Again, we are unsure exactly how to interpret your statement, and we disagree with your characterization of the issue entirely.  If what you are referring to is the answer that Telcordia provided in response to Cisco interrogatory no. 8, we intend to rely upon that answer.

Point 3

You wrote:

"(3) Willfulness opinion -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on the absence of a disclosed opinion of counsel."

Again, we are unsure exactly how to interpret your statement and disagree with your characterizations. Telcordia reserves the right to address the fact that the defendants did not identify any opinion of counsel during discovery, on their privilege logs or otherwise.

Point 4

You wrote:

"(4) Exclude undeposed witnesses for which timely depositions are not offered -- Telcordia does not want to take a position on the issue until defendants serve their witness list. Defendants plan to file a limine motion."

Again, we are unsure exactly how to interpret your statement. You are correct to note that it is premature to ask Telcordia to agree to offer and conduct additional depositions of potential trial witnesses before Telcordia has seen the defendants' proposed witness list (i.e., before Telcordia has any understanding of the number and identity of potential additional deponents).

If you are asking for an agreement to continue deposition discovery between now and the trial, we do not believe that the parties would be able to so agree. Discovery has long been closed and reopening depositions at this stage would violate the Court's scheduling order. Moreover, the Court's pretrial order requires each party to state that it has completed discovery, and indicates that absent good cause shown no further discovery will be permitted. As such, if we were to propose the continuation of deposition discovery at this stage it seems that leave of Court would be required. In sum, while we certainly are not foreclosing the possibility of agreement on this issue, we note that there are logistical hurdles, and that it is premature to consider the issue before Telcordia has had a chance to evaluate the defendants' witness list.

Point 5

You wrote:

"(5) Exclude FTI witnesses -- Telcordia reserves the right to call the FTI witnesses and does not know yet if it will do so. The parties agreed that the defendants should file a motion if they want."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. The proposed FTI witnesses would be offered only to authenticate summaries under Fed. R. Evid. 1006. That would be the entire scope of their testimony.

The testimony would be tailored to allow for the expeditious and smooth presentation of voluminous sales data.

Point 6

You wrote:

"(6)  Reliance on sales of platforms beyond accused modules -- Defendants are interested in precluding Telcordia from arguing that "boxes" are infringing and properly in the royalty base beyond the number of SRTS capable cards.  You will look into this and get back to us with your position."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  Additionally, we have been unable to address this issue fully with all of the necessary members of our team.  We will get back to you as soon as possible.

Point 7

You wrote:

"(7) References to Cisco's size / finances beyond products at issue -- Cisco is interested in precluding Telcordia from referencing Cisco's size or finances, except as it relates to the accused products.  Please let us know your position."

Again, we are unsure exactly how to interpret your statement.  Telcordia reserves its right to reference Cisco's size and finances.

Point 8

You wrote:

"(8) Alleged 'illegal boycott' by Cisco in the SRTS standardization process -- Cisco is interested in precluding Telcordia from arguing that it was involved in an 'illegal boycott.' Telcordia used this phrase in its trial brief.  Please confirm you will not reference any alleged illegal conduct or boycott or similar language at trial."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  Specifically, we don't know what you mean by "or similar language." Telcordia's identification of a "self styled illegal boycott" is based upon contemporaneous emails drafted by and circulated among Cisco employees.  Telcordia reserves all rights to use that evidence.

Point 9

You wrote:

"(9)  Foreign sales -- Cisco is interested in precluding Telcordia from seeking royalties

for foreign sales.  Please let us know your position."

Cisco has no basis to preclude Telcordia from seeking royalties from foreign sales, and the matter would be properly before (and decided by) a jury.

Point 10

You wrote:

"(10)  Alcatel-Lucent merger -- Lucent is interested in precluding Telcordia from referencing the Lucent-Alcatel merger.  Please let us know your position."

Telcordia reserves its right to reference the Alcatel-Lucent merger.

Regards,

John


This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

B

Westlaw.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

H
Briefs and Other Related Documents
Inline Connection Corp. v. AOL Time Warner Inc.D.Del.,2007.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
INLINE CONNECTION CORPORATION, Broadband Technology Innovations, LLC, and Pie Squared, LLC, Plaintiffs,
v.
AOL TIME WARNER INCORPORATED, et al., Defendants.
INLINE CONNECTION CORPORATION, Broadband Technology Innovations, LLC, and Pie Squared, LLC, Plaintiffs,
v.
EARTHLINK, INC., Defendant.
**No. C.A. 02-272-MPT, C.A. 02-477-MPT.**

Jan. 16, 2007.

**Background:** Patentee brought infringement action against Internet service providers (ISPs), alleging infringement of family of patents concerning simultaneous transmission of high frequency information signals and lower frequency voice band signals over conventional telephone wiring. Defendants brought motions for partial summary judgment and in limine.

**Holdings:** The District Court, Thynge, United States Magistrate Judge, held that:

(1) expert's testimony regarding licensing royalty base, which incorporated total number of competitors' customers, including those who did not infringe upon patent, was reliable;

(2) testimony of expert regarding competitor's bring your own access (BYOA) related commissions, profits, and revenues was not probative or relevant as to reasonable royalty from which to calculate damages; and

(3) fact issue existed as to reasonable royal corresponding applicable customer royalty bas

Motion in limine granted in part. Motion for summary judgment denied.

**[1] Evidence 157 ☞546**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
         157k546 k. Determination of Ques
Competency. Most Cited Cases
The determination of whether to exclude evidence is committed to the court's discretion.

**[2] Evidence 157 ☞555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.2 k. Necessity Sufficiency. Most Cited Cases
A trial judge has considerable leeway in d how to determine whether expert testim reliable.

**[3] Evidence 157 ☞146**

157 Evidence
   157IV Admissibility in General
      157IV(D) Materiality
         157k146 k. Tendency to Misl Confuse. Most Cited Cases

**Evidence 157 ☞546**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
         157k546 k. Determination of Ques

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Competency. Most Cited Cases
When making the decision to exclude expert evidence, a court must balance the need for the challenged evidence against the risk that it will confuse the jury and delay trial; to exclude evidence is within purview of the court, but determinations to exclude evidence before the challenging party has an opportunity to develop the record are unfair and improper. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[4] Evidence 157 &#8666;555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.2 k. Necessity and Sufficiency. Most Cited Cases
When the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying an expert's testimony. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A &#8666;2465.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)1 In General
            170Ak2465 Matters Affecting Right to Judgment
               170Ak2465.1 k. In General. Most Cited Cases
Summary judgment is not appropriately based on argument that parties' experts use different theories, data and reach different conclusions. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[6] Evidence 157 &#8666;570**

157 Evidence
   157XII Opinion Evidence
      157XII(F) Effect of Opinion Evidence
         157k569 Testimony of Experts
            157k570 k. In General. Most Cited Cases
A court may not determine the credibility of expert witnesses nor substitute its choice for that of the jury between conflicting elements of the evidence.

**[7] Federal Civil Procedure 170A &#8666;2461**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)1 In General
            170Ak2461 k. In General. Most Cases

**Federal Courts 170B &#8666;847**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Exte
        170BVIII(K)5 Questions of Fact, V and Findings
           170Bk847 k. Verdicts in General Cited Cases
To the extent that there are conflicts in the ev with respect to damages, neither the trial cour motion for summary judgment, nor the ap court, may substitute its findings for those jury.

To the extent that there are conflicts in the ev with respect to damages, neither the trial cour motion for summary judgment, nor the ap court, may substitute its findings for those jury.

**[8] Patents 291 &#8666;318(1)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
        291k318 Profits
          291k318(1) k. In General. Most Cases

**Patents 291 &#8666;319(1)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
        291k319 Damages
          291k319(1) k. In General. Most Cases
A patentee may seek to recover actual dama the form of lost profits, or, in the event th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

profits cannot be ascertained, on the basis of a reasonable royalty; patentee is entitled, at a minimum, to a reasonable royalty for infringement of its patent.

**[9] Patents 291 ☞314(5)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k314 Hearing
           291k314(5) k. Questions of Law or Fact. Most Cited Cases
The amount of damages, or harm sustained by a patentee, is a question of fact, decided by a jury when trial is to a jury.

**[10] Evidence 157 ☞555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
           157k555.2 k. Necessity and Sufficiency. Most Cited Cases

**Patents 291 ☞312(2)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k312 Evidence
           291k312(2) k. Admissibility. Most Cited Cases
Expert's testimony regarding licensing royalty base, which incorporated total number of competitors' customers, including those who did not infringe upon patent, was reliable, since expert possessed requisite knowledge, skill, experience, and training and his opinion incorporated methodologies used by experts in his field; although competitors wanted to limit damages claim to subset of their asymmetric digital subscriber line (ADSL) customers connected through remote terminal (RT) lines, expert's testimony could include customers provisioned through non-infringing central office (CO) digital subscriber line access multiplexers (DSLAMS). Fed.Rules. Evid.Rule 702, 28 U.S.C.A.; Fed.Rules Evid.Rule 403, 28 U.S.C.A.

Expert's testimony regarding licensing royalty which incorporated total number of comp customers, including those who did not i upon patent, was reliable, since expert po: requisite knowledge, skill, experience, and t and his opinion incorporated methodologies u experts in his field; although competitors wa limit damages claim to subset of their asyn digital subscriber line (ADSL) customers cor through remote terminal (RT) lines, testimony could include customers prov through non-infringing central office (CO) subscriber line access multiplexers (DSL Fed.Rules. Evid.Rule 702, 28 U.S.C.A.; Fe Evid.Rule 403, 28 U.S.C.A.

**[11] Evidence 157 ☞555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
           157k555.2 k. Necessity
Sufficiency. Most Cited Cases
Court could not evaluate and determine underlying expert's testimony which rela material contested facts that directly rela weight and credibility. Fed.Rules Evid.Rule ? U.S.C.A.

**[12] Patents 291 ☞312(2)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k312 Evidence
           291k312(2) k. Admissibility.
Cited Cases
Testimony of expert regarding competitor's your own access (BYOA) related commi profits, and revenues was not probative or r as to reasonable royalty from which to ca damages, in patent infringement action, revenues or profits from BYOA services we element of expert's reasonable computations; although expert's calculations were grounded on sufficient fac testimony would have shown completen expert's analysis of all relevant factors used fo

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

calculation, they were not critical to expert's analysis. Fed.Rules Evid.Rule 401, 28 U.S.C.A.

**[13] Evidence 157 ⟅⟆99**

157 Evidence
　157IV Admissibility in General
　　157IV(A) Facts in Issue and Relevant to Issues
　　　157k99 k. Relevancy in General. Most Cited Cases
When determining whether an item of evidence is relevant, a court evaluates whether the evidence tends to prove the matter sought to be proved. Fed.Rules Evid.Rule 401, 28 U.S.C.A.

**[14] Patents 291 ⟅⟆323.2(3)**

291 Patents
　291XII Infringement
　　291XII(C) Suits in Equity
　　　291k323 Final Judgment or Decree
　　　　291k323.2 Summary Judgment
　　　　　291k323.2(3) k. Particular Cases. Most Cited Cases
Genuine issue of material fact existed as to reasonable royalty and corresponding applicable customer royalty base, precluding summary judgment in patent infringement action. 35 U.S.C.A. § 284; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**Patents 291 ⟅⟆328(2)**

291 Patents
　291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
　　291k328 Patents Enumerated
　　　291k328(2) k. Original Utility. Most Cited Cases
5,844,596, 6,236,718, 6,243,446, 6,542,585. Cited.

Julia Heaney, Thomas C. Grimm, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Plaintiffs.
Chad Michael Shandler, Kelly E. Farnan, Richards, Layton & Finger, Gary William Lipkin, Duane Morris LLP, Wilmington, DE, for Defendants.
Broadband Technology Innovations LLC, pro se.

Pie Squared LLC, pro se.

MEMORANDUM ORDER
THYNGE, Magistrate J.

I. INTRODUCTION

**\*1** This is a patent infringement case. Communication Corporation ("Inline") America Online Inc. ("AOL") on April 12, and EarthLink, Inc. ("EarthLink") on June 4 alleging infringement of U.S. Patent Nos. 5,8 ("the '596 patent"), 6,243,446 ("the '446 pa and 6,236,718 ("the '718 patent").[FN1]

On August 31, 2006, AOL and EarthL defendants") jointly filed motions for summary judgment and *in limine* to pr damages for customers provisioned t non-infringing central office ("CO") DSLAI On September 20, 2006, Inline respond arguing that its expert's methodology on dam supported by substantial evidence and the any disagreement regarding appr methodologies is not properly determin summary judgment.[FN3] On October 27, AOL and EarthLink jointly filed a motion *in* to exclude the testimony of Inline's expert, Ja Malackowski,[FN4] arguing that his testimony supported by reliable evidence and is bas unsupported conclusions regarding hypot negotiations with Inline. Moreover, defendar that Malackowski be precluded from c testimony regarding AOL's "Bring Your Access" ("BYOA") service on the basis that t no evidence that sales of these services me legal requirements of a convoyed sale an revenues from such sales are irrelevan November 17, 2006, Inline responded by a that its damage calculations are ground sufficient facts and that BYOA service comm are probative under the *Georgia-Pacifi* factors.

In its opinion of December 5, 2006, the determined that the defendants' motions for summary judgment and *in limine* on the pre of damages for non-infringing CO lines, an motion *in limine* to exclude Malackowski's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

testimony were intrinsically related and should be decided together. For the reasons discussed herein, defendants' motions are granted in part and denied in part.

## II. POSITIONS OF THE PARTIES

### A. Motion *in limine* to Limit the Expert Testimony of James E. Malackowski.

AOL and EarthLink argue that Malackowski's analysis lacks the reliability required by the Federal Rules of Evidence and deviates from the standards in *Daubert* [FN6] and therefore is inadmissible evidence. Defendants contend that Malackowski improperly relied upon an unfounded conclusion that AOL and EarthLink would have agreed to pay a royalty on all ADSL customers because they would not have obtained remote terminal ("RT") deployment information. Defendants also argue that Malackowski's analysis is not "tied" to any reliable evidence or data. In this regard, they assert that Malackowski did not account for the possibility that some customers provisioned through a RT do not infringe the patents-in-suit because not all claim limitations are satisfied. Moreover, they state that neither Malackowski nor Dr. Charles Jackson (Inline's infringement expert) offer any evidence regarding the specific number of AOL or EarthLink users who infringe the patents in question.

**\*2** Defendants also move to preclude Malackowski's opinion regarding AOL's BYOA service [FN7] on the basis that there is no evidence that BYOA service infringes the patents-in-suit; BYOA sales have no relationship to a reasonable royalty rate calculation, and, as such, expert evidence would mislead the jury. They contend that Inline's conclusion that BYOA revenues influence a reasonable royalty calculation is flawed as a matter of law because BYOA service is not sold in connection with an infringing product. Defendants contend that the value of these transactions were not accounted for in Malackowski's computation of a reasonable royalty rate, and should therefore be omitted as not probative.

Inline contends that Malackowski's methodo supported by the evidence and accurately upon the hypothesis that AOL and EarthLink not or could not have obtained RT deplc information during the hypothetical negotiations. It argues that Malackowski p analyzed damages by determining the cost s that defendants enjoyed through the use inventions. Inline also contends that AOL's service is intrinsically related to ADSL According to Inline, "if sales of an inf product are used to increase sales non-infringing product, the non-infringing sa considered convoyed or derivative sales Since AOL receives commissions from a thir for each ADSL subscription by an AOL cus Inline contends that Malackowski p considered AOL's revenues under *Georgia-*Factor No. 6.[FN9] Inline further asserts Malackowski's opinion regarding AOL's services is not misleading, but demonstrat overall reasonableness of his damages analys

### B. Motion to Preclude Damages for Custon Provisioned through Non-Infringing CO DSL

AOL and EarthLink assert that the metho utilized by Malackowski is flawed as a ma law. AOL and EarthLink contend that expert impermissibly includes as part of his calculation those customers provisioned t non-infringing CO DSLAMS and that Inline entitled to compensation which incor non-infringing use. AOL and EarthLink reque Inline be prohibited from presenting a da model which applies a royalty to all ADSL including non-infringing CO lines.

In support of their position, AOL and Eai state that: (1) this court determined CO-provisioned ADSL lines do not infring matter of law; (2) Inline should not be perm circumvent this court's prior ruling; (3) expert relies on the absence of inforr specifically, telephone company records, to that a royalty base includes all ADSL lines; i Inline's expert ignores the actual and i

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

estimated RT deployment data. AOL and EarthLink argue that Inline's damage methodology is not based on a "reasonable royalty" formula and point to evidence which they say establishes that approximately two-thirds of ADSL customers are provisioned through non-infringing COs.

**\*3** Inline counters that the court should deny AOL and EarthLink's motion because the evidence supports the Cost Approach method employed by Malackowski. Inline argues that a methodology which employs a broader royalty base is not prohibited merely because it includes non-infringing sales.[FN11] In support of that argument, Inline points out AOL and EarthLink did not know whether customers would be provisioned through CO or RT lines, and as a result, they would have used truck roll installations for all subscribers to avoid infringement. Therefore, according to Inline, a reasonable royalty rate should reflect the cost of the truck rolls which defendants avoided by infringement.

Finally, Inline emphasizes that differences in methodologies for assessing damages, the credibility of each expert and the weight given to the evidence is within the province of the jury, which cannot be resolved on summary judgment.

### III. LEGAL STANDARD

A. Evidentiary Standards for Expert Testimony

AOL and EarthLink move to limit Inline's evidence regarding the licensing royalty base on which damages are calculated. Specifically, they want Malackowski's opinion confined to the subset of EarthLink or AOL customers who allegedly infringe the patents-in-dispute. Defendants argue that Malackowski's testimony lacks the reliability required by Federal Rules of Evidence ("FRE") 702.

Rule 702 provides in relevant part:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training or education, may thereto in the form of an opinion or otherwise the testimony is based upon sufficient facts (2) the testimony is the product of principles and methods, and (3) the witne applied the principles and methods reliably facts of the case.

In *Daubert,* the Supreme Court found that Ru "confides to the judge some gatek responsibility in deciding questions o admissibility of proffered expert testimony. This gatekeeper function of excluding unr testimony has also been applied to patent liti [FN13] *Daubert* provides a "non-exclusive ch [FN14] for trial courts to use in their assessn whether expert testimony met the rel requirements. FRE *Advisory Committee Note* are instructive as well. The 2000 Amen emphasize that no single factor is nece dispositive of the reliability of an testimony. Rather, the amendments iden number of factors relevant to non-scientific testimony on the issue of reliability.

[1] The determination of whether to exclude evidence is committed to the court's discretic The Third Circuit has noted, however, that: While evidentiary rulings are generally subje particularly high level of deference because t court has a superior vantage point to asse evidence ..., evaluating the reliability of sc methodologies and data does not generally i assessing the truthfulness of the expert wi and thus is often not significantly more diffi a cold record. Moreover, here there are facto counsel in favor of a hard look at (more st review of) the district court's exercise of disc For example, because the reliability stand Rules 702 and 703 is somewhat amorphous, t a significant risk that district judges will threshold too high and will in fact force plain prove their case twice. Reducing this r particularly important because the Federal R Evidence display a preference for admissibilit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

**\*4** The Third Circuit found that " 'the exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence," ' [FN18] and identified several factors for the court to consider in deciding whether to exclude testimony:

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order.[FN19]

The Third Circuit also noted that " 'the importance of the excluded testimony' should be considered." [FN20]

[2][3] Nonetheless, the trial judge has considerable leeway in deciding how to determine whether expert testimony is reliable. The Third Circuit found in *In re Paoli R.R.* that profferers of expert testimony do not have to "demonstrate ... by a preponderance of the evidence that the assessments of their experts are *correct,* they [need] only ... demonstrate by a preponderance of evidence that their opinions are reliable," [FN21] *Daubert* recognized that "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." [FN22] *Daubert* emphasized that the trial court must "focus" solely on principles and methodology, and not on the conclusions they generate.[FN23] A trial judge, however, is to scrutinize whether such methods have been properly applied to the facts of the case. [FN24] In making the decision to exclude evidence, the court must balance the need for the challenged evidence against the risk that it will confuse the jury and delay trial.[FN25] To exclude evidence is within purview of the court, but "determinations to exclude evidence before the challenging party has an opportunity to develop the record are unfair and improper." [FN26]

[4] Finally, the Federal Circuit's decision in *Micro Chemical Inc. v. Lextron, Inc.*[FN27] sheds light on

the role of the trial court under FRE 702. "W here, the parties' experts rely on conflicting facts, it is not the role of the trial court to e the correctness of facts underlying an c testimony." [FN28]

### B. Summary Judgment

[5][6][7][8][9] AOL and EarthLink move for summary judgment to limit Inline's damages to a subset of their ADSL customers con through RT lines. Summary judgment is pr the "pleadings, depositions, answer interrogatories, and admissions on file, to with affidavits, if any, show that there is no g issue as to any material fact and that the party is entitled to judgment as a matter of law This standard has also been applied to cases.[FN30] The party seeking summary jud bears the initial burden of establishing the la genuinely disputed material fact by demon: that there is an "absence of evidence to supp nonmoving party's case." [FN31] The court is the nonmoving party the benefit of all jus inferences and must resolve disputed issues in favor of the nonmovant.[FN32] Su judgment is not appropriately based on ar that parties' experts use different theories, d: reach different conclusions. "The court m determine the credibility of the witness substitute its choice for that of the jury b conflicting elements of the evidence." [FN33] extent that there are conflicts in the evidenc respect to damages, "neither the trial court the appellate court, may substitute its findir those of the jury." [FN34] A patentee may s recover actual damages in the form of lost or, in the event that lost profits cann ascertained, on the basis of a reasonable royalt The patentee is entitled, at a minimum, reasonable royalty for infringement of its pater The amount of damages, or harm su by a patentee, is a question of fact, "decide jury when trial is to a jury." [FN37]

### IV. ANALYSIS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

A. Motion *in limine* to Preclude Malackowski's
Opinion which Includes Customers Provisioned
through COs

*5 [10] AOL and EarthLink argue that
Malackowski's opinion is based on speculation, and
not on evidence or reliable data, because the
reasonable royalty resulting from the hypothetical
licensing negotiations would not apply to *all* of
defendants' ADSL customers, but only to those
serviced through RTs. Defendants contend that the
specific number of potentially infringing customers
should have been used and the analytical gap
between Malackowski's data and his conclusions is
too significant to be reliable. Defendants conclude
that his opinion is merely speculation, because it
relies entirely on assumptions without foundation.

Malackowski's conclusions are not unfounded, as
defendants suggest, simply because his calculations
incorporate the total number of defendants'
customers, including those who do not infringe.
Malackowski's report meets the requirements of
FRE 702 and the case law. Defendants cannot, and
have not argued that he lacks the requisite
knowledge, skill, experience and training. His
opinion incorporates methodologies used by experts
in his field. He employs three distinct methods to
evaluate a reasonable royalty rate: the Market
Approach, the Income Approach, and Cost
Approach.[FN38] Each approach is commonly used
by experts to value intangible assets. FRE 703
allows experts to use evidence that would not
commonly be admissible in court, as long as, it is
reasonably applied or relied upon by experts in the
field for their conclusions. Malackowski's report
concludes that the Cost Approach gives the "best
indication of a royalty in this case" and that $35 per
customer is a reasonable starting point.[FN39] AOL
and EarthLink do not dispute that Malackowski
employs generally accepted methods and principles;
rather, they contend that he improperly concludes
that they would have agreed to a royalty base of all
ADSL customers, including non-infringing COs.

[11] Both sides have argued to exhaustion whether
either could have determined the number of
customers that were provisioned through the CO

and RT lines at the time of the hypo
negotiations. Whether or not either side could
or should have made that determinati
irrelevant to the issues under consideration
parties' arguments demonstrate that n
contested facts exist which directly relate to
and credibility. Under *Daubert* and FRE 70
not the court's role to evaluate and determin
underlying an expert's testimony.

[12] AOL and EarthLink move to pr
Malackowski's testimony regarding BYOA
commissions, profits and revenues [FN40]
basis that BYOA services do not fall und
definition of convoyed goods and as such, h
probative value. "The expression 'convoyec
should preferably be limited to sales
simultaneously with a basic item." [FN41] Co
sales occur when the sale of one thing is li
cause the sale of another. [FN42] Although co
sales may be used in determining a reas
royalty rate where the hypothetical licensee
have anticipated increased convoyed sales
result of sales of the allegedly infringing p
[FN43] defendants argue that BYOA service dc
meet this definition and should not have
included in Malackowski's analysis.

*6 BYOA revenues are not probative or re
and therefore fail to meet the criteria for adr
under FRE 401 and 702. Malackowski admits
deposition that BYOA revenues are irrelevan
calculations of a reasonable royalty.
Q. Okay.... At the end of the day, if-if yo
this-if you took a pair of scissors and cut tl
section of your report that talked about
profits in Factor 6, that wouldn't have any imp
any of your opinions in this case, would it?
A. I don't think it would change anything.
Q. Nothing?
A. I don't think so.[FN44]

Malackowski later commented that BYO re
were "simply listed" in his opinion because tl
"a fact in the record." [FN45]

Clearly, Malackowski did not consider
revenues as relevant to his calculation
reasonable royalty. Although he concludes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

opinion, without any explanation of how or why BYOA offerings are convoyed sales, the revenues derived from that service are not an element of his reasonable royalty computations. Inline agrees that Malackowski does not use those revenues as part of his calculation of a reasonable royalty. It argues however, that AOL's BYOA revenues should be included to show the completeness of his analysis of all the *Georgia-Pacific* factors, including convoyed sales.[FN46]

FRE 401 defines relevant evidence as:
evidence having any tendency to make the existence of any fact that is *of consequence* to the determination of the action more or less probable than it would be without the evidence. (emphasis added).

[13] In determining whether an item of evidence is relevant, the court evaluates whether the evidence " tends to prove the matter sought to be proved." [FN47] The matter under consideration is the reasonable royalty from which to calculate damages. Malackowski concedes that his entire discussion regarding BYOA under *Georgia-Pacific* factor No. 6 literally could be "cut out" of his opinion and it would have no effect on his reasonable royalty analysis. The primary reason that he includes the discussion is because "[i]t's a fact in the record." Because a matter is a fact in the record does not make it a relevant fact. For a fact to be relevant it must be of consequence to the issue under determination. FRE 402 provides that " evidence which is not relevant is not admissible."

Although Inline argues that excluding evidence is an extreme sanction, particularly "before the challenging party has the opportunity to develop the record," this argument assumes that the evidence is relevant and ultimately critical to an expert's conclusions.[FN48] Malackowski concedes that the revenues and/or profits from BYOA services are not critical.

Therefore, the court determines that Malackowski not be allowed to affirmatively testify regarding the revenues and profitability of AOL's BYOA service offerings. This opinion does not address what Inline

may be allowed to present on rebuttal to ev presented by defendants regarding BYOA offerings.

**\*7** Based on the foregoing, AOL and Eartl motion *in limine* to exclude Malackowski's c regarding customers provisioned t non-infringing CO lines is denied. AO EarthLink's motion *in limine* to c Malackowski's testimony as to AOL's services (D.I.513) is granted to the extent herein.

### B. Motion to Preclude Damages for Non-Infri CO DSLAMS

[14] As stated previously herein, su judgment is available where there is no g issue of material fact. AOL and EarthLink a limit Inline's damages because 35 U.S.C. § 28 requires that damages be adequate to comp for the infringement. Defendants argue tha CO-provisioned ADSL lines do not infrin patents-in-suit, it therefore follows that d may only compensate a patentee for sa infringing products. Without further expla defendants also surmise that none c *Georgia-Pacific* factors or cases where court allowed recovery of damages on non-inf goods have any application to this situation. [FN]

The court finds that, at this stage, to restrict damages analysis as proposed by defend: inappropriate. The experts have differing c theories and, not surprisingly, have r different conclusions regarding damages question of a reasonable royalty an corresponding applicable customer royalty b: facts in dispute for the jury to decide. I argument, defendants ignore that calcula reasonable royalty is not merely a function number of infringing systems, other el contribute to and influence the analysis *Georgia-Pacific* factors, which defe disregard in a footnote as "inapplicable," contingencies that influence a reasonable determination. Defendants' misplaced foc Inline's alleged lack of diligence to obtain a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

F

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

underlying data, and arguments about the correctness of Inline's expert calculations show that summary judgment is inappropriate. The court does not determine the credibility of expert witnesses or substitute its judgment for that of the jury. The determination of a reasonable royalty is an issue of fact to be decided by the trier of that fact.

Defendants have not established the lack of a genuine issue of material fact and therefore, defendants' summary judgment motion to exclude damages other than for RT provisioned ADSL lines (D.I.441) is denied.

> FN1. Inline's U.S. Patent No. 6,542,585 (" the '585 patent") was subsequently added to this litigation. The '718 patent is not at issue in this litigation.

> FN2. D.I. 441 (Defendant's America Online, Inc.'s and EarthLink, Inc .'s Motion for Partial Summary Judgment and Motion *In Limine* Precluding Damages for Customers Provisioned through Non-Infringing Central Office DSLAMS). The court previously granted defendants' motion on failure to mark in *Inline Connection Corp. v. AOL Time Warner Inc.,* No. CIV. A. 02-272-MPT, CIV. A. 02-477-MPT, 2006 WL 3495979 (D.Del. Dec.5, 2006).

> FN3. D.I. 476 (Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Partial Summary Judgment and Motion *In Limine* Precluding Damages for Customers Provisioned through Non-Infringing Central Office DSLAMS).

> FN4. D.I. 513, 514 (Defendants' Motion *In Limine* to Exclude or Preclude the Expert Testimony of James E. Malackowski and Opening Brief in support thereof). Defendants also incorporate their Joint Motion for Partial Summary Judgment into this motion *in limine.* See D.I. 441, 444, and 493.

> FN5. *Georgia-Pacific Corp. v. Plywood Corp.,* 318 F.Supp. (S.D.N.Y.1970).

> FN6. *Daubert v. Merrell Dow Pharm* 509 U.S. 579, 113 S.Ct. 278( L.Ed.2d 469 (1993).

> FN7. D.I. 514 at 8. BYOA or "Brin; Own Access" is a service whereby ( and on-line services, such as e-ma provided. The BYOA subscrib responsible for acquiring high internet service, whether it is ADSL or satellite. In his expert Malackowski assumed that EarthLi not realize profits from BYOA se thus, he only commented on revenue AOL's BYOA sales in his opinion 477, Ex. F at 52 (April 17, 2006, Report of James E. Malackowski).

> FN8. D.I. 555 at 13.

> FN9. *Georgia-Pacific* provides a 15 framework for determining a rea: royalty from a hypothetical nego between the patent holder an infringer. *Georgia-Pacific* factor No. the effect of selling the patented sp in promoting sales of other products license; the existing value of the in to the licensor as a generator of sales non-patented items; and the extent c derivative or convoyed sales."

> FN10. D.I. 555 at 4. According to since Malackowski's analysis of commissions under Factor No. 6 c increase or decrease the royalty ra probative value of his opinion out any prejudice to AOL and his conc are, therefore, reasonable.

> FN11. D.I. 476. Malackowski use: methods in calculating a rea royalty-the Market Approach, l Approach, and Cost Approach. argues that Malackowski conclude

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

F

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

the Cost Approach was the most logical of the three because AOL and EarthLink would not have had profit projections at the time of the hypothetical negotiation.

FN12. *Daubert,* 509 U.S. at 600.

FN13. See *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

FN14. *Daubert,* 509 U.S. at 593.

FN15. "The specific factors explicated by the *Daubert* Court are (1) whether the expert's technique or theory can be or has been tested---that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." FRE 702, *Advisory Committee Notes,* 2000 Amendments.

FN16. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir.1994).

FN17. *Id.* at 749-50.

FN18. *Id.* at 791-92 (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 905 (3d Cir.1977)).

FN19. *Id.*

FN20. *Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 719 (3d Cir.1997) (quoting *Meyers,* 559 F.2d at 904).

FN21. *In re Paoli R.R.,* 35 F.3d at 744.

FN22. *Daubert,* 509 U.S. at 596.

FN23. *Id.* at 580.

FN24. *See Id.*

FN25. *See In re Paoli R.R.,* 35 F.3d at

FN26. *In re Paoli R.R. Yard PCB* 916 F.2d 829, 859 (3d Cir.1990).

FN27. 317 F.3d 1387 (Fed.Cir.2003).

FN28. *Id.* at 1392.

FN29. Fed. R. Civ. Pro. 56(c).

FN30. *See Johnston v. IVAC Corp* F.2d 574, 576-77 (Fed.Cir.1989).

FN31. *Celotex Corp. v. Catrett,* 47 317, 325, 106 S.Ct. 2548, 91 L.Ed.2 (1986).

FN32. *Eastman Kodak Co. v. Technical Servs., Inc.,* 504 U.S. 45 112 S.Ct. 2072, 119 L.Ed.2d 265 (199

FN33. *Arthrocare Corp. v. Sm Nephew, Inc.,* 310 F.Supp.2d 638 (D.Del.2004).

FN34. *Festo Corp. v. Shoketsu K Kogyo Kabushiki Co., Ltd.,* 72 F.3 867 (Fed.Cir.1996).

FN35. *See Fromson v. Western Lith & Supply Co.,* 853 F.2d 1568, (Fed.Cir.1988).

FN36. *See Rite-Hite Corp. v. Kelle Inc.,* 56 F.3d 1538, 144 (Fed.Cir.199 banc); *Panduit Corp. v. Stahlin Fibre Works,* 575 F.2d 1152, 116 Cir.1978) (holding that if damages i measured by lost profits, then the owner is entitled to a reasonable under 35 U.S.C. § 284).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

F

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

FN37. *Festo,* 72 F.3d at 866.

FN38. D.I. 477, Ex. F at 39-48. The Market Approach values assets based on comparable transactions between unrelated parties. Malackowski considered the licensing history of Inline, AOL and EarthLink; however, he notes that the defendants refused to provide any patent license agreements for the previous 5 years. The Income Approach estimates an asset's price based on the value of the benefits derived from the use of that asset. The 25% Rule of Thumb and the Analytical Approach are two variations of the Income Approach. The 25% Rule of Thumb suggests that a licensee might regard 1/4 of its expected profits from products incorporating a piece of intellectual property as a starting point in negotiating a license for that property. Malackowski explained that he could not locate information regarding AOL or EarthLink's financial projections dating from the time of the hypothetical negotiation; therefore, he used the actual operating profits of AOL and EarthLink from 1999 as a proxy, though these numbers produced 9.6% profit margin for AOL and between 0 and 3.5% profit margin for EarthLink. Lastly, the Cost Approach is based on the economic principles of substitution and price equilibrium. This approach considers out-of-pocket expenses in addition to risks and other adverse economic impacts associated with alternative technology. A portion of the cost-savings is shared between the licensee and licensor. Malackowski explained that he took the cost of defendants' next best alternative to performing self-installation-the performance of truck roll installation. As a result, Malackowski determined that $35 per customer would be a reasonable starting point for a royalty.

FN39. D.I. 477, Ex. F at 48.

FN40. BYOA commissions an resulting revenues and profits collectively referred to as "bounti both defendants and Inline in respective motions.

FN41. *Carborundum Co. v. Molten Equip. Innovations, Inc.,* 72 F.3d 87 n. 8 (Fed.Cir.1995).

FN42. *See Proctor and Gamble Paragon Trade Brands, Inc.,* 989 I 547, 610 (D.Del.1997).

FN43. *See Carborundum Co.,* 72 F.3d

FN44. D.I. 566, Ex. X at (Malackowski deposition transcrip 13, 2006).

FN45. *Id.*

FN46. Although the parties expou whether BYOA service is a convoye the court need not address the issue i of Malackowski's concession that re from BYOA service were not inclu his reasonable royalty calculation.

FN47. FRE 401 *Advisory Committee* 1972 Proposed Rules.

FN48. Inline's argument found at p of its answering brief (D.I.555) that helped customers procure inf self-install ADSL from other pro and received the bounties for doing part of its program to also sell customers subscriptions to AOL's offerings," goes to the issue of co sales. Malackowski, hc acknowledges that any such pu convoyed sales did not effect his u opinion on the reasonable royalty.

FN49. D.I. 444 at 15.
D.Del.,2007.
Inline Connection Corp. v. AOL Time Warner
--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    F

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**


Briefs and Other Related Documents (Back to top)

• 2005 WL 2385481 (Trial Motion, Memorandum
and Affidavit) Inline Connection Corporation's
Sur-Reply to Aol's Motion for Reconsideration of
the Court's April 13, 2005 Order (Jul. 29, 2005)
Original Image of this Document (PDF)
• 2005 WL 2385624 (Trial Motion, Memorandum
and Affidavit) Inline Connection Corporation's
Sur-Reply to Aol's Motion for Reconsideration of
the Court'S April 13, 2005 Order (Jul. 29, 2005)
Original Image of this Document (PDF)
• 2005 WL 2385479 (Trial Motion, Memorandum
and Affidavit) Inline Connection Corporation's
Sur-Reply to Defendants' Motion for
Reconsideration and/or Clarification of the Court's
April 13, 2005 Order (Jul. 28, 2005) Original Image
of this Document (PDF)
• 2005 WL 2385480 (Trial Motion, Memorandum
and Affidavit) Inline Connection Corporation's
Sur-Reply to Defendants' Motion for
Reconsideration and/or Clarification of the Court's
April 13, 2005 Order (Jul. 28, 2005) Original Image
of this Document (PDF)
• 1:02cv00477 (Docket) (Jun. 4, 2002)
• 1:02cv00272 (Docket) (Apr. 12, 2002)

END OF DOCUMENT


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

Edward Reines/SV/WGM/US          To   "John M. Williamson" <john.williamson@finnegan.com>
01/30/2007 03:25 PM              cc   "Steven C. Cherny" <Steven.Cherny@lw.com>
                                 bcc
                             Subject   Re: Telcordia v. Cisco / Lucent


John,

I am in receipt of your email below refusing to identify the documents that
you think support Telcordia's allegation of an illegal boycott in this patent
case.  Consequently we will have to find out about your basis for this
allegation through your response to our limine motion rather than the meet and
confer process.  That seems silly to me.  However, I will assume that you
believe this curious approach to the limine process is  based on confidential
trial strategy and will not push the issue further now.

Best,

Ed


    ----- Original Message -----
    From: "Williamson, John" [John.Williamson@finnegan.com]
    Sent: 01/30/2007 05:48 PM
    To: Edward Reines
    Cc: <steven.cherny@lw.com>
    Subject: RE: Telcordia v. Cisco / Lucent


   Ed,

   Your ongoing requests for specific information about Telcordia's trial strategy are not appropriate.

   Regards,

   John


        From: edward.reines@weil.com [mailto:edward.reines@weil.com]
        Sent: Monday, January 29, 2007 1:36 AM
        To: Williamson, John
        Cc: steven.cherny@lw.com
        Subject: Re: Telcordia v. Cisco / Lucent


        John:

        On the "illegal boycott" limine issue, if you have any particular documents that support the use of
        this kind of inflammatory language, please identify them specifically so we can consider them
        before we file a limine to preclude the use of that or similar language.

Best,

Ed

---

"Williamson, John" <John.Williamson@finnegan.com>

01/26/2007 03:56 PM

To <edward.reines@weil.com>

cc <steven.cherny@lw.com>

Subject Telcordia v. Cisco / Lucent

Ed,

I write in response to your January 24 email to Don Dunner. You have asked that we "respond to each point with []our position." In your email you said that your positions "should not be perceived as final." We echo that point as to our responses below.

Point 1

You wrote:

"(1) Fore settlement -- The parties agreed that the defendants should file a motion if they want because Telcordia plans to rely on this material."

We are unsure exactly how to interpret your statement. That said, Telcordia reserves its right to rely upon agreements with FORE Systems and, presently, it seems likely that such agreements would be part of our case.

Point 2

You wrote:

"(2) Uncorroborated '633 conception date -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on pre-September 1991 events on the inventorship issue."

Again, we are unsure exactly how to interpret your statement, and we disagree with your characterization of the issue entirely. If what you are referring to is the answer that Telcordia provided in response to Cisco interrogatory no. 8, we intend to rely upon that answer.

Point 3

You wrote:

"(3) Willfulness opinion -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on the absence of a disclosed opinion of counsel."

Again, we are unsure exactly how to interpret your statement and disagree with your characterizations. Telcordia reserves the right to address the fact that the defendants did not identify any opinion of counsel during discovery, on their privilege logs or otherwise.

Point 4

You wrote:

"(4) Exclude undeposed witnesses for which timely depositions are not offered -- Telcordia does not want to take a position on the issue until defendants serve their witness list. Defendants plan to file a limine motion."

Again, we are unsure exactly how to interpret your statement. You are correct to note that it is premature to ask Telcordia to agree to offer and conduct additional depositions of potential trial witnesses before Telcordia has seen the defendants' proposed witness list (i.e., before Telcordia has any understanding of the number and identity of potential additional deponents).

If you are asking for an agreement to continue deposition discovery between now and the trial, we do not believe that the parties would be able to so agree. Discovery has long been closed and reopening depositions at this stage would violate the Court's scheduling order. Moreover, the Court's pretrial order requires each party to state that it has completed discovery, and indicates that absent good cause shown no further discovery will be permitted. As such, if we were to propose the continuation of deposition discovery at this stage it seems that leave of Court would be required. In sum, while we certainly are not foreclosing the possibility of agreement on this issue, we note that there are logistical hurdles, and that it is premature to consider the issue before Telcordia has had a chance to evaluate the defendants' witness list.

Point 5

You wrote:

"(5) Exclude FTI witnesses -- Telcordia reserves the right to call the FTI witnesses and does not know yet if it will do so. The parties agreed that the defendants should file a motion if they want."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. The proposed FTI witnesses would be offered only to authenticate summaries under Fed. R. Evid. 1006. That would be the entire scope of their testimony. The testimony would be tailored to allow for the expeditious and smooth presentation of voluminous sales data.

Point 6

You wrote:

"(6) Reliance on sales of platforms beyond accused modules -- Defendants are interested in precluding Telcordia from arguing that "boxes" are infringing and properly in the royalty base beyond the number of SRTS capable cards. You will look into this and get back to us with your position."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. Additionally, we have been unable to address this issue fully with all of the necessary members of our team. We will get back to you as soon as possible.

Point 7

You wrote:

"(7) References to Cisco's size / finances beyond products at issue -- Cisco is interested in precluding Telcordia from referencing Cisco's size or finances, except as it relates to the accused products. Please let us know your position."

Again, we are unsure exactly how to interpret your statement. Telcordia reserves its right to reference Cisco's size and finances.

Point 8

You wrote:

"(8) Alleged 'illegal boycott' by Cisco in the SRTS standardization process -- Cisco is interested in precluding Telcordia from arguing that it was involved in an 'illegal boycott.' Telcordia used this phrase in its trial brief. Please confirm you will not reference any alleged illegal conduct or boycott or similar language at trial."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. Specifically, we don't know what you mean by "or similar language." Telcordia's identification of a "self styled illegal boycott" is based upon contemporaneous emails drafted by and circulated among Cisco

employees. Telcordia reserves all rights to use that evidence.

Point 9

You wrote:

"(9) Foreign sales -- Cisco is interested in precluding Telcordia from seeking royalties for foreign sales. Please let us know your position."

Cisco has no basis to preclude Telcordia from seeking royalties from foreign sales, and the matter would be properly before (and decided by) a jury.

Point 10

You wrote:

"(10) Alcatel-Lucent merger -- Lucent is interested in precluding Telcordia from referencing the Lucent-Alcatel merger. Please let us know your position."

Telcordia reserves its right to reference the Alcatel-Lucent merger.

Regards,

John


This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.


< END >

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

# Exhibit B

## MOTION *IN LIMINE* NO. 5B [FOR LUCENT ONLY]
## RE: REFERENCES TO THE ALCATEL-LUCENT MERGER

Defendant Lucent moves *in limine* to exclude Telcordia from referring to the recent merger between Lucent and Alcatel S.A.

## I.     STATEMENT OF FACTS

Telcordia filed the present action against Lucent on July 16, 2004. *See* D.I. 1 [Telcordia's Complaint and Demand for Jury Trial Against Lucent]. Telcordia simultaneously filed a similar action against Alcatel S.A., and Alcatel USA, Inc. *See* Alcatel D.I.[1] 1 [Telcordia's Complaint and Demand for Jury Trial Against Alcatel]. Alcatel S.A. was subsequently dismissed from that lawsuit. *See* Alcatel D.I. 218 [Order Granting Alcatel's Motion to Stay Proceedings]. The products accused of infringement in this case against Lucent were entirely different from the products accused of infringement in the Alcatel action.

On May 15, 2006, Telcordia filed actions before the International Trade Commission against, among others, Lucent and Alcatel. *See* Exh. 5B-A [Telcordia's Complaint in the ITC]. On July 10, 2006, Alcatel filed a motion to stay proceedings in the case pending against it in Delaware pursuant to its right under 28 U.S.C. § 1659. *See* Alcatel D.I. 214 [Alcatel's Motion to Stay Proceedings]. On July 18, Alcatel's Motion to Stay was granted. *See* Alcatel D.I. 218 [Order Granting Alcatel's Motion to Stay Proceedings]. Lucent, on the other hand, determined that it would proceed with the action pending in Delaware and did not request a stay. *See* D.I. 200 [July 10, 2006 letter from J. Shaw to The Hon. G.M. Sleet].

---

[1]   The term "Alcatel D.I.," as used herein, refers to documents entered in the docket for *Telcordia v. Alcatel USA, Inc.*, C.A. No. 04-874-GMS that, prior to a stay of proceedings, was also pending in the United States District Court for the District of Delaware. All other "D.I." numbers refer to documents entered into the docket for *Telcordia v. Lucent Technologies Inc.*, C.A. No. 04-875-GMS.

In November 2006, Lucent and Alcatel S.A. completed a merger and are now one company called Alcatel-Lucent. *See* Exh. 5B-B [Nov. 30, 2006 Press Release, Alcatel-Lucent Website]. However, both Lucent Technologies Inc. and Alcatel USA, Inc. still separately exist as subsidiaries to the merged parent, Alcatel-Lucent. No products that were the subject of Telcordia's action against Alcatel USA are involved in the present litigation.

## II.    ANY REFERENCE TO THE ALCATEL-LUCENT MERGER SHOULD BE EXCLUDED FROM TRIAL

Evidence of the Alcatel-Lucent merger should be excluded from trial because it is not relevant to any disputed issues. Under Federal Rule of Evidence 402, "evidence which is not relevant is not admissible" at trial. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Exh. 5B-C [*Software AG v. Bea Sys., Inc.*, No. 03-739 (GMS), 2005 WL 859266, *1 (D. Del. April 8, 2005)]; Fed. R. Evid. 401.

In the present case, no Alcatel product has ever been in dispute, and Telcordia's separate action against Alcatel has been stayed pursuant to Alcatel's statutory right. Accordingly, there is nothing about the Alcatel-Lucent merger that makes the determination of any disputed fact in this case "any more or less probable." Fed. R. Evid. 401. Given that the Alcatel-Lucent merger has no bearing on any disputed issues in this case, Lucent requested that Telcordia confirm that it will not make any reference to such merger at trial. Telcordia, however, refused to do so and stated that it "reserves its right to reference the Alcatel-Lucent merger." Exh. 5B-D [Jan. 26, 2007 email from J. Williamson]. Although Telcordia reserves this "right" it never explains the basis for its reservation or what possible relevance the fact of the merger would have to any issue in this case.

2

Federal Rule of Evidence 403 allows the court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." As described above, any evidence or reference to the Alcatel-Lucent merger has no probative value. Reference to the merger would be both misleading and confusing to a jury, especially given that Alcatel has been separately sued by Telcordia and chose to stay that litigation as permitted by statute.

## III. CONCLUSION

For the foregoing reasons, Lucent requests that Telcordia be precluded from making any reference to the Alcatel-Lucent merger.

3

A



**FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP**

901 New York Avenue, NW ▪ Washington, DC 20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

SMITH R. BRITTINGHAM IV
202.408.4158
smith.brittingham@finnegan.com

CBI _06-3/6_

May 15, 2006

DOCKET
NUMBER

_2485_

Office of the
Secretary
Int'l Trade Commission

**VIA HAND DELIVERY**

The Honorable Marilyn Abbott
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Re:    *Certain Equipment For Telecommunications Or
Data Communications Networks, Including
Routers, Switches, And Hubs, And Components
Thereof*

Dear Secretary Abbott:

Enclosed for filing on behalf of Complainant Telcordia Technologies, Inc.
("Telcordia" or "Complainant") are the following documents in support of Telcordia's
request that the Commission commence an investigation pursuant to Section 337 of the
Tariff Act of 1930, as amended. A separate request for confidential treatment of
confidential Exhibits 18-19 and confidential Appendix G, is included with this filing.

Accordingly, Telcordia submits the following documents for filing:

1.    An original and twelve (12) copies of the verified Complaint and an
original and six (6) copies of the accompanying exhibits, with the
Confidential Exhibits segregated from the other material submitted
(original and (1) copy unbound, without tabs (Rules 201.6(c),
210.4(f)(3)(i), and 210.8(a));

2.    Four (4) additional copies of both the Complaint and accompanying
non-confidential exhibits for service upon each proposed
respondent. (Rules 210.4 (f)(3)(i), 210.8(a), and 210.11(a));

3.    Four (4) additional copies of the Confidential Exhibits;

4.    Certified copies of United States Letters Patent Nos. 4,893,306
("the '306 patent"), Re. 36,633 ("the '633 patent"), and 4,835,763
("the '763 patent") (collectively the "Asserted Patents"), included as

Washington, DC ▪ Atlanta, GA ▪ Cambridge, MA ▪ Palo Alto, CA ▪ Reston, VA ▪ Brussels ▪ Taipei ▪ Tokyo

The Honorable Marilyn Abbott
May 15, 2006
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

Exhibits 1-3 in the original Complaint, and copies thereof included as Exhibits 1-3 in all copies of the Complaint;

5.  Certified copies of the assignments involving the Asserted Patents included as Exhibits 4-6 in the original Complaint, and copies thereof included as Exhibits 4-6 in all copies of the Complaint;

6.  Certified copies and three (3) copies thereof of the prosecution histories of each of the Asserted Patents included as Appendices A, C, and E (Rule 210.12(c)(2));

7.  Four (4) copies of each reference document mentioned in the prosecution histories of the applications leading to the issuance of the Asserted Patents included as Appendices B, D, and F;

8.  Three copies of each license under the asserted patents included as Confidential Appendix G;

9.  One (1) additional copy of the Complaint and the accompanying non-confidential exhibits for service upon the French embassy in Washington, D.C. (Rule 210.8(a) and 210.11(a)(1)); and

10. A letter and certification pursuant to Commission Rules 201.6(b) and 210.5(d) requesting confidential treatment of Confidential Exhibits 18-19 and Confidential Appendix G.

Thank you for your attention to this matter.

Respectfully submitted,

*Smith R. Brittingham IV/can*

Smith R. Brittingham IV

Enclosures



**FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP**

901 New York Avenue, NW ▪ Washington, DC 20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

SMITH R. BRITTINGHAM IV
202.408.4158
smith.brittingham@finnegan.com

May 15, 2006

**VIA HAND DELIVERY**

The Honorable Marilyn Abbott
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Re:     *Certain Equipment For Telecommunications Or
        Data Communications Networks, Including
        Routers, Switches, And Hubs, And Components
        Thereof*

Dear Secretary Abbott:

This firm represents Complainant Telcordia Technologies, Inc. ("Telcordia" or
"Complainant"), who is concurrently filing a complaint pursuant to Section 337 of the
Tariff Act of 1930, as amended, 19 U.S.C. § 1337.

In accordance with Commission Rules 201.6, 210.5, 19 C.F.R. §§ 201.6 and
210.5, Telcordia requests confidential treatment of the business information contained
in Confidential Exhibits 18-19 and Confidential Appendix G.

The information for which confidential treatment is sought is proprietary
commercial information not otherwise publicly available. Specifically, these Exhibits
contain proprietary commercial information concerning Telcordia's licensing of the
Asserted Patents, and investments in the domestic industry.

The information described above qualifies as confidential business information
pursuant to Rule 210.6(a) because:

1.     it is not available to the public;

2.     unauthorized disclosure of such information could cause substantial
       harm to the competitive position of Telcordia; and

3.     the disclosure of which could impair the Commission's ability to
       obtain information necessary to perform its statutory function.

Washington, DC ▪ Atlanta, GA ▪ Cambridge, MA ▪ Palo Alto, CA ▪ Reston, VA ▪ Brussels ▪ Taipei ▪ Tokyo

The Honorable Marilyn Abbott
May 15, 2006
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

 

Please contact me if you have any questions about this request, or if this request is not granted in full.

We appreciate your assistance in this matter.

Respectfully submitted,

*Smith R. Brittingham IV /EAN*

Smith R. Brittingham IV

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

| |
|---|
| **In the Matter of**<br><br>**CERTAIN EQUIPMENT FOR TELECOMMUNICATIONS OR DATA COMMUNICATIONS NETWORKS, INCLUDING ROUTERS, SWITCHES, AND HUBS, AND COMPONENTS THEREOF** |

Investigation No. 337-TA-_____

## COMPLAINT OF TELCORDIA TECHNOLOGIES, INC.
## UNDER SECTION 337 OF THE TARIFF ACT OF 1930, AS AMENDED

**COMPLAINANT**

Telcordia Technologies, Inc.
One Telcordia Drive
Piscataway, NJ 08854
(732) 699-2000

**COUNSEL FOR COMPLAINANT**

Smith R. Brittingham IV
Donald R. Dunner
Steven M. Anzalone
Houtan K. Esfahani
James T. Wilson
John Williamson
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 408-4000
Facsimile: (202) 408-4400

**PROPOSED RESPONDENTS**

Cisco Systems, Inc.
170 West Tasman Drive
San Jose, CA 95134
(408) 526-4000

Lucent Technologies, Inc.
600 Mountain Avenue
Murray Hill, NJ 07974
(908) 582-3000

Alcatel S.A.
rue La Boétie
75008, Paris, France
33-1-3077-3077

Alcatel USA, Inc.
3400 W. Plano Parkway
Plano, TX 75075
(972) 519-3000

## TABLE OF CONTENTS

I.      Introduction ............................................................................................ 1

II.     Complainant ............................................................................................ 2

III.    Proposed Respondents ......................................................................... 3

IV.     The Technology and Products in Issue ............................................. 4

V.      The Patents-In-Suit and Non-Technical Descriptions Of The Inventions ........................ 5

    A.  The '306 Patent .................................................................................... 5
        1.  Identification of the Patent and Ownership by Telcordia ............ 5
        2.  Non-Technical Description of the Patent ....................................... 5
        3.  Foreign Counterparts to the Patent ............................................... 7
        4.  Licenses ............................................................................................ 7

    B.  The '633 Patent .................................................................................... 7
        1.  Identification of the Patent and Ownership by Telcordia ............ 7
        2.  Non-Technical Description of the Patent ....................................... 8
        3.  Foreign Counterparts to the Patent ............................................... 9
        4.  Licenses ............................................................................................ 9

    C.  The '763 Patent .................................................................................... 9
        1.  Identification of the Patent and Ownership by Telcordia ............ 9
        2.  Non-Technical Description of the Patent ....................................... 10
        3.  Foreign Counterparts to the Patent ............................................... 11
        4.  Licenses ............................................................................................ 11

VI.     Unlawful And Unfair Acts Of Respondents—Patent Infringement ................. 12

    A.  Cisco ..................................................................................................... 13
        1.  The '306 Patent ............................................................................... 13
        2.  The '633 Patent ............................................................................... 15
        3.  The '763 Patent ............................................................................... 16

    B.  Lucent .................................................................................................. 16
        1.  The '306 Patent ............................................................................... 16
        2.  The '633 Patent ............................................................................... 18
        3.  The '763 Patent ............................................................................... 18

    C.  Alcatel .................................................................................................. 19
        1.  The '306 Patent ............................................................................... 19
        2.  The '633 Patent ............................................................................... 19

    D.  Direct, Contributory, and Induced Infringement ........................... 20

VII.    Specific Instances Of Unfair Importation And Sale .......................... 21

A.   Cisco ............................................................................................ 22

B.   Lucent .......................................................................................... 23

C.   Alcatel ......................................................................................... 24

VIII.   Harmonized Tariff Schedule Item Number ................................. 24

IX.   The Domestic Industry ................................................................. 25

X.   Related Litigation ........................................................................ 26

XI.   Relief Requested .......................................................................... 27

## TABLE OF EXHIBITS AND APPENDICES

| Public Exhibit | Document |
|---|---|
| Exhibit 1 | Certified copy of United States Letters Patent No. 4,893,306 |
| Exhibit 2 | Certified copy of United States Letters Patent No. Re. 36,633 |
| Exhibit 3 | Certified copy of United States Letters Patent No. 4,835,763 |
| Exhibit 4 | Certified copy of the recorded assignments of United States Letters Patent No. 4,893,306 |
| Exhibit 5 | Certified copy of the recorded assignments of United States Letters Patent No. Re. 36,633 |
| Exhibit 6 | Certified copy of the recorded assignments of United States Letters Patent No. 4,835,763 |
| Exhibit 7 | Claim Chart Comparing Cisco Products (such as the Catalyst 8510) to Claim 3 of U.S. Patent No. 4,893,306 |
| Exhibit 8 | Claim Chart Comparing Cisco Products (such as the Lightspeed 1010) to Claim 33 of U.S. Patent No. Re. 36,633 |
| Exhibit 9 | Claim Chart Comparing Cisco Products (such as the ONS 15327) to Claim 7 of U.S. Patent No. 4,835,763 |
| Exhibit 10 | Claim Chart Comparing Lucent Products (such as the CBX-500) to Claim 1 of U.S. Patent No. 4,893,306 |
| Exhibit 11 | Claim Chart Comparing Lucent Products (such as the CBX-500) to Claim 1 of U.S. Patent No. Re. 36,633 |
| Exhibit 12 | Claim Chart Comparing Lucent Products (such as the DMX Access Multiplexer (AM)) to Claim 7 of U.S. Patent No. 4,835,763 |
| Exhibit 13 | Claim Chart Comparing Alcatel Products (such as the OmniSwitch ) to Claim 1 of U.S. Patent No. 4,893,306 |
| Exhibit 14 | Claim Chart Comparing Alcatel Products (such as the Omniswitch) to Claim 1 of U.S. Patent No. Re. 36,633 |
| Exhibit 15 | A series of photographs of the Cisco Catalyst 8510 product |

| | |
|---|---|
| Exhibit 16 | A series of photographs of the Lucent CBX-500 product |
| Exhibit 17 | A series of photographs of the Alcatel Omniswitch product |
| **Confidential Exhibit** | **Document** |
| Confidential Exhibit 18 | A list of all entities licensed under the Asserted Patent |
| Confidential Exhibit 19 | Description of Telcordia's Domestic Industry |
| **Appendix** | **Document** |
| Appendix A | Four copies of the prosecution history of United States Letters Patent No. 4,893,306 |
| Appendix B | Four copies of each reference mentioned in the prosecution history of United States Letters Patent No. 4,893,306 |
| Appendix C | Four copies of the prosecution history of United States Letters Patent No. Re. 36,633 |
| Appendix D | Four copies of each reference mentioned in the prosecution history of United States Letters Patent No. Re. 36,633 |
| Appendix E | Four copies of the prosecution history of United States Letters Patent No. 4,835,763 |
| Appendix F | Four copies of each reference mentioned in the prosecution history of United States Letters Patent No. 4,835,763 |
| **Confidential Appendices** | **Document** |
| Confidential Appendix G | Three copies of licenses under the Asserted Patents |

## I.    INTRODUCTION

1.    This Complaint is filed by Telcordia Technologies, Inc. ("Telcordia"), pursuant to
Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, based on the unlawful
importation into the United States, the sale for importation and the sale within the United States
after importation, by manufacturers, importers, or consignees of certain equipment for
telecommunications or data communications networks, including routers, switches, and hubs,
and components thereof that infringe any of United States Letters Patent Nos. 4,893,306 ("the
'306 patent"), Re. 36,633 ("the '633 patent"), and 4,835,763 ("the '763 patent") sometimes
collectively referred to as "the Asserted Patents."

2.    The proposed respondents are Cisco Systems, Inc., Lucent Technologies, Inc.,
Alcatel, S.A., and Alcatel USA, Inc.

3.    Certified copies of the Asserted Patents are attached as **Exhibits 1 through 3,**
respectively.  Telcordia owns all right, title, and interest in each of the Asserted Patents.
Certified copies of the recorded assignments of each of the patents are attached as **Exhibits 4
through 6**.

4.    An industry as required by 19 U.S.C. § 1337(a)(2) and (3) exists in the United States
relating to the technology protected by the Asserted Patents.

5.    Telcordia seeks, as relief, an exclusion order barring from entry into the United States
infringing equipment for telecommunications or data communications networks, including
routers, switches, and hubs, and components thereof intended for Cisco, Lucent, or Alcatel
equipment.  Telcordia also seeks, as relief, cease and desist orders prohibiting the importation,
sale, offer for sale, advertising, testing, or the soliciting of the sale of equipment for
telecommunications or data communications networks, including routers, switches, and hubs,
and components thereof, encompassed by the Asserted Patents.

1

## II.    COMPLAINANT

6.    Complainant Telcordia is a corporation organized under the laws of the Delaware, with its principal place of business located at One Telcordia Drive, Piscataway, New Jersey 08854.

7.    Telcordia is a provider of communications software, engineering, and consulting services throughout the United States.

8.    Telcordia's roots in the telecommunications industry begin with Alexander Graham Bell.  Telcordia was formerly known as Bell Communications Research, Inc. (sometimes referred to as "Bellcore").  Bellcore was formed in 1984 as part of the breakup of AT&T to assist the newly created Regional Bell Operating Companies with technical support and research aimed at insuring the safety and integrity of the U.S. telecommunications network.

9.    Over the years, Telcordia has obtained more than 800 U.S. patents and has developed a rich history as an agent of change in the telecommunications industry.  Telcordia's research led to a number of important communications formats and standards, such as the Multipurpose Internet Mail Extensions (MIME), Asymmetric Digital Subscriber Line (ADSL), Virtual Local Area Network (VLAN), Asynchronous Transfer Mode (ATM), Frame Relay, Synchronous Optical NETwork (SONET), Advanced Intelligent Network (AIN), Integrated Services Digital Network (ISDN), as well as other industry breakthroughs.

10.  Today Telcordia is a leading provider of the software and services needed to manage multi-vendor, multi-technology, and multi-service networking infrastructures.

11.  Telcordia continues to be at the forefront of telecommunications and data communications research, employing a number of research and licensing personnel in the United States.

2

III.    PROPOSED RESPONDENTS

12. On information and belief, proposed respondent Cisco Systems, Inc. ("Cisco") is a corporation organized under the laws of California with its principal place of business located at 170 West Tasman Drive, San Jose, California 95134. Cisco designs and sells hardware, software, and services relating to Internet networks, including routers, switches and hubs used in regulating and directing the transmission of data over various types of Internet networks.

13. On information and belief, proposed respondent Lucent Technologies, Inc. ("Lucent") is a corporation organized under the laws of Delaware with its principal place of business located at 600 Mountain Avenue, Murray Hill, New Jersey 07974. Lucent designs and sells hardware, software, and services relating to various types of communications networks, including networks operating over the Internet.

14. On information and belief, proposed respondent Alcatel S.A. is a corporation organized under the laws of France with its principal place of business located at 54, rue La Boétie, 75008, Paris, France. Alcatel S.A. provides a wide range of communications solutions in the form of hardware and software to telecommunication carriers, Internet service providers and enterprises for delivery of voice, data and video applications. In 2000, Alcatel S.A. acquired a Canadian company known as "Canadian Newbridge," and began providing the ATM products previously being sold by Canadian Newbridge.

15. On information and belief, proposed respondent Alcatel USA, Inc. ("Alcatel USA") is a corporation organized under the laws of Delaware with its principal place of business located at 3400 W. Plano Parkway, Plano, Texas 75075, and is a subsidiary of Alcatel S.A. Alcatel USA assists Alcatel in selling products and services to United States customers. At times, Alcatel S.A. and Alcatel USA are referred to collectively as "Alcatel."

3

## IV.    THE TECHNOLOGY AND PRODUCTS IN ISSUE

16.   The products in issue in this Complaint are certain types of equipment for telecommunications or data communications networks, including (but not limited to) devices commonly referred to as routers, switches, and hubs.  Also at issue are components of that equipment, particularly printed circuit boards and semiconductor chips that go onto those boards.

17. Communications networks rely on creating a path for data travel from one node to another, often over lines that are shared by many different types of devices attempting to communicate with many other devices.  As a result, success depends on devices and systems that can direct a variety of data types to the correct destination.

18. Since information is placed on shared lines, it must be identifiable so that it can later be extracted from the stream of information traveling over the shared line.  Thus, such a network requires devices that will read the incoming information, determine where particular pieces of information should go, and direct each piece to the next series of lines available to send that particular information on its way.  Today's communications networks use devices known generally as routers, switches, and hubs, to perform the functions of identifying information and directing it to its proper address or further distributing it.

19. Initially, the most substantial nationwide communications network involved telephone signals, ie. voice transmission.  With the advent of the internet and the widespread use of fiber optic cable, communications networks now can carry different types of information.  For example, fiber optic cables now carry data as well as voice transmissions, and the various types of data now traveling over those networks can be formatted in different ways.

20. In addition, modern devices, such as computers, are now capable of accepting different types of signals—data, voice files, faxes, etc.  This in turn requires networks capable of

4

handling and routing different formatted information, as well as routers, switches and hubs that can support such capabilities.

## V.    THE PATENTS-IN-SUIT AND NON-TECHNICAL DESCRIPTIONS OF THE INVENTIONS

### A.    The '306 Patent

#### 1.    Identification of the Patent and Ownership by Telcordia

21.    United States Letters Patent No. 4,893,306, entitled "Method and Apparatus for Multiplexing Circuit and Packet Traffic," issued on January 9, 1990, to inventors Hung-Hsiang J. Chao, San H. Lee, and Liang T. Wu.  The '306 patent expires on November 10, 2007, and is based on Patent Application Serial No. 118,977 filed on November 10, 1987.

22.    The '306 patent has four independent claims and three dependent claims. Independent claims 1 and 3 and dependent claim 4 are being asserted in this investigation.

23.    Telcordia owns by assignment the entire right, title, and interest in and to the '306 patent. *See* **Exhibit 4.**

24.    This Complaint is accompanied by four copies of the certified prosecution history of the '306 patent, and four copies of each reference mentioned in the prosecution history. *See* **Appendices A and B.**

#### 2.    Non-Technical Description of the Patent

25.    The '306 invention allows different data sources, even those providing data at different bit rates (for example, voice, video, and computer data), to share the same communication link using a technique the patent calls "Dynamic Time Division Multiplexing" (DTDM).  In conventional "Time Division Multiplexing" (TDM), signals from different sources are transmitted over the same link by transmitting signals from each of the sources only during a fixed time period (slot) and in a fixed rotation.  In contrast, DTDM permits data from different

5

sources to be transmitted during any available time period, i.e., the multiplexing of signals is flexible or "dynamic." Further, because DTDM does not require each source to wait before its data can be transmitted over the shared link (as can happen in TDM), each stream of source data can be transmitted at its own particular "bit rate."

26. DTDM takes advantage of "high bandwidth" communication links, i.e., transmission media that can transfer large volumes of data at a high rate. Before source data (in the form of a series of ones and zeroes, or "bits") is transmitted, the bits are first arranged in the form of "packets," which consist of discrete blocks of data, each having a "header" at the front indicating where the data is being sent. As soon as a packet from any source has been formed and is ready to be sent, that packet can be written into an even larger package of data, referred to as a "frame," for transmission over a communication link. The frames, which are continually being created, are divided into separate "overhead" and "payload" fields, which are arranged so that packets of source data can be placed in the payload fields.

27. A simplified illustration of the "dynamic" multiplexing of data from three different sources on the same communication link, as taught by the '306 patent, is set forth below.


Shared Fiber Optic Line

28. The '306 patent's DTDM technique thus accommodates different sources of data, even ones that transmit data at different bit rates. This means that variable bit-rate sources (such as packet-generating computer devices that can transmit large but intermittent "bursts" of data) as well as constant bit-rate sources (such as traditional telephones that transmit a smaller but continuous volume of data) can transmit data over the same communication link. In this way,

6

the '306 invention eliminates the need to construct separate telecommunications infrastructures to deal with different kinds of data sources.

### 3. Foreign Counterparts to the Patent

29. There are no foreign patents or foreign patent applications corresponding to the '306 patent.

### 4. Licenses

30. A list of entities licensed under the Asserted Patents is attached as **Confidential Exhibit 18.** Pursuant to Commission Rule 210.12(c)(1) three copies of the licenses are included in **Confidential Appendix G.**

## B. The '633 Patent

### 1. Identification of the Patent and Ownership by Telcordia

31. United States Letters Patent No. Re. 36,633, entitled "Synchronous Residual Time Stamp for Timing Recovery in a Broadband Network," was reissued on March 28, 2000, to inventors Paul E. Fleischer and Chi-Leung Lau. The '633 patent is based on Patent Application Serial No. 09/639,887, filed on November 8, 1995. The '633 patent is a reissue of U.S. Patent 5,260,978, issued November 9, 1993 and now surrendered, which was based on Patent Application Serial No. 07/969,592, filed on October 30, 1992. The '633 patent expires on October 30, 2012.

32. The '633 patent has 15 independent claims and 17 dependent claims. Independent claims 1, 3, 5, 8, 11, and 33 are asserted in this investigation.

33. Telcordia owns by assignment the entire right, title, and interest in and to the '633 patent. *See* **Exhibit 5.**

7

34.  This Complaint is accompanied by four copies of the certified prosecution history of

the '633 patent, and four copies of each reference mentioned in the prosecution history. *See*

**Appendices C and D.**

>           **2.    Non-Technical Description of the Patent**

35.  The '633 invention ensures that the source and destination clocks used in

transporting data over a packet network are synchronized, using a technique referred to in the

industry as the Synchronous Residual Time Stamp ("SRTS") method of clock recovery.

Without "clock recovery," small timing differences caused by the packet transmission process

will eventually result in a loss of information.  This problem can be illustrated by imagining a

telephone call as a series of telegrams provided to a messenger at a rate of one every five

seconds.  If the messenger delivers the telegrams at a slower rate than they were received, the

telegrams will at some point overflow the "in basket," and the phone call will become

unintelligible as telegrams get lost or jumbled.

36. One solution to this problem is for the messenger to apply a "time stamp" to each

telegram as it is received, which would allow the messenger to deliver the telegrams at the same

rate they were received.  As explained above in connection with the '306 patent, source data can

be transmitted on a communication link with the bits arranged in the form of packets and

frames, which can be divided into separate fields.  In such a network, time stamp information

can be included in, for example, the "overhead" field of the packets or frames being transported.

37. Unfortunately, traditional clock recovery techniques using a "time stamp" required

transport of a relatively large number of data bits, thus taking up "bandwidth" in the

communication links (and "space" in the frames and packets) that could otherwise be used to

transmit data, voice, or video information.  Instead of relying on this traditional approach, the

'633 patent discloses a technique that transports timing information on a network more

efficiently, i.e., using less bandwidth and space. The invention discloses a "Residual" Time Stamp technique that significantly reduces the number of bits required to provide a time reference but still provides enough timing information to enable synchronization of the source and destination clocks. In a simplified analogy, instead of sending a message with a time stamp having information regarding the year, month, day, hour, minute, and second, the '633 invention provides a time stamp consisting only of the information regarding the second. Due to the inventors' ingenuity, however, this is still enough information to allow the clocks to be synchronized.

### 3.    Foreign Counterparts to the Patent

38.   There are no foreign patents or foreign patent applications corresponding to the '633 patent.

### 4.    Licenses

39.   A list of entities licensed under the Asserted Patents is attached as **Confidential Exhibit 18**. Pursuant to Commission Rule 210.12(c)(1) three copies of the licenses are included in **Confidential Appendix G**.

## C.    The '763 Patent

### 1.    Identification of the Patent and Ownership by Telcordia

40.   United States Letters Patent No. 4,835,763, entitled "Survivable Ring Network," issued on May 30, 1989, to Chi-Leung Lau. The '763 patent expires on February 4, 2008, and is based on Patent Application Serial No. 152,238, filed on February 4, 1988.

41.   The '763 patent has four independent claims and four dependent claims. Independent claims 1 and 7 and dependent claims 2 and 8 are asserted in this investigation.

42.   Telcordia owns by assignment the entire right, title, and interest in and to the '763 patent. *See* **Exhibit 6.**

9

43.   This Complaint is accompanied by four certified copies of the prosecution history of the '763 patent, and four copies of each reference mentioned in the prosecution history. *See* **Appendices E and F.**

**2.     Non-Technical Description of the Patent**

44.   The '763 patent provides a novel way for communications networks to survive accidents that might occur to portions of the network, such as utility workers digging into the ground and cutting a cable, potentially disrupting phone service, email, and other communications to buildings in the area.

45. In the typical prior art communications network, a "node" on the network can send messages to other nodes, but only in one direction.  As a result, the most common approach used in the prior art to avoid service disruptions caused by accidents is (as shown in the figure below) to have both a main path (Ring 1) and a standby path (Ring 2) that is used when the main path fails:



46. When a problem occurs, the prior art systems transfer communications to the standby ring or initiate a "looping back" of communication received on one ring to the other ring.  The techniques for transferring communications and "looping back," however, are complicated.

10

47. The '763 patent improves on the prior art by providing a simple way to survive accidents and other service failures. Like the old arrangements, the invention of the '763 patent arranges the network in a ring configuration and uses redundant communications paths. But unlike the prior art, the invention of the '763 patent does not seek to maintain the ring characteristics by transferring communications to a standby path following a fault. Indeed, the patented arrangement does not function as a ring following a break in the main path. Instead, the '763 patent teaches parallel, active paths and provides protection switching for lower level, or "subrate" communications, within the rings when faults occur.

48. Ring communications consist of message-carrying subrate channels that are combined together, or "multiplexed," to form a main signal. When a fault is detected, the patented arrangement inserts error signals into the faulty subrate channels within the main signal. The error signals allow the signals from the good subrate channels on the other ring to be substituted at the destination node for the signals from the faulty subrate channels. Using this arrangement, the nodes do not need to know in advance which "ring" or main signal to use, significantly reducing the complexity of the arrangement.

### 3.    Foreign Counterparts to the Patent

49. There are no foreign patents or foreign patent applications corresponding to the '763 patent.

### 4.    Licenses

50. A list of entities licensed under the Asserted Patents is attached as **Confidential Exhibit 18.** Pursuant to Commission Rule 210.12(c)(1) three copies of the licenses are included in **Confidential Appendix G.**

11

## VI.   UNLAWFUL AND UNFAIR ACTS OF RESPONDENTS—PATENT INFRINGEMENT

51. The accused products are devices and systems that work with telecommunications or data communications networks, including routers, switches, and hubs. Although the accused products have specific product numbers, the specific items sold to an individual customer may be uniquely configured for that customer. Indeed, many of the accused products are said to be "scalable," meaning they can be expanded to meet the customer's specific needs.

52. As sold to the customer, the accused products usually consist of a metal chassis or rack with a backplane communicating to slots for insertion of boards, the boards inserted into the chassis, and related items. The size of the chassis depends on the application for which the product is intended. Products for smaller applications may be roughly the size of a home stereo system component, while products for larger applications may be the size of a refrigerator or even larger. The chassis holds one or more modules or printed circuit boards, which in turn contain various integrated circuits as well as hardware for connecting the products to the telecommunications or data network. On information and belief, the final products may be assembled in the United States or abroad, but for those products assembled in the United States, most of the modules, printed circuit boards, and integrated circuits that make up final products are imported.

53. The specific products of Cisco, Lucent, and Alcatel that Telcordia currently believes have infringed or are infringing the asserted patent claims are set forth below. The list is based on Telcordia's current understanding, and it may be expanded or contracted as further information is obtained. By identifying specific products below, Telcordia is not intending to limit the scope of the investigation to the specific products listed, but rather intends to accused any products that infringe any of the asserted patent claims.

12

54. Among the components that may be imported and that, therefore, are at issue in this investigation, are boards that go into the accused routers, switches, and hubs, as well as particular semiconductor chips that are specially adapted for use in the accused devices. For example, on information and belief, many of the accused products use PMC-Sierra "framing" chips, such as the "S/UNI" family of chips, in a manner that infringes the '306 patent. ("S/UNI" is a PMC-Sierra registered trademark that stands for "Saturn User Network Interface".) Framing chips perform the function of arranging the data to be transmitted by the router or switch into frames as called for in, for example, the '306 patent. Without those chips, the larger equipment could not function, and the chips are designed and sold specifically to perform that function.

55. Many of the accused products also use other PMC-Sierra chips that implement, among other functions, the use of SRTS in a manner that infringes the '633 patent. Without those chips, the larger equipment could not perform that function, and the chips are designed and sold specifically to perform that function.

A.    Cisco

1.    The '306 Patent

56. On information and belief, Cisco products having components with framing chips that map packetized data into SONET frames infringe one or more of claims 1, 3 and 4 of the '306 patent. At least some of the accused Cisco products use PMC-Sierra framing chips.

57. The Cisco products believed to infringe claims 1, 3, and/or 4 of the '306 patent include at least:

- Cisco's Optical Networking Products including at least the ONS 15190, 15194, 15327, 15300 series (including 15301/ISR3301, 15303/ISR3303, 15304,15310, 15310-CL, 15310-MA, and 15327 units), 15454 MSPP, 15454 MSTP, and 15600 MSPP;

13

- Cisco's Switching Products, including at least the Catalyst 5000 series (including at least the 5000 and 5002 units), Catalyst 5500 series (including at least the 5500, 5505, and 5509 units), Catalyst 6000 series (including at least the 6006 and 6009 units), Catalyst 6500 series (including at least the 6503, 6509, 6509-NEB, 6509-NEB-A, and 6513 units), Catalyst 8500 series (including at least the 8510 MSR, 8510 CSR, and 8540 MSR units), Lightstream 1010, Lightstream 2020, MGX 8200 series (including at least the MGX 8220, 8230, 8240, 8250, and 8260 units), MGX 8800 series (including at least the MGX 8830, 8830/B, 8850, 8850/B and 8880 units), MGX 8900 series (including at least the MGX 8900 and 8950 units), IGX 8400 series (including at least the IGX 8410, IGX 8420, IGX 8430, and IGX 8450), BPX 8600 series (including at least the BPX 8620, BPX 8650, and BPX 8680);

- Cisco's Router Products including at least the 2691, 3600 series (including at least the 3620, 3631, 3640, 3660, 3661, and 3662 units), 3700 series (including at least the 3725 and 3745 units), 3800 series (including at least the 3725 and 3745 units), Cisco 6000 series (including at least the 6015, 6130, 6160, 6260, 6701, 6705, and 6732 units), Cisco 7000 series (including at least the 7000 and 7010 units), 7100 series (including at least the 7120 and 7140 units and the Cisco uBR7100 Universal Broadband Router Series, including the uBR7111, 7111E, 7114, and 7114E units), 7200 series (including at least the 7202, 7204, 7204 VXR, 7206, and 7206 VXR units and the Cisco uBR7200 Universal Broadband Router Series, including the uBR7223, uBR7246, and uBR7246VXR units), 7300 series (including at least the 7301 and 7304 units), 7400 series (including at least the 7401 ASR unit), 7500 series (including at least the 7505, 7507, 7513, and 7576 units), 7600 series (including at least the 7603, 7604, 7606, 7609,

14

and 7613), 10000 series (including at least the 10005, 10008, and 10720 units and the Cisco uBR10012 Universal Broadband Router), 12000 series (including at least the 12004, 12006, 12008, 12010, 12012, 12016, 12404, XR12404, 12406, XR12406, 12410, XR12410, 12416, XR12416, 12810, and 12816 units), and CRS-1, 6400 Broadband Concentrator, and 8110 Broadband Termination Unit.

58. A chart that applies representative claim 3 of the '306 patent to one of the products within the class of Cisco products using ATM SONET Framing Chips, specifically the Catalyst 8510, is attached as **Exhibit 7**.

        **2.**    **The '633 Patent**

59. On information and belief, Cisco's products capable of using the Synchronous Residual Time Stamp ("SRTS") clock recovery technique complying with the ATM Forum Standard, ITU-T Standard I.363.1 issued by the International Telecommunications Union, and/or ANSI T1.630 issued by the American National Standards Institute, infringe one or more of claims 1, 3, 5, 8, 11, and 33 of the '633 patent.

60. The Cisco products believed to infringe claims 1, 3, 5, 8, 11, and 33 of the '633 patent are products with ATM-enabled ports, including at least Cisco's Lightstream 1010 Switch, 3600 series (including at least the 3620, 3631, 3640, 3660, 3661, and 3662 units), uBR7200 series routers (including at least the uBR7223, uBR7246, and uBR7246VXR units), 7200 series routers (including at least the 7202, 7204, 7204VXR, 7206, and 7206VXR units), 7500 series routers (including at least the 7505, 7507, 7513, and 7576 units), MGX 8200 Series Edge Concentrator (including at least the 8220, 8230, 8240, 8250, and 8260 units), IGX 8400 series switches (including at least the 8410, 8420, 8430, and 8450 units), Catalyst 5500 series and 8500 series switches (including at least the 8510MSR, 8510CSR, and 8540MSR units), MGX

15

8830, 8850 and 8880 series switches, 8110 Broadband Termination Unit, IP Transfer Point, and ATM Port Adapter and Interface Modules.

61. A chart that applies representative claim 33 of the '633 patent to the Cisco products that uses the SRTS standard clock recovery technique, such as the Lightspeed 1010 Switch, is attached as **Exhibit 8.**

### 3.    The '763 Patent

62. On information and belief, Cisco's products that provide path protection switching, including Unidirectional Path Switched Ring ("UPSR") switching, infringe one or more of claims 1, 2, 7, and 8 of the '763 patent.

63. The Cisco products believed to infringe claims 1, 2, 7, and/or 8 of the '763 patent include at least the ONS 15301/ISR3301, ONS 15303/ISR1303, ONS 15304, ONS 15305, ONS 15310, ONS 15310-CL, ONS 15310-MA, ONS 15327, ONS 15350, ONS 15454, ONS15454 MSPP, ONS 15454 MSTP, ONS 15455, ONS 15530, ONS 15540 ESP, ONS 15540 ESPx, ONS 15600 MSPP, 6705 Access Device, and 6732 Access Device..

64. A chart that applies representative claim 7 of the '763 patent to one of the Cisco products that uses UPSR, specifically the ONS 15327, is attached as **Exhibit 9.**

### B.    Lucent

### 1.    The '306 Patent

65. On information and belief, Lucent products having components with framing chips that map packetized data into SONET frames infringe one or more of claims 1, 3 and 4 of the '306 patent. At least some of the accused Lucent products use PMC-Sierra framing chips.

66. The Lucent products believed to infringe claims 1, 3, and/or 4 of the '306 patent include at least:

16

- Lucent products or processes using PMC-Sierra S/UNI framing chips for mapping packets (ATM cells) into SONET frames, including Lucent's CBX-500 Multiservice WAN switch equipped with ATM enabled ports;

- Lucent's CBX-500 switch using physical layer devices other than the PMC-Sierra S/UNI ATM framing chips;

- the DMX Access Multiplexer, the GX-550 Multiservice WAN Switch, CBX-3500 Multiservice Edge Switch, DMXtend Access Multiplexer, DMXplore Access Multiplexer, DMXpress Access Multiplexer, DDM 2000, and LambdaUnite Multiservice Switch;

- the Flexent Serving GPRS Support Node (SGSN), Lucent Gateway GPRS Support Node (GGSN), and AnyMedia Access System;

- the AXC 2000, APX 1000, APX 8000, MAX TNT Universal Gateway, APX 8100;

- the Stinger series of products (including Stinger FS+, Stinger RT, Stinger LS, Stinger DSL, and Stinger MRT);

- the 5E-XC Switch and Lucent Compact Switch;

- the PacketStar PSAX 20, 1000, 1250, 2300, and 4500 platforms, and the PacketStar AC 60;

- and the B-STDX 8000/9000 and TMX0880 products.

67. A chart that applies representative claim 3 of the '306 patent to one of the products within the class of Lucent products using ATM SONET Framing Chips, specifically the CBX-500 with an S/UNI framing chip, is attached as **Exhibit 10**.

17

### 2.    The '633 Patent

68. On information and belief, Lucent's products capable of using the Synchronous Residual Time Stamp ("SRTS") clock recovery technique complying with the ATM Forum Standard, ITU-T Standard I.363.1 issued by the International Telecommunications Union, and/or ANSI T1.630 issued by the American National Standards Institute, infringe one or more of claims 1, 3, 5, 8, 11, and 33 of the '633 patent.

69. The Lucent products believed to infringe claims 1, 3, 5, 8, 11, and 33 of the '633 patent include at least the CBX 3500 MS Edge Switch, CBX 500 MS WAN Switch, GX 550 MS Wan Switch, the PacketStar PSAX 1000, 1250, 2300, and 4500, the PacketStar AC60, PacketStar PSAX 20, and AXC 2000 Switch.

70. A chart that applies representative claim 33 of the '633 patent to one of the Lucent products that uses the SRTS standard clock recovery technique, specifically the CBX-500 with a PMC-Sierra S/UNI framing chip, is attached as **Exhibit 11**.

### 3.    The '763 Patent

71. On information and belief, Lucent's products that provide path protection switching, including UPSR ("Unidirectional Path Switched Ring") switching, infringe one or more of claims 1, 2, 7, and 8 of the '763 patent.

72. The Lucent products believed to infringe claims 1, 2, 7, and/or 8 of the '763 patent include at least the DMX Access Multiplexer (AM), DMXtend Access Multiplexer, DMXplore Access Multiplexer, DMXpress Access Multiplexer, DDM 2000, LambdaUnite Multiservice Switch, WaveStar TDM 10G, and Wave Star TDM 2.5G products.

73. A chart that applies representative claim 7 of the '763 patent to one of the Lucent products that uses UPSR, specifically the DMX Access Multiplexer (AM), is attached at **Exhibit 12**.

18

C.    **Alcatel**

1.    **The '306 Patent**

74.  On information and belief, Alcatel products having components with framing chips that map packetized data into SONET frames infringe one or more of claims 1, 3 and 4 of the '306 patent.  At least some of the accused Alcatel products use PMC-Sierra framing chips.

75.  The Alcatel products believed to infringe claims 1, 3, and/or 4 of the '306 patent include at least:

- Alcatel's Omniswitch products using PMC-Sierra S/UNI framing chips in ATM Access Modules or other physical layer devices for mapping packets (ATM cells) into SONET frames;

- Alcatel's OmniAcess, 7670 RSP, 7670 ESE, 7x50 (including at least the 7450 and 7750), 7470 MSP, 7270 MSC, 3600 Mainstreet, and 3600+ Mainstreet products that map either or both ATM and non-ATM forms of packetized data into SONET frames.

76.  A chart that applies representative claim 3 of the '306 patent to one of the products within the class of Alcatel products using ATM SONET Framing Chips, specifically the Omniswitch, is attached as **Exhibit 13**.

2.    **The '633 Patent**

77.  On information and belief, Alcatel's products capable of using the Synchronous Residual Time Stamp ("SRTS") clock recovery technique complying with the ATM Forum Standard, ITU-T Standard I.363.1 issued by the International Telecommunications Union, and/or ANSI T1.630 issued by the American National Standards Institute, infringe one or more of claims 1, 3, 5, 8, 11, and 33 of the '633 patent.

19

78. The Alcatel products believed to infringe claims 1, 3, 5, 8, 11, and 33 of the '633 patent include at least the Omniswitch, OmniAccess, 7670 RSP, 7670 ESE, 7470 MSP, 7270 MSC, 3600 Mainstreet, 3600+ Mainstreet, and SpeedTouch 690 products.

79. A chart that applies representative claim 33 of the '633 patent to one of the Alcatel products that uses the SRTS standard clock recovery technique, specifically the Omniswitch, is attached as **Exhibit 14**.

**D.    Direct, Contributory, and Induced Infringement**

80. To the extent any of the asserted claims require products sold by the respondents to be installed in a network or operated in order to satisfy all claim elements, on information and belief the accused products infringe both directly and indirectly.

81. On information and belief, each of the respondents tests or operates the accused products in the United States by using them in a network and performing the claimed methods, thereby directly infringing any claim requiring such operation.

82. Cisco, Lucent, and Alcatel have had notice of the three asserted patents since, at a minimum, the filing of lawsuits in the U.S. District Court for Delaware in July 2004, as described below in Section X.

83. Each of the accused products listed above are specifically designed to be combined with telecommunications or data communications networks and to comply with various standards in a manner that results in the apparatuses and methods of the asserted claims.

84. The accused products have no substantial non-infringing use other than to be combined with telecommunications or data communications networks and to comply with various standards in a manner that results in the apparatuses and methods of the asserted claims.

85. Respondents induce infringement of the asserted claims by designing the accused products or boards to be incorporated into the accused products specifically for use in

20

telecommunications or data communications networks and to comply with various standards in a manner that results in the apparatuses and methods of the asserted claims, by publishing materials describing the use of the accused products in infringing manners, and by offering support and technical assistance to their customers that encourages use of the accused products in telecommunications or data communications networks in ways that infringed the asserted claims.

## VII.    SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

86. The accused equipment is not widely available to the general public. Instead, it is typically sold directly to customers developing or operating a telecommunications or data communications network, and is often modified to meet a customer's specific requirements. Some of the accused equipment is extremely large and costs several thousand dollars or more. The accused equipment is not sold at retail establishments and does not always have standard packaging or markings with geographic origins of the equipment or its components. Once installed in telecommunications or data communications networks, the equipment is typically kept in secure locations away from public scrutiny.

87. Cisco, Lucent, Alcatel, and PMC-Sierra have not stated publicly where the specific accused equipment or chips are manufactured, and such information is not widely available to the general public. As a result, Telcordia is unable to provide publicly available information that details the importation of the accused products.[1]

88. On information and belief, Cisco, Lucent, and Alcatel import, sell for importation, and/or sell within the United States after importation, the accused equipment, or at a minimum

---

[1] Telcordia has obtained information during discovery in the pending district court cases regarding these issues, but cannot currently disclose that information in light of the protective orders governing those litigations.

21

those three companies (or their contract manufacturers acting on their behalf) import components used in the accused products or they sell those imported components after importation as part of the larger accused equipment. Specifically, it is believed that Cisco, Lucent, and Alcatel use imported boards or modules containing, among other things, PMC-Sierra chips made overseas, to assemble and sell final products in the United States.

89. Due to the size and costs of the accused products, Telcordia has not submitted physical exemplars together with the Complaint. As described below, Telcordia has included as exhibits digital pictures of the accused infringing devices it has been able to obtain.

A.     Cisco

90. On information and belief, Cisco manufacturers and assembles various infringing routers, switches, hubs and other telecommunications equipment, and sells that equipment in the United States. It is believed that Cisco contracts with several well-known companies who provide printed circuit boards to the electronics industry, that those companies make the boards that go into Cisco's accused products, and that many (if not all) of those boards are made outside the United States. For example, in their most recent annual reports, Jabil Electronics, Celestica, Inc., and Solectron Corporation all list Cisco as one of their largest customers for electronic manufacturing services. *See generally* http://www.jabil.com, http://www.celestica.com, and http://www.solectron.com. Each of those suppliers has significant overseas operations.

91. In addition, each Cisco board contains a number of integrated circuits. On information and belief, nearly all integrated circuits are made, at least in part, outside the United States.

92. A Telcordia employee obtained a Cisco Catalyst 8510 from a distributor in the United States. **Exhibit 15** is a series of photographs of that product. The metal chassis indicates that it

22

was made in the United States, but at several of the circuit boards contained within the chassis indicates that they were made in Malaysia, and many of the chips bear legends indicating they were manufactured outside the U.S. The Catalyst 8510 boards include several PMC-Sierra chips, including a PMC-Sierra S/UNI 155-Lite framer chip, which is believed to be manufactured outside the United States.

**B.    Lucent**

93. On information and belief, Lucent manufacturers and assembles various infringing routers, switches, hubs and other telecommunications equipment, and sells that equipment in the United States. It is believed that Lucent contracts with several well-known companies who provide printed circuit boards to the electronics industry, that those companies make the boards that go into Lucent's accused products, and that many of those boards are made outside the United States. For example, in their most recent annual reports, Celestria, Inc., and Solectron Corporation all list Lucent as one of their largest customers for electronic manufacturing services. *See generally* http://www.celestria.com, and http://www.solectron.com. Each of those suppliers has significant overseas operations.

94. In addition, each Lucent board contains a number of integrated circuits. On information and belief, nearly all integrated circuits are made, at least in part, outside the United States.

95. A Telcordia employee obtained a Lucent CBX-500 from a distributor in the United States. **Exhibit 16** is a series of photographs of that product. The metal chassis indicates that it was assembled in the U.S. of U.S. and non-U.S. components. Many of the chips on those boards bear legends indicating that they were manufactured outside the U.S. At least one board contains a PMC-Sierra S/UNI 155 Dual framer chip, which is believed to be manufactured outside the United States.

23

C.    Alcatel

96.    On information and belief, Alcatel manufacturers and assembles various infringing routers, switches, hubs and other telecommunications equipment, and sells that equipment in the United States.  Like Cisco and Lucent, it is believed that Alcatel contracts with several well-known companies who provide printed circuit boards to the electronics industry, that those companies make the boards that go into Alcatel's accused products, and that many of those boards are made outside the United States.  .

97. In addition, each Alcatel board contains a number of integrated circuits.  On information and belief, nearly all integrated circuits are made, at least in part, outside the United States.

98.    A Telcordia employee obtained an Alcatel Omniswitch product from a distributor in the United States.  **Exhibit 17** is a series of photographs of that product.  The metal chassis indicates that it was assembled in the U.S. of U.S. and non-U.S. components.  Many of the chips on those boards bear legends indicating that they were manufactured outside the U.S.

## VIII.  HARMONIZED TARIFF SCHEDULE ITEM NUMBER

99. Since Telcordia is not a seller or importer of the accused products and is unaware of precisely which products or components are being imported, it is unsure what HTSUS numbers are used to cover the imports associated with the accused products.  At a minimum, semiconductor chips used as components in the accused products may be imported under any of the following classifications:  8541.50.00 (other semiconductor devices), various categories within section 8542 (electronic integrated circuits and microassemblies; parts thereof).  Routers, switches or hubs (including components such as modules or boards) may be imported under any of the following classifications:  various categories within section 8517.30 (telephonic or telegraphic switching apparatus), 8517.90.34 (electrical apparatus for line telephony or line

24

telegraphy ..., parts, printed circuit assemblies), 8534.00.00 (printed circuits), 8543.89.60

(articles designed for connection to telegraphic or telephonic apparatus or instruments or to

telegraphic or telephonic networks), or 8543.90.68 (electrical machines and apparatus ...,

printed circuit assemblies, other).

## IX.    THE DOMESTIC INDUSTRY

100.    Complainants have established a domestic industry under 19 U.S.C. §

1337(a)(3)(c).

101.    A domestic industry as defined by 19 U.S.C. § 1337(a)(3)(c) exists with respect to

Telcordia's activities in the United States that exploit the Asserted Patents by reason of

Complainants' substantial investment in licensing of the Asserted Patents.

102.    Telcordia employs several domestic employees whose primary responsibilities are

to further Telcordia's licensing activities related to the exploitation of Telecordia's

communications technology patent holdings, including the Asserted Patents.  Other employees,

such as clerical personnel and contract specialists, assist the licensing effort in addition to

supporting other corporate departments..

103.   The activities of these employees devoted to the Telcordia licensing program

include: the identification of companies that make, use, or sell products that may be covered by

any of the claims of any of the Telcordia patents; the contact of potential licensees, preparation

of correspondence with those potential licensees identifying products and patent claims in issue,

and the conduct of licensing negotiations; participation in the enforcement of the patents when

licensing negotiations fail; market and industry research; and participation in industry groups

and standards bodies that promote the use of the technology covered by Telcordia's patents.

104.    The licensing employees are employed in Telcordia's domestic facilities in

Piscataway, New Jersey.

105.    As noted above, **Confidential Exhibit 18** is a list of entities that are licensed under the Asserted Patents. In addition to those licenses, Telcordia's licensing personnel, or attorneys acting under their supervision, have contacted multiple other companies to offer potential licensing opportunities under the Telcordia patents, including the Asserted Patents.

106.    Telcordia has made substantial investments in the operating costs devoted to the licensing program at its domestic facility, including paying the salaries for personnel responsible for licensing activities. Telcordia has also made substantial investment in third party service providers related to the exploitation of the Asserted Patents. *See* **Confidential Exhibit 19.**

## X.    RELATED LITIGATION

107.    The '306 patent was the subject of litigation between Telcordia (then known as Bell Communications Research, Inc.) and Marconi Communications, Inc. (then known as Fore Systems, Inc. in the U.S. District Court for the District of Delaware. *See Bell Communications Research, Inc. v. Fore Systems, Inc.*, C.A. No. 98-586-JJF (D. Del.), amended as *Telcordia Technologies, Inc. v. Fore Systems, Inc.*, No. 98-586-JJF (D. Del.). An appeal of Judge Farnan's summary judgment ruling of September 21, 2000 was appealed to the Court of Appeals for the Federal Circuit, reversed, and remanded. *Bell Communications Research, Inc. v. Fore Systems, Inc.*, 62 Fed. Appx. 951 (Fed. Cir. 2003) (unpublished). While on remand, the parties settled, with Fore Systems taking a license under the '306 patent in addition to other Telcordia patents, including the Asserted Patents.

108.    All three Asserted Patents are the subject of litigation between Telcordia and Cisco that was filed on July 16, 2004 and is currently pending in the U.S. District Court for the District of Delaware. *See Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, C.A. No. 04-876-GMS (D. Del.). The case is currently in discovery, and a Markman hearing was held on May 5, 2006. Trial is currently scheduled for May 2007.

109.    All three Asserted Patents are the subject of litigation between Telcordia and Lucent that was filed on July 16, 2004 and is currently pending in the U.S. District Court for the District of Delaware. *See Telcordia Technologies, Inc. v. Lucent Technologies, Inc.*, C.A. No. 04-875-GMS (D. Del.). The case is currently in discovery, and a Markman hearing was held on May 5, 2006. Trial is currently scheduled for May 2007.

110.    All three Asserted Patents are the subject of litigation between Telcordia and Alcatel that was filed on July 16, 2004 and is currently pending in the U.S. District Court for the District of Delaware. *See Telcordia Technologies, Inc. v. Alcatel S.A.*, C.A. No. 04-87-GMS (D. Del.). Alcatel filed a counterclaim asserted that Telcordia infringed an Alcatel patent. The case is currently in discovery, and a Markman hearing was held on May 5, 2006. Trial is currently scheduled for May 2007.

## XI.    RELIEF REQUESTED

111.    WHEREFORE, by reason of the foregoing, Complainant Telcordia requests that the United States International Trade Commission:

(a)    Institute an immediate investigation, pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337(a)(1)(B)(i) and (b)(1), with respect to violations of Section 337 based upon the importation, sale for importation, and sale after importation, into the United States of certain equipment for telecommunications or data communications networks, including routers, switches, and hubs, and components thereof intended for incorporation into Cisco, Lucent, and Alcatel equipment, that infringe each of United States Letters Patent Nos. 4,893,306, 4,835,763, and Re. 36,633.

(b)    Schedule and conduct a hearing on said unlawful acts and, following said hearing;

(c)    Issue a permanent limited exclusion order, pursuant to 19 U.S.C. § 1337(d)(2)

27

barring from entry into the United States imported Cisco, Lucent, and Alcatel equipment for telecommunications or data communications networks, including routers, switches, and hubs, and components thereof intended for Cisco, Lucent, and Alcatel equipment, that infringe one or more claims of any of United States Letters Patent Nos. 4,893,306, 4,835,763, and Re. 36,633;

(d)  Issue permanent cease and desist orders, pursuant to 19 U.S.C. § 1337(f), directing those respondents in the United States to cease and desist from importing, marketing, advertising, demonstrating, testing, or warehousing inventory for distribution, sale or use of equipment for telecommunications or data communications networks, including routers, switches, and hubs, and components thereof intended for Cisco, Lucent, and Alcatel equipment, that infringe one or more claims of any of United States Letters Patent Nos. 4,893,306, 4,835,763, and Re. 36,633; and

(e)  Grant such other and further relief as the Commission deems just and proper based on the facts determined by the investigation and the authority of the Commission.

Respectfully Submitted,

Smith R. Brittingham IV
Donald R. Dunner
Steven M. Anzalone
Houtan K. Esfahani
James T. Wilson
John Williamson

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400
Counsel for Complainant Telcordia
Technologies, Inc.

28

## VERIFICATION OF COMPLAINT

I, Joe Giordano, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.12(a), under penalty of perjury, that the following statements are true:

1.     I am a Vice-President and Deputy General Counsel of Complainant Telcordia Technologies, Inc. and am duly authorized to sign this Complaint on behalf of Complainant;

2.     I have read the foregoing Complaint;

3.     To the best of my knowledge, information, and belief, based on reasonable inquiry, the foregoing Complaint is well-founded in fact and is warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

4.     The allegations and other factual contentions have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

5.     The foregoing Complaint is not being filed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Executed on ___May 9___, 2006.

29

B

**Alcatel·Lucent**

# Alcatel and Lucent complete merger creating world's leading communication solutions provider

Unparalleled communication solutions leader with global reach, and a local presence in 130 countries

A leader in wireline, wireless and converged broadband networking, IP technologies, applications and services

Ideally positioned to help service providers, governments and enterprises, transform their networks

Pro-forma annual revenues of Euro 18.6 billion* and Euro 2.7 billion* in R&D investments with approximately 23,000 engineers

Expected to generate pre-tax annual cost synergies of approximately Euro 1.4 billion within three years

**Paris and Murray Hill, N.J., November 30, 2006** – Alcatel (Paris: CGEP.PA and NYSE: ALA) and Lucent Technologies (NYSE: LU) today announced the completion of their merger transaction and that they will begin operations as the world's leading communication solutions provider on December 1st, 2006. The new company Alcatel-Lucent, with one of the largest global R&D capabilities in communications and the broadest wireless, wireline and services portfolio, is incorporated in France, with executive offices located in Paris. The company will be traded on Euronext Paris and the New York Stock Exchange (NYSE) from December 1st, 2006 under a new common ticker (Euronext Paris and NYSE: ALU). As a result of the merger, each outstanding share of Lucent common stock has been converted into the right to receive 0.1952 of an Alcatel ADS. In connection with the merger, Alcatel has issued approximately 878 million shares, which is equivalent to the total number of ADS to be issued to the holders of Lucent common stock. Following the completion of the merger, approximately 2.31 billion ordinary shares of Alcatel-Lucent are outstanding.

Serge Tchuruk, appointed today as Chairman of the Board of Alcatel-Lucent, said: "Alcatel-Lucent will be for our customers a partner with the scale and scope to design, build and manage increasingly complex networks that deliver advanced converged services and communications experience to the end-user. That is what Alcatel-Lucent will deliver with an unparalleled focus on execution, innovation and service for our customers: the company will have the most experienced global services team in the telecommunications industry, as well as one of the largest research, technology and innovation organizations in the industry. In fact, our combined company is ideally positioned to help our customers transform their networks so they can offer new kinds of personalized, blended applications and services."

Patricia Russo, appointed today as Chief Executive Officer of Alcatel-Lucent, added: "Through this merger, we are bringing together two top-ranking companies to form an undisputed leader in the industry, a company poised to enrich people's lives by transforming the way the world communicates. Alcatel-Lucent is a strong and enduring ally that service providers, governments and enterprises can count on to help them unlock new market and revenue opportunities. This combination represents a strategic fit of vision, geography, solutions and people, leveraging the best of both companies to deliver meaningful communications solutions that are personalized, simple to adopt and available globally. Both Alcatel and Lucent embraced a common culture of innovation and excellence that will help ensure the success of our merger."

**A global communications solutions provider**
With a comprehensive and diversified portfolio of complementary products, Alcatel-Lucent is well-positioned to address the fastest growing areas of network transformation. The company is a leader in IPTV, broadband access, carrier IP, IMS and next-generation networks, and 3G spread spectrum (UMTS and CDMA). With more than 18,000 employees working in services worldwide, the company has the largest and most experienced global services team in the industry. In enterprise communications solutions, Alcatel-Lucent is No. 1 in Europe and has more than 250,000 enterprise and government customers worldwide.

**A global reach with local presence**
With a worldwide presence in 130 countries, 79,000 employees (after completion of the Thales transaction) and balanced revenues across all regions, Alcatel-Lucent has strong customer relationships with the 100 largest telecommunications operators in the world. The company will have four geographic regions: Asia-Pacific, Europe and North, Europe and South and North America, to answer the needs of service providers, enterprises and end-users in the most advanced telecommunication markets, as well as in high-growth economies.

There will be five Business Groups: the Wireline Business Group, the Wireless Business Group and the Convergence Business Group (addressing the needs of the carrier market), the Enterprise Business Group and the Service Business Group. Each Business Group will have a decentralized regional organization that will provide strong local support to customers.

In addition there will be several corporate functions that support the company including worldwide integrated supply chain and procurement, finance, information technology, marketing, human resources, legal and communications.

"While our respective corporate structures have changed, one constant remains: our commitment to be a first class corporate citizen and to act in a socially responsible way in interactions with all our stakeholders," said Patricia Russo.

**Unrivaled breadth and depth of research and innovation expertise**
Approximately 23,000 of the 79,000 total number of employees at Alcatel-Lucent are in R&D, including global Bell Labs which will remain headquartered in New Jersey, USA. With Euro 2.7 billion invested in R&D in calendar year 2005 by Alcatel and Lucent and 25,000 active patents, Alcatel-Lucent stands as an innovation powerhouse, featuring one of the largest global R&D capabilities in communications ready to partner and collaborate with customers on breakthrough technology. Alcatel-Lucent also leads standards initiatives with some 600 experts participating in 130 standardization bodies.

**Creating Shareholder Value**
Significant cost synergies are expected to be achieved within three years of closing and will come from several areas, including consolidating support functions, optimizing the supply chain and procurement structure, leveraging R&D and services across a larger base, and reducing the combined worldwide workforce by approximately 9,000 employees. The merger is expected to result in approximately Euro 1.4 billion in pre-tax annual cost synergies. A substantial majority of the restructuring activity is expected to be completed within 24 months after closing. The transaction is expected to be accretive to earnings per share in the first year post closing with synergies, excluding restructuring charges and amortization of intangible assets.

**Corporate governance**
The 14 Members of the Board of Directors are: Daniel Bernard, W. Frank Blount, Jozef Cornu, Linnet Deily, Robert Denham, Edward Hagenlocker, Jean-Pierre Halbron, Karl Krapek, Daniel Lebègue, Patricia Russo, Henry Schacht and Serge Tchuruk, and two additional jointly agreed directors appointed by the Alcatel-Lucent Board: Sylvia Jay and Jean-Cyril Spinetta, who were not members of either Alcatel Board of Directors or Lucent Board of Directors prior to the merger. There will be two Board observers representing the employee shareholders of the company's Employee Investment Fund: Jean-Pierre Desbois and Thierry de Loppinot.

**Press conference**
The press conference will be available via a live audio webcast on Friday, December 1, 2006 at

1.00PM at: http://www1.alcatel-lucent.com/conferences/day1/

**About Alcatel-Lucent**
Alcatel-Lucent (Euronext Paris and NYSE: ALU) provides solutions that enable service providers, enterprises and governments worldwide, to deliver voice, data and video communication services to end-users. As a leader in fixed, mobile and converged broadband networking, IP technologies, applications, and services, Alcatel-Lucent offers the end-to-end solutions that enable compelling communications services for people at home, at work and on the move. With 79,000 employees and operations in more than 130 countries, Alcatel-Lucent is a local partner with global reach. The company has the most experienced global services team in the industry, and one of the largest research, technology and innovation organizations in the telecommunications industry. Alcatel-Lucent achieved proforma combined revenues of Euro 18.6 billion in 2005, and is incorporated in France, with executive offices located in Paris.

**Alcatel Press Contacts**

| | | |
|---|---|---|
| Régine Coqueran | Tel :+ 33 (0)1 40 76 49 24 | regine.coqueran@alcatel.com |
| Mark Burnworth | Tel :+ 33 (0)1 40 76 50 84 | mark.burnworth@alcatel.com |

**Alcatel Investor Relations**

| | | |
|---|---|---|
| Pascal Bantegnie | Tel: +33 (0)1 40 76 52 20 | pascal.bantegnie@alcatel.com |
| Maria Alcon | Tel: +33 (0)1 40 76 15 17 | maria.alcon@alcatel.com |
| Charlotte Laurent-Ottomane | Tel: +1 703 668 7016 | charlotte.laurent-ottomane@alcatel.com |

**Lucent Press Contacts**

| | | |
|---|---|---|
| Joan Campion | +1 908-582-5832 (office) | joancampion@lucent.com |
| | + 1201-761-9384 (mobile) | |
| MaryLou Ambrus | + 1 908-582-8501 (office) | mambrus@lucent.com |
| | + 1 908-239-6654 (mobile) | |

**Lucent Investor Relations**

| | | |
|---|---|---|
| John DeBono | + 1908-582-7793 (office) | debono@lucent.com |
| Dina Fede | +1 908-582-0366 (office) | fede@lucent.com |

SAFE HARBOR FOR FORWARD LOOKING STATEMENTS

*Except for historical information, all other information in this press release consists of forward-looking statements within the meaning of the US Private Securities Litigation Reform Act of 1995, as amended. These forward looking statements include statements regarding the future financial and operating results of Alcatel-Lucent as well as the benefits and synergies of the completed merger transaction and other statements about Alcatel-Lucent managements' future expectations, beliefs, goals, plans or prospects that are based on current expectations, estimates, forecasts and*

projections about Alcatel-Lucent, as well as Alcatel-Lucent's future performance and the industries in which Alcatel-Lucent operates, in addition to managements' assumptions. Words such as "expects," "anticipates," "targets," "goals," "projects," "intends," "plans," "believes," "seeks," "estimates," variations of such words and similar expressions are intended to identify such forward-looking statements which are not statements of historical facts. These forward-looking statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to assess. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements. These risks and uncertainties are based upon a number of important factors including, among others: difficulties and delays in achieving synergies and cost savings; fluctuations in the telecommunications market; the pricing, cost and other risks inherent in long-term sales agreements; exposure to the credit risk of customers; reliance on a limited number of contract manufacturers to supply products we sell; the social, political and economic risks of our global operations; the costs and risks associated with pension and postretirement benefit obligations; the complexity of products sold; changes to existing regulations or technical standards; existing and future litigation; difficulties and costs in protecting intellectual property rights and exposure to infringement claims by others; and compliance with environmental, health and safety laws. For a more complete list and description of such risks and uncertainties, refer to Alcatel-Lucent's Form 20-F for the year ended December 31, 2005, as amended, as well as other filings by Alcatel-Lucent and Lucent Technologies Inc. with the US Securities and Exchange Commission including Lucent's Proxy Statement dated August 7, 2006. Except as required under the US federal securities laws and the rules and regulations of the US Securities and Exchange Commission, Alcatel-Lucent disclaims any intention or obligation to update any forward-looking statements.

Copyright © 2006 Alcatel-Lucent. All rights reserved.

C

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 859266 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

C

Briefs and Other Related Documents
Software AG v. Bea Systems, Inc.D.Del.,2005.Only
the Westlaw citation is currently available.

United States District Court,D. Delaware.
SOFTWARE AG and Software AG Inc., Plaintiffs,
v.
BEA SYSTEMS, INC., Defendant.
**No. Civ.A.03-739 GMS.**

April 8, 2005.

Mary B. Graham, Morris, Nichols, Arsht & Tunnell,
Wilmington, DE, for Plaintiffs.
John G. Day, Steven J. Balick, Ashby & Geddes,
Wilmington, DE, for Defendant.

*MEMORANDUM*
SLEET, J.

## I. INTRODUCTION

**\*1** On April 4, 2005, the court held a pre-trial
conference with the above-captioned parties to
discuss, among other things, the motions *in limine*
filed by each side. With the exception of motion *in
limine* number eight filed by plaintiffs Software AG
and Software AG, Inc. (collectively "SAG"), the
court ruled on each motion during the conference. As
to the outstanding motion, the court reserved
judgment. After further deliberation, the court has
decided to grant SAG's motion, and therefore, to
preclude defendant BEA Systems, Inc. ("BEA")
from introducing evidence at trial of the involvement
of Sheldon Meyer in BEA's pre-litigation
correspondence with SAG, to the extent that he is
identified as a patent attorney.

## II. DISCUSSION

This is an action for patent infringement brought by
SAG against BEA, in which SAG has also accused
BEA of willful infringement. As part of its defense
against SAG's willfulness claim, BEA seeks to do the
following:
BEA intends, however, to call its General Counsel
Robert Donohue to testify to the facts showing that
BEA acted in good faith and with due care, and thus
did not willfully infringe. Among other things, Mr.
Donohue is expected to testify to the conduct and
content of BEA's discussions with SAG, including
the oral and written evidence that BEA presented to
SAG (and which it will present to the jury at trial)

that the '619 patent was neither infringed nor valid.
Mr. Donohue will also testify that BEA's outside
patent prosecution counsel Sheldon Meyer, of
Fliesler, Dubb, Meyer & Lovejoy, was extensively
involved in these prefiling interactions with SAG.
Mr. Meyer was present with Mr. Donohue and other
BEA personnel in conference calls with SAG, and
took part in the discussions. Mr. Meyer also authored
or is the recipient of much of the pre-litigation
correspondence between the parties concerning
SAG's allegations. BEA will not adduce evidence of
any privileged "opinion" that Mr. Meyer might have
formed, including whether or not he was asked to
form such an opinion. Nor will any testimony as to
the contents of the discussions with SAG reveal
privileged communications relating to an opinion.

(D.I. 188 at 2.) BEA further states, "[t]he facts
establishing the conduct and content of BEA's
discussions with SAG, *including that Mr. Meyer was
a significant participant,* are highly probative of
BEA's intent and lack of willfulness." (Id. at 3
(emphasis added).) BEA does not intend to have
Meyer himself testify.

SAG argues that testimony regarding the pre-
litigation involvement of Meyer will be unfairly
prejudicial in violation of Fed.R.Evid. 403 because it
is "designed to suggest to the jury that BEA acted
responsibly by consulting Mr. Meyer or that Mr.
Meyer provided a favorable opinion to BEA." (D.I.
204 Ex. 8 at 2.) This type of testimony, SAG argues,
was held to be impermissible in *Advanced
Cardiovascular Sys., Inc. v. Medtronic, Inc.,* 265 F.3d
1294 (Fed.Cir.2001).

The court agrees with SAG. Relevant evidence is
defined as "evidence having any tendency to make
the existence of any fact that is of consequence to the
determination of the action more probable or less
probable than it would be without the evidence."
Fed.R.Evid. 401. In the context of willful
infringement, the "fact that is of consequence" is
BEA's intent. *See Medtronic,* 265 F.3d at 1309.
However, the mere fact that a patent attorney was a
significant participant in the pre-litigation
correspondence does not make the existence of intent
"more probable or less probable than it would be
without the evidence." At most, Meyer's involvement
is probative of the fact that BEA engaged in a serious
effort to defeat SAG's allegations. Thus, the court
holds that Meyer's involvement is irrelevant to BEA's
defense to willful infringement insofar as he is
identified to the jury as a patent attorney.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 859266 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*2** Of course, to some degree, irrelevant evidence always has a way of finding itself before the jury. The extent of effort the court will undertake to exclude irrelevant evidence is a matter of judicial economy. In other words, it is not necessarily worth the court's time to exclude irrelevant evidence unless it is prejudicial, time consuming, etc. In *Medtronic,* the defendant sought to defend against an allegation that it willfully infringed one of the patents in the case by introducing evidence of its "consultation with legal counsel in its effort to design around" two *other* patents at issue in the case, while simultaneously asserting "privilege with respect to its legal consultations on the [allegedly willfully infringed patent]." 265 F.3d at 1309-10. The Federal Circuit held the evidence to be irrelevant due to its "lack of probative value." *Id. at* 1309. The court further explained that it "agreed with the district court that admitting evidence of [the defendant's] legal activities regarding the [two other patents] would have been potentially prejudicial to [the plaintiff]." *Id.* "Admitting the evidence in question," the court said, "would potentially have allowed [the defendant], in addition to asserting privilege, to establish an inference that it acted in a legally reasonable manner with respect to the [allegedly willfully infringed patent]. This would have prejudiced [the plaintiff]." *Id.* at 1310. Thus, the district court in *Medtronic* did not abuse its discretion by excluding this irrelevant and prejudicial evidence.

Furthermore, the Federal Circuit's decision in *Medtronic* was made three years before its decision in *Knorr-Bremse v. Dana Corp.,* in which the court held that "no adverse inference shall arise from invocation of the attorney-client and/or work product privilege." 383 F.3d 1337, 1344 (Fed.Cir.2004). In fact, the court in *Medtronic* specifically cited the rule prior to *Knorr-Bremse* (i.e., permitting an adverse inference from a party's decision to assert privilege), but nevertheless concluded that it is prejudicial to permit a defendant to introduce evidence of irrelevant legal consultations, while asserting privilege as to the truly probative communications, in an effort to show a lack of intent. 265 F.3d at 1309.

In the present case, BEA seeks to do something very similar to that which is prohibited by *Medtronic.* In particular, BEA would like to introduce evidence that its pre-litigation correspondence with SAG was handled in part by a patent attorney, while simultaneously asserting privilege as to his private communications with BEA, in an effort to show a lack of intent. In its brief, BEA denies that it will adduce evidence of any opinion that Meyer might

have formed, or whether Meyer was asked to form such an opinion. (D.I. 188 at 2.) And yet, almost in the very next breath, BEA asserts that Meyer's significant participation in the pre-litigation correspondence with SAG is "highly probative" on the issue of willful infringement. (Id. at 3.) This is an untenable position because Meyer's involvement can only be highly probative if it somehow reflects BEA's intent. But as discussed above, Meyer's involvement is legally irrelevant to BEA's intent. Therefore, the true value to BEA of this evidence is that it will permit BEA to give the jury a subtle "wink wink," in the hope that the jury will draw the improper inference that the patent attorney's involvement demonstrates BEA's lack of intent. Given the obvious prejudice to SAG, the court will not permit BEA to introduce the fact that Meyer was involved in the pre-litigation correspondence with SAG, to the extent he is identified as a patent attorney.

### III. CONCLUSION

**\*3** For the foregoing reasons, SAG's motion *in limine* number eight will be granted.

D.Del.,2005.
Software AG v. Bea Systems, Inc.
Not Reported in F.Supp.2d, 2005 WL 859266 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00739 (Docket) (Jul. 22, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

D



"Williamson, John"
&lt;John.Williamson@finnegan.
com&gt;

01/26/2007 03:56 PM

To  &lt;edward.reines@weil.com&gt;

cc  &lt;steven.cherny@lw.com&gt;

Subject  Telcordia v. Cisco / Lucent

Ed,

I write in response to your January 24 email to Don Dunner.  You have asked that we "respond to each point with []our position."  In your email you said that your positions "should not be perceived as final."  We echo that point as to our responses below.

Point 1

You wrote:

"(1) Fore settlement -- The parties agreed that the defendants should file a motion if they want because Telcordia plans to rely on this material."

We are unsure exactly how to interpret your statement.  That said, Telcordia reserves its right to rely upon agreements with FORE Systems and, presently, it seems likely that such agreements would be part of our case.

Point 2

You wrote:

"(2) Uncorroborated '633 conception date -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on pre-September 1991 events on the inventorship issue."

Again, we are unsure exactly how to interpret your statement, and we disagree with your characterization of the issue entirely.  If what you are referring to is the answer that Telcordia provided in response to Cisco interrogatory no. 8, we intend to rely upon that answer.

Point 3

You wrote:

"(3) Willfulness opinion -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on the absence of a disclosed opinion of counsel."

Again, we are unsure exactly how to interpret your statement and disagree with your characterizations.  Telcordia reserves the right to address the fact that the defendants did not identify any opinion of counsel during discovery, on their privilege logs or otherwise.

Point 4

You wrote:

"(4) Exclude undeposed witnesses for which timely depositions are not offered -- Telcordia does not want to take a position on the issue until defendants serve their witness list.  Defendants plan to file a limine motion."

Again, we are unsure exactly how to interpret your statement.  You are correct to note that it is premature to ask Telcordia to agree to offer and conduct additional depositions of potential trial witnesses before Telcordia has seen the defendants' proposed witness list (i.e., before Telcordia has any understanding of the number and identity of potential additional deponents).

If you are asking for an agreement to continue deposition discovery between now and the trial, we do not believe that the parties would be able to so agree.  Discovery has long been closed and reopening depositions at this stage would violate the Court's scheduling order.  Moreover, the Court's pretrial order requires each party to state that it has completed discovery, and indicates that absent good cause shown no further discovery will be permitted.  As such, if we were to propose the continuation of deposition discovery at this stage it seems that leave of Court would be required.  In sum, while we certainly are not foreclosing the possibility of agreement on this issue, we note that there are logistical hurdles, and that it is premature to consider the issue before Telcordia has had a chance to evaluate the defendants' witness list.

Point 5

You wrote:

"(5) Exclude FTI witnesses -- Telcordia reserves the right to call the FTI witnesses and does not know yet if it will do so.  The parties agreed that the defendants should file a motion if they want."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  The proposed FTI witnesses would be offered only to authenticate summaries under Fed. R. Evid. 1006.  That would be the entire scope of their testimony.  The testimony would be tailored to allow for the expeditious and smooth presentation of voluminous sales data.

Point 6

You wrote:

"(6)  Reliance on sales of platforms beyond accused modules -- Defendants are interested in precluding Telcordia from arguing that "boxes" are infringing and properly in the royalty base beyond the number of SRTS capable cards.  You will look into this and get back to us with your position."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  Additionally, we have been unable to address this issue fully with all of the necessary members of our team.  We will get back to you as soon as possible.

Point 7

You wrote:

"(7) References to Cisco's size / finances beyond products at issue -- Cisco is interested in precluding Telcordia from referencing Cisco's size or finances, except as it relates to the accused products.  Please let us know your position."

Again, we are unsure exactly how to interpret your statement.  Telcordia reserves its right to reference Cisco's size and finances.

Point 8

You wrote:

"(8) Alleged 'illegal boycott' by Cisco in the SRTS standardization process -- Cisco is interested in precluding Telcordia from arguing that it was involved in an 'illegal boycott.' Telcordia used this phrase in its trial brief.  Please confirm you will not reference any alleged illegal conduct or boycott or similar language at trial."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. Specifically, we don't know what you mean by "or similar language." Telcordia's identification of a "self styled illegal boycott" is based upon contemporaneous emails drafted by and circulated among Cisco employees. Telcordia reserves all rights to use that evidence.

Point 9

You wrote:

"(9) Foreign sales -- Cisco is interested in precluding Telcordia from seeking royalties for foreign sales. Please let us know your position."

Cisco has no basis to preclude Telcordia from seeking royalties from foreign sales, and the matter would be properly before (and decided by) a jury.

Point 10

You wrote:

"(10) Alcatel-Lucent merger -- Lucent is interested in precluding Telcordia from referencing the Lucent-Alcatel merger. Please let us know your position."

Telcordia reserves its right to reference the Alcatel-Lucent merger.

Regards,

John

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.