# EXHIBIT 4

## RESPONSE TO TELCORDIA'S MOTION *IN LIMINE* NO. 4
## RE: DEFENDANTS' INEQUITABLE CONDUCT COUNTERCLAIM

Telcordia's motion *in limine* seeking to exclude Defendants' inequitable conduct counterclaim regarding the '633 patent is ill-considered both procedurally and substantively. Procedurally, although termed an *in limine*, Telcordia's motion is, in essence, a summary judgment motion aspiring to eliminate Defendants' inequitable conduct counterclaim as a matter of law. If Telcordia had believed that there were no evidence sufficient to support a verdict for Defendants on this counterclaim, it should have sought permission to bring a summary judgment motion long ago, as required by this Court's Scheduling Order.

Substantively, Telcordia's argument that there is no viable inequitable conduct claim cannot be squared with the overwhelming evidence that there is especially compelling evidence of inequitable conduct. Specifically, Telcordia concealed from the Patent Office that France Telecom engineers were part of the collaboration from which the claimed invention arose and the true inventors of the claimed inventions. That alone constitutes inequitable conduct. When Telcordia sought a reissue of its patent, its new attorneys apparently attempted to purge this inequitable conduct by submitting documents memorializing communications between France Telecom and Telcordia that Telcordia had withheld during the original prosecution. However, one cannot cure inequitable conduct through a reissue proceeding. Moreover, what might be the most damning document on inventorship was again withheld during the reissue prosecution. Such repeated concealment of material information compels a finding of inequitable conduct.

## I.    TELCORDIA'S MOTION *IN LIMINE* IS PROCEDURALLY IMPROPER

In accordance with this Court's Scheduling Order, Telcordia sought permission to file seven different summary judgment motions. This Court allowed Telcordia to file some, but not others. A summary judgment motion challenging Defendants' inequitable conduct counterclaim regarding the '633 patent did not even make Telcordia's final list of proposed motions, much less receive Court approval.

1

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

Now, Telcordia brings such a motion in the guise of a motion *in limine*.[1] The closest Telcordia's motion comes to a true motion *in limine* is the suggestion that, if Defendants are permitted to pursue their counterclaim, it would "inflame" the jury. However, Telcordia *voluntarily agreed* to present this issue to the jury instead of the Court. In any event, Telcordia fails to explain how evidence of its inequitable conduct will cause *unfair* prejudice. That is because its motion is not about evidence. Rather, it is a belated attempt to eliminate a counterclaim without first seeking permission of the Court, or even meeting and conferring with Defendants as required by Local Rule 7.1.1.

## II.    TELCORDIA'S MOTION *IN LIMINE* IS SUBSTANTIVELY MERITLESS

Telcordia does not question that the France Telecom engineers are the true inventors of the '633 patent or that they were involved in a close collaboration with the named inventors. Nor could it do so successfully. The root of the '633 patent is a combination of two prior art approaches: Time Stamp and SFET. The idea to combine them and the identification of the key principles to do so was the idea of France Telecom, not the named inventors.[2]

### A.    Evidence that France Telecom's Engineers were the Proper Inventors of Telcordia's Patent was Highly Material to the Original Prosecution

Concealing the correct inventors, and thus the correct owners, of patent rights is obviously improper. *See PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F. 3d 1315, 1321-22 (Fed. Cir. 2000). Defying this basic principle, Telcordia argues that it was not obligated to identify to the Patent Office France Telecom's role in inventing the claimed subject matter. Telcordia labors to explain that the law of derivation under Section 102(f) of the Patent Code evolved over time, and that, even assuming Telcordia derived the essence of the claimed invention from France Telecom, the named inventors were not obligated to inform the Patent

---

[1]    In contrast, Cisco's motion *in limine* seeking to preclude Telcordia from seeking damages on revenue from products Telcordia admits do not infringe is procedurally proper because it seeks to eliminate a highly prejudicial damages number for which there is no legally cognizable theory of recovery.

[2]    ███████████████████████████████████

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

Office of that fact in 1992. This fancy legal footwork is irrelevant. Both law and common sense dictate that inventorship is always highly material to patent prosecution, particularly where the ownership of patent rights can change depending on who is identified as the proper inventor.

In *PerSeptive*, the Federal Circuit confirmed the basic principle that improper inventorship is material to patentability: "As a critical requirement for obtaining a patent, inventorship is material." 225 F. 3d at 1321. The Federal Circuit explained that examiners *must* reject applications based on "improper inventorship" under Patent Office rules:

> [T]he Manual of Patent Examining Procedure details the "rules" of inventorship to be used by examiners… and specifically notes that information about inventorship is material under 37 C.F.R. § 1.56.

*Id.* at 1321 (citations omitted).[3]

Moreover, the patent application at issue in *PerSeptive* was filed in 1989, two years *before* the patent application in this case, so the idea that the materiality of inventorship is something new or was something impossible to know in 1991 is meritless. *Id.* at 1319; *see also In re Metoprolol Succinate Patent Litigation*, Civil Action No. 1620, 2006 WL 120343, *14-26 (E.D. Mo. Jan. 17, 2006) (Exh. 4-E) (finding inequitable conduct based on failure to disclose information related to inventorship in patent applications filed in 1988 and 1990).

In short, Telcordia's argument that its intentional concealment of the correct inventorship was somehow not material is flatly contradicted by the common sense rule that inventorship is always material. Telcordia did not want to lose ownership rights to France Telecom, and thus withheld the identity of the true inventors. This is classic inequitable conduct.

### B.   Telcordia's Submission of Some France Telecom Correspondence During the Reissue Prosecution Did Not Cure Telcordia's Inequitable Conduct

There is no dispute that Telcordia withheld all of the France Telecom communications from the Patent Office during the original prosecution. During the reissue prosecution, Telcordia selectively submitted some of these communications. However, it is well-established that an

---

[3]   Telcordia's attorneys here also advanced the same losing argument in the *PerSeptive* case.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

applicant cannot cure inequitable conduct by submitting withheld information during the prosecution of a reissue application. *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 882 F.2d 1556, 1564 (Fed. Cir. 1989) ("It is well settled that, in the reverse case of inequitable conduct during the prosecution of the original application, reissue is not available to obtain new claims and thereby rehabilitate the patent."); *see also Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1236-1241 (Fed. Cir. 2003).

Moreover, even during the reissue prosecution, Telcordia (incredibly) failed to submit what is arguably the most relevant document relating to inventorship ████████████████████ ████████████ Telcordia argues that its withholding ████████████████ cannot be inequitable conduct as a matter of law because it is a Telcordia document and thus cannot possibly support the idea that France Telecom contributed to the invention. This makes no sense. █████████████████████ ████████████████████████████████████ That Telcordia authored this document *increases* its probative value – it does not render it irrelevant.

## C.    There Was No Need for Telcordia to Move To Exclude Defendants From Asserting Inequitable Conduct Based on Telcordia's Misrepresentation of Gonzales

Telcordia also seeks to exclude Defendants from relying on Telcordia's misrepresentation of the France Telecom prior art reference by Gonzalez ("the Gonzales reference") as a basis for inequitable conduct because it was before the Patent Office. Like Telcordia's request to preclude Defendants from referencing Telcordia's claim construction positions, the parties could have also resolved this issue without involving the Court had Telcordia engaged in the meet and confer process that Defendants requested and that Local Rule 7.1.1 requires. *See* Exh. 4-F [Email from J. Williamson dated February 5, 2007]. Had Telcordia done so, it would have learned that Defendants intend to rely on Telcordia's mischaracterization of Gonzales because it establishes

---

4    ████████████████████████████████████████████████████████

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

the named inventors' deceptive intent in concealing France Telecom's role in conceiving the claimed invention, not as a free-standing inequitable conduct counterclaim.[5]

---

[5] In any event, inequitable conduct *can* be based on prior art that is before the Patent Office. *See, e.g., Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys.*, 63 F. Supp. 2d 1064, 1076 (N.D. Cal. 1999) ("[I]f there is evidence of an intent to deceive the patent examiner, there can be inequitable conduct even if the misrepresented prior art is before the examiner.").

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

# TABS A-D

## REDACTED IN THEIR ENTIRETY

# TAB E

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

**H**

Briefs and Other Related Documents

In re Metoprolol Succinate Patent Litiga-
tionE.D.Mo.,2006.Only the Westlaw citation is cur-
rently available.

United States District Court,E.D. Missouri, Eastern
Division.

In re METOPROLOL SUCCINATE PATENT LIT-
IGATION
No. MDL NO. 1620.

Jan. 17, 2006.

Henry J. Renk, Jacob K. Baron, Lisa B. Pensabene,
Robert L. Baechtold, Scott K. Reed, Tara A. Byrne,
Fitzpatrick and Cella, New York, NY, Monica J. Al-
len, Robert T. Haar, Maggie B. Peters, Haar and
Woods, LLP, St. Louis, MO, Jack B. Blumenfeld,
Maryellen Noreika, Morris and Nichols, Wilmington,
DE, for Plaintiffs.

Anita Pamintuan Fusco, Charles A. Weiss, Michael J.
Freno, Richard L. Delucia, Kenyon and Kenyon,
Alan B. Clement, Martin P. Endres, Nicholas P.
Chiara, Hedman and Costigan, P.C., Richard D. Mar-
giano, Martin B. Pavane, William A. Alper, Cohen
and Pontani, New York, NY, Charles A. Weiss,
Daniel A. Crowe, Bryan Cave LLP, John H. Quinn,
III, Jeffrey H. Kass, Armstrong Teasdale, LLP, St.
Louis, MO, Madeline S. Baio, Marshall and Den-
nehey, Philadelphia, PA, Steven A. Maddox, Foley &
Lardner, Washington, DC, Paul J. Puricelli, Stone
and Leyton, Clayton, MO, Kevin J. Connors, Mar-
shall and Dennehey, George H. Seitz, III, Patricia P.
McGonigle, Seitz and Van Ogtrop, P.A., Wilming-
ton, DE, for Defendants.

*MEMORANDUM AND ORDER*

SIPPEL, J.

*1 Plaintiffs AstraZeneca AB, Aktiebolaget Hassle,
and AstraZeneca LP (collectively Astra) own patents
claiming the pharmaceutically active compound met-
oprolol succinate and "sustained release" forms of
that drug.[FN1] Defendants are drug makers seeking
approval from the Federal Drug Administration to
market extended release dosages of metoprolol suc-
cinate. Astra filed multiple lawsuits seeking declarat-

ory judgments that Defendants' products infringe
upon Astra's patents. Defendants have moved for
summary judgment contending Astra's patents are in-
valid and/or are unenforceable. Because I find that
the patents are invalid based on double patenting and
anticipation I will grant Defendants' motion for sum-
mary judgment on those grounds. Because I find that
Astra engaged in inequitable conduct during the pro-
secution of the patents I will also grant Defendants'
motion for summary judgment on that ground.

> FN1. The record before me established that
> AstraZeneca LP is the owner of the patents
> in suit. The legal standing of the other two
> Plaintiffs has never been formally explained
> by the parties.

*Legal standard*

*1 Defendants have moved for summary judgment on
Astra's claims. In considering whether to grant sum-
mary judgment, a district court examines the
"pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if
any...." Fed.R.Civ.P. 56(c). Summary judgment is ap-
propriate if the evidence, viewed in the light most fa-
vorable to the nonmoving party, demonstrates that
there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a
matter of law. Lynn v. Deaconess Medical Center,
160 F.3d 484, 486 (8th Cir.1998)(citing Fed.R.Civ.P.
56(c)). The party seeking summary judgment bears
the initial responsibility of informing the court of the
basis of its motion and identifying those portions of
the affidavits, pleadings, depositions, answers to in-
terrogatories, and admissions on file which it believes
demonstrates the absence of a genuine issue of mater-
ial fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323,
106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*1 When such a motion is made and supported by the
movant, the nonmoving party may not rest on his
pleadings but must produce sufficient evidence to
support the existence of the essential elements of his
case on which he bears the burden of proof. Id. at
324. In resisting a properly supported motion for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy. *Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1113 (8th Cir.2004).

**\*1** Patents are presumed to be valid. 35 U.S.C. § 282. Because of this presumption, a patent challenger must prove invalidity of a patent with clear and convincing evidence. *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1580 (Fed.Cir.1991).

## Background

**\*1** Astra owns patents claiming the pharmaceutically active compound metoprolol succinate and sustained release forms of that drug.

**\*1** Metoprolol succinate is an active chemical compound used in the treatment of angina, hypertension, and congestive heart failure. Metoprolol succinate was invented at Plaintiff Aktiebolaget Hassle's facilities in Sweden. Astra manufactures and markets different dosages of metoprolol succinate in "extended release"[FN2] forms under the brand name Toprol-XL®. Astra holds two United States patents that claim "sustained release" formulations of metoprolol succinate and metoprolol succinate itself. These patents are United States Patent 5,001,161 (the '161 patent) and United States Patent 5,081,154 (the '154 patent) respectively. Astra asserts that its Toprol-XL® products are protected from infringement by these two patents.

> **FN2.** Astra refers to its Toprol-XL® as an "extended release" drug in its Complaints against Defendants and in various documents that are part of the record in this case including its memorandum of law in support of its motion to dismiss Defendant KV Pharmaceutical's counterclaims (E.D. Mo. Cause No. 4:03CV592, Doc. # 31).

**\*2** Defendants KV Pharmaceutical Company (KV), Andrx Pharmaceuticals, LLC and Andrx Corporation (Andrx), and Eon Labs, Inc. (Eon)[FN3] are pharmaceutical companies who seek to market their own extended release dosages of metoprolol succinate. KV, Andrx, and Eon separately filed Abbreviated New Drug Applications (an ANDA) with the United States

Food & Drug Administration (the FDA) seeking approval of their extended release metoprolol succinate formulations as the first step to placing these drugs on the market.[FN4] In their respective ANDAs, Defendants asserted that their extended release metoprolol succinate formulations have the bioequivalence of Astra's Toprol-XL®. Astra claims that Defendants' metoprolol succinate drugs are merely generic versions of Toprol-XL® and infringe upon Astra's '161 and '154 patents.

> **FN3.** KV, Andrx, and Eon are collectively referred to as "Defendants".

> **FN4.** Defendants KV Pharmaceutical, Andrx, and Eon each seek to market 25, 50, 100, and 200 mg. strengths of their respective metoprolol succinate formulations.

**\*2** The Federal Food, Drug and Cosmetic Act, codified in pertinent part at 21 U.S.C. § 355 and 35 U.S.C. § 271, (Hatch-Waxman Act), creates a safe harbor from claims of patent infringement for certain activities directed to preparing an ANDA. However, the filing of an ANDA seeking FDA approval to enter the market with a generic drug before the expiration of patents claiming the drug or its use is considered an act of infringement. 21 U.S.C. § 271(e)(2). In such a circumstance the owner of the patent is authorized to bring suit for injunctive relief to prevent the commercial manufacture, use, offer to sell, or sale of the generic drug within the United States. 21 U.S.C. § 271(e)(4).

**\*2** Because Defendants seek to market their extended release metoprolol succinate drugs before the expiration of Astra's '161 and '154 patents, Astra filed the present lawsuits seeking declaratory judgments of infringement.[FN5] Defendants have countered that their products do not infringe on Astra's patents and, in the alternative, that Astra's patents are invalid based on double patenting and inequitable conduct.

> **FN5.** Astra brought suit against Defendant KV Pharmaceutical in this Court. Astra's suits against Defendants Andrx and Eon were filed in the United States District Court for the District of Delaware. These lawsuits

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

were transferred to this Court by the United States Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

*2 Specifically, Defendants assert that Astra's '161 and '154 patents are invalid for double patenting over earlier issued patents United States Patent 4,780,318 (the '318 patent) and United States Patent 4,957,745 (the '745 patent); and that the '154 patent is invalid for double patenting over the '161 patent. Defendants also argue that the '161 is invalid as anticipated by prior art under 35 U.S.C. § 102(b).

*2 Additionally, Defendants assert that patents '161 and '154 are unenforceable based on inequitable conduct by Astra during their prosecution of the patents before the United States Patent and Trademark Office (USPTO). Defendants allege that named inventors of metoprolol succinate were intentionally misrepresented to the USPTO. Alternatively, Defendants assert that the three-year dispute between Astra and another drug company concerning inventorship of metoprolol succinate should have been disclosed to the USPTO.

*Discussion*

Invalidity based on double patenting

*2 Defendants assert that Astra's '161 patent and '154 patents are invalid for obviousness-type double patenting. Obviousness-type double patenting, also referred to as nonstatutory double patenting (as distinguished from statutory double patenting under 35 U.S.C. § 101), is a judicially created doctrine that prevents the issuance of a patent on claims that are nearly identical to claims in an earlier patent. *Geneva Pharmaceuticals, Inc. v. GalaxoSmithKline PLC,* 349 F.3d 1373, 1377-78 (Fed.Cir.2003). This doctrine prevents patent applicants from extending their patent term for an invention beyond the statutory limits by claiming a mere obvious variant of the claims in a prior patent. *In re Emert,* 124 F.3d 1458, 1460 (Fed.Cir.1997).

*3 The public policy behind this doctrine is to allow the public to freely use a patent upon its expiration. *In re Longi,* 759 F.2d 887, 892 (Fed.Cir.1985)(citing *In re Zickendraht,* 50 C.C.P.A. 1529, 319 F.2d 225,

232 (C.C.P.A.1963)(Rich, J. concurring)). Not only should the invention claimed in the patent be available to the public upon its expiration "but also modifications or variants which would have been *obvious* to those of ordinary skill in the art at the time the invention was made...." *Id.*

*3 In deciding whether a challenged patent is invalid for obviousness-type double patenting, a court must determine whether the claims of the challenged patent define an obvious variation of the claim in an earlier issued patent. *In re Emert,* 124 F.3d at 1461; *General Foods Corp. v. Studiengesellschaft Kohle,* 972 F.2d 1272, 1280 (Fed.Cir.1992)(double patenting principles extend to merely obvious variants of what has been patented). In order to compare claims of patents a court must construe what the claims are in each patent.

Claim construction

*3 Defendants assert that Plaintiff's '161 patent and '154 patent are invalid based on double patenting of claim 8 of the '318 patent. Defendants originally stated that they would apply Astra's construction of the '161 patent for purposes of their invalidity motion. That was before Defendants learned how Astra construed the term "sustained release" in the claim of that patent. The meaning of the term "sustained release" is disputed by the parties as is the construction of claim 8 of the '318 patent.

*3 The United States Court of Appeals for the Federal Circuit has recently summarized and clarified the claim construction process in its decision in *Philips v. AWH Corp.,* 415 F.3d 1303 (Fed.Cir.2005).[FN6] The "claims of a patent define the invention to which a patentee is entitled to the right to exclude." *Id.* at 1312. The claims are of primary importance in the effort to ascertain what it is that has been patented. *Id.* The words of a claim are generally given their ordinary and customary meaning. *Id.* The meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question as of the effective filing date of the patent application. *Id.* at 1313. Importantly, the person of ordinary skill in the art is deemed to have read the claim term in the context of the claim as well as in the context of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

entire patent, including the specification. *Id.*

> FN6. I have excluded all internal quotations and citations in my citations to *Phillips.*

**\*3** To determine the meaning of a term in a field of art, a court "looks to those sources available to the pubic that show what a person of skill in the art would have understood the disputed claim language to mean." *Id.* at 1314. Those sources include intrinsic evidence, which encompasses the words of the claims themselves, the specification, and the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art. *Id.*

**\*4** Claims "must be read in view of the specification, of which they are a part." *Id.* at 1315. The specification is the single best guide to the meaning of a disputed term. *Id.* It is entirely appropriate for a court, in the course of claim construction, to rely heavily on the written description in the specification for guidance as to the meaning of the claims. *Id.* at 1317.

**\*4** Although a court may refer to extrinsic evidence in the form of expert and inventor testimony, dictionaries, and learned treatises, these sources are less significant than the intrinsic record in determining the legally operative meaning of claim language. *Id.* Conclusory or unsupported assertions by experts as to the definition of a claim term are not useful to a court performing a claim construction. A court should discount an expert's testimony regarding the meaning of a claim term if it is clearly at odds with the claim construction mandated by the intrinsic evidence of the claims themselves, the specification, and the prosecution history. *Id.* at 1318.

**\*4** Defendants assert that claim 8 of the '318 patent is a specific extended release formulation of metoprolol succinate. They argue that the claim in the '161 patent for "sustained release" formulations of metoprolol succinate is merely an obvious variant of claim 8. The claim of the '154 patent simply claims the compound metoprolol succinate. Defendants contend that the claims in the '161 and '154 patents are a genus of the species identified in claim 8 of the '318 patent and are therefore void for double patenting.

**\*4** To determine whether the '161 and the '154 patents are invalid for double patenting over claim 8 of the '318 patent, the inventions claimed in each patent must first be construed. Because Defendants initially represented that the claim of the '161 patent was not in dispute a formal claims construction hearing was not held. As the positions of the parties crystalized during the summary judgment briefing it became clear that the parties did not agree to the construction of the term "sustained release" used in the '161 patent. The parties were clearly aware of this dispute and fully briefed and presented evidence in support of their construction of that term in their cross motions for summary judgment. I held a summary judgment hearing at which the parties presented intrinsic and extrinsic evidence in support of their construction of the claims in the '161, '154, and '318 patents. As a consequence, the parties placed into the record both intrinsic and extrinsic evidence in support of their claim construction positions.

### The '318 patent

**\*4** This patent concerns a drug formulation that allows the delivery of active drugs to the small intestine. Claim 8 of this patent includes a delivery formulation for metoprolol succinate. The "Abstract" of the '318 patent states that "[t]he present invention relates to a new oral pharmaceutical composition having an improved release of the therapeutically active compound present therein, in the lower part of the gastrointestinal duct...."

**\*5** Under the heading "Background Of The Invention" the patent states that

**\*5** [t]here exists an everlasting problem within pharmacy to be able to administer a therapeutically active compound as close as possible to the colon or preferably in the colon, in order to thereby to eliminate the risk of adverse influence on the active compound by the gastric juice, or to prevent irritation of the ventricular mucous membranes, or to obtain a therapeutically effect in the lower part of the gastrointestinal tract.

**\*5** Under the heading "Object Of The Invention" the patent states that

**\*5** [i]t has now surprisingly been shown possible to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

be able to solve the aforesaid problem by the present invention, which is a pharmaceutical composition in unit dosage form characterized by a core comprising a therapeutically active substance in the form of a weak base or a weak acid, on which core there is provided a first, inner layer of a diffusion membrane in the form of ethyl cellulose and/or a copolymer of polyethyl acrylate, methyl methacrylate, and trimethylammonium ethyl methacrylate chloride, and or which inner layer there is provided a second layer of at least one anionic polymer and/or fatty acid having a pk suba of 4.5 to 7, preferably 6 to 6.5.

*5 In the "Detailed Description Of The Invention" section the patent states that

*5 [b]y means of the present invention the core is protected against attack by gastric juice after ingestion by means of the outer layer comprising an anionic polymer and/or fatty acid having a pk suba of 4.5 to 7. When this outer layer has been removed by dissolution upon passage of the composition into the small intestine with its higher pH, a slow but controlled release of the therapeutically active compound from the core by diffusion through the diffusion membrane occurs due to the difference in concentrations on each side of said membrane. The release takes thereby place at such a rate that 80-90% of the therapeutically active compound has been released after 7 to 10 hrs, which means that the release can take place in a constant, pH-independent way, and thereby in a very reproducible way. (emphasis added)

*5 Defendants argue that the '161 patent and the '154 patent are invalid for double patenting over claim 8 of the '318 patent. Because claim 8 depends from claim 7, which depends from claim 6, the starting point for claim construction is claim 6. Claim 6 is directed to oral controlled release pharmaceutical compositions with a core of the active drug, surrounded by a coating that is a diffusion membrane, and a second coating that resists dissolving in the pH of the stomach. It also specifies the materials used in each coating. Claim 6, 7 and 8 are as follows:

*5 6. Oral pharmaceutical composition having an improved release therefrom of a therapeutically active compound therein which is soluble in gastric juice, independent of its solubility, having a core comprising the therapeutically active compound, a first inner

layer coating on the core, in the form of a diffusion membrane which is a mixture of ethyl cellulose and a copolymer of polyethyl methacrylate-methyl methacrylate-trimethyl ammonium ethylmethacrylate chloride, in a weight relationship between the monomers of the copolymer of 63 to 65:31.7 to 32.3:2.5 to 5, and a second outer layer coating on the inner layer of at least one anionic polymer having a pk suba of 4.5 to 7.

*6 7. Pharmaceutical composition according to claim 6, wherein the therapeutically active compound in the core has a solubility in the pH range 1 to 8 which exceeds 0.5 to 1 g per 100 ml.

*6 8. Pharmaceutical composition according to claim 7, wherein the active compound is quinidine sulphate, quinidine bisulphate, quinidine gluconate, quinidine hydrochloride, metoprolol tartrate, metoprolol succinate, metoprolol fumarate, or furosemide, 5-aminosalicylic acid, propranolol or alprenolol or a pharmaceutically acceptable salt thereof, or a mixture thereof with another weak base, weak acid, or salt thereof having a pk suba of 1 to 8.

*6 Distilled to its essence, and pertinent to this lawsuit, claim 8 is directed to an oral pharmaceutical composition that has (i) a core that contains metoprolol succinate (or one of several other drugs), (ii) the core is surrounded by an inner coating that allows a controlled release of metoprolol succinate and (iii) an outer coating that resists dissolving in the stomach with the goal of releasing the metoprolol succinate close to or within the colon.

*6 The meaning of the term "improved release" in claim 6 can be interpreted from the specification which states that the goal of the invention is to release the active drug as close to the colon as possible. The specification also states that the diffuse membrane surrounding the core of metoprolol succinate acts to allow a "slow but controlled release" of the drug. Claim 8 patents a particular type of formulation to allow the slow and controlled release of metoprolol succinate in or near the colon.

### The '161 patent

*6 The '161 patent "Abstract" states that "[t]he present invention relates to metoprolol succinate, a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 6
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

new therapeutically active compound, and pharmaceutical preparations comprising this new compound."

*6 Under the patent heading "Technical Field" the patent states that "[t]he object of the present invention is to obtain a therapeutically active compound intended to be released close to or within the colon, and particularly to such active compounds which are soluble in the pH range 1 to 8" (emphasis added).

*6 Under the heading "Description of the Present Invention" the patent states that
*6 "[t]his compound can, in order to be administered orally be treated in accordance with the method proposed in EP-A1-0 040 590. Herein it has been proposed an oral pharmaceutical composition comprising a core containing a therapeutically active compound, which core has been coated with a layer comprising 10 to 85% by weight of an anionic polymer soluble at a pH above 5.5, and 15 to 90% by weight of a water insoluble polymer selected from the group of quaternary ammonium substituted acrylic polymers.
*6 ...
*6 When dosing the ready made product a number of discrete, coated particles/granules corresponding to a therapeutical dose unit of the actual therapeutical compound is administered.
*6 When administering, in order to achieve a steady blood plasma level of the therapeutically active compound, a split dose unit of the therapeutically active compound provided with a coating according to the present invention can be administered together with some particles/granules which are not coated. (emphasis added)

*7 The sole claim of the '161 patent is "[a] [FN7] sustained release pharmaceutical composition comprising metoprolol succinate together with a pharmaceutically acceptable carrier."

> FN7. The term "sustained release" was recently repositioned in the "claim" section of the '161 patent by the USPTO. The USPTO amended the patent to have the term follow the initial "a" in this claim sentence from following the second "a" as originally filed. The amendment was made at Astra's re-

quest.

*7 For the purposes of their motion for summary judgment based on invalidity, Defendants agreed to the revised wording of the sole claim of the '161 patent. [FN8] Astra broadly construes the definitions of the terms used in this claim. Defendants disagree with Astra's definition of the term "sustained release." Astra contends that sustained release means dosage forms which, "upon ingestion, released active to achieve desired blood plasma levels and maintained relatively steady blood plasma levels for an extended period of time." (Pls.' Memo. in Opp. at 23.) Defendants assert that the term sustained release, as used in the mid 1980s by a person of ordinary skill in the art when this patent application was filed, was deemed interchangeable with the terms "extended release" and "controlled release."

> FN8. The USPTO had not yet approved Astra's request to change the location in the claim of the term sustained release when the briefing of this motion was filed.

*7 The term "sustained release" does not appear in the specification of the '161 patent. The invention described by the specification is a core of "active," metoprolol succinate, coated by an anionic polymer with the goal of releasing metoprolol succinate close to or within the colon. The specification also states that uncoated particles/granules of metoprolol succinate may be combined with metoprolol succinate "provided with a coating according to the present invention" (emphasis added) to achieve a steady blood plasma level of metoprolol succinate. This last specification clearly regards the invention as the coated metoprolol succinate. It does not state that the invention is the coated metoprolol succinate combined with uncoated metoprolol succinate to achieve a steady blood plasma level. Astra contends that the invention claimed in the '161 patent is this latter construction which Astra labels "sustained release."

*7 In support of its construction of the term "sustained release," Astra offers the affidavit of its expert Gerald S. Brenner. In paragraph 35 of his affidavit, Brenner states that one skilled in the art in the mid 1980s would "generally have considered a sus-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

tained release dosage form one that initially (upon ingestion) releases active to achieve desired blood plasma levels and maintains relatively steady blood plasma levels of the active for an extended period of time." (Pls.' Opp'n Summ. J. Ex. A) In support of this statement Brenner's affidavit refers to three documents without identifying them or vouching for their use by experts in his field as reference tools. The three documents are excerpts from what appear to be pharmaceutical texts. I presume that these are treatises used in the field of pharmacology.

*7 The first excerpt is from Robert E. Notari, *Biopharmaceuticals and Clinical Pharmacokinetics, An Introduction* (Marcel Dekker, Inc., 3rd ed.1980). Notari discusses the term sustained release and states that *8 "[g]eneral terms such as timed release, time release, extended action, or long-acting may or may not be meant to indicate that the formulation is a sustained release preparation. Unfortunately, there are no standard definitions or classifications. The following distinction will be used as a starting point, and later more precise terminology and definitions will be given to sustained release dosage forms."

*8 *Id.* at 152. Notari then goes on to define the meaning of the terms "repeataction tablets," "sustained release dosage forms," and "prolonged-action preparations." He defines sustained action dosage forms as providing an "initial therapeutic dose that is available upon administration of the product followed by a gradual release of medication over a prolonged period of time." *Id.* He states that prolonged-action preparations provide the slow release of a drug and may differ from sustained release dosage only in that no initial dose in included in the prolonged-action formulation. *Id.*

*8 Although Notari's definition of sustained release at first blush appears to support Astra's definition, Notari specifically notes that there were no standard definitions or classifications of dosage terms including sustained release. Rather, Notari's article was his attempt to create definitions that would presumably be adopted at some time in the future by a person skilled in the art. As a result, Notari's text does not support Astra's contention that sustained release had a specific meaning to one skilled in the art as of the ef-

fective date of the patent application. Instead, Notari's article establishes the opposite position; that in the mid 1980s there was no consistent interpretation of the term sustained release.

*8 The second document relied on by Brenner is equivocal in supporting his definition of sustained release. That excerpt is from Howard C. Ansel, *Introduction to Pharmaceutical Dosage Forms,* (Lea & Febiger 1969). Ansel states that

*8 [s]ome solid dosage forms are designed to release their medication to the body for absorption rapidly and completely; other products may be designed to release the drug slowly for more prolonged drug release and sustained drug action. The latter type of dosage form is commonly referred to by a designation such as a *sustained-action, prolonged-action, sustained-release, prolonged-release, timed-release, extended-action,* or *extended-release* tablet or capsule.

*8 *Id.* at 274. Ansel then states that "most" sustained-action dosages are designed so that a single dosage provides the "immediate release of an amount of the drug that promptly produces the desired therapeutic effect and gradual and continual release of other amounts of drug to maintain this level of effect over an extended period...." *Id.* Ansel uses the term "most" which indicates that his definition is not universal to all sustained-action dosages. As quoted above, Ansel notes the term sustained release was also referred to as extended release, timed release, extended action among other terms. These terms interchangeably referred to dosages, which Notari highlighted in his treatise published ten years after Ansel's, that may not be an indication of sustained release as defined by Ansel because there were still no standard definitions of any of these terms in 1980.

*9 Finally, the third treatise Brenner relies on for his definition of sustained release is *Remington's Pharmaceutical Sciences* (Mack Pub. Co., Arthur Osol ed.1980). That treatise states that long-acting oral products have been described by a variety of terms. *Id.* at 1596. The treatise then proposes classifying long-acting products into the following three types: sustained release, prolonged release, and repeat action. *Id.* This treatise does not state that sustained re-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

lease is defined similarly by those skilled in the art. To the contrary, it offers a definition that may be adopted at some time in the future by those skilled in the art.

**\*9** The three treatises relied on by Astra and its expert Brenner are consistent only in that none of the treatises state that sustained release had a uniform definition used by those skilled in the art in the mid 1980s. At best these treatises offer definitions which may or may not have been uniformly adopted. What is clear is that sustained, extended, or timed release dosages were deemed to be dosages that released more slowly over time than immediate release dosages.

**\*9** The prosecution history of the '161 patent also demonstrates that Astra's own definition of sustained release was not consistently maintained during the prosecution of the patent. As previously noted, the term sustained release does not appear in the specification of the patent. When originally filed, the claims of the patent were directed to metoprolol succinate and a "pharmaceutical composition, characterized in that the active compound is metoprolol succinate." (Defs.' Ex. Q at 145) The USPTO examiner rejected these claims as obvious over prior art. Id. at 167-169. Hassle (Astra) responded to the rejection with a declaration of Dr. John Anders Sandberg. Hassle represented that Sandberg's declaration showed that metoprolol succinate was "useful as a sustained release form of metoprolol." Id. at 174. Sandberg's declaration interchangeably used the terms extended release, sustained release, and controlled release in supporting the selection of metoprolol succinate. Id. at 181, 184, and 189. The examiner agreed to issue the '161 patent if the term sustained release was inserted into the claim. In his deposition for this case, Sandberg stated that he thought that controlled release, sustained release, and extended release dosages were essentially the same. (Defs.' Ex. V at 413) One of the named inventors of the '161 and '154 patents, Curt Appelgren, stated in his deposition that in 1983 the terms controlled release, extended release, and sustained release were use interchangeably. The other named inventor of the '161 and '154 patents, Eva Christina Eskilsson, stated in her deposition that sustained release could be the same as extended release, which

could be a dosage form completely releasing an active drug from "one to many hours." (Defs.' Ex. T at 345)

**\*9** Defendants have placed more treatises and articles into the record that state that sustained release, prolonged action, controlled release, extended action, and time release were all used interchangeably to describe preparations that release a drug over an extended period of time. (Defs.' Exs. AB, AC, and AD)

**\*10** Astra itself uses the term "extended release" in their Complaints and various pleadings when they describe their drug Toprol-XL® which is the subject of this infringement action.

**\*10** Based on the lack of a definition of sustained release in the '161 patent, the specification's statement that the "object of the present invention is to obtain a therapeutically active compound *intended to be released close to or within the colon*" and the extrinsic evidence offered by the parties, I conclude that sustained release simply refers to a dosage that is distinguished from immediate release in that it releases metoprolol succinate over a controlled or extended period of time close to or within the colon. Astra's definition requiring an immediate release is not supported by the specification. Astra's extrinsic evidence in the form of Brenner's affidavit "is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history" and is discounted. *Phillips*, 425 F.3d 1318. In addition, Brenner's definition is not even supported by the treatises he relies on in support of his position.

**\*10** The specification itself states that if a steady blood plasma level of the therapeutically active compound is desired, an optional formulation of uncoated metoprolol succinate can be combined with metoprolol succinate with a coating according to the present invention. That statement, read in context of the entire patent, indicates that the invention of the '161 patent is a coated forms of metoprolol succinate that provides for a controlled or extended release of the drug; it is not a pharmaceutical composition that includes an immediate release of metoprolol succinate as Astra would define the term sustained release.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

Page 9

The '154 patent

**\*10** The only claim in the '154 patent is "metoprolol succinate." The invention is the composition itself.

Comparing the claims

**\*10** Claim 8 of the '318 patent is directed to a specific type of controlled release formulation of metoprolol succinate. The claim describes a metoprolol succinate core surrounded by two coatings (an inner diffuse membrane that allows a slow but controlled release of active and an outer coating that resists stomach acid so that the active can release near or in the colon).

**\*10** The claim of the '161 patent is directed to coated forms of metoprolol succinate that are designed to have a controlled release of the metoprolol succinate (the active) near or in the colon. The claim does not limit the method or structure by which controlled release is achieved. It is broadly directed to formulations that would provide a controlled release of metoprolol succinate near or in the colon.

**\*10** Defendants argue that claim 8 of the '318 patent is a particular type of a controlled release formulation of metoprolol succinate and that the claim of the '161 patent is a broad claim to any controlled release formulations of metoprolol succinate. Defendants assert that the relationship between the claim 8 of the '318 patent and the claim of the '161 patent is that of "species and genus," that is, the former discloses a specific embodiment within the latter's general scope.

**\*11** A species/genus relationship is a form of double patenting wherein the second broader claim is deemed invalid because it is anticipated by, and therefore not patently distinct from, an earlier species claim. See *In re Goodman*, 11 F.3d 1046, 1053 (Fed.Cir.1993); *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001); *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1383 (Fed.Cir.2003).

**\*11** Astra asserts that the relationship between claim 8 of the '318 patent and the claims of the '161 patent and the '154 patent should be viewed as that of combination/element which does not implicate the doc-

trine of double patenting. See *In re Allen*, 52 C.C.P.A. 1315, 343 F.2d 482, 486 (C.C.P.A.1965); *In re Heinle*, 52 C.C.P.A. 1164, 342 F.2d 1001 (C.C.P.A.1965). Astra contends that the claims of the '161 patent and the '154 patent are independent elements of the combination claim of claim 8 of the '318 patent. Astra argues that metoprolol succinate was not a necessary element to the combination claim 8 of the '318 patent and that metoprolol succinate has utility by itself or in other combinations. As a result, Astra argues, its claims concerning metoprolol succinate cannot be invalidated for double patenting.

**\*11** However, " '[i]n situations in which an element or subcombination issues after the combination, the matter should be analyzed as one of a generic claim issuing after a later filed specific or improvement claim.' " *In re Emert*, 124 F.3d 1458, 1462 (Fed.Cir.1997)(quoting 3 Donald S. Chisum, *Chisum on Patents* § 9.03[2][b][iii] ).

**\*11** That is the situation in the present case. Even if the '161 claim and the '154 claims are classified as elements, they issued after the combination claim of claim 8 of the '318 patent issued. It is therefore appropriate to analyze these claims as a species/genus relationship. I find that claim 8 of the '318 patent is a particular type of a controlled release formulation of metoprolol succinate and that the claim of the '161 patent is a broad generalized claim to controlled release formulations of metoprolol succinate. Because the earlier issued claim 8 of the '318 patent is a species of the later issued genus claim of the '161 patent, the '161 claim is invalid for obviousness type double patenting.

**\*11** The sole claim of the '154 patent is "metoprolol succinate." Such a claim encompasses any formulation that uses this chemical composition without limitation. Claim 8 of the '318 patent is directed to certain pharmaceutical compositions containing metoprolol succinate. The '154 patent broadly claims any pharmaceutical compositions containing metoprolol succinate. The relationship between these claims is that of species/genus. The '154 patent is a genus of the species claimed in the '318 patent. Consequently, the claim of the '154 patent is anticipated by claim 8 of the '318 patent and is void for double patenting be-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

cause it is not patently distinct form claim 8 of the '318 patent.

*12 If the '161 and '154 patents were valid, they would prevent the public from using the earlier issued invention of claim 8 of the '318 patent upon its expiration because they completely encompass claim 8 as to metoprolol succinate. Such a result would defeat the public policy behind the double patenting doctrine which is to allow the public to freely use a patent upon its expiration.

*12 As a result, I find by clear and convincing evidence that the '161 patent and the '154 patent are invalid on the basis of double patenting over claim 8 of the '318 patent.

Terminal disclaimers

*12 Defendants also asserted that the '161 and '154 patents are invalid for double patenting over earlier issued patent United States Patent 4,957,745 (the '745 patent); and that the '154 patent is invalid for double patenting over the '161 patent.

*12 Claim 7 of the '745 patent is another controlled release formulation of metoprolol succinate. It claims a formulation of metoprolol succinate wherein the metoprolol is released through a coating over a period of at least fifteen hours. Base on the same analysis applied to claim 8 of the '318 patent, I find that claim 7 of the '745 patent is a species of the later filed genus in the claims of the '161 and '154 patents. The claim of the '161 patent and '154 patent would be invalid for double patenting over claim 7 of the '745 patent if not for the question of terminal disclaimers.

*12 By the same analysis the claim of the '154 patent would also be invalid for double patenting over the '161 patent.

*12 However, Astra filed terminal disclaimers under 35 U.S.C. § 253 as to the '161 patent and the '154 so that they expire at the same time that the '745 patent expires.[FN9] Astra contends that these terminal disclaimers cure any double patenting issues that may have arose between the '154 patent and the '161 patent and those two patents and the '745 patent.

> FN9. Defendants state that the expiration date of the '745 patent is September 18, 2007.

*12 Defendants argue that the terminal disclaimers should have been made while the '161 and '154 patents were being prosecuted. Defendants assert that Astra's disclaimers, filed years after the patents have issued, are ineffective based on public policy. Defendants contend that a listing of pharmaceutical patents and their expiration dates in the Orange Book [FN10] deters others from competing with the patent holder on those patents. Defendants assert that allowing a patent holder to avoid a double patenting litigation by filing a terminal disclaimer years after a patent was issued gives the patentee an unfair advantage by suppressing competition.

> FN10. The United States Food & Drug Administration's "Approved Drug Products with Therapeutic Equivalence Evaluations" publication, commonly referred to as "the Orange Book," is a register that provides notice of patents covering name brand drugs.

*12 The terminal disclaimer statute doe not set a time limit to file a disclaimer. The language of the statute clearly contemplates that a disclaimer can be filed by a patentee regarding a patent that has already issued. 35 U.S.C. § 253 ("patentee ... may disclaim ... the entire term, or any terminal part of the term, of the patent granted...."). The United States Court of Appeals for the Federal Circuit has recently confirmed that a terminal disclaimer may be filed after a patent is issued. _Perricone v. Medicis Pharmaceutical Corp._, 432 F.3d 1368, 2005 WL 3468126, at *5 (Fed.Cir. December 20, 2005). The _Perricone_ opinion also states that a "terminal disclaimer can indeed supplant a finding of invalidity for double patenting." _Id._ The opinion strongly infers that a terminal disclaimer filed years after a judicial finding of invalidity can reinstate the validity of the patent. _Id._ The court in _Perricone_ did not raise concerns that equity or public policy should prevent terminal disclaimers from being effective if filed years after a patent has issued.

*13 Based on the language of the terminal disclaimer statute and the opinion in _Perricone_, I find that As-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
**(Cite as: Not Reported in F.Supp.2d)**

tra's terminal disclaimers of the '161 patent and the '154 patent effectively avoids a finding of double patenting of those patents over the '745 patent and the '154 patent over the '161 patent.

### The '161 patent not entitled to priority and is therefore invalid as anticipated

**\*13** Defendants also argue that the '161 invalid as anticipated by prior art under 35 U.S.C. § 102(b). Defendants contend that the '161 patent was not entitled to priority to the '318 patent application. Through the use of priority, its possible for a patentee to avoid the consequences of any prior art which existed before his present patent application was filed. That is because a priority entitles the patentee to adopt the earlier filing date of a related patent application.

**\*13** The '161 patent issued from a continuation-in-part patent application filed in March 1988. The application claimed priority to the United States application for the '318 patent which was filed on January 10, 1985 (the '318 patent application in turn claimed priority to the Swedish patent application (SE 8400085) filed on January 10, 1984). If the '161 patent is not entitled to priority to the '318 patent application, its effective filing date would be March 1988. Any references with sustained release metoprolol succinate formulations that existed before March 1988 might qualify as prior art that anticipates the '161 patent.

**\*13** Patent law allows a patent applicant to claim priority to an earlier filed patent application. 35 U.S.C. § 120. For a claim in a later-filed application to be entitled to the filing date of an earlier application under section 120, the earlier application must comply with the written description requirement of paragraph one of 35 U.S.C. § 112. *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed.Cir.1998).

**\*13** Paragraph 1 of section 112 requires that the specification "contain a written description of the invention, and of the manner and process of making and using it." To meet this requirement, "the disclosure of the earlier application, the parent, must reasonably convey to one of skill in the art that the inventor possessed the later-claimed subject matter at the time the parent application was filed." *Id.* (citations omitted.)

A disclosure in a parent application that "merely renders the later-claimed invention obvious is not sufficient to meet the written description requirement; the disclosure must describe the claimed invention with all its limitations." *Id.* (citation omitted).

**\*13** As previously discussed, the '318 patent is directed to, in pertinent part, a specific type of controlled release formulation of metoprolol succinate. The claim describes a metoprolol succinate core surrounded by two specified coatings (an inner diffuse membrane that allows a slow but controlled release of active and an outer coating that resists stomach acid so that the active can release near or in the colon). The specification of the '318 patent is limited to this dual-coating system. The specification does not describe other systems for the sustained release of metoprolol succinate.

**\*14** The '161 patent broadly claims sustained release formulations of metoprolol succinate with little, if any, limitation. The specification of the '318 patent does not reasonably convey to one of skill in the art that the inventor of the '318 patent possessed the subject matter of the '161 patent at the time the '318 application was filed. To be entitled to a priority the disclosure in the '318 patent must describe the '161 patent invention with all its limitations. The '318 patent does not contain this information.

**\*14** Because the specification of the '318 patent does not meet the written description requirement of invention of the '161 patent, the '161 patent is not entitled to priority to the '318 patent. As a result, the effective filing date of the '161 patent is March 25, 1988.

**\*14** Swedish patent application SE 8400085 is the parent of the '318 patent and the grandparent of the '161 patent. The Swedish application published on July 17, 1985. The Swedish application discloses, among other things, the species of sustained release metoprolol succinate that becomes claim 8 of the '318 patent. The disclosure of the species in Swedish patent anticipates the genus of sustained release metoprolol succinate which is the invention of the '161 patent. Because the species in the Swedish patent application was published (July 1985) more than one

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 12
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

year before the '161 patent application was filed (March 1988), the '161 patent is invalid under 35 U.S.C. § 102(b) (a person is entitled to a patent unless the invention was described in a printed publication more than one year before the patent application was filed in the United States).

*14 Similarly, as already discussed, the '745 patent and the '161 patent have a species/genus relationship. The '745 patent was filed in September 1986. An issued United States patent qualifies as prior art as of its filing date. 35 U.S.C. § 102(e). Because the '745 patent application was filed more than one year before the '161 patent application, the '745 patent is prior art which anticipates the '161 patent and renders it invalid.

*14 As a result, I find by clear and convincing evidence that the '161 patent is not entitled to priority to the '318 patent and that the '161 patent is invalid as anticipated by the publication of the Swedish patent application and the filing of the '745 patent application.

Unenforceablility based on inequitable conduct

*14 For more that three years, from October 1985 through the late fall of 1988, Astra and a competitor named Lejus Medical contested the issue of who invented metoprolol succinate. This dispute was uncovered during discovery in this lawsuit. Astra never revealed its inventorship dispute with Lejus to the USPTO during the prosecution of the patents in suit. Astra's failure to disclose this long-running inventorship dispute is one basis for Defendants' motion for summary judgment for inequitable conduct.

*14 Defendants also assert that Astra intentionally did not name the correct inventors in Astra's prosecution of the patents in suit. Curt Appelgren and Eva Eskilsson are the two named inventors of the '161 patent and the '154 patent. Defendants assert that Appelgren and Eskilsson are not the inventors of the patents in suit and that listing them as the named inventors on the patent applications was a material misrepresentation to the USPTO.

*15 Defendants contend that Astra's naming the wrong inventors on the patents and Astra's failure to

disclose to the USPTO the inventorship dispute each independently constitute an act of inequitable conduct which render the patents in suit unenforceable.

*15 Astra denies these allegations. It asserts that it named the correct inventors of the '161 and the '154 patents. Astra also contends that, through its United States patent counsel, it fully satisfied its duties of candor and disclosure to the USPTO during the prosecution of these patents.

*Standard regarding inequitable conduct*

*15 "Inequitable conduct includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.,* 225 F.3d 1315, 1318 (Fed.Cir.2000) (citation omitted). Because the defense of inequitable conduct is entirely equitable in nature, it is an issue for the court and not a jury to decide. *Id.*

*15 To determine whether inequitable conduct exists requires the trial court to determine whether the conduct meets a threshold level of materiality and whether the evidence shows a threshold level of intent to mislead the USPTO. *Id.* at 1318-19. Materiality and intent must be established with clear and convincing evidence. *Frazier v. Roessel Cine Photo Tech, Inc.,* 417 F.3d 1230, 1234 (Fed.Cir.2005). Once threshold levels are established, the trial court is required to weigh materiality and intent. *PerSeptive Biosystems, Inc.,* 225 F.3d 1319. "The more material the conduct, the less evidence of intent will be required in order to find that inequitable conduct has occurred." *Id.* (citation omitted). In "the absence of a credible explanation, intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information." *Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd.,* 394 F.3d 1348, 1354 (Fed.Cir.2005). After weighing materiality and intent, the court must then determine whether the applicant's conduct is so culpable that the patent should be held unenforceable. *PerSeptive Biosystems, Inc.,* 225 F.3d 1319. Defendants assert that Astra engaged in inequitable conduct towards the USPTO by (1) misrepresenting the inventors of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

'161 patent and the '154 patent, and (2) failing to disclose the inventorship dispute between Astra[FN11] and it competitor Lejus.[FN12] Defendants argue that this information about inventorship was material to the prosecution of the patents.

> FN11. This dispute was actually between Hassle and Lejus. Hassle is now part of AstraZeneca and I will use the term "Astra" to refer to both Hassle and Astra as the parties have done in their briefs.

> FN12. Defendants' allegations of inequitable conduct arose from information uncovered in discovery concerning who originally conceived and synthesized metoprolol succinate and a dispute over inventorship of that compound.

*15 Information is material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. _Id._ at 1322 (quotations and citations omitted). Because it is a critical requirement for obtaining a patent, the issue of inventorship is highly material in the patent prosecution process. _Id._ at 1321; 35 U.S.C. § 102(f) (A person shall be entitled to a patent unless he did not himself invent the subject matter sought to be patented.). In turn, conduct that would mislead the USPTO as to the identity of the true inventors of a patent or conduct that fails to disclose information about a dispute concerning inventorship would be highly material to the question of inequitable conduct because of the patentee's duty of candor and disclosure. _See_ 37 C.F.R. § 1.56 ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section.").

*16 Disputes concerning inventorship are material information that need to be disclosed. _PerSeptive Biosystems, Inc.,_ 225 F.3d at 1321 (citing Manual of Patent Examining Procedure § 2001.06(c) and § 2004). Because conduct concerning inventorship is so highly material, less evidence of intent is required in

order to find that inequitable conduct has occurred.

*Inventorship of metoprolol succinate*

*16 The compound metoprolol was invented in the 1960's by Hassle, at the time, a Swedish pharmaceutical research and development company located in Mölndal, Sweden. Metoprolol was discovered to be very useful in treating heart disease. Astra (Hassle) began work to develop a commercial metoprolol product. Astra investigated various salts of metoprolol to be used in a drug formulation. It is undisputed that in 1971, an Astra chemist named Toivo Nitenberg synthesized metoprolol succinate as well as the tartrate and sulfate salts of metoprolol. Nitenberg recorded the synthesis of these salts in his lab notebook. The tartrate salt was chosen for commercialization and became Astra's product known as Lopressor.

*16 In the 1980's Astra perceived a need for a once-daily dosing formulation of metoprolol. Because this goal could not be effectively achieved with metoprolol tartrate, Astra formed a research group to develop an extended release form of metoprolol. Curt Appelgren and Eva Eskilsson were part of that group.

*16 In 1982, Appelgren and his colleague Ulf Jonsson went to Astra's facility in Södertälje, Sweden and asked chemists there to form some metoprolol salts with a lower solubility than the tartrate for evaluation as an extended release form of metoprolol. They met with Urban Stenhede, a chemist and head of the research department. Jonsson (Astra's Rule 30(b)(6) witness)[FN13] testified in his deposition that he and Appelgren asked Stenhede to make some salts of metoprolol, other than the tartrate, with lower solubility. Jonsson testified that there was no specific request made to Stenhede to make metoprolol succinate.

> FN13. A Rule 30(b)(6) witness must be able to gives binding answers on a corporation's behalf. _Reilly v. Natwest Markets Group Inc.,_ 181 F.3d 253, 268 (2nd Cir.1999).

*16 In Appelgren's deposition, when asked about his and Jonsson's meeting with Stenhede, Appelgren could not recall specific details of the meeting. He

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

did not testify that he gave Stenhede a list of salts to make, including metoprolol succinate. But in his later filed declaration submitted in opposition to summary judgment on the issue of inequitable conduct, dated ten months after his deposition, Appelgren states that he did give Stenhede a list of salts to make that included metoprolol succinate. No such list was produced in discovery.

*16 Stenhede, in turn asked chemist Lars Lilljequist to form salts of metoprolol with a lower solubility than the tartrate salt. Lilljequist is the person who actually synthesized metoprolol succinate. In his deposition, Lilljequist did not recall who suggested which salts of metoprolol to form nor could he recall if he was given a list of salts to make. Yet he clearly testified that no one specified which acids to use to make the salts (specifying the acids to use would be another way of specifying which salt to form). (Def. Andrx's Memo in Reply Ex. 3 at 87) But in his later filed declaration submitted in opposition to summary judgment, dated seven months after his deposition, Lilljequist states that he received a list of salts to make that included metoprolol succinate.

*17 In their depositions, both Appelgren and Eskilsson testified that they were unaware that Nitenberg had formed metoprolol succinate at their company in 1971. They testified that they had never seen his lab book entry showing the formation of that salt. In her deposition, Eskilsson states that she did not recall asking anyone to make metoprolol succinate and that she never made metoprolol succinate. She also did not recall why she was a named inventor of metoprolol succinate in United States Patent Application No. 172,897 (the application that became the '161 patent and through a continuation the '154 patent). (Defs. Memo in Supp. Ex. 16 at 496) However, in her later filed declaration submitted in opposition to summary judgment, dated ten months after her deposition, she asserts that she did invent metoprolol succinate and the basis for that belief.

*17 In December 1982, Appelgren left Astra to found Lejus Medical, a Swedish pharmaceutical research and development company. A few months later Eskilsson also became employed at Lejus.

*17 On January 10, 1984, Lejus filed a patent application (SE 8400085) with the Swedish Patent Office. That application published as EP 148811 on July 17, 1985. The Swedish patent application was for delayed and extended release dosage forms of pharmaceutical compositions, including metoprolol succinate. Appelgren and Eskilsson are listed as the named inventors.

*17 On January 1, 1985, the same application was filed in the United States as United States Application No. 690,197 which issued on October 25, 1988, as the '318 patent discussed above. The '318 patent is the parent and grandparent of the patents in suit, the 161 patent and the '154 patent, respectively.

*17 When the Swedish patent application published in July 1985 it was noticed by Astra. Astra believed that metoprolol succinate had been invented by its employee Toivo Nitenberg and that extended release dosage formulations of metoprolol succinate were also Astra's invention. In an internal memorandum dated September 19, 1985, Astra's in-house counsel, Bengt Wurm, stated that it appeared Lejus was trying to appropriate Astra's claim to metoprolol succinate and extended release dosage formulations of metoprolol succinate. Wurm warned that "the important principle is that the use of metoprolol succinate became known because Lejus' [published] application was generally available on July [17], 1985, and therefore can be cited as a novelty reference with respect to later applications that concern preparations containing substances such as metoprolol succinate." (Defs.' Memo in Supp. Ex. 10) In other words, the publication could constitute potentially invalidating prior art of any subsequent Astra application seeking to patent metoprolol succinate.

*17 On October 21, 1985, Astra filed an action in the Swedish Patent Office to transfer the metoprolol succinate inventions of the Lejus' Swedish application to Astra. Astra's petition, signed by Astra's in house counsel Wurm, asserted that metoprolol succinate had not been invented by Appelgren or Eskilsson, but rather it had been invented by an Astra chemist named Toivo Nitenberg. (Defs.' Memo in Supp. Ex. 11) In 1985, Astra's petition at the Swedish Patent Office noted that Appelgren and Eskilsson merely

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

"worked with preparations for controlled release of the compound invented by Toivo Nitenberg." *Id.* In making this assertion, Wurm relied on information from John Sjogren, the head of the formulation department at Astra. (Defs.' Memo in Supp. Ex. 12)

*18 Wurm advised Astra, however, that seeking transfer of the metoprolol succinate invention under Swedish patent law could be time consuming, expensive, uncertain and of questionable future value because the Lejus publication could be cited as prior art to "later applications that concern preparations containing substances such as metoprolol succinate." (Defs.' Memo in Supp. Ex. 10)

*18 As an alternative to pursing its action in the Swedish Patent Office, Astra attempted to reach an accommodation with Lejus. In the fall of 1985, Astra approached Lejus and asserted that metoprolol succinate (and its pharmaceutical compositions) had not been invented by Appelgren and Eskilsson but had, in fact, been invented by Nitenberg at Astra. Lejus did not dispute Astra's claim. Lejus agreed to file new patent applications on the metoprolol succinate inventions (to be carved from the 1984 Swedish patent application and each of its foreign counterparts, e.g. the '318 patent application) and then assign these applications to Astra. In exchange Astra agreed to withdraw its ownership claim with the Swedish Patent Office claiming that Toivo Nitenberg was the actual and sole inventor of metoprolol succinate. In April 1986, Astra and Lejus entered a written agreement incorporating these terms.

*18 Prior to the signing of the formal agreement, Lejus had already filed, in January 1986, the required new application in Sweden on the metoprolol succinate inventions (Swedish Patent Application No. 8600202-9).

*18 Wurm was succeeded by Rune Nasman as Astra's in-house attorney. On February 12, 1988, almost two years after Astra and Lejus entered the agreement regarding the metoprolol inventions, Nasman wrote two letters to Lejus' outside patent agent Ulf Inger still asserting that Toivo Nitenberg was the sole inventor of metoprolol succinate. In the first letter, entitled "Metoprolol succinate-divided application in

the United States," Nasman reasserts Astra's position that Toivo Nitenberg was *the* inventor of metoprolol succinate ("As we understand it, and as was stated in the objection to the Swedish Patent Office, *the inventor is Toivo Nitenberg,* employed by Hassle.") (emphasis added) (Defs.' Memo in Supp. Ex. 23)

*18 In the second letter of February 12th, entitled "Swedish patent application 8600202-9, AB Hassle," Nasman tells Inger that Toivo Nitenberg should be named as the inventor of metoprolol succinate. He states that Appelgren and Eskilsson can remain as co-inventors with Nitenberg because the application also "pertains to a pharmaceutical composition, and Appelgren and Eskilsson appear to have invented a special form of pharmaceutical composition under this patent claim." (Defs.' Memo in Supp. Ex. 24)

*18 On March 25, 1988, a little over a month after Nasman sent these letters, Lejus filed United States Patent Application No. 172,897 (which became the '161 patent). This application was the United States counterpart to the Swedish Application No. 8600202-9 discussed in Nasman's letters. Like its Swedish counterpart, the United States application claimed: 1) metoprolol succinate and 2) "a pharmaceutical composition, characterized in that the active compound is metoprolol succinate." The named inventors were Appelgren and Eskilsson. The application was filed as a continuation-in-part of United States Patent Application No. 690,197 (which became the '318 patent). By filing the application as a continuation-in-part of the '197 application and naming the same inventors, the '897 application was entitled to priority to the earlier filing date of the '197 application, January 10, 1985. A material benefit of the January 10, 1985, filing date would be to avoid a potential hurdle of prior art revealed in the publication of EP 148811 on July 17, 1985. The issue of a potential prior art problem had been specifically identified by Wurm two and a half years earlier in his September 19, 1985 internal memorandum at Astra.

*19 On May 31, 1988, *two months after* the '897 application is filed in the United States, Nasman writes another letter to Inger stating that he looks forward to Lejus' assignment of the European and United States metoprolol succinate patent applications to Astra per

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

their agreement. Nasman again reemphasizes Astra's desire for Nitenberg to be named as the inventor of metoprolol succinate because *"[t]here can be no doubt* that the invention as specified in claim 1 was made in connection with Toivo Nitenberg's synthesis of the salt." (emphasis added) (Defs. Memo in Supp. Ex. 25.) He further states that Appelgren's and Eskilsson's roles as inventors to claim 2 (a generally specified pharmaceutical composition of metoprolol succinate) "should be limited to the special form of pharmaceutical composition that is specified in Lejus' original application." *Id.*

**\*19** In late 1988, the prosecution of the '897 patent application was transferred from Lejus' United States patent counsel to Astra's United States patent counsel, Edward Filardi. On January 9, 1989, Nasman wrote to Filardi for advice with respect to inventorship, which Nasman described as an *"open question"* with respect to the '897 application. (emphasis added) (Defs. Memo in Supp. Ex. 27) His letter states, in pertinent part, as follows:

**\*19** The background, to my knowledge, is that meto-prolol [succinate] was first synthesized on September 6, 1971 by the Hassel chemist Toivo Nitenberg. I enclose a copy of Mr. Nittenberg's lab protocol of the synthesis (in Swedish).

**\*19** In 1985 we discovered that a Swedish patent application (no. 8400085-0) filed by Lejus Medical AB and naming two former Hassle employees, Kurt Appelgren and Christina Eskilsson, mentioned metoprolol succinate as an active component for an invented pharmaceutical composition. Hassle took action against Lejus in the Swedish patent office asserting rights under the patent based on Hassle's view that the invention of metoprolol succinate was made by Mr. Nitenberg and that Appelgren and Eskilsson had used secret Hassle know-how in making reference to metoprolol succinate in the Lejus patent application. After negotiations between the parties a settlement was reached stipulating inter alia that Lejus w[as] to divide out the parts of their applications pertaining to metoprolol succinate into separate applications, which were to be assigned to Hassle, and that Hassle w[as] to withdraw all actions for rights under the patents.

**\*19** As I understand it, there remains an open ques-

tion who is the proper inventor of the invention claimed in the instant U.S. patent application [the '161 patent application], and your advice on this would be appreciated. I may inform you that we have [u]nofficially proposed to Lejus, via Ulf Inger, to add Mr. Nitenberg as an inventor in the Swedish counterpart to the instant application, but so far Lejus h[as] not agreed to do this.

**\*19** *Id.* The letter does not inform Filardi that Astra also sought to have Lejus name Nitenberg as the inventor of metoprolol succinate in the United States patent applications. *See* Nasman's letters to Inger above.

**\*20** On January 10, 1989, Filardi sent a letter to Nasman stating that he discussed the inventorship issue with Peder Berntsson and Gerhard Miksche but had several questions that could not be resolved. (Defs.' Memo in Supp. Ex. 28) Filardi proposed that he call Nasman the next day, January 11, 1989, with Berntsson and Miksche participating in the call, to discuss the issue further.

**\*20** The call was made on January 11th. Nasman writes a letter to Filardi the same day referring to patent application '897 (and two other applications). (Defs.' Memo in Supp. Ex. 29) The letter refers to "the very useful telephone conversation today with you." Berntsson, Miksche, and a Margareta Linderoth also participated in the call. The issue of inventorship is not mentioned in the letter. This letter ends the paper trial of how the open question of inventorship was addressed by Nasman and Filardi.

**\*20** On April 19, 2005, Filardi was deposed for this lawsuit. He was asked if he reviewed documents in preparation of his deposition. He said that he had and that some of the documents helped refresh his recollection of what occurred during the prosecution of the patent applications as issue. He testified that he could not recall anything that was said during the January 11, 1989 telephone call with Nasman. He specifically states that he could not recall anything that was said about the inventorship of the '897 application. He could not recall if he did, or did not, render any opinion regarding inventorship of the '897 application during the phone call. Aside from Nasman's January

11th letter, the record does not contain any other contemporaneous evidence of Filardi's advice regarding the "open question" of inventorship raised by Nasman.

**\*20** Astra states that Peder Berntsson was Nitenberg's boss at Astra and was very familiar with Nitenberg's synthesis of metoprolol succinate. Berntsson met with Filardi on January 10th and was involved in the conversations between Nasman and Filardi on January 11th. However, there is no evidence in the record of what Berntsson specifically discussed with Filardi on January 10th and 11th. Berntsson has submitted a declaration in opposition to summary judgment on the issue of inequitable conduct. Berntsson's declaration does not mention these meetings with Filardi. Nor does it reveal that he ever provided any information to Filardi or Nasman about inventorship of metoprolol succinate.

**\*20** According to Astra's memorandum in opposition to summary judgment:

**\*20** During the January 11 telephone call, Filardi advised Nasman with the requested legal advice on inventorship. In particular, Filardi advised Nasman that, in his opinion, Nitenberg was not an inventor or co-inventor of metoprolol succinate, that there was no doubt about it, that none of the information set forth in Nasman's letter to Filardi was material, and that, therefore, the information did not need to be disclosed to the USPTO.

**\*20** (Pls.' Memo in Opp. at 20) Astra cites to the declarations of Nasman and Filardi in support of this assertion.

**\*21** Astra's assertion of what was discussed during the January 11th phone call is not supported by the record in this case. In his deposition, Filardi stated that he had no recollection of what was discussed about inventorship in his conversation with Nasman on January 11th. Filardi made a declaration, however, three months after his deposition which has been submitted in opposition to summary judgment. In pertinent part of his declaration concerning the inventorship issue, Filardi does not state that he recalls what happened but rather what is "clear" to him based on review of some documents. In other words, Filardi

still does not recall the relevant conversation. Filardi never declares what he actually knew, considered or said. His declaration reflects that he is surmising or guessing at what he must have told Nasman.

**\*21** For example he states that based on the contemporaneous documents:

**\*21** *it is clear* that I considered the five items of information provided to me by Mr. Nasman and consulted with a senior Astra scientist who knew Mr. Nitenberg; I concluded that, under U.S. law, Mr. Nitenberg was not an inventor.

**\*21** *it is clear* to me that I gave an opinion to Mr. Nasman that Mr. Nitenberg was not an inventor

**\*21** *it is clear* to me that I concluded that the information provided to me by Mr. Nasman, including the assertions he had made to Lejus that he considered Nitenberg to be an inventor under Swedish law, were not "material" under Rule 56 and need not be disclosed to the USPTO.

**\*21** (emphasis added) (Declar. of Filardi ¶ 10) Also, "I believe that I discussed the question of inventorship with Astra's Peder Berntsson and Astra's Gerhard Miksche, both of whom happened to be in my New York City offices on another Astra matter." (Declar. of Filardi ¶ 12) These are not recollections of what happened but rather are a guess of what must have of happened in Filardi's opinion. I find that this declaration contradicts Filardi's deposition testimony about his recall of events and should be discounted. *See Dotson v. Delta Consol. Industries, Inc.,* 251 F.3d 780, 781 (8th Cir.2001) (a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition).[FN14]

> FN14. I note here that Astra has maintained a pattern of submitting witness declarations that contradict their own deposition testimony. For example, compare Appelgren's deposition testimony that he could not recall the particulars of his meeting with Stenhede in Södertälje with his post-deposition declaration that he provided a list of salts to make which included metoprolol succinate. This declaration contradicts not only Appelgren's deposition responses but also the deposition

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

of Astra's Rule 30(b)(6) witness, Ulf Jonsson, who stated that when he and Appelgren met with Stenhede they did not specifically direct him to make metoprolol succinate. A party cannot avoid summary judgment by filing a declaration that contradicts that party's Rule 30(b)(6) deposition testimony. *See Rainey v. American Forest and Paper Ass'n, Inc., 26 F.Supp.2d 82, 95 (D.D.C.1998).* In his deposition, Lilljequist did not recall who suggested which salts of metoprolol nor could he recall if he was given a list of salts to make. Yet he clearly stated that no one specified which acids to use to make the salts (specifying the acids to use would be another way of specifying which salt to form). Yet in his post-deposition declaration he states that he did receive a list of salts to make that included metoprolol succinate. Similarly, in her deposition Eskilsson could not recall why she was a named inventor of metoprolol succinate. Yet in her post-deposition declaration she asserts that she did invent metoprolol succinate and the basis for her belief.

**\*21** Even if I were to ignore Filardi's deposition testimony and I were to rely solely on Filardi's declaration, Filardi's conclusion that "there was no inventorship issue for the USPTO to decide" (Declar. of Filardi ¶ 12) is flawed because it is undisputed that Filardi was not provided with all of the facts or documents regarding the inventorship dispute. Two assumptions made by Filardi in his declaration highlight the lack of full disclosure made by Astra to Filardi which materially prevented Filardi from being fully apprised of the inventorship dispute.

**\*21** The first assumption concerns the question of what Filardi was told about the inventorship dispute with Lejus regarding Appelgren and Eskilsson. In his declaration, Filardi states that he "does not recall being aware of *any information* that called into question whether Appelgren and Eskilsson were the true and correct inventors." (emphasis added) And that *"the only question raised by Astra* was whether, under U.S. law, Nitenberg should be *added* as an additional inventor ...." (emphasis added) (Declar. of Filardi ¶

10)

**\*22** The reason that Filardi's is not able to recall "any information that called into question" Appelgren's and Eskilsson's roles as inventors is that it is undisputed that Astra never gave Filardi copies of Nasman's letters to Ulf Inger dated February 12, 1988 and May 31, 1988. Astra's contention that Appelgren and Eskilsson did not invent metoprolol succinate was the subject of a long-running dispute between Astra and Lejus. As discussed above, Nasman's letters clearly assert that Nitenberg is *the* inventor of metoprolol succinate and that Appelgren's and Eskilsson's inventorship *"should be limited* to the special form of pharmaceutical composition that is specified in Lejus' original application" which is claim 2 of the Swedish and United States applications. (emphasis added)

**\*22** In addition, Astra initiated an action in the Swedish Patent Office asserting that Nitenberg was true inventor of <u>metoprolol</u> succinate and that Appelgren and Eskilsson merely "worked with preparations for controlled release of the compound invented by Toivo Nitenberg." (Defs.' Memo in Supp Ex. 11) It is undisputed that Astra did not give Filardi a copy of the Swedish Patent Office submission filed by Astra contesting the Lejus patent based on the dispute over inventorship. It is also undisputed that Astra did not provide Filardi with a copy of the agreement reached between Astra and Lejus regarding dividing up the patents.

**\*22** Based on Filardi's "recollection" of events, it is apparent that he was not told the whole story of the long-running dispute between Astra and Lejus concerning who invented metoprolol succinate. Because Filardi "had no information that would cause [him] to question whether Appelgren and Eskilsson were the correct inventors ... there is nothing to indicate to [him] that any further "inquiry" into the issue was needed." *Id.* at ¶ 17. As a result of Astra's undisputed failure to fully disclose to Filardi Astra's position that Appelgren and Eskilsson did not invent metoprolol succinate, Filardi did not attempt to interview them or investigate the role of Stenhede and Lilljequist (the chemists at Södertälje) regarding its invention.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 19
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

**\*22** The second flawed assumption involves putting the horse before the cart or, at best, circular reasoning. In his declaration, Filardi states that **\*22** it made no difference as to priority whether Nitenberg was added or not added [as an inventor to the U.S. application] as a far as claiming priority on the January 1985 U.S. priority application. In either case, the '161 patent would have been entitled to at least the January 1985 U.S. priority date, which is prior to the July 1985 publication date of the Lejus Swedish application.

**\*22** (Declar. of Filardi ¶ 18) Astra had not given Filardi a copy of the September 19, 1985, memorandum drafted by Wurm highlighting the fundamental issue that the "use of metoprolol succinate became known because Lejus' [published] application was generally available on July [17], 1985, and therefore can be cited as a novelty reference" to any of Astra's future claims concerning metoprolol succinate. Because Filardi was not provided with the memorandum he was not informed of Wurm's concern that even a victory in the Swedish Patent Office regarding inventorship may be hollow because of the prior art effect of the Lejus publication.

**\*23** Without this information, Filardi could not have appreciated that Astra's later equivocation of the inventorship issue in January 1989 might need to be disclosed to the USPTO, or at a minimum, might require further investigation as to the true inventor of metoprolol succinate. Because Filardi's legal analysis was directed toward the sole issue of *adding* Nitenberg as an inventor in the '897 patent application, he not aware that there was a genuine dispute that Appengren and Eskilsson were improperly named inventors and that the '897 application may not be entitled to priority to the January 1985 United States application.

**\*23** If Astra had prevailed with either the Swedish Patent Office or with Lejus in naming Nitenberg as the sole inventor of metoprolol succinate, the claim to metoprolol succinate (in the '161 patent application and in the '154 patent application) would not have been entitled to priority to the January 1985 United States application which listed only Appelgren and Eskilsson as inventors. So Filardi's statement in his

declaration that adding Nitenberg made no difference would be correct if either Appelgren and Eskilsson were also still a named inventor. Filardi's statement would be incorrect, however, if Nitenberg replaced both Appelgren and Eskilsson as the inventor. Astra did not give Filardi a chance to consider such a scenario because it failed to provide him with the complete facts concerning its three year dispute with Lejus about inventorship.

**\*23** Based on the Astra's failure to fully disclose the inventorship dispute to Filardi, I find that Filardi was prevented by Astra from considering information that would have led to a disclosure of the inventorship dispute to the USPTO.

**\*23** Astra has submitted a declaration of then in-house counsel Nasman in opposition to summary judgment. Defendants assert that this evidence should not be considered based on Astra's failure to identify Nasman as a person with information regarding the inventorship dispute in Astra's Rule 26(a) disclosures and in responses to Defendants' discovery requests.

**\*23** Even if I were to consider Nasman's declaration, however, it does not change my conclusion that he and Astra failed to be fully candid in providing information to Filardi so that Filardi could make informed decisions regarding the duty of candor and disclosure to the USPTO. Nasman's declaration states in a conclusory fashion that during the telephone call of January 11, 1989, Filardi provided him with advice on the issue of inventorship and that based on Filardi's advice Nitenberg "was not an inventor and that Mr. Appelgren and Ms. Eskilsson were the proper inventors." (Declar. of Nasman at ¶ 17) Because Nasman and Astra failed to provide Filardi with all the information that Astra had regarding its concern with Lejus' July 17, 1985 publication and Astra's three-year inventorship dispute with Lejus (seeking not just to *add* Nitenberg to the patent applications but asserting that Nitenberg be named as *the* inventor of metoprolol succinate) Filardi's advice cannot be relied upon by Nasman to justify his conclusion concerning inventorship.

**\*24** Nasman's declaration further states that he concluded from his own investigation that Nitenberg

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

should not be a named inventor. However, in his deposition taken after this declaration was made, Nasman states that his investigation consisted of (1) reviewing the Nitenberg lab protocol document, (2) reviewing the Lejus Swedish Application to which Astra claimed priority, and (3) talking to Filardi by telephone in January 1989. (Defs. Reply Memo. Ex. 11 at 66, 73, and 77) I need not consider the contradictions between Nasman's declaration and his deposition testimony. Whether Nasman conducted a minimally competent investigation as to who invented metoprolol succinate does not matter at this stage of the lawsuit. In the present summary judgment context, the question of whether the correct inventors were named in the patents in suit is secondary because the undisputed question of inequitable conduct centers around the failure of Astra to inform the USPTO about its long-running inventorship dispute with Lejus. It is undisputed in the record that Nasman and Astra failed to fully disclose material information to its United States patent counsel, Filardi, concerning Astra's inventorship dispute with Lejus.

*A finding of inequitable conduct*

**\*24** Contradictory evidence abounds concerning whether Appelgren and Eskilsson were the true inventors of metoprolol succinate. Although the contradictions are predominately created by Astra's post-deposition declarations and are subject to be discounted, enough material facts are in dispute to prevent summary judgment on the issue of whether Astra submitted false information regarding inventorship to the USPTO.

**\*24** Clear and convincing evidence, however, has established that Astra and Lejus were engaged in an prolonged dispute over inventorship of metoprolol succinate and this dispute was not disclosed to the USPTO. The undisputed documents establish that the dispute regarding inventorship spanned more than a three-year period. Inventorship is very material information in a patent prosecution. There was a substantial likelihood that a reasonable examiner would have considered the inventorship dispute between Astra and Lejus important in deciding whether to allow the '161 and '514 patent applications to issue.

**\*24** *Each individual* associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the USPTO, which includes a duty to disclose to the USPTO all information known to that individual to be material to patentability as defined in this section. 37 C.F.R. § 1.56. "Close cases should be resolved by disclosure, not unilaterally by the applicant." *LaBounty Mfg., Inc. v. United States International Trade Commission, 958 F.2d 1066, 1076 (Fed.Cir.1992).* Disputes concerning inventorship are material information that need to be disclosed. *PerSeptive Biosystems, Inc., 225 F.3d at 1321.*

**\*24** On March 25, 1988, Lejus filed, on Astra's behalf, the '897 (which became the '161 patent and the '154 patent) naming Appelgren and Eskilsson as inventors. At that time Astra had been asserting to Lejus for more than two years that Nitenberg had solely invented metoprolol succinate through letters and by initiating an inventorship dispute with the Swedish Patent Office. *Even after the patent application was filed* Astra's counsel wrote to Lejus to demand that Nitenberg be listed as *the* inventor of metoprolol succinate in the European and United States patent applications filed per their agreement.

**\*25** Yet Lejus failed to disclose this long-running material dispute to the USPTO in its filing and prosecution of the '897 application. Nor did Astra disclose this information to the USPTO. Although Astra's United States patent counsel, Filardi, believed he made all of the disclosures necessary, Astra failed to provide him with important and material information concerning its dispute with Lejus. Astra cannot benefit from its failure to disclose material information to its United States patent counsel and then hide behind its argument that he acted in good faith and candor in his prosecution of the patent. It was Astra's own failure to disclose which led Filardi to believe he was disclosing all information known to be material to patentability. Astra's employee Nasman was an individual associated with the filing and prosecution of the patent application and had a duty of candor and good faith to the USPTO. Nasman was fully aware of the extent of the inventorship dispute. Nonetheless, Nasman and Astra failed to fully disclose the inventorship dispute with Lejus to Filardi which prevented

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 21
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

the possibility of the dispute from being disclosed to the USPTO.

**\*25** I do not believe that the question of whether to disclose the inventorship dispute was a close call. To find otherwise is to find that Astra's filing with the Swedish Patent Office and its three-year dispute with Lejus were pursued in bad faith.

**\*25** Not only was the issue of the dispute of inventorship highly material, Astra had a strong incentive to not disclose the dispute. If a patent examiner had learned of the dispute and found Nitenberg to be the sole inventor of metoprolol succinate, the '897 patent application would not have been entitled to priority to the January 1985 United States application. The effective filing date for the '897 patent would have been March 25, 1988. As a consequence, Astra's metoprolol succinate patents may have been denied as anticipated by the prior art of the publication of the Lejus' European application on July 17, 1985.

**\*25** I find by clear and convincing evidence that the inventorship dispute between Astra and Lejus was highly material and should have been disclosed to the USPTO during the prosecution of the patents in suit. I also find by clear and convincing evidence that Astra's motivation to not reveal the dispute was great based on the risk of losing its metoprolol succinate inventions as anticipated by prior art. The intent to deceive is clearly present. Afer weighing materiality and intent I find that Astra's conduct was so culpable that its '161 patent and '154 patent are unenforceable.

*Conclusion*

**\*25** I find by clear and convincing evidence that Astra's '161 patent and ''154 patent are invalid on the basis of double patenting over the '318 patent. I also find by clear and convincing evidence that the '161 patent is not entitled to priority to the '318 patent application filing date. As a consequence I find that the '161 patent is invalid as anticipated.

**\*26** Finally, I find by clear and convincing evidence that the '161 patent and '154 patent are unenforceable based on Astra's inequitable conduct in the prosecution of these patents in the United States Patent and Trademark Office. Astra failed to disclose to the

USPTO the material dispute it had with Lejus concerning inventorship of metoprolol succinate. The failure to disclose was done with an intent to deceive the patent examiner as to this material dispute. Astra failed to provide material information in order to avoid questions concerning Astra's ability to claim priority to the '318 patent application and to avoid potential prior art concerning metoprolol succinate.

**\*26** Accordingly,

**\*26** IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment of Invalidity [# 120] is GRANTED. Plaintiffs' Motion for Partial Summary Judgment of No Invalidity of United States Patent 5,081,164 for Double Patenting [# 297] is DENIED.

**\*26** IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment Seeking a Declaration that United States Patent Nos. 5,001,161 and 5,081,154 are Unenforceable for Inequitable Conduct [# 241] is GRANTED.

**\*26** IT IS FURTHER ORDERED that all other pending motions in this case are DENIED as moot.

E.D.Mo.,2006.
In re Metoprolol Succinate Patent Litigation
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3726145 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to Astra's Motion (D.I. 297) for Partial Summary Judgment That U.S. Patent No. 5,081,154 is Not Invalid for Double Patenting (Oct. 6, 2005) Original Image of this Document (PDF)
• 2005 WL 3726144 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to defendants' Motion for Summary Judgment Ÿ#1201˜ (Feb. 14, 2005) Original Image of this Document (PDF)
• 2005 WL 3726341 () Expert Declaration of Gerald S. Brenner. Ph.D. (Feb. 11, 2005)
• 2005 WL 3726143 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 120343 (E.D.Mo.)
(Cite as: Not Reported in F.Supp.2d)

Their Motion to Compel Supplemental Responses to Interrogatories (Feb. 1, 2005) Original Image of this Document (PDF)
• 2005 WL 3726142 (Trial Motion, Memorandum and Affidavit) Plaintiffs Astrazeneca's Memorandum in Opposition to Andrx's Motion to Compel Plaintiffs to Answer 30(b)(6) Deposition Questions and Sanctions Against Plaintiffs (Jan. 6, 2005) Original Image of this Document (PDF)
• 2004 WL 3682640 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Motion for Summary Judgment of Invalidity (Dec. 30, 2004) Original Image of this Document (PDF)
• 2004 WL 3682650 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Motion to Compel Production of Patent Prosecution Documents (Dec. 13, 2004) Original Image of this Document (PDF)
• 2004 WL 3682663 (Trial Pleading) Eon's Second Amended Answer to Amended Complaint (Dec. 7, 2004) Original Image of this Document (PDF)
• 2004 WL 3682649 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Support of its Motion to Compel Production of Patent Prosecution Documents (Dec. 2, 2004) Original Image of this Document (PDF)
• 2004 WL 3682662 (Trial Pleading) First Amended Answer and Counterclaim (Dec. 2004) Original Image of this Document (PDF)
• 2004 WL 3682647 (Trial Motion, Memorandum and Affidavit) Defendants', Andrx Corporation and Andrx Pharmaceuticals, LLC, Memorandum in Support of Their Motion to compel the Designation and Production of 30(b)(6) Witnesses (Nov. 15, 2004) Original Image of this Document (PDF)
• 2004 WL 3682644 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Motion to Compel Production of Patent Prosecution Documents (Oct. 7, 2004) Original Image of this Document (PDF)
• 2004 WL 3682645 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendant's Motion to Compel Answers to Interrogatories (Oct. 7, 2004) Original Image of this Document (PDF)
• 2004 WL 3682646 (Trial Motion, Memorandum and Affidavit) Defendants', Andrx Pharmaceuticals, LLC and Andrx Corporation, Memorandum in Support of Motion to Compel Plaintiffs to Answer Interrogatories, Respond to Requests for Admissions and Produce Documents (Oct. 7, 2004) Original Image of this Document (PDF)
• 2004 WL 3682642 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Support of Its Motion to Compel Production of Patent Prosecution Documents (Oct. 1, 2004) Original Image of this Document (PDF)
• 2004 WL 3682643 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Its Motion to Compel Andrx to Produce Documents and Answer Interrogatories (Oct. 1, 2004) Original Image of this Document (PDF)
• 2004 WL 3682641 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendants' Motion for Judgment on the Pleadings of no Willful Infringement (Sep. 28, 2004) Original Image of this Document (PDF)
• 4:04md01620 (Docket) (Aug. 11, 2004)
• 2004 WL 3690593 () Expert Declaration of Gerald S. Brenner, Ph.D. (2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB F



"Williamson , John"
<John.Williamson @finnegan
.com>

02/05/2007 12:09 PM

To   <edward.reines@weil.com>

cc   <steven.cherny@lw.com>

Subject   RE: Pretrial Statement

Ed,

On your first point, Finnegan, Henderson will represent Dr. Chao in response to your subpoena.

On your second point, we believe that it is premature to meet and confer at this stage. If, after the defendants have considered the relief requested in Telcordia's motions, the defendants determine that they will stipulate to some or all of the requested relief, we will be happy to meet and confer with you at that time.

Finally, we received no response to our February 1 email asking the defendants to raise any issues regarding due dates, requested extensions, etc., for their portion of the draft joint pretrial order before the end of the week last week. As such, we expect to receive the defendants' complete portion of the draft final joint pretrial order on February 8 as set forth in our stipulation.

Regards,

John

**From:** edward.reines@weil.com [mailto:edward.reines@weil.com]
**Sent:** Friday, February 02, 2007 9:11 PM
**To:** Williamson, John
**Cc:** steven.cherny@lw.com
**Subject:** RE: Pretrial Statement

John,

Thank you for the response on these two points. Because we served Dr. Chao with a trial subpoena today, the service issue is now moot. Although you describe Dr. Chao as independent of Telcordia, do you still represent him in this matter?

Regarding Telcordia's potential limines, is Telcordia planning to meet and confer?

# EXHIBIT 5

**RESPONSE TO TELCORDIA'S MOTION *IN LIMINE* NO. 5
RE: DEPOSITION TESTIMONY OF THIERRY HOUDOIN**

Telcordia's motion asks the Court to preclude Defendants from introducing the deposition transcript of Thierry Houdoin, who appears on Telcordia's own witness list and for whom Telcordia has designated testimony for use in its case-in-chief. After apparently having a last-minute change-of-heart regarding the usefulness of Mr. Houdoin's transcript, Telcordia now argues that the testimony it has designated is hearsay because Telcordia did not have an adequate opportunity to cross-examine Mr. Houdoin. However, the record reveals that Telcordia had ample opportunity to cross-examine Mr. Houdoin, and that Telcordia never took any concrete steps to obtain additional cross-examination opportunities. Moreover, contrary to Telcordia's urging, the deposition of Mr. Houdoin was not conducted in an unfair or inequitable manner. Telcordia's motion should thus be denied.

**I.    MR. HOUDOIN'S DEPOSITION TESTIMONY IS NOT HEARSAY BECAUSE TELCORDIA HAD AMPLE OPPORTUNITY TO CROSS-EXAMINE HIM**

"The principle requiring a testing of testimonial statements by cross-examination has always been understood as requiring, not necessarily an actual cross examination, but merely an *opportunity to exercise the right to cross-examine* if desired." 5 Wigmore, Evidence § 1371 at 55 (emphasis in original); *see also De Luryea v. Winthrop Labs., Div. of Sterling Drug, Inc.*, 697 F.2d 222, 227 (8th Cir. 1983) ("Opportunity and motivation to cross-examine are the important factors, not the actual extent of cross-examination.").

Telcordia had more than sufficient opportunity to exercise its right to cross-examine Mr. Houdoin. The deposition of Mr. Houdoin took place on April 5, 2006. Telcordia contends that it did not have adequate time at that deposition to cross-examine Mr. Houdoin. Even assuming Telcordia's argument were valid, Telcordia had, but utterly failed to pursue, the opportunity to seek additional cross-examination time on a different day.

Depositions in this litigation were ongoing through the early part of July, and Telcordia thus had roughly three months to pursue additional testimony from Mr. Houdoin. Telcordia took no such steps. Telcordia did not (1) e-mail, telephone, or send a letter to Cisco, Lucent or

1

Alcatel, requesting an opportunity to take additional testimony from Mr. Houdoin; (2) make any efforts to contact France Telecom, Mr. Houdoin's employer, to see if they would make him available for additional deposition time as they had done on April 5; (3) subpoena Mr. Houdoin through procedures outlined in the Hague Convention; or (4) seek this Court's assistance in obtaining additional testimony from Mr. Houdoin. Other than its designation of Mr. Houdoin's testimony and exhibits from his deposition in its portion of the Pretrial Order, Telcordia's motion *in limine* represents the first time Telcordia has even mentioned Thierry Houdoin since that initial trip to France in early April.

To try and neutralize its lack of diligence, Telcordia points to nothing more than the perfunctory "preservational" objections it made during the deposition of Mr. Houdoin and the deposition of a completely different witness two days later. In making those objections, Telcordia identified no particular topics it still needed to cover with Mr. Houdoin or any specific deficiencies in the cross-examination that it did conduct with Mr. Houdoin. Indeed, Telcordia could not even provide a generalized description of its evidentiary needs or an estimate of how much additional time it would require with Mr. Houdoin. Exh. 5-A [Houdoin Depo.] at 132:23-133:11.

Nevertheless, Telcordia belatedly attempts to manufacture substance for its objections by listing four topics in its motion that it was allegedly "prevented" from exploring. This Court should place little weight on such after-the-fact rationalizations. *See Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 552 (5th Cir. 2000) (in considering the "motive" prong of the former testimony hearsay exception noting that the "availability of cross-examination opportunities that were forgone is one factor to be considered, but is not conclusive because examiners will virtually always be able to suggest lines of questioning that were not pursued at a prior proceeding").

These facts illustrate that Telcordia had no genuine interest in pursuing additional testimony from Mr. Houdoin. Rather, Telcordia's motion is nothing more than an eleventh-hour

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

attempt to selectively remove evidence it recently decided was bad for its case even though Telcordia designates Mr. Houdoin's testimony for use in its case-in-chief.

## II.    MR. HOUDOIN'S DEPOSITION WAS NOT SCHEDULED NOR CONDUCTED IN AN UNFAIR OR INEQUITABLE MANNER

Telcordia alleges various inequities in the scheduling and execution of Mr. Houdoin's deposition. However, even assuming that these alleged injustices had merit, Telcordia cites no authority suggesting that they provide grounds for the exclusion of Mr. Houdoin's deposition transcript. For instance, Telcordia states that Alcatel cancelled the deposition of Mr. Houdoin, only to declare "unilaterally" on April 3, 2006, that Mr. Houdoin would be deposed two days later. In fact, on March 23, 2006, Alcatel apprised Telcordia that they were working to reschedule Mr. Houdoin's deposition so that it could be done in a timeframe coinciding with the deposition of Jean-Yves Cochennec and Pierre Adam on April 6-7, 2006. Thus, Telcordia had roughly two-weeks notice of the approximate date of Mr. Houdoin's deposition, and is in no position to complain that they were prejudiced by delayed notice of Mr. Houdoin's deposition date. *See Pearl v. Keystone Consol. Indus., Inc.*, 884 F.2d 1047, 1052 (7th Cir. 1989) (noting that six days notice of a deposition is sufficient in "this day of jet travel"); D. Del. L.R. 30.1 (requiring five days notice of deposition).

Telcordia further implies that it was prejudiced by its inability to conduct a pre-deposition interview with Mr. Houdoin, a neutral third-party witness. Telcordia points to no correspondence or any other evidence showing that it ever requested its own pre-deposition interview. To the extent Defendants met with Mr. Houdoin prior to his deposition, it was a meeting *voluntarily* attended by Mr. Houdoin merely so that counsel could educate him regarding the purposes and procedures of depositions in the American legal system. *See* Exh. 5-B [Adam Depo.] at 87:13-94:20. Telcordia had, but failed to pursue, the opportunity to seek its own interview of Mr. Houdoin. And, in any event, Telcordia provides no authority whatsoever stating that it is entitled to such a pre-deposition interview of a third-party witness.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

Ultimately, Telcordia's story of unfairness is woefully inadequate to support exclusion of Mr. Houdoin's deposition transcript in light of its total lack of diligence in pursuing an effective cross-examination of Mr. Houdoin. *See Pearl*, 884 F.2d at 1052 (holding that a party who had six days' notice of a deposition, did not move to delay the deposition, and did not attend the deposition had "opportunity" to cross-examine the deponent and could not later complain that its absence at the deposition made the deposition transcript inadmissible). Telcordia has not identified any persuasive reason to exclude Mr. Houdoin's testimony from trial.

4

# TAB A

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

TELCORDIA TECHNOLOGIES, INC.,                )
                                             )
                                             )
    Plaintiff/Counterclaim Defendants,       )
                                             )
            -against-                        )
                                             )
ALCATEL S.A. and ALCATEL USA, INC.,          )
                                             )
    Defendants/Counterclaim Plaintiffs.      )
                                             )
Civil Action No. 04-874 (GMS)                )
_____              )

         Videotaped deposition of THIERRY HOUDOIN

    held at the offices of Weil Gotshal & Manges,

    2, rue de la Baume, Paris, France, on

    Wednesday, April 5, 2006, commencing at

    1:49 p.m., before Steven Faigenbaum, Legal

    Video Specialist; Joanna Dezio, French/English

    Interpreter; and James W. Johnson, Registered

    Professional Reporter and a Notary Public of

    the State of New York.

## Page 2

APPEARANCES:

FINNEGAN HENDERSON FARABOW
GARRETT & DUNNER LLP
   Attorneys for the Plaintiff
   Two Freedom Square
   11955 Freedom Drive
   Reston, Virginia 20190-5675
   BY:  JAMES K. HAMMOND, ESQ.
      (202) 251-6332, james.hammond@finnegan.com

KENYON & KENYON LLP
   Attorneys for Defendant Alcatel
   One Broadway
   New York, New York 10004-1007
   BY:  STUART J. SINDER, ESQ.
      (212) 908-6151, ssinder@kenyon.com
      - and -
   MARK A. HANNEMANN, ESQ.
      (212) 908-6238, mhannemann@kenyon.com

WEIL GOTSHAL & MANGES LLP
   Attorneys for Defendant Cisco
   201 Redwood Shores Parkway
   Redwood Shores, California 94065
   BY:  EDWARD R. REINES, ESQ.
      (650) 802-3022, edward.reines@weil.com
LATHAM & WATKINS LLP
   Attorneys for Defendant Lucent
   Sears Tower, Suite 5800
   233 South Wacker Drive
   Chicago, Illinois 60606-6401
   BY:  DAVID C. McKONE, ESQ.
      (312) 777-7316, david.mckone@lw.com
FRANCE TELECOM
   38-40, rue du Général Leclerc
   92794 Issy-les-Moulineaux Cedex 9
   BY:  VIVIANE SIMON, ESQ.
      Responsable de groupe Brevets
      Mandataire européen
      01.45.29.55.68
      viviane.simon@francetelecom.com

## Page 3

APPEARANCES (cont'd.):

ALSO PRESENT:
   JOANNA DEZIO, Ph.D.,
      French/English Interpreter
   JULIA DELILLE GOMORY,
      French/English Interpreter
   STEVEN FAIGENBAUM, Legal Video Specialist

## Page 4

1
2
3        IT IS HEREBY STIPULATED AND AGREED by
4   and between the attorneys for the respective
5   parties herein, that the filing and sealing of
6   the within deposition be waived.
7        IT IS FURTHER STIPULATED AND AGREED that
8   all objections, except as to the form of the
9   question, shall be reserved to the time of the
10  trial.
11       IT IS FURTHER STIPULATED AND AGREED that
12  the within deposition may be sworn to and
13  signed before any officer authorized to
14  administer an oath with the same force and
15  effect as if signed and sworn to before the
16  Court.
17            - oOo -

## Page 5

1   Houdoin
2        THE VIDEOGRAPHER:  Good afternoon.  We
3   are on the record.  The time is 1:49 p.m. on
4   the 5th of April, the year 2005.  My name
5   is -- excuse me -- 2006.  Thank you very much.
6   I'm glad you're listening.
7        My name is Stephen Faigenbaum.  I'm the
8   video operator.  I work for Global Deposition
9   Services in New York City.  We are here today
10  to take the deposition of Mr. Thierry Houdoin
11  in the matter of Telcordia Technologies,
12  Incorporated versus Alcatel SA and Alcatel
13  USA, Incorporated in the United States
14  District Court for the District of Delaware,
15  Civil Action Number 04-874.
16       The court reporter today is James
17  Johnson.  Is this deposition taken on behalf
18  of the plaintiff or the defendant?  This is a
19  defendants' deposition.
20       MR. HANNEMANN:  Correct.
21       THE VIDEOGRAPHER:  Now will the reporter
22  please swear in the interpreter and the
23  witness, and then will counsel introduce
24  themselves.
25  JOANNA DEZIO,     a French/English

2 (Pages 2 to 5)

Page 6

Houdoin

1
2    interpreter, having been first duly sworn by a
3    Notary Public, translated from English into
4    French and from French into English as
5    follows:
6    THIERRY HOUDOIN,    called as a
7    witness, having been first duly sworn by a
8    Notary Public, was examined and testified
9    under oath as follows:
10       MR. HANNEMANN:  Mark Hannemann from
11   Kenyon & Kenyon for Alcatel.
12       MR. SINDER:  Stuart Sinder from Kenyon &
13   Kenyon for Alcatel.
14       MR. REINES:  Edward Reines from Weil
15   Gotshal for Cisco.
16       MR. McKONE:  David McKone from Latham &
17   Watkins for Lucent.
18       MR. HAMMOND:  Jim Hammond from Finnegan
19   Henderson for Telcordia.
20   EXAMINATION BY MR. HANNEMANN:
21   Q.   What is your name, sir?
22       (The witness testified in English.)
23   A.   My name is Thierry Houdoin.
24   Q.   And are you appearing here today to
25   testify voluntarily?

Page 7

Houdoin

1
2    A.   Yes, I do.
3    Q.   I just asked you a question in English,
4    as I'm sure you noticed.
5        Are you comfortable -- you're
6    comfortable testifying in English at least for now;
7    is that right?
8    A.   I don't know.  I will start in English.
9    I will try to do it in English, but sometimes I
10   will need to speak in French.
11   Q.   If ever you are confused at all about
12   what my question means or about the best way to
13   phrase it in English, absolutely, we can switch to
14   French.  We have interpreters here, so that won't
15   be a problem.
16   A.   Okay.
17       MR. HAMMOND:  Mr. Hannemann, before we
18   start, I don't wish to repeat here the
19   objections that we've had to the time, manner
20   and place and other procedural aspects of this
21   deposition.
22       Just let me say that, as per our April
23   4th letter of last night and our formal
24   objections of April 3rd, 2006 and other
25   objections that we've interposed, I just want

Page 8

Houdoin

1
2    to repeat them here, incorporate them by
3    reference so that it's plain the nature of our
4    objections.
5        I don't wish to take the witness' time
6    further, so you can proceed with your
7    examination subject to our objections.
8        MR. REINES:  And this is Ed Reines from
9    Cisco on behalf of defendants.  I interpose an
10   objection to Mr. Hammond's questioning and
11   participating, because he's a witness in this
12   case.
13       MR. SINDER:  Stuart Sinder, also on
14   behalf of defendants.  I also will not burden
15   the record with our responses to the various
16   objections which Telcordia has raised in their
17   correspondence of last night and their formal
18   objections to the deposition, but will only
19   say we disagree with them.
20       We don't believe they are well founded,
21   and that is a matter that obviously can be
22   taken up at a later time in front of the
23   court.
24       MR. HAMMOND:  Thank you, and just for
25   completeness' sake to respond to Mr. Reines'

Page 9

Houdoin

1
2    objection about my participation, I also
3    disagree with what you've said and object to
4    your objections, and so we can move on.  I
5    apologize for the interruption.
6        MR. HANNEMANN:  If we didn't all
7    disagree I guess there wouldn't be a case
8    anyway, right?
9    Q.   Mr. Houdoin, we -- you and I have met
10   before; is that right?
11   A.   Yes.  Yes.  Yes.
12   Q.   And where was that meeting?
13   A.   It was in Lannion and it was last year.
14   It was in November or December last year.  Lannion,
15   L-A-N-N-I-O-N, in Brittany, where I work.
16   Q.   And was that the only meeting that you
17   have had with -- well, we spoke again earlier
18   today; is that right?
19   A.   Yes.
20   Q.   And are those two meetings the only
21   meetings that you have had with people from
22   Kenyon & Kenyon about this lawsuit?
23   A.   Yes, it was the only meeting.
24   Q.   Let's talk about your background just a
25   little bit to start.

3  (Pages 6 to 9)

Page 130

Houdoin

1
2  it France Télécom the most important customer of
3  Alcatel or is it Deutsche Telekom or -- I don't
4  know.
5      Q.  But you would agree with me that France
6  Télécom is a customer of Alcatel, correct?
7          MR. HANNEMANN: Objection to form.
8      A.  It is a customer of Alcatel, yes.
9      Q.  And you would agree that France Télécom
10 is a significant customer of Alcatel, correct?
11         MR. HANNEMANN: Objection to form.
12     A.  I don't know.
13     Q.  How would you characterize it?
14     A.  I think it's an important customer, but
15 I don't know more. I am not aware of the market
16 share of France Télécom and Alcatel. I am --
17     Q.  Has anyone told you that it would be in
18 France Télécom's interest to have you claim joint
19 inventorship of the SRTS patent?
20     A.  France Télécom, no, I don't think so.
21 No. No. Never, nobody said to me so. No.
22     Q.  Do you believe it would be in France
23 Télécom's interest if the SRTS patent were to be
24 questioned?
25     A.  No, I don't think so.

Page 131

Houdoin

1
2          MR. HANNEMANN: Objection to form.
3      A.  I don't think so. I -- in fact, I don't
4  think that we use SRTS in France, so --
5      Q.  Well, Alcatel sells product in the
6  United States, correct?
7          MR. HANNEMANN: Objection to form.
8      A.  Yes, maybe Alcatel, but not France
9  Télécom.
10     Q.  And France Télécom has a close
11 relationship with Alcatel, correct?
12         MR. HANNEMANN: Objection to form.
13     A.  Close? I don't know.
14     Q.  How would you describe the relationship?
15     A.  It's one of our suppliers, yes, but
16 others. Cisco. Lucent. But also others. I think
17 that most telecommunication manufacturers are
18 suppliers from France Télécom. It's the case of
19 Alcatel, but also Ericsson, also Nokia, all the
20 main manufacturers in the telecom industry.
21     Q.  At any time from November 4th, 1991,
22 which is on or about the date of Houdoin
23 Exhibit 10, to the present, have you complained to
24 either Richard Lau or Paul Fleischer about the
25 inventorship on the SRTS patent?

Page 132

Houdoin

1
2      A.  No. As I have said, we didn't know that
3  there was a patent. We knew right after. No, we
4  didn't, we never contacted either Paul Fleischer or
5  Richard Lau, no.
6      Q.  Was Houdoin Exhibit 4 and Houdoin
7  Exhibit 7 and Houdoin Exhibit 9 --
8      A.  Please, last question, because --
9      Q.  Do you have any reason to believe that
10 Houdoin Exhibit 4, Houdoin Exhibit 7 or Houdoin
11 Exhibit 9 were in and of themselves disclosed
12 outside of either Bellcore or France Télécom?
13         MR. HANNEMANN: Objection to form.
14     A.  Outside France Télécom from our part? I
15 don't think so. Outside Bellcore I have no
16 knowledge. I don't know. I was not within
17 Bellcore.
18         MR. HAMMOND: I'm sorry, I've done the
19 best that I can. I'm still going to have
20 additional and extensive cross-examination of
21 this witness, so I reserve my right to
22 continue.
23         MR. REINES: You've represented on the
24 record that you have extensive questioning.
25 How much would you say it is, a matter of

Page 133

Houdoin

1
2  days, or what do you think it is, according to
3  your position?
4          MR. HAMMOND: I don't believe it's a
5  matter of days. I would have to go back
6  and -- hold on. The witness on direct
7  examination said so many things that I have
8  notes that I want to go back and ask him about
9  those issues.
10         MR. REINES: So you have no estimate?
11         MR. HAMMOND: Not now. I'm sorry.
12         MR. REINES: Off the record.
13         THE VIDEOGRAPHER: We're going off the
14 video record. The time is 6:04. This is the
15 end of videotape four.
16         (Time noted: 6:04 p.m.)
17
18
19         _____
                  THIERRY HOUDOIN
20
21 Sworn and subscribed to
22 before me this _____ day
23 of _____ 2006.
24
25         _____
                  NOTARY PUBLIC

34  (Pages 130 to 133)

# TAB B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

———————————————————

TELCORDIA TECHNOLOGIES, INC.,                    )
                                                 )
                                                 )
    Plaintiff/Counterclaim Defendants,           )
                                                 )
             -against-                           )
                                                 )
ALCATEL S.A. and ALCATEL USA, INC.,              )
                                                 )
    Defendants/Counterclaim Plaintiffs.          )
                                                 )
Civil Action No. 04-874 (GMS)                    )
                                                 )

———————————————————

         Videotaped deposition of PIERRE ADAM
    held at the offices of Weil Gotshal & Manges,
    2, rue de la Baume, Paris, France, on Friday,
    April 7, 2006, commencing at 9:50 a.m., before
    Steven Faigenbaum, Legal Video Specialist;
    Joanna Dezio, French/English Interpreter; and
    James W. Johnson, Registered Professional
    Reporter and a Notary Public of the State of
    New York.

## Page 2

```
 1
 2
 3   A P P E A R A N C E S:
 4
 5   FINNEGAN HENDERSON FARABOW
       GARRETT & DUNNER LLP
 6   Attorneys for the Plaintiff
       Two Freedom Square
 7   11955 Freedom Drive
       Reston, Virginia 20190-5675
 8   BY:  JAMES K. HAMMOND, ESQ.
       (202) 251-6332, james.hammond@finnegan.com
 9
     KENYON & KENYON LLP
10   Attorneys for Defendant Alcatel
       One Broadway
11   New York, New York 10004-1007
     BY:  STUART J. SINDER, ESQ.
12       (212) 908-6151, ssinder@kenyon.com
           - and -
13       MARK A. HANNEMANN, ESQ.
       (212) 908-6238, mhannemann@kenyon.com
14
     WEIL GOTSHAL & MANGES LLP
15   Attorneys for Defendant Cisco
       201 Redwood Shores Parkway
16   Redwood Shores, California 94065
     BY:  EDWARD R. REINES, ESQ.
17       (650) 802-3022, edward.reines@weil.com
18   LATHAM & WATKINS LLP
     Attorneys for Defendant Lucent
19   Sears Tower, Suite 5800
       233 South Wacker Drive
20   Chicago, Illinois 60606-6401
     BY:  DAVID C. McKONE, ESQ.
21       (312) 777-7316, david.mckone@lw.com
22   FRANCE TELECOM
       38-40, rue du Général Leclerc
23   92794 Issy-les-Moulineaux  Cedex 9
     BY:  VIVIANE SIMON, ESQ.
24   Responsable de groupe Brevets
       Mandataire européen
25       01.45.29.55.68
       viviane.simon@francetelecom.com
```

## Page 3

```
 1
 2
 3   A P P E A R A N C E S (cont'd.):
 4
     ALSO PRESENT:
 5     JOANNA DEZIO, Ph.D.,
         French/English Interpreter
 6     JULIA DELILLE GOMORY,
         French/English Interpreter
 7     STEVEN FAIGENBAUM, Legal Video Specialist
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2
 3       IT IS HEREBY STIPULATED AND AGREED by
 4   and between the attorneys for the respective
 5   parties herein, that the filing and sealing of
 6   the within deposition be waived.
 7       IT IS FURTHER STIPULATED AND AGREED that
 8   all objections, except as to the form of the
 9   question, shall be reserved to the time of the
10   trial.
11       IT IS FURTHER STIPULATED AND AGREED that
12   the within deposition may be sworn to and
13   signed before any officer authorized to
14   administer an oath with the same force and
15   effect as if signed and sworn to before the
16   Court.
17             - oOo -
18
19
20
21
22
23
24
25
```

## Page 5

```
 1             Adam
 2       THE VIDEOGRAPHER:  Good morning.  We're
 3   on the record.  The time is 9:50 a.m. on the
 4   7th of April in the year 2006.  My name is
 5   Steven Faigenbaum.  I am the video operator.
 6   I work for Global Deposition Services in New
 7   York.  The court reporter today is James
 8   Wesley Johnson.
 9       We are here today to take the deposition
10   of Mr. Pierre Adam in the matter of Telcordia
11   Technologies, Incorporated versus Alcatel SA
12   and Alcatel USA, Incorporated in the United
13   States District Court for the District of
14   Delaware, Civil Action Number 04874.
15       This deposition is being taken on behalf
16   of the plaintiff, and we are -- I'm sorry,
17   excuse me -- on behalf of the defendants.
18   This deposition is being taken in Paris,
19   France.  Would the reporter please swear in
20   the interpreter and then the witness, and then
21   will the counsel please identify themselves
22   for the record.
23   J O A N N A  D E Z I O,     a French/English
24       interpreter, having been first duly sworn by a
25       Notary Public, translated from English into
```

2  (Pages 2 to 5)

Page 86

Adam

1
2     Q.    And Geneva is in Switzerland, correct?
3     A.    Switzerland, yes.
4     Q.    Any other places you worked?
5     A.    And in the previous contribution I was
6  definitely in charge.  In Matsuyama in Japan I was
7  also in charge of that, and there is a small group.
8  We were sometimes three, four, five people, a very
9  small one.  We can meet in the corridor -- we have
10 no problem with meeting rooms -- to discuss this
11 topic, technical issue.
12          It's a very limited world.  One guy from
13 Japan, KDD, the chairman of the group, of AAL-1,
14 Mr. Yamazaki; one guy from DT, Santons (ph).  There
15 could have been some guy from AT&T or so, but so,
16 so -- not so often, so I'm not sure I can remember
17 his name.
18    Q.    Did you ever visit Mr. -- I'm sorry, did
19 you ever visit Dr. Lau or Dr. Fleischer in the
20 United States?
21    A.    No.
22    Q.    Are you represented by counsel here at
23 this deposition today?
24    A.    By whom?
25    Q.    Do you have a lawyer representing you?

Page 87

Adam

1
2     (French interpretation.)
3     A.    No. No.
4     Q.    Does Ms. Viviane Simon, who is sitting
5  to your left, represent you at the deposition?
6     A.    Okay, I need to correct that.  So
7  Viviane is attending the meeting as a patent
8  attorney.
9     Q.    And she represents you here at this
10 deposition; is that correct?
11    MR. HANNEMANN:  Objection to form.
12    A.    Yes.
13    Q.    What did you do in preparation for the
14 deposition?
15    A.    What did I do?  At first surprised,
16 because it's less than one week, 10 days.
17          The first fax which is quoted here was
18 referring to me that I should have to be here, and
19 beyond that I'm trying to reconstruct in my brain
20 what occurred during this period, what I've done,
21 and it's -- so I, I'm elaborating what, what was
22 the reality during this period, what we have done,
23 what, how was the discussion and so on.
24    Q.    Did you meet with counsel for defendants
25 at a meeting earlier this week to prepare for this

Page 88

Adam

1
2  deposition?
3     A.    Yes, this week.
4     Q.    Earlier this week?
5     A.    No, in this week we meet -- when it was?
6  Yesterday?  No, two days ago.  At the first, at the
7  very beginning, the morning, you met Thierry
8  Houdoin, so as my -- I, and I am, asked to them to
9  explain me what is the scheme.
10          That I am supposed there is a judge in
11 this room.  I have to consider there is a judge in
12 this room.  Everything is under a statement of the
13 US law to have said -- I'm testifying, yes, and
14 that you put questions to have answers to clarify
15 to both parts what was the exact situation as far
16 as I am able to recollect.
17    Q.    And you learned that information in a
18 meeting with Mr. Sinder, Mr. Hannemann, Mr. McKone
19 and Mr. Reines?
20    A.    I, I -- they were, they were present
21 during this meeting to explain me how is the
22 process.
23    Q.    Where did this meeting take place?
24    A.    In the room close to this one.
25    Q.    And how long did the meeting last?

Page 89

Adam

1
2     A.    Two hours?  Three hours?  It started in
3  the morning, and it stopped for lunch.  Two.  Two.
4     Q.    And was Ms. Simon present?
5     A.    Yes.
6     Q.    And this meeting with Mr. Sinder,
7  Mr. Hannemann, Mr. McKone, Mr. Reines and Ms. Simon
8  was for the purpose of going over your testimony
9  here today?
10          MR. HANNEMANN:  Objection to form.
11    A.    It was in order to help me to be as
12 efficient as possible to answer the questions
13 according to the way as US rules are settled.  This
14 is what I was pleased to, to know, because I am
15 really discovering something absolutely new for me.
16    Q.    And were Mr. Houdoin and Mr. Cochennec
17 also present with you at the same time, at this
18 meeting that you had with defense counsel a couple
19 of days ago here in these offices?
20          MR. SINDER:  I think the term "defense
21 counsel" may need to be translated.
22          (French interpretation.)
23    A.    Are you speaking about the same meeting
24 which took place in the morning before you, you got
25 the testimony of Thierry Houdoin?  This week?

23  (Pages 86 to 89)

Page 90

Adam

1
2  Q.  Yes.
3  A.  That's -- I already answered.  It's, the
4  meeting for me is how is the process ongoing, what,
5  how the questions are expressed, how you, you
6  should -- the question could be -- and I really
7  recognize that it's very strange for me -- you can
8  put your question 20 times.  I have to answer 20
9  times the same answer.  Absolutely strange for me,
10 but this is what I learned during this meeting.
11 Q.  What else was said to you during this
12 meeting attended by defense counsel as well as
13 Mr. Houdoin and Mr. Cochennec?
14 A.  The explanation of the background of
15 what is the need for this meeting, what, what you,
16 what's the reason for such a meeting.
17 Q.  And what were you told about the reason
18 for such a meeting?
19 A.  Because there is a debate between
20 Bellcore and US -- in the US, US vendors, about
21 property of the royalties, potential royalties to
22 deal with this patent in the US.
23 Q.  And did defense counsel discuss with you
24 the legal issues?
25 A.  They explained us --

Page 91

Adam

1
2  MR. HANNEMANN:  Objection to form.
3  A.  They explained us how the meeting will
4  run.  Beyond that, it's up to, it's up to the US
5  judge to decide what is from one way or what's the
6  other side.  It's not, it was not discussed there.
7  Q.  And defense counsel told you how to
8  answer certain questions, correct?
9  MR. HANNEMANN:  Objection to form.
10 MR. McKONE:  Objection.
11 MR. REINES:  Objection.
12 MR. McKONE:  Leading.
13 A.  They told me that I have to answer the
14 questions.
15 Q.  And they told you how to answer certain
16 of the questions, correct?
17 MR. HANNEMANN:  Objection to form.
18 MR. McKONE:  Objection.
19 MR. REINES:  Objection.
20 A.  Well, I, I do not understand why I have
21 to answer certain questions in one word.
22 Q.  Did the meeting with defense counsel
23 where Mr. Houdoin and Mr. Cochennec were present
24 affect your testimony here today?
25 MR. HANNEMANN:  Objection to form.

Page 92

Adam

1
2  A.  No.  I am trying to -- the difficult job
3  is to remind what was occurring during this period,
4  so we are helping each other, okay, how it was, who
5  were there, how were the -- we were processing, so
6  it's to be able to be as clear as possible.  I
7  mean, it's a hard job.
8  Q.  Did anyone suggest to you at the meeting
9  or at any other time that it would be in France
10 Télécom's best interest to have the Bellcore patent
11 on SRTS challenged?
12 MR. McKONE:  Objection.
13 A.  No, I -- no, but I will give you my
14 private position.  I am very worried by the fact
15 that Bellcore has took a patent in this issue, very
16 worried, but this is a private issue, because we
17 were putting this to have a standard, to have it
18 used by the networks and by the providers for such
19 networks, and if we were looking for a patent we
20 would have done it in advance.
21 And the way that we discovered several
22 years later that Bellcore has a patent on that,
23 this is very, very, very frustrating for us,
24 because we, from some point of view we got the
25 impression to have been trapped by the Bellcore

Page 93

Adam

1
2  lawyers, because I do not think to be trapped by
3  the technical guys, because it's, it's a fact that
4  it does not fit European behavior.
5  In Europe when you bring something to
6  standard you have to say, "I have a patent."  If
7  you have no patent, forget it.  This is the way we
8  proceeded, and from this point of view anything
9  which is different, it's a, it does not fit our way
10 to work.
11 Q.  Did you discuss any of these issues in
12 the meeting with defense counsel a couple of days
13 ago?
14 A.  I gave them the same, the same feeling.
15 Q.  Are you an attorney?
16 A.  No.
17 Q.  Do you have any familiarity with the way
18 standards groups operate from a legal perspective
19 in the United States?
20 MR. HANNEMANN:  Objection to form.  It's
21 vague.
22 MR. HAMMOND:  I'll rephrase it.
23 Q.  You don't have any understanding, do
24 you, with respect to the legal aspects of standards
25 groups in the United States?

24  (Pages 90 to 93)

Page 94

Adam

1
2    A.   No.
3         MR. HANNEMANN:  Objection to form.
4         MR. McKONE:  Objection.
5         MR. REINES:  Objection.
6    A.   No, because I am discovering that you
7    can put a patent several years after you have
8    issued your document.
9         MR. REINES:  That obviously is not --
10   Q.   But you yourself have no familiarity
11   with the legal regulations with respect to
12   standards groups as it applies to the United
13   States, correct?
14        MR. HANNEMANN:  Objection to form.
15   A.   I, I -- my, my clear understanding is
16   completely -- completely -- is much, much, it's so
17   different from European, the regulations, that I
18   have no, no understanding of how it's, how it's
19   going. I know it's very tough some days, but I
20   know it's -- I do not know how it's running.
21   Q.   You said on your direct testimony that
22   you personally attended the Geneva meeting in 1991;
23   is that correct?
24   A.   Yes.
25   Q.   Did you talk to Arthur Reilly at that

Page 95

Adam

1
2    meeting?
3    A.   Yes.
4    Q.   Do you recall any of the conversations
5    you had with Art Reilly at that meeting? Just
6    answer yes or no.
7         MR. McKONE:  Objection, vague, form.
8    Q.   Do you recall the content of any
9    communications you had with Art Reilly at the
10   Geneva meeting in 1991 with respect to clock --
11   A.   We were trying to find a solution.
12   Q.   Do you recall specifically what you said
13   to Art Reilly?
14   A.   No, we were trying to understand the
15   position of each other and trying to see how we
16   could fit, how we could reach a possible agreement,
17   so we were discussing technical issues.
18   Q.   Do you recall any of the details of the
19   technical issues that you discussed?
20   A.   No. No.
21   Q.   Did you attend the Melbourne meeting in
22   1991?
23   A.   No, it was the job of Jean-Yves
24   Cochennec.
25   Q.   Did you attend the Ottawa meeting in

Page 96

Adam

1
2    1991?
3    A.   No, it was the job of Thierry Houdoin.
4    Q.   The time stamp method of France Télécom,
5    in your view and as published, required 16 bits,
6    correct?
7    A.   No.
8         MR. HANNEMANN:  Objection to form.
9    Q.   But as published --
10   A.   It's published as 16 bits, but it's
11   clear that 16 bits are a very comfortable field
12   which can be reduced.
13   Q.   Was the 16-bit time stamp ever
14   implemented in the standard?
15        MR. McKONE:  Objection, vague.
16   A.   In the standard, no, because we were in
17   the process of reaching agreement on the standard.
18   Q.   So the 16-bit time stamp was not
19   commercially successful, was it?
20        MR. HANNEMANN:  Objection to form.
21   A.   It was not the matter.  We are a
22   research lab working for a telco.  Our object is to
23   have a standard and to request a vendor to provide
24   according to the standard.  We are not selling the
25   time stamp; we are asking the vendor to comply to

Page 97

Adam

1
2    the standard, as well as Bellcore.
3    Q.   But the 16-bit time stamp method that
4    you've testified about was not implemented in
5    commercial products, correct?
6         MR. McKONE:  Objection, vague.
7    A.   It was implemented in the lab's model to
8    assess, to allow us to assess if our technical
9    solution was able to face what we were claiming
10   for, but our viewpoint in France Télécom is that as
11   long as it's not in the standard you do not ask, or
12   you are very careful to ask, a manufacturer to
13   implement something which is not in the standard.
14        So it was a blocking issue, because we
15   were waiting to have something agreed in the
16   standard before having it in commercial use.  Is it
17   clear? From our perspective, it does not make
18   sense to have a commercial product applying time
19   stamp if the time stamp is not in the standard.
20   Q.   And the 16-bit time stamp was not
21   accepted as the standard anywhere, correct?
22   A.   We failed in Geneva, in which we were
23   promoting this solution, so this brings us to the
24   summer discussion which is quoted in this document.
25   Q.   And the 16-bit time stamp of France

25 (Pages 94 to 97)